**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Involuntary Chapter 7 |
| | : | |
| Honors Holdings, LLC, | : | Case No.: 24-44875 (ESS) |
| | : | |
| Alleged Debtor. | : | |
| | : | |

------------------------------------------------------- x

## MOTION TO DISMISS INVOLUNTARY PETITION

Honors Holdings, LLC ("Honors"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a), 303, and 305(a)(1) of title 11 of the United States Code, 11 U.S.C. § 101–1532 (the "Bankruptcy Code"), Rules 1011 and 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") (incorporated by reference through Bankruptcy Rule 1011), dismissing the involuntary petition [Docket No. 1] (the "Involuntary Petition") filed by Core2000 LLC ("Core2000"), BOTF, LLC ("BOTF"), and CA 531 86th Street LLC ("CA 531") (collectively, the "Petitioning Creditors").  In support of the Motion, Honors respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Court should dismiss the Involuntary Petition because it was filed in bad faith and does not satisfy the requirements of section 303(b) of the Bankruptcy Code.  The filing of the Involuntary Petition is a tactical maneuver by the Petitioning Creditors—one of which is prohibited from joining in the Involuntary Petition—to stall the valid exercise of remedies by WhiteHorse Capital Management LLC (in its capacity as agent, "WhiteHorse"), which is agent for a lender

group that lent more than $100 million to Honors and holds a perfected first priority security interest over substantially all of Honors' assets under applicable law.

2.      Honors received a notice of default under the WhiteHorse credit facility in early 2024.  After several months of extensive negotiations and deliberations with WhiteHorse, on September 25, 2024, Honors entered into a Partial Strict Foreclosure Agreement under Section 9-620 of the New York Uniform Commercial Code with WhiteHorse (the "PSFA"). Pursuant to the PSFA, the membership interests in 137 subsidiaries of Honors, including 109 subsidiaries that operate Orangetheory Fitness ("OTF" or the "Franchisor") studios (the "Franchisees"), along with other assets of Honors and other of its subsidiaries and other collateral of WhiteHorse, were accepted by WhiteHorse in exchange for the partial satisfaction of the amounts owing under its credit facility.  Additionally, certain liabilities and certain agreements, including Honors' subsidiaries' franchise agreements with OTF, were assumed (collectively, the "Foreclosure").[1] Thereafter, on November 8, 2024, WhiteHorse exercised its rights under the PSFA to foreclose on the equity interests of an additional twelve (12) Honors' subsidiaries.  Such Franchisees are continuing to operate under the ultimate ownership of Camarillo Fitness Holdings as going concerns with the support of OTF.  Although $70 million of the more than $114 million owing to WhiteHorse by Honors and its affiliates was satisfied under the PSFA, WhiteHorse continues to have a secured claim against Honors and its affiliates in excess of $44 million.

3.      Ample grounds exist for dismissing the Involuntary Petition.  Under section 303(b)(1) of the Bankruptcy Code, a creditor may only commence an involuntary case if that

---

[1] Under the PSFA, the membership interests in such Franchisees and certain existing Franchise Agreements among other Honors' subsidiaries and OTF, were acquired by Camarillo Fitness Holdings, LLC ("Camarillo Fitness Holdings") and Camarillo Fitness Opco, LLC, a wholly-owned subsidiary of Camarillo Fitness Holdings ("Camarillo Fitness Opco"), each in their capacity as assignees of WhiteHorse as set forth in greater detail in the PSFA.

creditor's claim is "not contingent as to liability or the subject of a bona fide dispute as to liability *or* amount." 11 U.S.C. § 303(b)(1) (emphasis added). BOTF's claim is both contingent and the subject of a bona fide dispute because BOTF is party to a Promissory Note with Honors that includes a standstill provision. Pursuant to that standstill provision, BOTF expressly agreed, among other things, that (a) no payment may be made to BOTF until WhiteHorse is indefeasibly paid in full in cash and all commitments have been terminated, and (b) prior to such time, BOTF would not take any action against Honors or join with any other creditor of the Company in commencing an involuntary. Promissory Note § 10(b); Allonge § 3(a). Because BOTF is not presently entitled to payment under the Promissory Note, it does not qualify under section 303(b)(1) of the Bankruptcy Code as an entity that can participate in the filing of the Involuntary Petition. In addition, because WhiteHorse has not been indefeasibly paid in full in cash, there is a bona fide dispute as to the validity of BOTF's claim against Honors.

4. On top of this, there is clear evidence that the filing of the Involuntary Petition constitutes bad faith. For months, Anthony Bianucci and Michael Bianucci, principals of BOTF (collectively with Barbara Bianucci and BOTF, the "Bianucci Parties") have aggressively pursued both Honors and WhiteHorse and their personnel, demanding payment and threatening personal visits, litigation, including the filing of an involuntary proceeding against Honors, all in direct contravention of the standstill agreement BOTF executed. And if that were not enough grounds to find bad faith, the Bianucci Parties appear to be telling the media that the reason they filed the Involuntary Petition was to "collect the remaining $2.85 million" allegedly owed to them, as stated in that certain *Franchise Times* article published on December 10, 2024, a copy of which is attached hereto as **Exhibit B**. Core2000's principal Robert Scot James ("James" and collectively with Core2000, "RSJ") is quoted in the same *Franchise Times* explaining that he participated in

the filing of the Involuntary Petition because he has "been trying to collect on the judgment for well over a year." These facts—sourced straight from James—are demonstrative of a bad faith filing. *See Atlas Mach. & Iron Works v. Bethlehem Steel Corp.,* 986 F.2d 709, 716 (4th Cir. 1993) (petitioning creditor's concession that it filed the involuntary petition to collect a debt supported the bankruptcy court's finding of bad faith).

5.      Moreover, RSJ has engaged in extensive litigation with Honors and WhiteHorse for over a year in Georgia state and federal courts, but has not been able to overcome the reality that, as found by the Georgia State Court over a year ago, any claims owing to Core2000 and James sit behind the tens of millions of dollars of secured debt owing to WhiteHorse. Filing the Involuntary Petition is no more than a bad faith, Hail Mary attempt by RSJ to somehow alter the priority scheme and force Honors to make a payment that it cannot make.

6.      The decision by Honors to participate in the Foreclosure was not taken lightly and was the product of several months of negotiation between Honors, WhiteHorse, and OTF. After weighing its various options, in a reasonable exercise of its business judgment, Honors determined that the Foreclosure was in the best interests of its various stakeholders, not only because it addressed approximately $70 million of the more than $114 million in senior secured debt owing to WhiteHorse, but also kept 121 out of 143 of Honors' fitness studios open and preserved the jobs of more than 1,500 employees. In addition, since the Foreclosure consisted of a transfer of Honors' equity ownership in such Franchisees (rather than simply a foreclosure on the assets of such Franchisees), in effect, Camarillo Fitness Holdings assumed the liabilities associated with such entities as well as relieving Honors of such obligations.

7.      As of the date hereof, Honors remains the owner of only 28 entities that operate studios and Honors is working with Camarillo Fitness Holdings, OTF, and various landlords for

those studios to determine the ultimate fate of those studios. During this time, as additional consideration for the Foreclosure, WhiteHorse, through its assignee Camarillo Fitness Holdings, is funding operations at many of its studios pursuant to a Transition Services Agreement. At this time, Honors expects those negotiations to run through the end of January 2025. Once the negotiations are completed, Honors intends to formally wind down, potentially through a liquidating chapter 11 plan, a chapter 7 filing, or an assignment for the benefit of creditors. Importantly, Honors has already agreed to fund an assignment for the benefit of creditors as set forth in the Transition Services Agreement. An involuntary chapter 7 liquidation forced by a few disgruntled creditors at this time will not result in a better outcome for such other creditors, all of whom are junior in priority to WhiteHorse, who is owed a secured debt far in excess of the value of Honors' remaining assets.

8.    Importantly, none of the Petitioning Creditors has suggested or alleged that Honors is incapable of managing its wind-down process. Honors respectfully submits that the Court should allow Honors to continue its wind-down outside of court. Dismissing the Involuntary Petition and allowing Honors to complete its wind-down outside of a court process or, in the alternative, suspending the case, will not prejudice any creditors, who would likely receive no recovery in a chapter 7. If anything, creditors may fare better outside of a chapter 7 case as Honors continues to be paid under a Transition Services Agreement funded by Camarillo Fitness Holdings.

9.    For these reasons and the reasons stated below, the Court should dismiss the Involuntary Petition. Alternatively, if the Court does not dismiss the Involuntary Petition at this time, the Court should utilize its powers under section 305 of the Bankruptcy Code to suspend the case until Honors completes the foreclosure process described below.

## FACTUAL AND PROCEDURAL BACKGROUND

10.     Prior to the Foreclosure, Honors was the leading franchisee of OTF studios and, through 191 subsidiaries, operated 143 OTF locations in 16 states and Washington, D.C., through licenses issued by the Franchisor.  OTF is a fitness studio franchise that operates on a membership basis and hosts fitness classes where members work out together with the guidance of a coach.

11.     When the COVID-19 pandemic began in March 2020, all OTF corporate locations closed to prevent the spread of COVID-19 during in-person fitness classes.  Franchisees were also encouraged to close to protect their members.  Accordingly, Honors shut down many of the OTF locations it operated, and its business experienced a massive downswing due to the loss of membership revenues.  When OTF locations began reopening at the tail end of the pandemic, many members remained hesitant to reinstate their memberships and attend in-person fitness classes. Honors has since struggled to recover from the loss of revenue caused by the pandemic.

12.     Honors finances its operations through monthly membership fees, a la carte class fees, and third-party financing.

### Honors Enters into the Credit Facility With WhiteHorse; WhiteHorse Exercises Remedies Upon the Occurrence of Event of Default

13.     Approximately six months before the COVID-19 shutdowns, Honors, HH Holdco, Inc., a Delaware corporation and Honors' manager ("Holdings"), the Credit Parties thereto, WhiteHorse, and the Lenders thereto (each as defined therein) entered into that certain Credit Agreement, dated as of September 6, 2019 (as same has been and may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time,[2] the

---

[2] These documents include the Credit Agreement as amended by that certain First Amendment to Credit Agreement, dated as of December 2, 2019, as amended by that certain Limited Consent No. 1 and Second Amendment to Credit Agreement, dated as of December 19, 2019, as supplemented by that certain Limited Consent No. 2 to Credit Agreement, dated as of February 28, 2020, as supplemented by that certain Forbearance Agreement, dated as of June 5, 2020, as amended by that certain Limited Waiver and Third Amendment to Credit Agreement, dated as of July 6,

"Credit Agreement"). Pursuant to the Credit Agreement, WhiteHorse provided Honors with access to $100 million of funding.

14. Honors' subsidiaries, in their capacities as "Guarantors" and WhiteHorse among others entered into that certain Subsidiary Guarantee Agreement, dated as of September 6, 2019 (as same has been or may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guarantee Agreement"), pursuant to which each Guarantor agreed, among other things, to guarantee the payment and performance of the Honors' obligations and liabilities under the Credit Agreement and the other loan documents.

15. Holdings and WhiteHorse entered into that certain Holding Company Security Agreement, dated as of September 6, 2019 (as same has been or may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Holding Company Security Agreement"), pursuant to which Holdings granted to WhiteHorse a security interest in, among other things, all right, title and interest owned by Holdings in any membership interests Holdings owned in Honors, as security for the payment or performance, as applicable, in full of the Credit Party Obligations (as defined therein) Honors owed to WhiteHorse by the credit parties under the loan documents (the "Honors Pledged Equity").

---

2020, as amended by that certain Limited Waiver and Fourth Amendment to Credit Agreement, dated as of February 19, 2021, as supplemented by that certain Limited Consent No. 3 to Credit Agreement, dated as of April 14, 2021, as amended by that certain Fifth Amendment to Credit Agreement, dated as of April 20, 2021, as amended by that certain Sixth Amendment to Credit Agreement, dated as of April 29, 2022, as amended by that certain Seventh Amendment, dated as of September 29, 2022, as supplemented by that certain Temporary Waiver Agreement, dated as of May 19, 2023, as amended by that certain Limited Waiver and Eighth Amendment to Credit Agreement, dated as of July 11, 2023, as supplemented by that certain extension letter agreement, dated as of December 1, 2023, as supplemented by that certain extension letter agreement, dated as of December 5, 2023, as supplemented by that certain extension letter agreement, dated as of December 19, 2023, as supplemented by that certain Supplement to Credit Agreement, dated as of February 2, 2024, as supplemented by that certain extension letter agreement, dated as of March 8, 2024, as supplemented by that certain extension letter agreement, dated as of March 29, 2024 and as amended by that certain Ninth Amendment to Credit Agreement, dated as of June 20, 2024.

16.     Honors and the other subsidiary grantors (collectively, the "Grantors") and WhiteHorse entered into that certain Security Agreement, dated as of September 6, 2019 (as same has been or may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), pursuant to which each Grantor (including, without limitation, the Guarantors) granted WhiteHorse a security interest in and liens upon substantially all of their assets (as set forth therein, collectively, the "Collateral").

17.     On April 22, 2024, WhiteHorse delivered to Holdings, Honors and the other credit parties, that certain Notice of Default and Reservation of Rights, dated as of April 22, 2024 (the "Notice of Default"), notifying them that, among other things, an Event of Default had occurred and was continuing as a result of Honors' failure to pay a required interest payment under the Credit Agreement (the "Existing Event of Default").

18.     Upon the occurrence and continuance of the Existing Event of Default, pursuant to the Holding Company Security Agreement, all of Holdings' rights to (i) exercise the voting and other consensual rights which it would otherwise be entitled to exercise and (ii) receive the dividends, principal and interest payments and other distributions which Holdings would otherwise be authorized to receive and retain pursuant to the Holding Company Security Agreement, automatically ceased without the necessity for any action to be taken by any person, and all such rights and all other rights of Holdings with respect to the Honors Pledged Equity, including, without limitation, the right to participate in the management of Honors, became vested in WhiteHorse to the same extent as Holdings.

19.     WhiteHorse was entitled pursuant to the Holding Company Security Agreement, among other things, to exercise all voting and other rights pertaining to the Honors Pledged Equity in WhiteHorse's reasonable discretion.  On April 22, 2024, WhiteHorse, in  its capacity as pledgee,

exercised such rights to vote the Honors Pledged Equity to exercise the rights, powers and privileges to which Holdings was entitled as the Honors' sole member to amend that certain Second Amended and Restated Limited Liability Company Agreement of Honors, dated as of September 6, 2019, to, among other things (i) remove Holdings as manager of Honors, (ii) provide that Honors would be manager-managed, (iii) appoint Grant Lyon as the sole independent manager of Honors (the "Independent Manager") and (iv) vest all authority to manage and operate Honors in the Independent Manager.

20.     On April 22, 2024, among other things, the Independent Manager removed all previously appointed officers of Honors and its direct and indirect subsidiaries, took full and exclusive access to and disposition over the property, books and records, facilities and bank accounts of Honors and its direct and indirect subsidiaries, and since such date, has been independently operating Honors and its direct and indirect subsidiaries.

21.     On May 6, 2024, Honors and WhiteHorse entered into that certain Forbearance Agreement, pursuant to which WhiteHorse and Honors agreed to explore potential strategic options to address Honors' debt obligations.  WhiteHorse extended the Forbearance Agreement multiple times until its expiration on September 19, 2024.  As of September 24, 2024, Honors had more than $114 million outstanding under the Credit Agreement (the "WhiteHorse Secured Debt").

22.     On September 25, 2024, WhiteHorse and Honors entered into the PSFA pursuant to which, among other things, the equity interests of 109 of Honors' Franchisee subsidiaries, certain other assets of Honors, including equity interests in and assets of other Honors subsidiary entities and the option to acquire Honors' membership interests in other wholly-owned subsidiaries and other Collateral of WhiteHorse was accepted by WhiteHorse and assigned to Camarillo Fitness

Holdings and Camarillo Fitness Opco as set forth therein in exchange for the partial satisfaction of $70 million of the WhiteHorse Secured Debt.

23.     Honors and WhiteHorse also entered into the Transition Services Agreement under which Honors agreed to provide services to Camarillo Fitness Holdings and its affiliates, facilitate the transfer of personnel and WhiteHorse agreed to fund a budget to, among other things, permit Honors to operate the 22 Honors studio subsidiaries that were not acquired by Camarillo Fitness Holdings and to permit personnel employed by Camarillo Fitness Holdings or its affiliates to provide services to Honors and its subsidiaries on the terms set forth therein.

24.     On November 8, 2024, WhiteHorse exercised its rights under the PSFA to foreclose on the equity interests of an additional twelve (12) Honors subsidiaries.  Honors, WhiteHorse, Franchisor, and various landlords have since been negotiating the disposition of the remaining studios operated by Honors and expect to complete these negotiations in the coming weeks. WhiteHorse, through Camarillo Fitness Holdings, has provided funding to date and the services of personnel through the Transition Services Agreement to allow Honors to continue its operation of such studios in the interim.

## **The Petitioning Creditors**

25.     Upon information and belief, BOTF's claim arises out of that certain Interest Purchase Agreement (the "IPA"), dated April 29, 2021, by and between Honors and the Bianucci Parties, pursuant to which Honors acquired from the Bianucci Parties 100% of the outstanding equity interests of nineteen (19) entities that operated OTF-franchised studios.  In connection with the IPA, Honors issued a promissory note (the "Promissory Note") to BOTF, under which Honors promised to pay BOTF $5.7 million.  The Promissory Note was amended pursuant to that certain Allonge to Promissory Note by and between Holdings and BOTF dated as of August 30, 2023 (the

"Allonge"; the Allonge and the Promissory Note are referred to herein, collectively, as the "Promissory Note").

26.     Importantly, as noted above and explained further below, BOTF unequivocally agreed in the Allonge to not "(A) take any action or exercise any remedy against [Honors] under th[e] Note; (B) commence, or join with any other creditor of [Honors] in commencing, any insolvency or similar proceeding against [Honors]; or (C) acquire any security interests or liens securing th[e] Note . . . ."  Allonge § 3(a).

27.     The Promissory Note is clear and unambiguous.   As an initial matter, the Promissory Note contains the following Legend in the first page header:

> THE PAYMENT OF AND PERFORMANCE OF OBLIGATIONS BY THE COMPANY UNDER THIS PROMISSORY NOTE AND THE RIGHTS AND REMEDIES OF THE HOLDER OF THIS PROMISSORY NOTE ARE SUBORDINATED TO THE PAYMENT AND PERFORMANCE BY THE COMPANY OF ITS OBLIGATION TO THE SENIOR CREDITORS IN ACCORDANCE WITH THE PROVISIONS BELOW.

Promissory Note, Header; Allonge, § 3(c).

28.     Furthermore, Section 10(b) of the Promissory Note, as amended by the Allonge, specifically requires that BOTF forbear from taking "any action" or exercising "any remedy" against Honors, or commencing or joining with any other creditor in commencing an insolvency or similar proceeding against Honors states clearly as follows:

> **Until all Senior Debt shall have been indefeasibly paid in full in cash and all commitments of the Senior Creditors to extend further credit constituting Senior Debt shall have terminated in their entirety**, (i) except as otherwise permitted by the Credit Agreement, **no payment may be made or accepted on this Note, whether of principal or interest or other obligations**, other than, so long as no "Default" or "Event of Default" has occurred and is continuing (as defined in the applicable agreements governing the Senior Debt) or would result immediately therefrom, payment of principal on the Maturity Date and payment of accrued interest at

the rate specified herein (and subject to the limitations herein), (ii) **the Holder shall not (A) take any action or exercise any remedy against the Company under this Note; (B) commence, or join with any other creditor of the Company in commencing, any insolvency or similar proceeding against the Company; or (C) acquire any security interests or liens securing this Note** and (iii) the Holder waives all rights of subrogation, reimbursement and any similar rights with respect to the indebtedness evidenced by this Note.

Promissory Note § 10(b) (emphasis added); Allonge § 3(a) (emphasis added).

29.     In addition, Section 11 of the Promissory Note provides as follows:

Suspension of Payments. Notwithstanding any other provision of this Note, the Company is not required to make a payment hereunder to the extent that any payment under this Note would (i) trigger a default or violation of any covenant or ratio under the Credit Agreement, or (ii) otherwise be prohibited by the <u>Section 10</u> hereof or the Credit Agreement, in which case, the Holder shall not accept any payment from the Company, with any such payment or acceptance of payment being deferred until the earliest date that the Company can make such payment without violating <u>Section 10</u> hereof and the Credit Agreement. Any such amounts suspended hereunder shall continue to accrue interest as provided in <u>Section 2</u>.

Promissory Note § 11; Allonge, § 3(b).

30.     Finally, Section 10 of the Promissory Note provides as follows:

Without limitation of the foregoing, if Holder violates the terms and conditions of this <u>Section 10</u>, the Senior Creditors may interpose the agreement of Holder contained herein as a defense thereto and shall be entitled to specific performance of the terms [t]hereof.

Promissory Note § 10; Allonge, § 3.

31.     Over the past several months, certain of the Bianucci Parties have threatened Honors and WhiteHorse and their personnel, threatened to engage in self-help or other impermissible action in connection with the Promissory Note, upon information and belief had communications with other third parties in violation of the confidentiality provisions of the IPA

and the Promissory Note, and asserted that WhiteHorse owes the Bianucci Parties money which they are well aware are not obligations of WhiteHorse. Such actions are not authorized, were taken by the Bianucci Parties in bad faith, are a breach of the Promissory Note, an abuse of process, and tortious interference with Honors' and WhiteHorse's rights, for which such Bianucci Parties may be held accountable and for which such Bianucci Parties may be held personally accountable.

32. Upon information and belief, the claims of RSJ arise out of that certain Asset Purchase Agreement (the "APA"), dated May 16, 2022, pursuant to which Honors purchased several OTF studios from RSJ. On May 31, 2023, RSJ filed a complaint against Honors in the United States District Court for the District of Delaware (the "Delaware Court"), alleging that Honors had breached the APA and owed RSJ $5.5 million plus interest. On September 29, 2023, the Delaware Court entered a Stipulated Final Judgment in the amount of $5,947,533, plus $85,000 in attorneys' fees.

33. RSJ has taken various steps to execute on their judgment. On November 14, 2023, RSJ initiated a garnishment proceeding in the Georgia State Court of Cobb County (the "Georgia State Court"), seeking the contents of Honors' bank account. The Georgia State Court rejected the effort to garnish Honors bank account because WhiteHorse held a superior claim to the funds.

34. On January 30, 2024, RSJ again initiated another virtually identical garnishment proceeding in the Georgia State Court. RSJ agreed to voluntarily dismiss such action on February 16, 2024.

35. RSJ has also sought extensive document discovery into Honors' assets and financial condition through Rule 45 subpoenas, in response to which Honors produced bank statements, limited liability company agreements, debt documents, and other documents evidencing Honors' financial condition.

36. RSJ did not stop there. On July 19, 2024, RSJ filed an application for a charging order in the United States District Court for the Northern District of Georgia (the "<u>Georgia District Court</u>") to satisfy their judgment against Honors. RSJ also deposed representatives of both Honors and WhiteHorse pursuant to Rule 30(b)(6), during which they questioned both about the PSFA and Foreclosure that had previously been effectuated. RSJ also received from WhiteHorse a copy of the PSFA. At the time the Involuntary Petition was filed, the Georgia District Court was considering RSJ's fully-briefed charging order application and was supervising further discovery requested by RSJ.

37. Upon information and belief, CA 531's claims arise out of that certain lease agreement, dated May 6, 2022 by and between CA 531, OTF, and Honors as the guarantor. On July 11, 2024, CA 531 filed a complaint against OTF and Honors, alleging that OTF breached the lease agreement and Honors breached its guaranty of such lease agreement, and that Honors and OTF owed CA 531 approximately $5 million.

38. On November 20, 2024 (the "<u>Involuntary Petition Date</u>"), the Petitioning Creditors commenced this case by filing the Involuntary Petition for bankruptcy under chapter 7 of title 11 of the Bankruptcy Code against Honors.

39. The Involuntary Petition summarily states the nature of the claims of each creditor as "breach of contract." The Petition does not allege any mismanagement of Honors and the Petitioning Creditors have not since filed any supporting documents suggesting that Honors has been mismanaged. Nor have the Petitioning Creditors filed any statement in support of the Involuntary Petition.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1409 and 1408.

## ARGUMENT

41.     The Petitioning Creditors' attempt to force Honors into bankruptcy should be dismissed pursuant to Bankruptcy Rule 1011(b) and Rule 12(b), as the Involuntary Petition contains fatal deficiencies and thus is procedurally improper. Bankruptcy Rule 1011(b) provides that a defense to an involuntary petition must conform to Rule 12. *In re Taub*, 439 B.R. 261, 270 (Bankr. E.D.N.Y. 2010). A motion to dismiss under Rule 12(b) is proper to challenge petitioning creditors' standing due to bona fide disputes with respect to their asserted claims. *Id.*

42.     Due to the serious consequences an involuntary bankruptcy petition may cause an alleged debtor and its stakeholders, section 303 of the Bankruptcy Code imposes a number of strict requirements on petitioning creditors. *See In re Murray*, 543 B.R. 484, 496 (Bankr. S.D.N.Y. 2016) ("The Code's provisions and rules of procedure governing involuntary cases are strict because of the severe nature of involuntary relief and the extreme consequences to the debtor in being forced into bankruptcy."); *see also In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015) (holding that involuntary petitions are "extreme remedies" that must be carefully scrutinized); *In re Forster*, 465 B.R. 97, 102 (Bankr. W.D. Va. 2012) (same). For this reason, section 303(i) imposes significant risks on petitioning creditors who improperly commence involuntary bankruptcy proceedings, including punitive damages. As discussed in further detail below, the Petitioning Creditors have failed to meet these requirements.

### I. The Involuntary Petition is Procedurally Deficient.

        A.    <u>BOTF is Ineligible to File the Petition Because its Claim is Contingent and Subject to a Bona Fide Dispute</u>.

43.    The Involuntary Petition is procedurally deficient under section 303 of the Bankruptcy Code, which warrants dismissal. A requirement of section 303 is that to commence an involuntary proceeding against the alleged debtor, the petition must be filed "by three or more entities, each of which is a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b). This Court has adopted an objective test in determining if there is a bona fide dispute. *In re Ishaky*, No. 1-09-40387 (DEM), Bankr. LEXIS 807, at *8 (Bankr. E.D.N.Y. Mar. 11, 2010). If the bankruptcy court determines there is an objective basis for the legal or factual dispute and debtor not paying the debt, a creditor may be disqualified. *Id.*

44.    BOTF is not a qualifying creditor under section 303 of the Bankruptcy Code. BOTF is ineligible to file the Involuntary Petition because its claim is contingent and subject to a bona fide dispute—therefore, BOTF lacks standing to join in the Involuntary Petition. In short, Honors is not in breach of the Promissory Note at this time. As such, the Petitioning Creditors do not meet the numerosity requirement to file the Involuntary Petition under section 303(b).

45.    As noted above, pursuant to the Promissory Note, BOTF expressly agreed to subordinate the obligations under the Promissory Note to the WhiteHorse Secured Debt owed by Honors, defined as "Senior Debt" therein. Nor can a payment be made on the Promissory Note if an Event of Default under the Senior Debt has occurred and is continuing. More than $44 million of WhiteHorse Secured Debt remains outstanding. BOTF, which is in possession of certain of Honors' financial materials, has also been repeatedly advised that as of the time of filing of the Involuntary Petition, an Event of Default had occurred under the Credit Agreement and remained

outstanding and that the WhiteHorse Secured Debt has not been indefeasibly paid in full in cash. Accordingly, on the Involuntary Petition Date, pursuant to Section 10(b) of the Promissory Note, BOTF was not entitled to receive any payment from Honors under the Promissory Note. BOTF nonetheless improperly stated its claim for "breach of contract" against Honors in the Involuntary Petition and listed the amount of the claim as $2,850,000, the principal amount payable on the Promissory Note. As Honors has not breached the Promissory Note, BOTF's breach of contract claim against Honors is, at a minimum, subject to a bona fide dispute.

46.     BOTF's claim against Honors is contingent and subject to a bona fide dispute. Under section 303(b) of the Bankruptcy Code, creditors holding claims that are subject to a bona fide dispute are not eligible petitioning creditors. Therefore, BOTF is not an eligible creditor and lacks standing. Accordingly, the Petitioning Creditors cannot sustain their burden and the Involuntary Petition must be dismissed.

        B.    <u>In Addition, BOTF is Contractually Obligated to Abstain From Commencing an Involuntary Petition Against Honors</u>.

47.     In exchange for partial payment of the Promissory Note and additional interest payments, BOTF expressly waived its rights under the Allonge to be a Petitioning Creditor. Under the Promissory Note, BOTF agreed not to "(A) take any action or exercise any remedy against [Honors] under this Note; (B) . . . join with any other creditor of [Honors] in commencing [an involuntary] . . . ." Promissory Note § 10(b); Allonge § 3(a). Accordingly, BOTF is contractually obligated against exercising its remedies under the Promissory Note, which include initiating an involuntary proceeding under the Bankruptcy Code.

48.     The Petitioning Creditors bear the burden of proof with respect to section 303(b) eligibility. *See In re Persico Contracting and Trucking, Inc.*, No. 10-22736 (RDD), 2010 WL 3766555, at *3 (Bankr. S.D.N.Y. Aug. 10, 2010). Since BOTF is not an eligible creditor (both

because it does not have the qualifying debt under section 303 of the Bankruptcy Code and because it contractually agreed not to be a qualifying creditor), the Involuntary Petition has been filed by only two potentially eligible creditors. Accordingly, the Petitioning Creditors have failed to meet the numerosity requirement of section 303(b) of the Bankruptcy Code. As such, the Petitioning Creditors have not sustained their burden to establish eligibility to file the Involuntary Petition. Therefore, the Involuntary Petition must be dismissed.

## II. This Court Should Dismiss the Involuntary Petition as an Inappropriate Use of the Bankruptcy Code.

49. Additionally, the Petitioning Creditors are improperly employing the Involuntary Petition as a collection vehicle, which warrants dismissal. Bankruptcy courts customarily review "cause" for dismissal of chapter 11 cases pursuant to section 1112(b) of the Bankruptcy Code. While section 1112(b) is inapplicable to chapter 7 cases, caselaw analyzing cause for dismissal in those cases is instructive to the instant matter.

50. "Inappropriate use of the Bankruptcy Code may constitute cause to dismiss," whether or not such misuse rises to the level of "bad faith." *Wilke Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 60–61 (2d Cir. 2018) (noting that "[w]e need not, however, classify misuse of the Bankruptcy Code as bad faith in order to accept it as cause to dismiss"); *see also Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.)*, 594 B.R. 576, 606 (Bankr. S.D.N.Y. 2018) (following *Murray* and dismissing involuntary petition that was not a "genuine attempt to reorganize the [alleged debtors] so that it can reemerge from bankruptcy as a viable on-going business," but rather "a last-ditch effort by a senior sophisticated noteholder to further its personal, tactical and pecuniary aims"). "[A] central purpose of the Bankruptcy Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for

future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan* v. *Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co.* v. *Hunt*, 292 U.S. 234, 244 (1934)). In *Murray*, the Second Circuit affirmed the dismissal of an involuntary bankruptcy petition that failed to serve that purpose. *In re Murray*, 900 F.3d at 61.

51.     As in *Murray*, this case "present[s] a variant of a common practice in cases in this Court and elsewhere—the filing of a case under the Bankruptcy Code as a tactic in a two-party dispute," for which "adequate remedies exist in state law." *In re Murray*, 543 B.R. at 486; *see also In re The Bridge to Life, Inc.*, 330 B.R. 351, 357 (Bankr. E.D.N.Y. 2005) (dismissal for cause appropriate in two-party dispute "involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11") (quoting *In re HBA E., Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988)).

A.     The Petition Was Filed In Bad Faith By A Small Group of Disaffected Creditors and is Opposed by WhiteHorse, Honors' Largest Secured and Unsecured Creditor.

52.     The Petitioning Creditors represent a small group of disaffected creditors and the Involuntary Petition only frustrates Honors' efforts to negotiate an appropriate wind-down with WhiteHorse and OTF.  WhiteHorse still holds in excess of $44 million in secured debt, ahead of all of Honors' unsecured creditors, including the Petitioning Creditors.

53.     The Bianucci Parties and RSJ are attempting, through the filing of the Involuntary Petition, to improperly collect on their claims.  Bankruptcy courts have used the "improper use" test to determine that an involuntary filing occurred in bad faith when a petitioning creditor uses an involuntary bankruptcy proceeding to gain a disproportionate advantage for itself, rather than to protect against other creditors gaining a disproportionate advantage, especially when the petitioner could have obtained that advantage in an alternate forum. *See In re Better Care*, 97 B.R. 405, 410–11 (Bankr. N.D. Ill. 1989).  Here, RSJ has already initiated litigation twice in Georgia

State Court and thereafter in the Georgia District Court which was only stayed upon RSJ filing the Involuntary Petition. And both the Bianucci Parties and RSJ have stated that their filing of the Involuntary Petition is an attempt to collect on the unsecured debts owed to them (which in the case of Bianucci, is subject to a standstill). The Involuntary Petition is thus a bad faith attempt by the Petitioning Creditors to collect on their debts.

54. Courts have additionally used the "improper purpose" test to find bad faith when the filing of an involuntary petition was motivated by ill will, malice, or a desire to harass the alleged debtor. *Lubow Mach. Co. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.)*, 209 F.3d 100, 105 (2d Cir. 2000). The Bianucci Parties' history of aggressive behavior towards Honors and WhiteHorse and their personnel, despite no payment being due to them, demonstrates their intent and purpose of filing the Involuntary Petition to continue to bully Honors and WhiteHorse in a bad faith attempt to collect. The Bianucci Parties' joining in the filing of the Involuntary Petition is plainly in bad faith. The filing of the Involuntary Petition cannot pass the improper use or improper purpose tests, and is therefore an improper use of the Court and the Bankruptcy Code to collect on debts before pursuing remedies in alternate forums.

**III. Alternatively, the Court Should Suspend this Case Under 11 U.S.C. § 305.**

55. Section 305(a)(1) of the Bankruptcy Code allows a court to dismiss a case commenced under section 303, or suspend all proceedings if "the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ." 11 U.S.C. § 305(a)(1).

56. Courts utilize a multi-factor analysis to determine whether it should abstain from considering an involuntary petition pursuant to Section 305(a)(1). *See, e.g., In re Grigoli,* 151 B.R. 314, 319–20 (Bankr. E.D.N.Y. 1993) (authorizing abstention if: "(1) the petition was filed by a few disgruntled creditors and most creditors oppose the bankruptcy proceeding; (2) there is an out-of-court restructuring in progress; and (3) the debtor's and creditors' interests are furthered by

dismissal."); *see also In re Korean Radio Broad., Inc.*, No. 19-46322 (ESS), 2020 Bankr. LEXIS 1170, at *19–20 (Bankr. E.D.N.Y. Mar. 31, 2020) (employing a multi-factor test). Courts in this Circuit have found that "'abstention pursuant to section 305 is an extraordinary remedy and is appropriate only in the situation where the court finds that both creditors and the debtor would be better served by a dismissal.'" *In re Selectron Mgmt. Corp.*, 2010 WL 3811863, at *12 (Bankr. E.D.N.Y. Sep. 27, 2010).

57.    In *Korean Radio Broad*, this Court noted the following non-exhaustive factors to be considered when coming to an abstention determination pursuant to § 305(a)(1):

> (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

2020 Bankr. LEXIS 1170, at *19–20.

58.    Courts also take into account the legislative history of section 305(a)(1) in determining whether abstention is appropriate. *In re Bd. Of Dirs. Of Multicanal S.A.*, 314 B.R. 486, 522 (Bankr. S.D.N.Y. 2004). The legislative history of section 305(a)(1) highlights that abstention may be appropriate when an out-of-court agreement acceptable to all, but a few dissident creditors has been reached and the dissidents commence an involuntary case. H.R Rep. No. 95-595, 95th Cong., 1st Sess. 325 (1977). For the reasons set forth below, the facts here warrant suspending consideration of the instant involuntary petition.

A. **Abstention Is Appropriate Where, As Here, An Out-of-Court Restructuring Has Already Concluded And There Are No Material Assets for a Trustee to Administer**.

59. Courts have consistently abstained from involuntary bankruptcy cases where an out-of-court restructuring is in progress or has already concluded, as is the case here. *In re Bioline Laboratories, Inc.*, 9 B.R. 1013 (Bankr. E.D.N.Y. 1981) (abstaining from involuntary chapter 11 case where debtor had made an out-of-court settlement by which it arranged bulk sale of its assets, free and clear of liens, and purchaser had guaranteed minimum 50 percent payment to debtor's unsecured creditors); *In re Colonial Ford, Inc.*, 24 B.R. 1014 (Bankr. D. Utah 1982) (abstaining from an involuntary chapter 11 case where the case was filed after parties had entered into a comprehensive settlement agreement); *In re Artists' Outlet, Inc.*, 25 B.R. 231 (Bankr. D. Mass. 1982) (abstaining from involuntary chapter 7 petition where out of court sale of debtor's assets already occurred); *In re Rimpull Corp.*, 26 B.R. 267 (Bankr. W.D. Mo. 1982) (abstaining was in the best interest of debtors and creditors where arrangement had been worked out by debtor with its creditors, where arrangement had been accepted by vast majority of creditors, where money was in place to fund major part of the arrangement, and where only a minority of creditors had dissented from the arrangement and had filed a petition requesting involuntary adjudication).

60. As a result of the properly-conducted prepetition Foreclosure, Honors has virtually no remaining assets with any material value. Indeed, what remains are mostly liabilities, rather than assets. And regardless of the value of the remaining assets, those assets are subject to the liens of WhiteHorse, which liens secure remaining indebtedness of more than $44 million. Accordingly, if an order for relief were entered, this would, without a doubt, be a "no asset" case, with no assets for a trustee to administer, let alone to distribute to unsecured creditors.

61. Judicial economy and equities of the case dictate that dismissal or abstention of the Involuntary Petition is warranted.

## <u>RESERVATION OF RIGHTS</u>

62.    Honors respectfully reserves all rights with respect to the subject matter of this Motion and the Involuntary Petition, including, without limitation, the right to amend or supplement the Motion or the arguments made herein at any hearing the Court schedules on the Motion, to assert other and/or additional defenses to the Involuntary Petition, and to seek to recover fees, costs, and other damages.  *See* 11 U.S.C. § 303(i).

*[Remainder of page intentionally left blank]*

## <u>CONCLUSION</u>

For the reasons set forth herein, Honors respectfully requests that the Court enter the Proposed Order dismissing the Involuntary Petition with prejudice pursuant to sections 105, 303, and 305 of the Bankruptcy Code, or in the alternative, abstain from the proceedings, and grant such other relief as the Court deems just and proper.

Dated: December 13, 2024               WILLKIE FARR & GALLAGHER LLP
      New York, NY

                                By:   */s/ Brian S. Lennon*
                                   Brian S. Lennon
                                   Philip F. DiSanto
                                   787 Seventh Avenue
                                   New York, New York 10019
                                   Telephone:  (212) 728-8000
                                   Facsimile:  (212) 728-8111
                                   blennon@willkie.com
                                   pdisanto@willkie.com

                                   *Counsel for Honors Holdings, LLC*