# EXHIBIT 1

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
(Complex Business Litigation Division)**

| | |
|---|---|
| ROBERT SCOT JAMES, and<br>CORE2000, LLC,<br><br>Plaintiffs,<br><br>v.<br><br><br>WHITEHORSE CAPITAL MANAGEMENT LLC,<br>HH COLLECTIONS, LLC,<br>BRAINTREE FITNESS, LLC,<br>CAMARILLO FITNESS HOLDINGS, LLC,<br>CAMARILLO FITNESS OPCO, LLC,<br>H.I.G. WHITEHORSE PRINCIPAL LENDING<br>HOLDINGS, LLC,<br>H.I.G. WHITEHORSE PRINCIPAL LENDING<br>OFFSHORE HOLDINGS, LLC,<br>WHITEHORSE ONSHORE CREDIT<br>OPPORTUNITIES I SPV, LLC,<br>WHITEHORSE FINANCE CREDIT I, LLC,<br>H.I.G. WHITEHORSE TRISTAR CREDIT, LLC,<br>H.I.G. WHITEHORSE TRINITY CREDIT, LLC,<br>H.I.G. WHITEHORSE SMA ABF, LLC,<br>H.I.G. GLOBAL CREDIT HOLDINGS, LLC,<br>WEBSTER BANK, N.A.,<br>and<br>GRANT LYON, AN INDIVIDUAL<br><br>Defendants. | Case No.: 2025-011769-CA-01 |

**SECOND AMENDED COMPLAINT**

Plaintiffs, Robert Scot James ("James") and Core2000, LLC ("Core2000") (collectively, "Plaintiffs") sue Defendants WhiteHorse Capital Management, LLC ("WhiteHorse"), HH Collections, LLC ("HH Collections"), Braintree Fitness, LLC ("Braintree"), Camarillo Fitness Holdings, LLC ("Camarillo Holdings"), Camarillo Fitness OPCO, LLC ("Camarillo Opco"), H.I.G. Whitehorse Principal Lending Holdings, LLC ("HIG Holdings"), H.I.G. Whitehorse

Principal Lending Offshore Holdings, LLC ("HIG Offshore"), Whitehorse Onshore Credit Opportunities I SPV, LLC ("Whitehorse SPV"), Whitehorse Finance Credit I, LLC ("Whitehorse Finance"), H.I.G. Whitehorse Tristar Credit, LLC ("HIG Tristar"), H.I.G. Whitehorse Trinity Credit, LLC ("HIG. Trinity"); H.I.G. Whitehorse SMA ABF, LLC ("HIG SMA"); H.I.G. Global Credit Holdings, LLC ("HIG Global"), Webster Bank, N.A., (HIG Holdings, HIG Offshore, Whitehorse SPV, Whitehorse Finance, HIG Tristar, HIG Trinity, HIG SMA, HIG Global and Webster Bank are together referred to as the "WhiteHorse Lenders"), and Grant Lyon ("Lyon") (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. This is an action for damages by James and Core2000 against the Defendants in excess of $5,500,000, inclusive of interest, costs, and attorney's fees.

2. Plaintiffs seek relief against the Defendants for: (1) tortious interference with Plaintiffs' contract; (2) tortious interference with Plaintiffs' business relationships; (3) breach of fiduciary duties; and (5) avoiding fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.106(1), Florida Statutes.

## PARTIES, JURISDICTION, AND VENUE

3. Plaintiff Robert Scot James is a natural person who is a resident and citizen of Sarasota County, Florida.

4. Plaintiff Core2000 is a Tennessee limited liability company owned and managed by Plaintiff James.

5. Defendant WhiteHorse is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

6. Defendant HH Collections is a Georgia limited liability company with its principal place of business located in Atlanta, Georgia.

7. Defendant Braintree is a Massachusetts limited liability with its principal place of business located in Norfolk County, Massachusetts.

8. Defendant Camarillo Holdings is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

9. Defendant Camarillo Opco is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

10. Defendant HIG Holdings is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

11. Defendant HIG Offshore is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

12. Defendant Whitehorse SPV is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

13. Defendant Whitehorse Finance is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

14. Defendant HIG Tristar is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

15. Defendant HIG Trinity is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

16. Defendant HIG SMA is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

17. Defendant HIG Global is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida.

18. Defendant Webster Bank is a national association with its principal place of business located in Stamford, Connecticut.

19. Defendant Lyon is an individual over the age of eighteen who, on information and belief, resides in New York, New York.

20. This Court has jurisdiction over the Defendants pursuant to section 48.193(1)(a)(1), Florida Statutes, because each defendant either (1) operates, conducts, engages in, or carries on a business or business venture in Florida and has an office or agency in Florida; (2) engages in substantial and not isolated activity within Florida; or (3) committed a tortious act within Florida. Additionally, Defendants WhiteHorse, Camarillo Holdings, Camarillo Opco, HIG Holdings, HIG Offshore, Whitehorse SPV, Whitehorse Finance, HIG Tristar, HIG Trinity, HIG SMA and HIG Global are all citizens of Miami-Dade County, Florida as their headquarters and principal place of business is located in Miami-Dade County, Florida.

21. This Court has jurisdiction over the subject matter of this action pursuant to section 26.012, Florida Statutes, because the amount in controversy is in excess of $50,000.00, exclusive of interest, attorney's fees, and costs.

22. Venue is proper in this Circuit because (i) James and Core2000's causes of action accrued in Miami-Dade County, Florida, and (ii) the Defendants WhiteHorse, Camarillo Holdings, Camarillo Opco, HIG Holdings, HIG Offshore, Whitehorse SPV, Whitehorse Finance, HIG Tristar, HIG Trinity, HIG SMA and HIG Global reside Miami-Dade County, Florida as all these entities operate out of WhiteHorse's headquarters in Brickell.

4

## GENERAL ALLEGATIONS

### Plaintiffs file the Delaware Action and Obtain Judgment Against Honors Holdings

23.     Plaintiff Core2000 is a limited liability company which owned Orangetheory® Fitness franchise studios and related assets.

24.     Honors Holdings, LLC ("Honors" or "Honors Holdings") is a limited liability company which until September 2024 pursuant to franchise agreements with Orangetheory® Fitness owned approximately 143 LLCs which in turn operated approximately 143 Orangetheory® Fitness studios (the "Honors Entities"). Honors Holdings is currently in Chapter 7 bankruptcy proceedings pending before the Eastern District of New York, Case No. 1:24-bk-44875.

25.     On or about May 16, 2022, pursuant to an asset purchase agreement (the "APA"), Core2000 sold Honors Holdings four (4) of its Orangetheory® Fitness studios, the Area Developer Rights to Tennessee and related assets. The Area Developer collects a percentage of royalties on all open studios in the territory and grants exclusive rights to open or sell additional studios in the assigned territory. At the time of the sale there were approximately 24 open studios generating approximately $500,000 in annual earnings/profits from the Area Developer and another $1,200,000 in earnings/profit from the other studios. A copy of the APA is attached as **Exhibit A**.

26.     As required by Exhibit J (3) to the APA, Honors Holdings made some payments. However, the two remaining deferred payments, totaling $5,500,000, to be paid to Plaintiff James, for distribution to Core2000 were not made.

27.     Pursuant to Section 2 of Exhibit J to the APA, prior to an "Event of Default" interest accrued on the outstanding principal balance of the Deferred Payments at 5% per annum until paid. Honors Holdings paid the interest due through February 28, 2023, but made no further payment to Plaintiffs.

28.     The third Deferred Payment of $3,500,000 plus accrued interest was due on March 16, 2023. Honors Holdings failed to make that payment on that date.

29.     Pursuant to Section 2(b) of Exhibit J to the APA, Honors Holdings' failure to make the third Deferred Payment within the contractual five-business-day grace period (i.e., by March 23, 2023) constituted an Event of Default and caused the interest rate on the outstanding total principal balance of the Deferred Payments (i.e., $5,500,000) to increase to 15% per annum from March 24, 2023 until paid in full.

30.     The fourth installment of $2,000,000, plus accrued interest was due on May 16, 2023. Again, Honors Holdings failed to pay it within the five-business-day grace period provided under the APA.

31.     On May 16, 2023, James notified Honors Holdings that, due to the Event of Default resulting from Defendant's failure to make the third Deferred Payment by March 23, 2023: (a) the outstanding balance of the Deferred Payments, together with all interest due thereon, was immediately due and payable pursuant to the terms of the APA; and (b) James intended to exercise all of his and Core2000's rights and remedies for default if the outstanding balance of the Deferred Payments was not paid in full by May 23, 2023. Honors failed to pay said balance or any part of it.

32.     On May 30, 2023, Plaintiffs filed a lawsuit against Honors Holdings in the District Court of Delaware.

33.     On September 28, 2023, the District Court of Delaware entered a judgment in favor of Plaintiffs against Honors Holdings in the amount of $5,947,533, plus pre-judgment interest, $85,000 in attorneys' fees and continuing post-judgment interest (the "Judgment" or the "Final Judgment"). *See* the Judgment, attached as **Exhibit B**.

34. After judgment was entered, Honors Holdings informed Plaintiffs that its lender, WhiteHorse, directed Honors not to pay its Plaintiffs and that payment to Plaintiffs would result in a default on its loan with WhiteHorse per the most recent amendment to the loan agreement between WhiteHorse and Honors Holdings.

35. Specifically, Honors Holdings informed Plaintiffs the Eighth Amendment to WhiteHorse's Credit Agreement (the "Eighth Amendment") expressly precluded Honors from paying Plaintiffs any amount because WhiteHorse had restricted its ability to pay creditors from whom Honors acquired studios. A copy of the Eighth Amendment is attached as **Exhibit C.**

36. At the time, Honors Holdings owed WhiteHorse and the WhiteHorse Lenders approximately $75,000,000.00. *Id*. at 198.

37. Pursuant to the Eight Amendment, WhiteHorse was appointed as an agent pursuant to Section 9 of the Eighth Amendment, and, at all material times, was acting as both lender and agent for the WhiteHorse Lenders in connection with requiring the execution of the Eighth Amendment, directing Honors Holdings to limit its payment to Plaintiffs, directing the fraudulent transfers discussed below, directing Honors which creditors to pay and which creditors not to pay, and the remaining tortious conduct discussed below. *Id*. at pg. 1 and § 9.

38. In 2022, WhiteHorse, as lender and Agent of the WhiteHorse Lenders, approved Honors Holdings acquiring studios from Plaintiffs and from another creditor in order to effectuate its plan to surreptitiously direct Honors Holdings not pay Plaintiffs and the other creditor for the studios or the Area Developer Rights for Tennessee, so that WhiteHorse and the WhiteHorse Lenders could ultimately take the high performing studios Plaintiffs sold Honors Holdings without ever paying for them.

39.     Unbeknownst to Plaintiffs at the time the APA was executed, WhiteHorse knew that Honors could not meet its credit obligations and put in a plan for Honors to intentionally default on its obligations towards Plaintiffs so that WhiteHorse foreclosed upon Plaintiffs high performing studios without paying for them.

40.     In 2023, Honors Holdings' earnings before interest, taxes, depreciation, and amortization (EBITDA in 2023) was nearly $ 20 million and its gross revenue was approximately $90,000,000. It continued to build new studios at the cost of approximately $1 million per studio at WhiteHorse's direction while having defaulted on its obligation to Plaintiffs and other creditors.

41.     Through December 2023, the Honors Entities collected payment from customers and make monthly distributions to Honors Holdings of those payments.

42.     In turn, Honors Holdings collected the revenue money from these approximately 143 individual LLC studios and placed it in a JP Morgan Chase Bank account in its name (the "Chase Account").

43.     WhiteHorse and Honors used the Eighth Amendment as justification to not pay on the judgment as well as to not pay other creditors from whom Honors acquired studios, instead, using the millions of dollars it earned to build new studios that WhiteHorse could take upon a default.

**WhiteHorse and the WhiteHorse Lenders interfere with Plaintiffs' and Honors Holdings' Business Relationship by Directing Honors not to Pay Plaintiffs and Memorializing that <u>Requirement in the Eighth Amendment to the Credit Agreement</u>**

44.     The Eighth Amendment to the Credit Agreement was entered into on July 11, 2023, only a few weeks after Plaintiffs filed the Delaware lawsuit.

45. As explained by Honors Holdings representatives to Plaintiffs, the purpose for WhiteHorse requiring the Eight Amendment was in part to limit Honors ability to pay certain creditors, including Plaintiffs, from whom Honors had recently purchased studios.

46. The reason WhiteHorse wanted to limit Honors ability to pay Plaintiffs was so that it could end up with Plaintiffs' studios and the lucrative Area Developer Rights for Tennessee without having to pay for them.

47. Importantly, WhiteHorse knew that the studios Honors purchased from Plaintiffs were high performing and in fact performed much better than the majority of Honors's studios.

48. According to Honors, the changes to Section 6.15 under the Eight Amendment limiting the ability of Honors to pay Plaintiffs were required by WhiteHorse under threat of default. In other words, Honors was told that if it did not agree to limit its ability to pay Plaintiffs, WhiteHorse would pursue a default.

49. Under the Eight Amendment, Section 6.15 of the Credit Agreement, which was amended in response to the Delaware Lawsuit, set a ceiling of $300,000 in the aggregate on payments by Honors Holdings to Plaintiffs and another creditor from whom it also had recently acquired Orangetheory Fitness studios. This $300,000 cap is a total aggregate amount of what could be paid to Plaintiffs and the other creditor for the life of the Credit Agreement between WhiteHorse and Honors. Ex. C at § 6.15.

50. The $300,000 aggregate sum was insufficient to pay the approximately $5,947,533 owed to Plaintiffs at the time.

51. Moreover, shortly after the execution of the Eighth Amendment, WhiteHorse approved that the $300,000 aggregate sum be paid to the other creditor effectively directing Honors not to pay Plaintiffs anything after the Eighth Amendment under risk of default, which would have

resulted in a loss of all assets because all of Honors's assets served as collateral over WhiteHorse's loan.

52. In sum, after Plaintiffs commenced the action in Delaware, WhiteHorse amended its Credit Agreement with Honors Holdings to prevent Honors Holdings from paying Plaintiffs.

**<u>Honors Holdings, WhiteHorse and Braintree Conspire to Fraudulently Transfer<br>Garnished Funds outside the reach of Plaintiffs</u>**

53. In November of 2023, a garnishment order was issued against Honors Holdings in Georgia state court (the "Garnishment Proceeding"). In connection with the Garnishment Proceeding, approximately $3.7 million was garnished from Honors Holdings' Chase account and placed in the registry of the Georgia state court.

54. Honors Holdings' bank records for its Chase Account demonstrate that Honors Holdings would receive between $5 million - $7 million a month on average in this account from the 143 or so studios it controlled.

55. During the Garnishment Proceeding, WhiteHorse asserted that it had a perfected interest in the garnished funds and that those funds should be turned over to it because it had declared a default and exercised its secured creditor rights under an account control agreement that gave it control over the funds.

56. Although WhiteHorse represented that it had a secured interest in the garnished funds, it had no intent to execute on the collateral and only claimed its secured interest to thwart Plaintiffs' collection efforts and assist Honors in thwarting Plaintiffs' collection efforts.

57. Prior to the hearing on the enforcement of the garnishment, WhiteHorse and Honors agreed that WhiteHorse would not execute on the garnished funds, but instead immediately

transfer those funds to Honors through a wire transfer made by WhiteHorse to a wholly owned and controlled subsidiary of Honors: Braintree.

58. As a result of WhiteHorse's claiming a secured interest, the state court ordered the garnished funds be turned over to WhiteHorse.

59. However, upon receiving the $3.7 million subject to garnishment from the court registry, WhiteHorse turned over every penny to Honors.

60. WhiteHorse did not transfer the garnished funds to Honors directly, because that would only subject those funds to future garnishment by Plaintiffs.

61. Instead, as agreed with Honors, WhiteHorse assisted Honors Holdings in its fraudulent transfers, and transferred the funds to Honors' wholly owned subsidiary, Braintree, on or about December 2023.

62. In other words, WhiteHorse's execution on the garnished funds was a sham designed to defraud Plaintiffs and thwart their collection efforts.

63. At the time the transfer to Braintree was made, Honors was insolvent in that it was not paying its debts as they became due.

64. Although the $3.7 million garnished funds were transferred to Braintree, Honors retained full control over the funds and exercised complete dominion and control over the funds.

65. This transfer was made intentionally for the purpose of thwarting Plaintiffs' collection efforts against Honors.

66. In essence, WhiteHorse deceptively asserted an interest in the garnished funds to prevent Plaintiffs from garnishing those funds, when it never actually intended to take custody of the collateral. Instead, once the Plaintiffs were thwarted, WhiteHorse returned the garnished funds to Honors.

67. According to Honors, the garnishment money was then used to pay other creditors of Honors including the various studio landlords at WhiteHorse's instruction.

68. Further, following the garnishment, Honors ceased using any bank accounts in its name and instead it did its banking in accounts in the name of its wholly owned subsidiaries', Braintree and HH Collections, to collect its revenue and pay its expenses in an effort to thwart Plaintiffs' ability to reach Honors's assets.

69. Honors used the accounts in the name of its subsidiaries to conduct its business with WhiteHorse's knowledge, approval, and consent.

70. Honors' corporate representative testified that it used Braintree and HH Collection's bank accounts to collect its money and conduct its business to prevent Plaintiffs from executing future garnishments.

71. During the time of these transfers and while Honors was using accounts in the name of its subsidiaries, through discovery in the Georgia Federal Action in aid of execution, Plaintiffs requested production of all Honors's accounts at JP Morgan Chase.

72. However, in January of 2024, Honors reported it had no bank accounts at any bank and failed to produce the statements of its subsidiaries it was using to conduct its business to prevent Plaintiffs from learning of the details of its fraudulent transfers.

73. The statement by Honors that it had no accounts was intentionally false and misleading in that Honors had at least two accounts, albeit in the name of its subsidiaries, it was using at JP Morgan Chase to conduct its business.

74. Braintree provided no value to Honors or to WhiteHorse for the $3.7 million it received, and Honors nor WhiteHorse received value or other consideration in exchange for transferring $3.7 million to Braintree.

**The Georgia Federal Action**

75. In October of 2023, Plaintiffs registered the Judgment in the Southern District of Florida and the Northern District of Georgia. Additionally, Plaintiffs looked to execute a charging order against Honors in the Northern District of Georgia for the purpose of recovering the Judgment (the "Georgia Federal Action").

76. During discovery in the Georgia Federal Action in aid of execution, Plaintiffs became aware that WhiteHorse and Honors were taking suspicious actions concurrently to thwart Plaintiffs' ability to collect.

77. During depositions in the Georgia Federal Action, Honors Holdings' corporate representative confirmed that WhiteHorse demanded the addition of Section 6.15 to the credit agreement, which intentionally prevented Honors from paying its debt evidenced by the judgement to Plaintiffs.

78. During Honors Holdings' deposition, it testified it could not pay Plaintiffs a single dollar to Plaintiffs because it had entered a refinancing agreement with the other creditor listed in section 6.15 under which it paid the other creditor $300,000, which was the aggregate limit WhiteHorse allowed it to pay under the Eighth Amendment to the Credit Agreement.

79. WhiteHorse knew and approved of Honors decision to pay the $300,000 to the other creditor and not to pay Plaintiffs.

**Honors Holdings Fraudulently Transfers millions to its Subsidiary HH Collections**

80. Honors' production of documents in the Georgia Federal Action revealed the Honors Entities stopped making their monthly payments to Honors Holdings' Chase Account after the Garnishment Proceeding was initiated in November of 2023. Prior to this, Honors Holdings received approximately $5,000,000 to $7,000,000 per month from the Honors Entities.

13

81. Although WhiteHorse limited Honors' ability to pay Plaintiffs and thwarted Plaintiffs' efforts, it allowed Honors to pay other creditors and directed Honors to continue to build new studios.

82. On or about December 2023, Honors created another wholly owned subsidiary, HH Collections, for the purpose of receiving fraudulent transfers of monies due to Honors Holdings from the Honors Entities and protecting this income from future garnishments.

83. As mentioned above, in December 2023, Honors began collecting the approximately $5 - $7 million monthly revenue from its studios through the HH Collections Chase account.

84. HH Collections received Honors Holdings funds in its Chase account from December 2023 through September 2024.

85. Upon information and belief, HH Collections received in excess of $40 million in fraudulent transfers during this time period.

86. HH Collections, which at the time was a wholly owned subsidiary of Honors, received no consideration for the monthly transfers.

87. In other words, HH Collections was used for the purpose of hindering, delaying, and defrauding Plaintiffs and preventing them from executing upon assets of Honors Holdings that should have been available to pay Honors Holdings debts.

88. After creating HH Collections, Honors created an account at JP Morgan Chase in the name of HH Collections (the "HH Collections Account").

89. The HH Collections Account was used to collect the monthly funds due from the Honors Entities to Honors Holdings.

90. During a deposition in the Georgia Action, Honors' corporate representative testified the purpose of using Braintree account to receive the garnished funds and prevent Plaintiffs from garnishing those funds in the future.

91. Similarly, Honors' corporate representative confirmed that HH Collections was created surreptitiously to conduct Honors' banking and avoid future garnishments by Plaintiffs.

**The Appointment of the "Independent" Manager and Further Fraudulent Transfers**

92. In or about April of 2024, after Honors defaulted on its obligations to WhiteHorse, WhiteHorse appointed an Independent Manager of Honors Holdings, who, at the direction of WhiteHorse, removed all previously appointed officers of, and took full control over the property and accounts of, Honors Holdings and its direct and indirect Subsidiaries, on behalf of WhiteHorse.

93. The Independent Manager is Grant Lyon, who was selected exclusively by WhiteHorse and reported to WhiteHorse on a weekly basis.

94. At the time Grant Lyon was appointed, Honors Holdings was insolvent.

95. Although called an "independent manager," Grant Lyon acted at the direction and control of WhiteHorse at the expense of all other creditors and Honors Holdings.

96. By April 2024, WhiteHorse's control over Honors Holdings was complete. WhiteHorse decided what debts to pay, which landlords to default upon and which creditors to benefit.

97. Honors Holdings had no say in the appointment or retention of Grant Lyon.

98. As the sole office and director of Honors Holdings an insolvent company, Grant Lyon owed a fiduciary duty to all of Honors Holdings' creditors.

99. Upon information and belief, since Lyon was appointed as the Independent Manager and became the only board member of Honors, there have been no board meetings.

100. On or about September 25, 2024, Grant Lyon at WhiteHorse's direction executed a transfer agreement (the "Camarillo Transfer Agreement") under which Honors Holdings transferred its 108 most profitable studios to two entities designated and controlled by WhiteHorse, Camarillo Holdings and Camarillo Opco.

101. Under the Camarillo Transfer Agreement, Grant Lyon and WhiteHorse also transferred Honors' interest in HH Collections and Braintree to Camarillo Holdings and Camarillo Opco.

102. WhiteHorse left the 35 least profitable studios with Honors. Before the transfer, WhiteHorse and Grant Lyon intentionally defaulted on the leases of these 35 studios so as to leave the other creditors of Honors no assets to collect upon.

103. Grant Lyon acted to the detriment of Honors Holdings by leaving it with the 35 least profitable studios and ensuring that Honors had no viable path to reorganize, restructure its debts, and/or remain a viable company.

104. While engaging in these actions, Grant Lyon acted with the intent to benefit WhiteHorse to the detriment of Honors Holdings' remaining creditors and Honors Holdings itself.

105. Although WhiteHorse termed the transfer of the 108 studios a "strict foreclosure", it did not comply with the procedures and statutory requirements of a strict foreclosure.

106. Specifically, WhiteHorse provided no notice to the lienholders including Plaintiffs, the landlords of the various studios that had defaulted on their obligations or other creditors who had sold studios to Honors.

107. Because Plaintiffs and other creditors were not given notice of the transfers to WhiteHorse, they did not have an opportunity to bid at the sale, to challenge the valuation of the collateral or redeem the property to protect their interests.

16

108.    At the time of the Camarillo Transfer Agreement, Plaintiffs had a perfected judgment lien which Grant Lyon and WhiteHorse were aware of, yet Lyon and WhiteHorse did not give notice of the transfer which they claimed was a 'foreclosure' without notice.

109.    Lyon and WhiteHorse executed the Camarillo Transfer Agreement after Plaintiffs filed their application for charging order seeking an assignment of interest in the 140 studios.

110.    Lyon and WhiteHorse did not comply with the detailed requirements of Honors Holdings franchise agreement with Orangetheory Fitness including obtaining prior approval for the transfer and obtaining permission from the landlords before the transfer. In fact, OTF did not approve the transfer to the Camarillo entities until February 2025.

111.    As a result of the Camarillo Transfer Agreement, the four studios sold to Honors under the APA were transferred to Camarillo Opco and Camarillo Holdings as well as the Area Developer Rights for Tennessee (which combined generated approximately $1,800,000/yr. in income) despite the fact that Plaintiffs had not received the bargained for payment for the four studios and the Area Developer Rights.

112.    WhiteHorse had Lyon execute the Camarillo Transfer Agreement to prevent Plaintiffs from being able to collect from Honors.

113.    Moreover, since the appointment of Lyon, Honors has continued to perform poorly, and is currently in bankruptcy proceedings.

114.    Lyon, WhiteHorse, the Lenders, and all other Defendants have acted in tandem to defraud Plaintiffs in various ways, including (1) the removal of Honors' entire board, (2) the appointment of an Independent Manager who acts solely at the instruction of WhiteHorse, (3) the creation of various entities to shield Plaintiff from recovering its funds, (4) the transfer of Honors' assets to entities created by WhiteHorse to prevent Plaintiff from recovering its funds, and (5) the

transferring of garnished funds to an account in the name of another wholly owned subsidiary of Honors' in order to avoid garnishments by Plaintiffs.

115. Defendants' interference with Plaintiffs and Honors' business relationships continues to damage James and Core2000.

116. Defendants have caused and will continue to cause injury to Plaintiffs by not paying them pursuant to the APA and the Judgment.

117. All conditions precedent to the filing of this action have occurred, have been performed, have otherwise been fulfilled, or their performance has been waived.

118. Petitioner has retained undersigned counsel and agreed to pay them a reasonable fee.

**COUNT I**
**Tortious Interference with Contract**
(Against WhiteHorse, the WhiteHorse Lenders, Grant Lyon and Camarillo Entities)

119. James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118 as if set forth fully herein.

120. The APA is a valid and enforceable contract between Plaintiffs and Honors Holdings.

121. Since the APA was executed, Defendants WhiteHorse, the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities have interfered with the contract between Honors Holdings and Plaintiffs by acting dishonestly, interfering with garnishment proceedings, improperly creating and using various entities to prevent Plaintiffs from collecting its debt, and ultimately by transferring Honors Holdings assets and preventing payment Plaintiffs are entitled to receive the sale of its Orangetheory® Fitness studios.

122. At all times relevant hereto, WhiteHorse, the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities had knowledge of Plaintiffs and Honors' Agreement.

123. Further, WhiteHorse was on notice of the APA since its inception as it approved the acquisition of studios.

124. Despite knowledge of the APA, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, directed Honors Holdings not to pay Plaintiffs for the 4 studios Honors purchased.

125. WhiteHorse required Honors Holdings to execute the Eighth Amendment which prevented Honors from paying the amounts owed to Plaintiffs or risk a default on a $75 million loan.

126. Indeed, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, intentionally and unjustifiably interfered with James and Core2000's right to payment by amending its Credit Agreement to prevent Honors from paying Plaintiffs.

127. Honors confirmed that it did not make payments under the APA and the later judgment because doing so would have triggered a default.

128. Had Whitehorse, acting for itself and on behalf of the WhiteHorse Lenders, not interfered with Honors Holdings ability to pay Plaintiffs, Plaintiffs would have received payment for the 4 studios.

129. Additionally, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, intentionally and unjustifiably interfered with James and Core2000's right to receive the garnishment funds in satisfaction of the obligations due under the APA.

130. As detailed above, in December 2023, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, claimed it sought to execute on the garnished funds in the Georgia

garnishment action as a senior creditor and due to its representations received the $3.7 million garnished funds; however, WhiteHorse had no intention to execute on those funds and instead turned over the every penny of the $3.7 million garnished funds to Honors Holdings thereby thwarting Plaintiffs from being paid for their obligations.

131. Had WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, not interfered with the garnishment, Plaintiffs would have received $3.7 million from Honors.

132. Lastly, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities also intentionally and unjustifiably interfered with the APA between Plaintiffs and Honors by executing the Camarillo Transfer Agreement which divested Honors of all its material assets without notice to Plaintiffs or other creditors and without giving Plaintiffs an opportunity to redeem their interest in Honors' assets.

133. As a result of WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities' tortious interference with the APA, James and Core2000 have suffered damages in excess of $5,947,533, plus interest.

134. Additionally, WhiteHorse and the Camarillo Entities' tortious interference has caused and will continue to cause injury to James and Core2000 so long as Plaintiffs are not paid.

WHEREFORE, Plaintiffs requests judgment in its favor and against WhiteHorse, the WhiteHorse Lenders, Grant Lyon and Camarillo Entities for damages, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

### COUNT II
### Tortious Interference with Business Relationship
(Against WhiteHorse, the WhiteHorse Lenders, Grant Lyon and Camarillo Entities)

135. James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118 as if set forth fully herein.

136. Since the APA was executed, Defendants WhiteHorse, the WhiteHorse Lenders, Grant Lyon and Camarillo Entities have used wrongful means to interfere with Honors Holdings and Plaintiffs' business relationships by acting dishonestly, interfering with garnishment proceedings, improperly creating and using various entities to prevent Plaintiffs from collecting its debt, and ultimately by transferring Honors Holdings assets and preventing payment Plaintiffs are entitled to receive the sale of its Orangetheory® Fitness studios.

137. At all times relevant hereto, WhiteHorse, the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities had knowledge of Plaintiffs and Honors' business relationship; specifically, the debt owed by Honors to Plaintiffs.

138. Despite knowledge of the APA, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, directed Honors Holdings not to pay Plaintiffs for the 4 studios Honors purchased.

139. WhiteHorse required Honors Holdings to execute the Eighth Amendment which prevented Honors from paying the amounts owed to Plaintiffs or risk a default on a $75 million loan.

140. Indeed, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, intentionally and unjustifiably interfered with James and Core2000's right to payment by amending its Credit Agreement to prevent Honors from paying Plaintiffs.

141. Honors confirmed that it did not make payments under the APA and the later judgment because doing so would have triggered a default.

142. Had Whitehorse, acting for itself and on behalf of the WhiteHorse Lenders, not interfered with Honors Holdings ability to pay Plaintiffs, Plaintiffs would have received payment for the 4 studios.

143. Additionally, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, intentionally and unjustifiably interfered with James and Core2000's right to receive the garnishment funds in satisfaction of the obligations due by Honors to Plaintiffs.

144. As detailed above, in December 2023, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, claimed it sought to execute on the garnished funds in the Georgia garnishment action as a senior creditor and due to its representations received the $3.7 million garnished funds; however, WhiteHorse had no intention to execute on those funds and instead turned over the every penny of the $3.7 million garnished funds to Honors Holdings thereby thwarting Plaintiffs from being paid for their obligations.

145. Had WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, not interfered with the garnishment, Plaintiffs would have received $3.7 million from Honors.

146. Lastly, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities also intentionally and unjustifiably interfered with the obligations due by Honors to Plaintiffs by executing the Camarillo Transferred Agreement which divested Honors of all its material assets.

147. As a result of WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities' tortious interference with the APA, James and Core2000 have suffered damages in excess of $5,947,533, plus interest.

148. Additionally, WhiteHorse and the Camarillo Entities' tortious interference has caused and will continue to cause injury to James and Core2000 so long as Plaintiffs are not paid.

149. WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, Grant Lyon and the Camarillo Entities intentionally and unjustifiably interfered with James and Core2000's

business relationships for the purpose of harming James and Core2000's business and relationships with their clients.

WHEREFORE, Plaintiffs requests judgment in its favor and against WhiteHorse and the Camarillo Entities for damages, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## COUNT III
### **Breach of Fiduciary Duties**
(Against Grant Lyon)

150. James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118 as if set forth fully herein.

151. As the Independent Manager and the sole board member of Honors Holdings, Lyon had fiduciary duties to Honors Holdings, including the duties of loyalty, care, and good faith.

152. At the time, Lyon was appointed as sole officer and director, Honors Holdings was an insolvent company as it was not paying its debts due including its debt to Plaintiffs, but also it was subject to multiple claims from various landlords as Honors Holdings had defaulted on several leases, claims by other entities from whom it purchased studios and had defaulted on its $75,000,000.00 obligation to WhiteHorse.

153. As an officer and director of an insolvent company, Lyon owed fiduciary duties to all creditors.

154. Lyon breached his fiduciary duties to all creditors by advancing soley the interests of WhiteHorse, to Honors and Plaintiffs' detriment.

155. As noted above, at all times, Lyon took his direction solely from WhiteHorse, who selected him, appointed him and for whom Lyon acted as an agent.

156. At WhiteHorse's instructions, Lyon defaulted on approximately 35 leases causing those studios to be potentially subjected to eviction proceedings and causing those studios to lose their value.

157. Lyon further violated his fiduciary duties owed to Plaintiffs by refusing to speak with Plaintiffs after June 2024. Lyon failed to answer questions from Plaintiffs regarding the leases Lyon defaulted upon and repayment of Plaintiffs' debt.

158. Lyon further violated these fiduciary duties by failing to act in the best interest of Honors Holdings, by authorizing the Camarillo Transfer Agreement, by which Lyon authorized transferring the 108 most profitable studios to two entities designated and controlled by WhiteHorse and damaged Honors by leaving it with the 35 least profitable studios.

159. Lyon further failed to comply with the procedures required for a strict foreclosure when he executed the Camarillo Transfer Agreement, thereby, breaching his fiduciary duties to all creditors including his duty to act in good faith, his duty of disclosure and his duty to follow the law.

160. Specifically, Lyon provided no notice to the lienholders including Plaintiffs, the landlords of the various studios that Honors stopped paying or other creditors who had sold studios to Honors.

161. Because Plaintiffs and other creditors were not given notice of the transfers to WhiteHorse, they did not have an opportunity to bid at the sale or redeem the property to protect their interests.

162. At the time of the Camarillo Transfer Agreement, Plaintiffs had a perfected judgment lien which Grant Lyon and WhiteHorse were aware of, yet Lyon and WhiteHorse did not give notice of the transfer which they claimed was a 'foreclosure'.

163. Lyon and WhiteHorse executed the Camarillo Transfer Agreement after Plaintiffs filed their application for charging order seeking an assignment of interest in the 140 studios.

164. Furthermore, Lyon did not comply with the requirements of Honors Holdings franchise agreement with Orangetheory Fitness including obtaining prior approval for the transfer and receiving permission to the landlords that ownership of the studios would be transferred.

165. WhiteHorse had Lyon execute the Camarillo Transfer Agreement to prevent Plaintiffs from being able to collect from Honors.

166. Plaintiffs have been damaged by Lyon's breach of fiduciary duties, as Lyon has purposefully prevented Honors from paying its Plaintiffs and other creditors for the benefit of WhiteHorse.

167. James and Core2000 have suffered damages and will continue to suffer damages as a direct result of Lyon's breaches of his fiduciary duties.

WHEREFORE, Plaintiffs requests judgment in its favor and against Grant Lyon for damages, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## COUNT IV
### Breach of Fiduciary Duties
(Against WhiteHorse)

168. James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118, 121 through 134 and 151 through 167 as if set forth fully herein.

169. WhiteHorse owed a fiduciary duty to Plaintiffs under the Eighth Amendment and as a result of WhiteHorse's control over the actions and decisions of its agent, Lyon. Through the Eighth Amendment and its control over and direction of agent, Lyon, WhiteHorse owed fiduciary duties to Honors Holdings and its creditors, including the duties of loyalty, care, and good faith.

170. WhiteHorse exercised complete control over Lyon's conduct as the Independent Manager of Honors Holdings and acted through its agent Lyon to violate the fiduciary duties owed to Honors and creditors.

171. WhiteHorse acted through its agent Lyon in breaching its fiduciary duties to Plaintiffs by generating the plan to prevent all creditors from collecting upon their debts and instructing Lyon to default on payment of leases of approximately 35 studios.

172. WhiteHorse breached its fiduciary duties to Plaintiffs by planning the fraudulent partial strict foreclosure, by which Lyon authorized transferring the 108 most profitable studios to two entities designated and controlled by WhiteHorse and left Honors with the 35 least profitable studios which were all subject to eviction actions and have since closed.

173. WhiteHorse further acted through its agent Lyon to breached its fiduciary duties to Plaintiffs by instructing Lyon not to provide notice of the so-called 'strict foreclosure' to other secured creditors, by not allowing other secured creditors including Plaintiffs to participate in the 'foreclosure', by instructing Lyon not to provide discovery materials to Plaintiffs in the Georgia Action, by instructing Lyon to withhold disclosure of the transfer of the 108 studios, and by having Lyon agree to an inaccurate and wholly unsubstantiated valuation for the 108 studios transferred.

174. Plaintiffs have been damaged by WhiteHorse's breaches of its fiduciary duties, as WhiteHorse planned and had Lyon execute damaging actions that caused Honors to be insolvent and prevented Honors from paying its creditors.

175. James and Core2000 have suffered damages and will continue to suffer damages as a direct result of both WhiteHorse and Lyon's breaches of their fiduciary duties..

WHEREFORE, Plaintiffs requests judgment in its favor and against WhiteHorse and Lenders for damages, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## COUNT V
### Fraudulent Transfers Pursuant to § 726.105(1)(a) and §726.106(1)
(Against Braintree)

176. James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118 as if set forth fully herein.

177. This count seeks to avoid and recover actual fraudulent transfers to Braintree pursuant to §§ 726.105(1)(a), 726.106(1) and 726.108(1)(a) and (c).

178. As detailed above in December 2023, WhiteHorse, acting for itself and on behalf of the WhiteHorse Lenders, at the direction of Honors Holdings transferred $3,709,722.77 representing the garnishment funds to Braintree for Honors to use.

179. Honors directed WhiteHorse to transfer the garnishment funds to Braintree in order to avoid execution by Plaintiffs over these funds.

180. Such transfer was fraudulent as to Plaintiffs, whose Claim arose before the transfers were made, because WhiteHorse and Honors Holdings made the transfer with actual intent to hinder, delay, or defraud James and Core2000.

181. Pursuant to § 726.105(2), numerous "badges" of fraud are present, the trades: (a) transfer was made to an insider of the debtor, Braintree (the wholly owned subsidiary of Honors Holdings); (b) the debtor, Honors Holdings, admittedly retained control of the funds post-transfer as, at all times; (c) the transfers were concealed from Plaintiffs; (d) before the transfers were made, Honors had been sued by Plaintiffs and a judgment had been obtained; (e) the debtor removed or concealed assets through the transfers by effectuating a transfer to its wholly owned subsidiary; (f)

Braintree gave no consideration or value in exchange for the transfers; (g) Honors was insolvent or became insolvent shortly after the transfers were made; and (h) the transfers occurred shortly after a substantial debt—the Final Judgment in favor of Plaintiffs—was incurred.

182. Additionally, the "badge" of fraud set forth in § 726.105(2)(k) was met in that the debtor, Honors Holdings, transferred the essential assets of its business to a lienor, WhiteHorse, who then transferred the assets to Honors's insider, Braintree.

183. Honors received no consideration or any reasonably equivalent value in exchange for the transfers to Braintree.

184. As a result, Plaintiffs have incurred damages by way of an inability to collect their Judgment from Honors due to the fraudulent transfer of assets from Honors to Braintree.

185. In addition, the transfer to Braintree is per se a fraudulent transfer under § 726.106(1), regardless of intent, because Plaintiffs claim arose before the transfer was made and Honors Holdings did not receive reasonably equivalent value in exchange for the transfer and was insolvent at that time or became insolvent as a result of the transfer or obligation.

WHEREFORE, Plaintiffs demand judgment on their claims for relief against Braintree, as follows:

(a) Avoiding the transfers in amounts necessary to satisfy Plaintiffs' claims;

(b) Attaching and imposing a constructive trust over Braintree's interests in the transfers in amounts necessary to satisfy Plaintiffs' claims;

(c) Providing for the recovery of and execution upon Braintree's interests in the transfers to the extent necessary to satisfy Plaintiffs' claims;

(d) Holding Braintree liable to Plaintiff in amounts equal to their interests in the transfers to the extent necessary to satisfy Plaintiffs' claims;

(e)     Providing for the avoidance of the transfers and/or enjoining against further disposition by Braintree of the transfers in amounts necessary to satisfy Plaintiffs' claims;

(f)     Providing for declaratory relief holding that the transfers were fraudulent as to Plaintiffs, pursuant to the Florida Fraudulent Transfer Act, Fla. Stat. § 726.101, et seq.

(g)     Awarding all costs, expenses, and fees, including attorneys' fees, of this action upon Defendants; and

(h)     Granting such other and further relief as this Court deems just, equitable and proper.

## COUNT VI
### Fraudulent Transfers Pursuant to § 726.105(1)(a) and §726.106(1)
(Against HH Collections)

186.     James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118 as if set forth fully herein.

187.     This count seeks to avoid and recover actual fraudulent transfers to HH Collections pursuant to §§ 726.105(1)(a), 726.106(1) and 726.108(1)(a) and (c).

188.     Honors Holdings transferred tens of millions of dollars to its wholly owned subsidiary HH Collections beginning in December 2023 through September 2024.

189.     As detailed above, Honors created HH Collections in December 2023 for the purpose of conducting its banking business through its wholly owned subsidiary for the purpose of hindering, delaying and defrauding Plaintiffs.

190.     Beginning in December 2023 and through September 2024, HH Collections received income due to Honors from the approximately 143 Orangetheory Fitness studios. Honors retained full control over HH Collections and its bank account.

191.     Plaintiffs' claim arose before the transfers were made.

192.     Pursuant to § 726.105(2), numerous "badges" of fraud are present, the trades: (a) were to an insider, HH Collections (a wholly owned subsidiary of Honors); (b) Honors retained control of the funds post-transfer as, at all times; (c) the transfers were concealed from Plaintiffs who requested bank records from Honors but were not provided records for HH Collections; (d) before the transfers were made, Honors had been sued by Plaintiffs who obtained a judgment; (e) the debtor removed or concealed assets through the transfers; (f) HH Collections gave no consideration or value in exchange for the transfers; (g) Honors was insolvent or became insolvent shortly after the transfers were made; and (h) the transfers occurred shortly after a substantial debt—the Final Judgment in favor of Plaintiffs—was incurred.

193.     Honors received no consideration or any reasonably equivalent value in exchange for the transfers to HH Collections.

194.     As a result, Plaintiffs have incurred damages by way of an inability to collect its Judgment from Honors due to the fraudulent transfer of assets from Honors to HH Collections.

195.     In addition, the transfer to HH Collections is per se a fraudulent transfer under § 726.106(1), regardless of intent, because Plaintiffs claim arose before the transfer was made and Honors Holdings did not receive reasonably equivalent value in exchange for the transfer and was insolvent at that time or became insolvent as a result of the transfer or obligation.

WHEREFORE, Plaintiffs demand judgment on their claims for relief against HH Collections, as follows:

(a)     Avoiding the transfers in amounts necessary to satisfy Plaintiffs' claims;

(b)     Attaching and imposing a constructive trust over HH Collections' interests in the transfers in amounts necessary to satisfy Plaintiffs' claims;

(c)     Providing for the recovery of and execution of HH Collections' interests in the transfers to the extent necessary to satisfy Plaintiffs' claims;

(d)     Holding HH Collections liable to Plaintiff in amounts equal to their interests in the transfers to the extent necessary to satisfy Plaintiffs' claims;

(e)     Providing for the avoidance of the transfers and/or enjoining against further disposition by HH Collections of the transfers in amounts necessary to satisfy Plaintiffs' claims;

(f)     Providing for declaratory relief holding that the transfers were fraudulent as to Plaintiffs, pursuant to the Florida Fraudulent Transfer Act, Fla. Stat. § 726.101, et seq.

(g)     Awarding all costs, expenses, and fees, including attorneys' fees, of this action upon HH Collections; and

(h)     Granting such other and further relief as this Court deems just, equitable and proper.

### COUNT VIII
### Unjust Enrichment
(Against WhiteHorse, the WhiteHorse Lenders and the Camarillo Entities)

196.    James and Core2000 reallege and incorporate the allegations contained in Paragraphs 1 through 118 as if set forth fully herein.

197.    As a result of the Camarillo Transfer Agreement, the four studios sold to Honors under the APA were transferred to Camarillo Opco and Camarillo Holdings despite the fact that the four studios had not been paid for.

198.    Plaintiffs were the owners of the four studios and ultimately conferred a benefit on Defendants WhiteHorse, the WhiteHorse Lenders and the Camarillo Entities who received the four Orangetheory that belonged to Plaintiffs without paying for the studios.

31

199. Defendants WhiteHorse, the WhiteHorse Lenders and the Camarillo Entities accepted and retained the benefit of the four studios under circumstances that it made it inequitable for them to do so without paying value for the studios.

200. Defendant WhiteHorse and the WhiteHorse Lenders specifically directed Honors not to pay for the four studios and ultimately received the studios from Honors without the studios being paid for.

201. Plaintiffs lack an adequate remedy at law.

WHEREFORE, Plaintiffs requests judgment in its favor and against all Defendants for damages, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## VERIFICATION BY PLAINTIFFS

Under penalty of perjury, I declare that I have read the foregoing Verified Amended Complaint and the facts alleged therein are true and correct to the best of my knowledge and belief.

Robert Scot James

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all claims so triable.

DATED:  May 20, 2026

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Jonathan Etra*
Jonathan Etra
Fla Bar No. 686905
jonathan.etra@nelsonmullins.com
yusimy.bordes@nelsonmullins.com
 2 S. Biscayne Blvd.
One Biscayne Tower, 21st Fl.
Miami, Florida 33131
Tel     305.373.9425
Fax     305.373.9443
*Counsel for Robert Scot James and Core2000, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on May 20, 2026, a true and correct copy of the foregoing was filed using the Clerk of Court's E-Filing Portal which will send a notice of electronic filing of the same to all Parties and counsel of record.

Respectfully submitted,

*/s/ Jonathan Etra*
Jonathan Etra, Esq.

# Exhibit A

**EXECUTION VERSION**

_____

## ASSET PURCHASE AGREEMENT

by and among

### HONORS HOLDINGS, LLC
(as Purchaser)

### CORE2000 LLC, LJAMES FITNESS, LLC, LJAMES KNOXVILLE LLC, PEGRAM2015, LLC & TYCMTJULIET, LLC
(as Sellers)

### ROBERT SCOT JAMES, ELIZABETH MCKNIGHT JAMES, JOSEPH D. PEGRAM & MARTINE MAHONEY
(as Seller Principals)

and

### ROBERT SCOT JAMES
(as Representative)

_____

Dated as of May 16, 2022

**TABLE OF CONTENTS**

Page

**ARTICLE I PURCHASE AND SALE** ..........................................................................................1

Section 1.1     Agreement to Purchase and Sell ...........................................................1
Section 1.2     Assets ...................................................................................................2
Section 1.3     Excluded Assets ...................................................................................2
Section 1.4     Liabilities .............................................................................................3
Section 1.5     Consideration .......................................................................................4
Section 1.6     Intentionally Omitted ..........................................................................4
Section 1.7     Intentionally Omitted ..........................................................................4
Section 1.8     Closing Date Statement........................................................................5
Section 1.9     Payment of Consideration ...................................................................5
Section 1.10    Adjustment to the Closing Date Payment ...........................................5
Section 1.11    Allocation of Consideration .................................................................6
Section 1.12    *Intentionally Omitted* ..........................................................................6
Section 1.13    Deferred Purchase Price Payment........................................................6
Section 1.14    Bearden Lease Payment…………………………………………………6
Section 1.15    Withholding .........................................................................................7

**ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ...............................8

Section 2.1     Organization and Power of the Sellers.................................................8
Section 2.2     Due Authorization; Enforceability........................................................8
Section 2.3     Capitalization .......................................................................................9
Section 2.4     No Conflict; Consents..........................................................................9
Section 2.5     Compliance With Laws........................................................................9
Section 2.6     Title to and Sufficiency of the Assets ..................................................9
Section 2.7     Licenses and Permits............................................................................9
Section 2.8     Financial Statements ...........................................................................10
Section 2.9     No Undisclosed Liabilities...................................................................10
Section 2.10    Change in Business ..............................................................................10
Section 2.11    Litigation.............................................................................................10
Section 2.12    Contracts; Franchise Agreements ........................................................10
Section 2.13    Tax Returns and Payments; Tax Liens .................................................11
Section 2.14    No Broker or Finder Fees.....................................................................11
Section 2.15    Environmental......................................................................................11
Section 2.16    Intellectual Property.............................................................................11
Section 2.17    Leased Real Property ...........................................................................13
Section 2.18    Employees; Employee Benefit Plans....................................................14
Section 2.19    Related Party Transactions...................................................................15
Section 2.20    Insurance Policies ................................................................................15
Section 2.21    Consumer Contracts and Consumer Law Protections...........................15
Section 2.22    PPP Loan Obligations ..........................................................................15

US-DOCS\118042221.9
*ACTIVE 55400592v1*

*4894-9459-6383 v.2 060071/00001, 1:59 PM, 05/13/2022*

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF REPRESENTATIVE**...................**15**

Section 3.1 Power and Authority ..................................................................................16
Section 3.2 Enforceability.............................................................................................16
Section 3.3 No Conflict; Consents ...............................................................................16
Section 3.4 No Broker or Finder; Fees ........................................................................16

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** .....................**16**

Section 4.1 Organization and Authority of Purchaser .................................................16
Section 4.2 Due Authorization; Enforceability.............................................................16
Section 4.3 No Conflict; Consents ...............................................................................17
Section 4.4 No Broker or Finder; Fees ........................................................................17
Section 4.5 Litigation and Claims................................................................................17

**ARTICLE V CERTAIN COVENANTS AND AGREEMENTS**...........................................................**17**

Section 5.1 Records.......................................................................................................17
Section 5.2 Vendors ......................................................................................................17
Section 5.3 Tax Matters ................................................................................................17
Section 5.4 Employees ..................................................................................................18
Section 5.5 Further Action; Access to Records ...........................................................19
Section 5.6 Public Announcements ..............................................................................19
Section 5.7 Non-Assignable Contracts .........................................................................19
Section 5.8 Misdirected Payments................................................................................19
Section 5.9 Confidential Information............................................................................20
Section 5.10 Release of Guaranties................................................................................20
Section 5.11 Release .......................................................................................................20

**ARTICLE VI CLOSING; CLOSING DELIVERABLES** ........................................................................**22**

Section 6.1 Closing .......................................................................................................22
Section 6.2 Deliveries by the Sellers and the Representative.......................................22
Section 6.3 Deliveries by the Purchaser........................................................................23

**ARTICLE VII INDEMNIFICATION**.......................................................................................................**24**

Section 7.1 Indemnification ..........................................................................................24
Section 7.2 Indemnification Procedure.........................................................................24
Section 7.3 Defense of Claims......................................................................................25
Section 7.4 Survival; Limits..........................................................................................26
Section 7.5 Exclusive Remedy......................................................................................27
Section 7.6 Adjustment to Consideration .....................................................................27

**ARTICLE VIII MISCELLANEOUS PROVISIONS**...............................................................................**27**

Section 8.1 Construction ...............................................................................................27
Section 8.2 Entire Agreement; Amendment; Waiver ...................................................28
Section 8.3 Counterparts; Copies..................................................................................28
Section 8.4 Expenses.....................................................................................................28
Section 8.5 Notices .......................................................................................................28

Section 8.6  Governing Law; Consent to Jurisdiction ....................................................29
Section 8.7  Waiver of Jury Trial..........................................................................................30
Section 8.8  Exhibits ...............................................................................................................30
Section 8.9  No Third-Party Beneficiary ..............................................................................30
Section 8.10  Assignment.........................................................................................................30
Section 8.11  Severability ........................................................................................................30
Section 8.12  No Recourse.......................................................................................................30
Section 8.13  Drafting..............................................................................................................31

## EXHIBITS

| | |
|---|---|
| Exhibit A | Defined Terms |
| Exhibit B | Locations |
| Exhibit C | *Intentionally Omitted.* |
| Exhibit D | Bill of Sale |
| Exhibit E | IP Assignment |
| Exhibit F | New Franchise Agreements |
| Exhibit G | New Area Representative Agreement |
| Exhibit H | *Intentionally Omitted.* |
| Exhibit I | Purchase Price Allocation Principles |
| Exhibit J | Deferred Purchase Price Payment |
| Exhibit K | Assignment and Assumption Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule I | Percentage Allocation Schedule |
| Schedule II | Net Working Capital |

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is dated as of May 16, 2022, by and among (a) **HONORS HOLDINGS, LLC**, a Georgia limited liability company (the "Purchaser"); (b) each of **LJAMES FITNESS, LLC**, a Tennessee limited liability company ("OTF Bearden"), **LJAMES KNOXVILLE LLC**, a Tennessee limited liability company ("OTF Farragut"), **PEGRAM2015, LLC**, a Mississippi limited liability company ("OTF Oxford"), **TYCMTJULIET, LLC**, a Tennessee limited liability company ("OTF Mt. Juliet"), and **CORE2000 LLC**, a Tennessee limited liability company ("Core2000" and, together with OTF Bearden, OTF Farragut, OTF Oxford and OTF Mt. Juliet, each, individually, a "Seller" and, collectively, the "Sellers"); (c) each of **ROBERT SCOT JAMES**, an individual ("S. James"), **ELIZABETH MCKNIGHT JAMES**, an individual ("E. James"), **JOSEPH D. PEGRAM**, an individual ("J. Pegram"), and **MARTINE MAHONEY**, an individual ("M. Mahoney" and, together with S. James, E. James and J. Pegram, each, individually, a "Seller Principal" and, collectively, the "Seller Principals"); and (d) **ROBERT SCOT JAMES**, in his capacity as the "*Representative*" hereunder (in such capacity, the "Representative"). Each of the Purchaser, the Seller Parties, and the Representative are sometimes referred to herein, individually, as a "Party" and, collectively, as the "Parties". Capitalized terms used, but not otherwise defined, in this Agreement shall have the respective meanings ascribed to such terms in Exhibit A attached hereto.

## RECITALS:

**WHEREAS**, the Sellers are in the business of operating a health and fitness training facility system specializing in trainer-supervised fitness regimens involving groups both in classes and in individual training under the "Orangetheory®" brand (the "Business") at the locations set forth on Exhibit B (the "Locations");

**WHEREAS**, the Sellers own all of the assets and properties used in connection with, necessary for, or used in the business and operations of the Business; and

**WHEREAS**, the Parties desire to enter into this Agreement pursuant to which the Purchaser desires to purchase from the Sellers, and the Sellers desire to sell, assign and transfer to the Purchaser, the Assets, and the Purchaser has agreed to assume the Assumed Liabilities, subject to the terms and conditions set forth in this Agreement (the "Acquisition").

## AGREEMENT:

**NOW THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants, agreements and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

Section 1.1     Agreement to Purchase and Sell.  Subject to the terms and conditions of this Agreement, on the Closing Date and as of the Effective Time, the Sellers shall, and hereby do, grant, sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser shall, and hereby does, purchase and acquire from the Sellers, free and clear of all Liens, other than Permitted Liens, all of the Sellers' right, title and interest in and to the Business and the Assets, and the Purchaser shall, and hereby does, assume the Assumed Liabilities.

Section 1.2     Assets.   The "Assets" means all of the assets, properties and rights of the Sellers held in connection with, necessary for, or used in the Business, in each case, of every kind or description, real, personal and mixed, tangible and intangible, wherever located, including, without limitation, the following assets, properties and rights of the Sellers held in connection with, necessary for, or used in the Business, as of the Effective Time (other than the Excluded Assets):

(a)     all fixed assets, equipment, furnishings, computer hardware, electronic devices, fixtures and other tangible personal property;

(b)     all inventory, including office and other supplies, and other inventory property stored on behalf of or in transit to any Seller;

(c)     all accounts receivable;

(d)     all rights under the Assumed Contracts;

(e)     all goodwill of the Business;

(f)     all Seller Intellectual Property, including telephone numbers and urls for the Locations;

(g)     all rights to causes of action, lawsuits, judgments, claims and demands of any nature arising out of or related to the Business or the Assets, whether arising by way of counterclaim or otherwise;

(h)     all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights in favor of a Seller arising out of or related to the Business or the Assets (other than those that relate to the Excluded Assets or Excluded Liabilities);

(i)     all rights of the Sellers in and to the Leased Real Property and under the Leases, including, without limitation, any Lease Deposits;

(j)     all deposits (other than the Lease Deposits), advances, pre-paid expenses paid by the Sellers, accrued rebates and credits, excluding utility deposits;

(k)     all rights, claims or causes of action of the Sellers arising under any insurance policies covering the Assets or the Business of any Seller(s), as well as any amount(s) payable thereunder due to damage or claims arising prior to the Closing Date;

(l)     all Permits, to the extent transferrable; and

(m)     copies of all information, files, correspondence, records, data, plans, reports, contracts and recorded knowledge, including customer, supplier, member, price and mailing lists, franchise related information, and all accounting or other books and records of the Sellers in whatever media retained or stored, including computer programs and disks (collectively, "Purchased Records").

Section 1.3     Excluded Assets.   The Assets will not include (and expressly exclude) the following assets, properties and rights of the Sellers (collectively, the "Excluded Assets"):

(a)     all Cash and Cash Equivalents;

(b)     all bank accounts owned, used or to which any Seller Party had access in connection with the operation and conduct of the Business, each of which is identified on Schedule 1.3(b) (each, individually, a "Seller Bank Account" and, collectively, the "Seller Bank Accounts");

(c)     formation documents, charters, certificates of formation, articles of incorporation, bylaws, operating agreements, limited liability company agreements, or minute and equity record books of the Sellers;

(d)     income tax returns and reports of the Sellers;

(e)     corporate seals, checkbooks and cancelled checks of the Sellers;

(f)     all rights, claims and causes of action relating to any Excluded Asset or Excluded Liability;

(g)     all refunds of any Tax of a Seller, including, but not limited to, any Employee Retention Credits to which any Seller is entitled or to which any Seller may become entitled as of, or subsequent to, the Closing with respect to any time period ending on or before the Effective Time;

(h)     all written communications, including emails, relating to the Excluded Assets, Excluded Liabilities and negotiations related to the Acquisition;

(i)     all rights of any Seller under this Agreement, and all other agreements executed and delivered by the Sellers in connection with the Transactions;

(j)     all rights of the Sellers under contracts or agreements that are not Assumed Contracts;

(k)     all Permits, to the extent not transferrable;

(l)     all Equity Interests of the Sellers and any of their Affiliates;

(m)     all property, casualty, and individual life insurance policies owned or obtained by any Seller on behalf of, or in connection with, the Business;

(n)     any vehicles;

(o)     any tangible and intangible assets, which are exclusively or primarily owned, licensed, leased or used in connection with the operation and conduct of any business(es) or franchise(s) other than the Business;

(p)     those assets (if any) set forth on Schedule 1.3(p).

Section 1.4     Liabilities.

(a)     Assumed Liabilities.  On the terms and subject to the conditions of the Agreement, as of the Effective Time, the Purchaser will assume only the Assumed Liabilities, to the extent not satisfied or extinguished as of the Effective Time.  The "Assumed Liabilities" means only (i) the obligations of the Sellers under the Assumed Contracts to the extent arising and accruing from and after the Effective Time and not relating to a breach or default by the Sellers prior to the Effective Time, and (ii) those trade accounts payable and accrued expenses of the Sellers, which are expressly reflected in the Closing Date Statement and constitute line items in the "*Working Capital*" calculation contemplated therein; provided, that this

clause (ii) shall not encompass (and expressly excludes) any liabilities for breach of contract, breach of warranty, torts, infringements, violations of law, charges, complaints, Actions, suits, proceedings, hearings, investigations, claims and demands, which directly or indirectly relate to, arose in connection with or constitute the result of any act, omission or circumstance existing or occurring as of, or prior to, the Effective Time.

(b)  Excluded Liabilities.  Except for the Assumed Liabilities, it is expressly understood and agreed that the Purchaser will not assume, and will not be liable for, any liabilities or obligations of the Seller Parties or the Business (collectively, the "Excluded Liabilities"), and the Seller Parties will retain responsibility for, and discharge when due, all liabilities and obligations of the Seller Parties or the Business accrued as of the Effective Time and all liabilities and obligations attributable to the Seller Parties' operations of the Business prior to the Effective Time, whether or not disclosed, including the Excluded Liabilities (but excluding the Assumed Liabilities). Specifically, and without limiting the generality of the foregoing, with the exception of the Assumed Liabilities, the Purchaser will not assume, and will not be liable for, any of the following liabilities or obligations: (i) any and all liabilities and obligations arising out of or relating to the Business or the Assets prior to the Effective Time (including, without limitation, Pre-Closing Member Chargebacks); (ii) any and all liabilities and obligations for Taxes, including relating to (A) any liability or obligation for the unpaid Taxes of the Seller Parties or the Representative or any other equityholder of a Seller with respect to any period, or (B) any Taxes imposed on the Assets or with respect to the Business prior to the Effective Time; (iii) any Indebtedness of the Seller Parties, the Representative, or any other equityholder of a Seller with respect to the Business; (iv)  any and all liabilities or obligations pertaining to an Excluded Asset; (v) any and all liabilities or obligations arising under or relating to any former operations of the Seller Parties or predecessors thereof that have been discontinued or disposed of prior to the Effective Time; (vi) any and all liabilities or obligations arising under or relating to any Seller Benefit Plan arising or accruing prior to the Effective Time or any Employment Agreements to which a Seller Party is a party; (vii) any and all liabilities or obligations for accrued vacation and other paid personal leave time arising and accruing prior to the Effective Time; (viii) any and all liabilities or obligations arising out of or relating to (A) claims made in pending or future suits, actions, investigations, or other legal, governmental or administrative proceedings, or (B) claims based on violations of Law, breach of contract, employment practices, or environmental, health and safety matters or any other actual or alleged failure of the Seller Parties or the Representative (or any other equityholder of a Seller) to perform any obligation, in each case arising out of, or relating to, (I) events that have occurred, (II) Services or Products rendered or sold or (III) the operation of the Sellers or the Business, in each case, prior to the Effective Time; (x) any Seller Transaction Expenses; (xi) any and all liabilities or obligations relating to any non-compliance by the Seller Parties with any bulk-sales laws; (xii) any unpaid sums due to, or accrued in favor of, the Franchisor or under any Franchise Agreement (other than transfer fees payable to the Franchisor in connection with the Transactions, which, for the avoidance of any doubt, shall be borne and paid by the Purchaser); (xiii) any management fees payable by any Seller Party to any Person; and (xiv) any and all liabilities or obligations arising out of claims, actions, litigation, or proceedings arising out of or relating to any of the foregoing, and all out-of-pocket costs and expenses incurred in connection therewith.

Section 1.5  Consideration.  The purchase price for the Assets is equal to the Closing Date Payment (as defined in Section 1.9 herein), *plus* the Deferred Purchase Price Payment Amount, *plus*, if, and solely to the extent payable pursuant to Section 1.14 hereinbelow, the Bearden Lease Payment Amount. In addition to the foregoing, as consideration for the Assets, the Purchaser will assume and discharge the Assumed Liabilities.

Section 1.6  [*Intentionally Omitted*].

Section 1.7  [*Intentionally Omitted*].

Section 1.8    Closing Date Statement.    Prior to the Closing Date, the Representative has delivered to the Purchaser a statement (the "Closing Date Statement"), signed by the Representative (on behalf and in the name of the Seller Parties), which sets forth the Sellers Parties' calculation of (a) the Closing Date Indebtedness, (b) Net Working Capital, (c) the Net Working Capital Deficit (if any), (d) the Net Working Capital Surplus (if any), (e) the Seller Transaction Expenses, and (f) the Closing Date Payment.

Section 1.9    Payment of Consideration. The "Closing Date Payment" means $3,500,000, *plus* the Working Capital Surplus (if any), *minus* the Working Capital Deficit (if any), *minus* the Closing Date Indebtedness, *minus* the Seller Transaction Expenses.  At the Closing, the Purchaser will pay to the Sellers to such accounts specified to the Purchaser by the Representative, the Closing Date Payment (which amounts are more particularly described in Schedule I attached hereto).  Upon such payment and delivery, the Purchaser will be fully released and discharged of any obligation with respect to the payment of the Closing Date Payment, subject to any adjustments owed pursuant to Section 1.10.  At the Closing on the Closing Date, the Purchaser shall pay (i) the Closing Date Indebtedness amount to the Lenders in accordance with payoff letters from each of the Lenders, and (ii) the Seller Transaction Expenses to the third parties to whom such expenses are owed in accordance with invoices from each recipient (as applicable). The Purchaser shall retain the Deferred Purchase Price Payment Amount at Closing and shall pay the Deferred Purchase Price Payment Amount to the Representative (for distribution to the applicable Sellers) subsequent to the Closing pursuant to, and in accordance with, Section 1.13 hereinbelow and Exhibit J attached hereto. The Purchaser shall retain the Bearden Lease Payment Amount at Closing and shall pay the Bearden Lease Payment Amount to the Representative (for distribution to OTF Bearden) subsequent to the Closing, if and solely to the extent required, pursuant to Section 1.14 hereinbelow.

Section 1.10    Adjustment to the Closing Date Payment.

(a)    No later than ninety (90) days following the Closing Date, the Purchaser will prepare and deliver to the Representative a statement (the "Preliminary Schedule"), which sets forth the Purchaser's calculation of (i) the Net Working Capital, (ii) the Net Working Capital Deficit or Net Working Capital Surplus (as the case may be), (iii) the Closing Date Indebtedness, (iv) the Seller Transaction Expenses, and (v) the Final Closing Payment.

(b)    The Representative will have thirty (30) days following receipt of the Preliminary Schedule during which to notify the Purchaser of any dispute of any item contained in the Preliminary Schedule, which notice must set forth in reasonable detail the basis for such dispute.

(c)    If the Representative does not notify the Purchaser of any such dispute within such thirty (30) day period, the Preliminary Schedule will be deemed to be the Final Schedule.

(d)    If the Representative notifies the Purchaser of any such dispute within such thirty (30) day period, the Purchaser and the Representative will cooperate in good faith to resolve any such dispute as promptly as possible, and upon such resolution, the Final Schedule will be prepared in accordance with the agreement of the Purchaser and the Representative.

(e)    If the Purchaser and the Representative are unable to resolve any dispute regarding the Preliminary Schedule within fifteen (15) days (or such longer period as the Purchaser and the Representative mutually agree in writing), following notice of such dispute, such dispute will be submitted to, and all issues having a bearing on such dispute will be resolved by a mutually agreed upon regional accounting firm (the "Arbitrator").  Such resolution will be final and binding on the Parties.  The Purchaser and the Representative will instruct the Arbitrator to make a final determination of the items set forth in the Preliminary Schedule, if any, based solely on the items that are in dispute and that, in resolving such items

in dispute and in determining the items set forth in the Preliminary Schedule, if any, the Arbitrator will not assign to any item in dispute a value that is (A) greater than the greatest value for such item assigned by the Purchaser, on the one hand, or the Representative, on the other hand, or (B) less than the smallest value for such item assigned by the Purchaser, on the one hand, or the Representative, on the other hand. The Purchaser and the Representative will instruct the Arbitrator to use commercially reasonable efforts to complete its work within thirty (30) days following its engagement. The fees, costs and expenses of the Arbitrator (1) will be borne by the Sellers in the proportion that the aggregate dollar amount of all such disputed items so submitted that are unsuccessfully disputed by the Representative (as finally determined by the Arbitrator) bears to the aggregate dollar amount of such items so submitted and (2) will be borne by the Purchaser in the proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by the Representative (as finally determined by the Arbitrator) bears to the aggregate dollar amount of all such items so submitted. If any disputes are submitted to the Arbitrator pursuant to this Section 1.10(e), the Final Schedule will be prepared in accordance with the decision of the Arbitrator and, to the extent applicable, the agreement of the Purchaser and the Representative.

(f)     If the Post-Closing Adjustment Amount, as finally determined in accordance with this Section 1.10 is a positive number, the Purchaser shall pay to the Representative (for distribution to the Sellers based on each Seller's pro rata portion of such amount) an amount equal to the Post-Closing Adjustment Amount. If the Post-Closing Adjustment Amount is a negative number, the Purchaser shall set-off such amount (in accordance with Exhibit J and this Section 1.10) as a dollar-for-dollar reduction to the aggregate amount outstanding under the Deferred Purchase Price Payment Amount. Within thirty (30) Business Days after acceptance of the Final Schedule (or, if there are items of dispute, then within five (5) Business Days after the resolution of such items of dispute), if (i) the Post-Closing Adjustment Amount is a positive number, the Purchaser shall pay to the Representative (for distribution to the Sellers based on each Seller's pro rata portion of such amount) the amount of the Post-Closing Adjustment Amount via wire transfer of immediately available funds to such account(s) as directed by the Representative, and (ii) the Post-Closing Adjustment Amount is a negative number, the Purchaser shall notify the Representative in writing (email being sufficient for purposes hereof) of the amount being setoff from the Deferred Purchase Price Payment Amount in accordance herewith.

Section 1.11     Allocation of Consideration. Within thirty (30) days after the determination of the Final Schedule pursuant to Section 1.10, the Representative and the Purchaser will work together to draft a schedule (the "Allocation Schedule") allocating the consideration payable under this Agreement (together with the Assumed Liabilities and any other items treated as consideration for the Assets for Tax purposes) among the Assets. The Allocation Schedule will be reasonable and will be prepared in accordance with Section 1060 of the Code and the Treasury Regulations thereunder and the principles set forth in Exhibit I. If the parties are unable to agree within thirty (30) days after the determination of the Final Schedule pursuant to Section 1.10, the Purchaser will deliver to the Representative a proposed Allocation Schedule for the Representative's approval. The Purchaser, the Seller Parties and the Representative agree to file their respective Internal Revenue Service Forms 8594, and all federal, state, and local Tax Returns, in accordance with the Allocation Schedule as finally determined under this Section 1.11. The Purchaser, the Seller Parties, and the Representative each agree to provide the other promptly with any other information required to complete the Allocation Schedule and their Forms 8594.

Section 1.12     [*Intentionally Omitted*].

Section 1.13     Deferred Purchase Price Payment. After the Closing, the Purchaser shall pay to the Representative (for distribution to the Sellers) the Deferred Purchase Price Payment Amount (the "Deferred Purchase Price Payment") on the terms and conditions set forth in Exhibit J attached hereto, which Exhibit J is incorporated herein and made a part hereof by reference.

Section 1.14    <u>Bearden Lease Payment</u>.

(a)    Each of the Purchaser, the Representative, the Sellers, and the Seller Principals hereby agrees and acknowledges that the term of the Bearden Studio Lease shall expire on February 28, 2023, unless, *inter alia*, Ground Tenant secures a food store tenant (an "<u>Anchor Tenant</u>") for the premises more commonly known as 140 N Forest Park Blvd, Knoxville, Tennessee 37919 (the "<u>Anchor Premises</u>") and validly exercises its option to extend the term of the Bearden Ground Lease on or prior to May 31, 2022. The Purchaser has informed each of the Sellers, the Representative and the Seller Principals of its potential desire to relocate the Bearden Studio to a location other than the Existing OTF Bearden Studio Address in the event that the Bearden Ground Lease is not so extended on or prior to such date. Accordingly, the Parties hereby agree as follows:

(i)    If as of May 31, 2022, Ground Tenant shall have secured an Anchor Tenant for the Anchor Premises and validly exercised its option to extend the term of the Bearden Ground Lease pursuant to, and in accordance with, the terms and conditions prescribed therein, the Purchaser hereby agrees to, and shall, pay (or cause to be paid) to the Representative (for distribution to OTF Bearden) the Bearden Lease Payment Amount. Solely to the extent required hereunder, the Purchaser shall pay the Bearden Lease Payment Amount pursuant to this <u>Section 1.14(a)(i)</u> on the Final Payment Date (as defined in <u>Exhibit J</u> attached hereto) via wire transfer of immediately available funds to an account designated by the Representative on or prior thereto.

(ii)    (A) If as of May 31, 2022, Ground Tenant shall have failed to secure an Anchor Tenant for the Anchor Premises and validly exercise its option to extend the term of the Bearden Ground Lease, but (B) following the Effective Time and on or prior to March 1, 2023, the Purchaser or any Affiliate(s) thereof shall have entered into a written agreement with the existing ground lessor under the Bearden Ground Lease or any other rightful lessor of the Existing OTF Bearden Studio Address regarding the Purchaser's or such Affiliate's continued use and occupancy of the Bearden Studio at the Existing OTF Bearden Studio Address for a term extending beyond March 1, 2023, the Purchaser hereby agrees to, and shall, pay (or cause to be paid) to the Representative (for distribution to OTF Bearden) the Bearden Lease Payment Amount. Solely to the extent required hereunder, the Purchaser shall pay the Bearden Lease Payment Amount pursuant to this <u>Section 1.14(a)(ii)</u> on the Final Payment Date via wire transfer of immediately available funds to an account designated by the Representative on or prior thereto.

(iii)    If (A) as of May 31, 2022, Ground Tenant shall have failed to secure an Anchor Tenant for the Anchor Premises and validly exercise its option to extend the term of the Bearden Ground Lease, and (B) on or prior to March 1, 2023, neither the Purchaser nor any Affiliate(s) thereof shall have, subsequent to the Effective Time, affirmatively elected to enter into a written agreement with the existing ground lessor under the Bearden Ground Lease or any other rightful lessor of the Existing OTF Bearden Studio Address regarding the Purchaser's or such Affiliate's continued use and occupancy of the Bearden Studio at the Existing OTF Bearden Studio Address for a term extending beyond March 1, 2023, the Purchaser shall retain the entire Bearden Lease Payment Amount and none of the Sellers, the Representative nor any Seller Principal shall have any right, claim or entitlement with respect thereto. For the avoidance of any doubt, it is the express intent of the Parties that the Bearden Lease Payment Amount shall not be or become owing or payable by the Purchaser under this Agreement, unless (and solely to the extent that) the Purchaser or an Affiliate thereof continues to lease and occupy the Bearden Studio at the Existing OTF Bearden Studio Address after March 1, 2023, pursuant to (1) Ground Tenant's securing an Anchor Tenant for the Anchor Premises and validly exercising its option to extend the term of the Bearden Ground Lease on or prior to May 31, 2022, or (2) the Purchaser's or its Affiliate's entry into a written agreement, dated as of a date subsequent to the Effective Time but prior to March 1, 2023, with the existing ground lessor under the Bearden Ground Lease or any other rightful lessor of the Existing OTF Bearden Studio Address regarding the Purchaser's or such Affiliate's continued use and occupancy of the Bearden

Studio at the Existing OTF Bearden Studio Address for a term extending beyond March 1, 2023.

(b)     Any payments made to any party pursuant to this <u>Section 1.14</u> shall be treated as an adjustment of the Purchase Price for all Tax purposes to the greatest extent permitted by law and shall be reported as such by the Parties on their Tax Returns.

(c)     Notwithstanding the foregoing, if prior to March 1, 2023, (i) the Purchaser undergoes a Change in Control (a "<u>Subsequent Purchaser Transaction</u>") and (ii) the conditions described in either <u>Section 1.14(a)(i)</u> or <u>Section 1.14(a)(ii)</u> shall have been satisfied as of the effective date of such Subsequent Purchaser Transaction, then the Purchaser shall pay (or cause to be paid) to the Representative (for distribution to OTF Bearden) the Bearden Lease Payment Amount on the closing date of the Subsequent Purchaser Transaction. If the conditions described in either <u>Section 1.14(a)(i)</u> or <u>Section 1.14(a)(ii)</u> shall have been satisfied subsequent to the consummation of a Subsequent Purchaser Transaction, but prior to March 1, 2023, then the Purchaser shall pay (or cause to be paid) to the Representative (for distribution to OTF Bearden) the Bearden Lease Payment Amount on the Final Payment Date.

(d)     The Parties acknowledge that none of the Sellers, the Seller Principals nor the Representative shall have any obligation to secure a new location for the Purchaser (or any Affiliate(s) of the Purchaser) in the event that the conditions prescribed under <u>Section 1.14(a)(i)</u> and <u>Section 1.14(a)(ii)</u> are not met on or before the dates specified therein.

Section 1.15     <u>Withholding</u>.  The Purchaser shall be entitled to deduct and withhold, or cause to be deducted and withheld, from any amounts otherwise payable pursuant to this Agreement to any Person such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the Treasury Regulations, or any provision of state, local or foreign Tax Law.  To the extent that amounts are so withheld and remitted to the appropriate Tax Authority, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

In order to induce the Purchaser to enter into this Agreement and consummate the Transactions, the Seller Parties, jointly and severally, represent and warrant to the Purchaser as follows:

Section 2.1     <u>Organization and Power of the Sellers</u>.  Each Seller is a limited liability company organized, validly existing and in good standing under the laws of the state of its formation. Each Seller has all necessary power and authority to own, lease and operate its properties and conduct the Business as it is presently being conducted, to execute and deliver this Agreement and such other documents to be delivered hereunder (collectively, the "<u>Transaction Documents</u>") to which such Seller is or will be a party and to consummate the transactions contemplated hereby and thereby (the "<u>Transactions</u>") and to perform each of its obligations under the Transaction Documents.  The Sellers have heretofore made available to the Purchaser correct and complete copies of their charter documents as currently in effect.  <u>Schedule 2.1</u> sets forth each jurisdiction where each Seller is qualified or registered as a foreign company to transact business. Each Seller is duly qualified or registered as a foreign company to transact business under the Laws of each jurisdiction where the character of its activities or the location of the properties owned or leased by it requires such qualification or registration, except where the failure of such qualification or registration would not reasonably be expected to be material to the Business.

Section 2.2     <u>Due Authorization; Enforceability</u>. The execution and delivery of this Agreement and each of the Transaction Documents by the Sellers and the performance by the Sellers of the obligations

hereunder and thereunder and the consummation of the Transactions have been duly and validly authorized by all necessary action of such Sellers' board of managers and the Representative and other equityholders of such Seller, as applicable. This Agreement and each of the Transaction Documents to which a Seller is a party constitutes, or will constitute, when executed and delivered, a valid and binding agreement of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws relating to or affecting the enforcement of creditors' rights and remedies generally and the availability of specific performance or other equitable remedies.

Section 2.3 <u>Capitalization</u>. <u>Schedule 2.3</u> accurately and completely sets forth the capital structure of each Seller by listing thereon the number or percentage of limited liability company membership interests or other equity interests of each such Seller which are authorized and which are issued and outstanding as of the Closing Date, and the record holders and the amounts of such limited liability company membership interests or other equity interests held by such record holders as of the Closing Date.

Section 2.4 <u>No Conflict; Consents</u>. Except as set forth on <u>Schedule 2.4</u>, neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of the organizational documents of any Seller, (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Person, (c) result in a default under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any Assumed Contract, Lease or Franchise Agreement, or (d) violate in any respect any Law, order, injunction or decree applicable to any Seller.

Section 2.5 <u>Compliance With Laws</u>. Each Seller is (and has been at all times during the past five (5) years) in compliance in all material respects with all applicable Laws. Except as set forth on <u>Schedule 2.5</u>, no Seller has received any notice of being in violation of, or under any investigation with respect to, any applicable Law, agency agreement, penalty or fine entered by any Governmental Entity relating to the operations of the Business or to any of the Assets.

Section 2.6 <u>Title to and Sufficiency of the Assets</u>.

(a) Except for the Franchise Agreements, each Seller has, and is transferring to the Purchaser at Closing, good, valid and marketable title to the Assets, free and clear of all Liens (other than Permitted Liens). Except as set forth on <u>Schedule 2.6</u>, there are no outstanding rights, options, agreements or commitments giving any Person any right to require such Seller or the Representative to sell, lease or otherwise dispose of any of the Assets.

(b) The Assets, together with the New Franchise Agreements and the New Area Representative Agreement, (i) constitute all of the assets, tangible and intangible of the Sellers (other than Cash and Cash Equivalents), necessary to operate the Business in the manner presently operated by the Sellers, and (ii) include all of the operating assets of the Sellers (other than Cash and Cash Equivalents) related to the Business. No part of the Business is operated through any entity other than a Seller. Taken as a whole, the Assets are adequate for the purposes for which such assets are currently used or are held for use and in good repair and operating condition in all material respects (subject to normal wear and tear) and, to the Representative's Knowledge there are no facts or conditions affecting the Assets which could, individually or in the aggregate, interfere with the use or operation thereof as currently used or operated, or their adequacy for such use. No Person other than a Seller owns any equipment or other material tangible personal property or assets situated on the premises of the Business, except for the leased items that are subject to personal property leases that are included in the Assets.

Section 2.7 <u>Licenses and Permits</u>. Each Seller has all material licenses, permits, regulatory approvals and all other similar authority necessary for the conduct of the Business ("<u>Permits</u>"). <u>Schedule</u>

2.7 lists all Permits held by the Sellers. All such Permits are in full force and effect and no Seller is in violation or default in any material respect under any of the Permits.

Section 2.8    Financial Statements. The Sellers have provided the Financial Statements to the Purchaser. The Financial Statements (i) have been prepared from the books and records of each Seller, which such books and records have been maintained on a basis consistent with the historical accounting methods of such Seller and such Seller's past practices, and (ii) fairly present in all material respects the financial condition of each Seller as of the dates indicated, and the results of its operations for the periods indicated, in each case, in accordance with the historical accounting methods of each Seller consistently applied and such Seller's past practices. The books and records of the Sellers are true, correct and complete in all material respects and have been maintained in accordance with sound business practices sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of the Financial Statements in all material respects.

Section 2.9    No Undisclosed Liabilities. Except as disclosed on Schedule 2.9, and for any Excluded Liabilities, no Seller has any liability or obligation (whether absolute, accrued, contingent or otherwise) required to be set forth on a balance sheet prepared in accordance with GAAP that is not fully reflected or reserved against in the latest Financial Statements, except for liabilities and obligations that have been incurred since the date of the latest Financial Statements in the Ordinary Course consistent with past practice and which are not, individually or in the aggregate, in excess of $10,000.

Section 2.10    Change in Business. Except as set forth on Schedule 2.10, since December 31, 2021: (a) the Sellers have conducted the Business in the Ordinary Course; (b) there has not been any Material Adverse Effect; (c) there has been no material damage, destruction, loss or casualty to property or assets of a Seller (including the Assets), whether or not covered by insurance; (d) there has been no change in the accounting methods or practices of the Sellers or any change in depreciation or amortization policies or rates theretofore adopted by the Sellers; and (e) the Sellers have not changed the terms upon which memberships are sold and/or offered in violation of any Franchise Agreements or applicable laws.

Section 2.11    Litigation. Except as set forth on Schedule 2.11, there are no claims, actions, suits, proceedings or investigations pending or, to the Representative's Knowledge, threatened before any Governmental Entity, brought by or against a Seller or any of their respective officers, directors, employees, agents or Affiliates involving, affecting or relating to the Assets, the Business or the Transactions, nor, to the Representative's Knowledge, does there exist any fact which would reasonably be expected to give rise to any such suit, proceeding, dispute or investigation. None of the items set forth on Schedule 2.11, if finally determined adversely, is reasonably likely, individually or in the aggregate, to have a material adverse effect upon the Business. None of the Sellers, nor any of the Assets, are subject to any order, writ, judgment, award, injunction or decree of any Governmental Entity involving, affecting or relating to the Assets, the Business or the Transactions.

Section 2.12    Contracts; Franchise Agreements.

(a)    Correct and complete copies of all Assumed Contracts have been made available to the Purchaser by the Sellers and are listed on Schedule 2.12(a). All of the Assumed Contracts are in full force and effect and are valid, binding and enforceable against the parties thereto in accordance with their terms. No breach, default or event of breach or default by a Seller, or, to the Representative's Knowledge, any other party thereto, exists under any of the Assumed Contracts and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a

material breach or material default under an Assumed Contract on the part of the applicable Seller, nor, to the Knowledge of the Representative, on the part of the other party thereto.

(b)        Schedule 2.12(b) sets forth a correct and complete list of all of the franchise, area representative or similar agreements to which a Seller is a party with the Franchisor and which are in effect as of immediately prior to the Closing, including any and all amendments thereto (collectively, the "Franchise Agreements"). Correct and complete copies of the Franchise Agreements, including all amendments and modifications thereto, have been made available to the Purchaser. None of the Seller Parties nor the Representative has received any written notice or other communication from the Franchisor regarding any actual or alleged breach, default or violation of the Franchise Agreements, or any other agreements or requirements therewith.

Section 2.13        Tax Returns and Payments; Tax Liens.  The Sellers (a) have duly and timely filed or caused to be filed all federal, state, local and foreign income and other material Tax Returns required to be filed with respect to the Assets or the Business, and all such Tax Returns are correct and complete in all material respects; (b) have paid all Taxes shown to be due and payable on such Tax Returns (which Taxes are all the Taxes due and payable under the laws and regulations pursuant to which such Tax Returns were filed); and (c) have sufficient resources to pay, outside of the Assets or the Business, and will timely pay, all Taxes accrued but not paid as of the Closing Date.  No deficiency in payment of any such Taxes for any period has been asserted by any Taxing Authority and remains unsettled.  All Taxes required to be withheld, collected or deposited by the Sellers have been timely withheld, collected or deposited and, to the extent required, have been paid to the relevant Tax Authorities.  There are no Tax liens on any of the Assets, other than liens for current Taxes which are not yet due or payable.

Section 2.14        No Broker or Finder Fees.  Except for MOK Capital Advisors, LLC, no Seller has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the Transactions.  The fees and expenses of MOK Capital Advisors, LLC are payable at Closing as part of the Seller Transaction Expenses.

Section 2.15        Environmental.  The Sellers have complied in all material respects with all Environmental Laws.  There is no litigation, investigation or other proceeding, ruling, order or citation pending, or to the Knowledge of the Representative, threatened or contemplated, by any Governmental Entity with respect to a Seller, the Business, the Leased Real Property, or the Assets, in each case relating to noncompliance with, or liabilities or obligations pursuant to, Environmental Laws.

Section 2.16        Intellectual Property.  In the case of (a) through (e) below, in each case other than with respect to Franchisor Intellectual Property:

(a)        Schedule 2.16(a) contains a correct and complete list of all of the following Intellectual Property: (i) all registered trademarks and pending trademark applications owned by a Seller, including, as appropriate, registration and application dates and numbers, or licensed to a Seller and used in the Business; (ii) all registered copyrights owned by a Seller or licensed to a Seller and used in the Business; (iii) all domain names owned by a Seller or licensed by a Seller and used in the Business; (iv) all registered patents and pending applications owned by a Seller or licensed to a Seller and used in the Business; and (v) all Seller Software.

(b)        Except as set forth on Schedule 2.16(b), (i) a Seller owns and possesses all right, title and interest in the Seller Intellectual Property, free and clear of all Liens (other than Permitted Liens); (ii) there are no judgments, consents, settlements, decrees, orders, injunctions, or rulings impairing the validity, use, ownership, or enforceability of any of the Seller Intellectual Property, or finding any of the Seller Intellectual Property to be invalid or unenforceable; (iii) there are no proceedings pending or, to the

Knowledge of the Representative, threatened, that challenge or impair the validity, use, ownership, or enforceability of the Seller Intellectual Property; and (iv) the maintenance fees necessary to maintain the Seller Intellectual Property through the Closing Date have been paid.

(c)        Except as set forth on Schedule 2.16(c): (i) neither the use of the Intellectual Property as currently used by the Sellers, nor the conduct of the Business as presently conducted, infringes, misappropriates or violates the rights of any Person in any Intellectual Property, (ii) no Seller has received any written notice in the past five (5) years alleging any of the same, and (iii) no actions or claims are threatened against a Seller alleging any of the same.

(d)        Except as set forth on Schedule 2.16(d): (i) there are no claims, proceedings, actions, suits, hearings, arbitrations, investigations, charges, complaints, demands or similar actions currently pending or threatened, or that have been brought in the past five (5) years, by a Seller against any Person alleging infringement, misappropriation, or violation of any Seller Intellectual Property; and (ii) to the Knowledge of the Representative, no Person is currently infringing upon, misappropriating, or otherwise violating any of the Seller Intellectual Property.

(e)        The Seller Intellectual Property includes all of the Intellectual Property used in the conduct of the Business, and there are no other items of Intellectual Property that are material to the Business.

(f)        The Sellers have information technology systems sufficient to operate the Business as it is currently conducted.  The Sellers' information technology systems are in sufficiently good working condition to effectively perform all information technology operations and include a sufficient number of license seats for all software, in each case as necessary for the operation of the Business.  The Sellers have taken reasonable steps and implemented reasonable procedures to ensure that the information technology systems used in connection with the operation of the Business are free from any disabling codes or instructions, timer, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software routines or hardware components that permit unauthorized access or the unauthorized disablement or erasure of such. There have been no unauthorized intrusions or breaches of security, failures, breakdowns, continued substandard performance, or other adverse events affecting the Sellers' information technology systems that have caused any substantial disruption of or interruption in or to the use of such information technology systems. The Sellers maintain commercially reasonable disaster recovery and business continuity plans, procedures, and facilities, act in compliance therewith.  The Sellers use commercially reasonable efforts to protect the confidentiality, integrity, and security of its information technology systems from any unauthorized use, access, interruption, or modification by third parties.

(g)        The Sellers have commercially reasonable safeguards in place to protect Personal Data in the Sellers' possession and used in the Business or control from unauthorized access by third persons.  No Person has made any illegal or unauthorized use of Personal Data that was collected by or on behalf of the Sellers and is in the possession or control of a Seller. To the Knowledge of the Representative, no Seller is currently under any investigation by any state, federal, or foreign jurisdiction regarding its protection, storage, use, and disclosure of Personal Data, nor has there been any unauthorized intrusions or breaches of security into the Sellers' systems.

(h)        The Sellers are, and at all times have been, in compliance with (i) Laws pertaining to (A) data security, cyber security, and e-commerce; and (B) the collection, storage, use, access, disclosure, processing, security, and transfer of Personal Data (referred to collectively in this Agreement as "Data Activities"); (ii) the PCI Security Standards Council's Payment Card Industry Data Security Standard and all other applicable rules and requirements by the PCI Security Standards Council, by any member thereof,

or by any entity that functions as a card brand, card association, payment processor, acquiring bank, merchant bank or issuing bank with respect to a payment card bearing the logo of a PCI Security Standards Council member, including the Payment Application Data Security Standards and all audit and filing requirements; and (iii) all contracts (or portions thereof) to which a Seller is a party that are applicable to Data Activities (collectively, "Privacy Agreements").

(i)     There is no pending, nor to the Knowledge of the Representative, has there ever been any, complaint, audit, proceeding, investigation, or claim against a Seller initiated by (i) any Person; (ii) the United States Federal Trade Commission, any state attorney general or similar state official; (iii) any other governmental entity, foreign or domestic; or any regulatory or self-regulatory entity alleging that any Data Activity of the Sellers or the Business: (A) is in violation of any Laws, (B) is in violation of any Privacy Agreements, (C) is in violation of the Sellers' policies pertaining to privacy and data security; or (D) otherwise constitutes an unfair, deceptive, or misleading trade practice.

Section 2.17    Leased Real Property.

(a)     The Sellers do not own, and have never owned, any real property used in connection with the Business.

(b)     Correct and complete copies of all leases and amendments thereto (individually, a "Lease" and collectively, the "Leases") with respect to each parcel of real property leased or sub-leased by a Seller (the "Leased Real Property") have been made available to the Purchaser and are set forth on Schedule 2.17(b). A Seller has a valid leasehold interest in the Leased Real Property and the Leases granting such interests are legal, valid, binding, enforceable and in full force and effect.

(c)     To the Knowledge of the Representative, no portion of the Leased Real Property, or any building or improvement located thereon, violates any Law, including those relating to zoning, building, land use, environmental, health and safety, fire, air, sanitation and noise control.  Except for the Permitted Liens, no Leased Real Property is subject to (i) any governmental decree or order of any Governmental Entity or, to the Knowledge of the Representative, threatened or proposed order, or (ii) any rights of way, building use restrictions, exceptions, variances, reservations or limitations that affect the Business.

(d)     Except as set forth on Schedule 2.17(d), the improvements and fixtures on the Leased Real Property are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, are adequate and suitable for the purposes for which they are presently being used.  To the Knowledge of the Representative, there is no condemnation, expropriation or similar proceeding pending or threatened against any of the Leased Real Property or any improvement thereon. The Leased Real Property constitutes all of the real property utilized by the Sellers with respect to the Business.

(e)     The Leases are in full force and effect and there are no written or oral promises, agreements, undertakings, or commitments between a Seller and the lessors thereunder, except as disclosed in the Leases.  There are no amendments or modifications to the Leases that have not been provided to the Purchaser in writing.  No event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a material breach or material default under a Lease on the part of the applicable Seller, nor, to the Knowledge of the Representative, on the part of the other party thereto. No security deposit or portion thereof deposited with respect to a Lease has been applied in respect of a breach or default thereunder which has not been replenished to the extent required under such Lease.  No rental, lease or other similar commissions are payable by a Seller with respect to the Leases.  No Seller has subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property (or

any portion thereof) that is the subject matter of such Lease and no Seller has collaterally assigned or granted any other security interest in such Leased Real Property or any interest therein.

Section 2.18    Employees; Employee Benefit Plans.

(a)    Schedule 2.18(a) contains a correct and complete list of all of the employees (whether full-time, part-time or otherwise) and independent contractors of the Sellers (the "Business Employees"), specifying their position, status as exempt or non-exempt from overtime under the FLSA, annual salary, hourly wages, date of hire, work location, start date, length of service, employee benefit coverages selected, consulting or other independent contractor fees, other benefits provided to each of them, respectively.

(b)    Except as set forth on Schedule 2.18(b), no Seller is a party to or bound by any Employment Agreement with respect to any Business Employee. The Sellers have not received a claim from any Governmental Entity, Business Employee or any other independent contractor of a Seller to the effect that a Seller has improperly classified as an independent contractor any person named on Schedule 2.18(a) and no basis for such a claim exists. The Sellers have not received a notification from the United States Department of Homeland Security, the Social Security Administration or any other Governmental Entity that the social security number it has for one or more of the Business Employees does not match the records of such Governmental Entity. The Sellers have not received a claim from any Governmental Entity to the effect that a Seller has improperly classified any of the Business Employees as exempt or non-exempt from overtime under the FLSA and no basis for such a claim exists. No Seller has received any written notice of any inspection or investigation relating to its alleged noncompliance with or violation of Immigration Reform and Control Act of 1986 ("IRCA"), nor has it been warned, fined or otherwise penalized by reason of any failure to comply with IRCA, nor does the basis for such claim exist. As of the date hereof, all Business Employees are citizens of the United States or permanent residents of the United States, and the Sellers have established procedures, controls, processes and policies reasonably designed to comply with IRCA. Except as set forth on Schedule 2.18(b), the Sellers have not made any verbal commitments to any officer, employee or former employee, consultant or independent contractor with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions contemplated by this Agreement or otherwise. All of the Business Employees are active on the date hereof.

(c)    None of the Business Employees are represented by a labor organization or group that was either voluntarily recognized or certified by any labor relations board (including the United States National Labor Relations Board) or by any other Governmental Entity. None of the Business Employees are a signatory to a collective bargaining agreement with any trade union, or any labor organization or group, in each case with respect to their employment with any Seller. No labor dispute, walk out, strike, hand billing, picketing, or work stoppage involving the Business Employees has occurred, is in progress or, to the Knowledge of the Representative, has been threatened in the past five (5) years.

(d)    Except as disclosed in Schedule 2.18(d), there are no outstanding obligations of the Sellers relating to severance or termination pay to any employees of the Seller.

(e)    Schedule 2.18(e) contains a correct and complete list of each Seller Benefit Plan. None of the Sellers nor any ERISA Affiliate has any liability under, or is subject to, any lien, restriction or other adverse right relating to, any Seller Benefit Plan or ERISA Affiliate Plan (i) that would affect the Purchaser's right, title and interest in or the Purchaser's right to use or enjoy (free and clear of any Liens) any Assets, or (ii) that would result in the assumption by or imposition on the Purchaser or any of its Affiliates or successors of any liability other than liabilities expressly included as Assumed Liabilities. The Sellers have complied in all material respects with ERISA Title I, Subtitle B, Part 6 and Code section 4980B

("COBRA"). Each Seller Benefit Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and no event has occurred and no condition exists which could reasonably be expected to result in the revocation of any such determination letter or opinion letter. No litigation or administrative or other proceeding, audit, examination or investigation is pending or asserted, or, to the Knowledge of the Representative, threatened, anticipated or expected to be asserted with respect to any Seller Benefit Plan or the assets of any such plan (other than routine claims for benefits arising in the ordinary course). No Seller or any of their respective Affiliates has filed, or is considering filing, an application under the IRS Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program with respect to any Seller Benefit Plan. With respect to each Business Employee, full payment has been made of all amounts which a Seller is required under applicable law or under any Seller Benefit Plan or any agreement relating to any Seller Benefit Plan to have paid on behalf of such Business Employee as contributions or premiums thereunder as of the last day of the most recent fiscal year of such Seller Benefit Plan ended prior to the date hereof or have been timely reflected on the most recent Financial Statement filed prior to the date hereof or accrued in the account records of the Sellers.

Section 2.19    Related Party Transactions. Except as set forth in Schedule 2.19, (a) no employee or any equityholder of a Seller, (b) no Person with whom any such employee or equityholder of a Seller has any direct or indirect relation by blood, marriage or adoption or owns any beneficial interest or (c) any Affiliate of any of the foregoing or any current or former Affiliate of a Seller has any interest in:  (i) any contract, arrangement or understanding with, or relating to, a Seller, the Business, the Leased Real Property, the Assets or the Assumed Liabilities, (ii) any loan, arrangement, understanding, agreement or contract for or relating to a Seller, the Business or the Assets or (iii) any property (real, personal or mixed), tangible or intangible, used or currently intended to be used by a Seller in the Business.

Section 2.20    Insurance Policies.   Schedule 2.20 sets forth a list of all policies of insurance owned or held by a Seller.  Correct and complete copies of each of the insurance policies have been made available to the Purchaser.  The Sellers maintain insurance for the Business and the Assets consistent with past practices and in types and amounts as set forth on Schedule 2.20.  All insurance policies and bonds with respect to the Business and Assets are in full force and effect and the Sellers have not reached or exceeded policy limits for any insurance policy in effect at any time during the past five (5) years.

Section 2.21    Consumer Contracts and Consumer Law Protections. The Sellers have complied in all material respects with (i) all obligations arising from contracts between the Sellers and members/consumers, and (ii) all applicable Laws pertaining to consumer protection, including all state and federal consumer protection statutes or regulations, automatic renewal laws, and statutes or regulations governing health or fitness clubs or studios.

Section 2.22    PPP Loan Obligations. Sellers have provided a true, correct and complete list of all PPP Loans and all PPP Applications associated therewith. A true, correct and complete list of the PPP Loans is attached as Schedule 2.22.  All information provided and certifications made in connection with the PPP Applications were true, accurate and complete. Each PPP Application satisfied the requirements of all Laws applicable to the PPP Loan Obligations or such PPP Application. As of the Effective Time, each PPP Loan has been forgiven, in full, pursuant to, and in accordance with, applicable Law(s).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER PRINCIPALS & REPRESENTATIVE

In order to induce the Purchaser to enter into this Agreement and consummate the Transactions,

the Seller Principals and the Representative represent and warrant to the Purchaser as follows:

Section 3.1     Power and Authority.  Each Seller Principal and the Representative has all necessary power and authority to execute and deliver the Transaction Documents to which such Seller Principal and the Representative is or will be a party and to consummate the Transactions and to perform each of its obligations under the Transaction Documents. The Transaction Documents have been duly executed and delivered, to the extent any Seller Principal or the Representative is party thereto, by such Seller Principal and the Representative.

Section 3.2     Enforceability.  The execution and delivery of each of the Transaction Documents by the Seller Principals and the Representative and the performance by the Seller Principals and the Representative of their obligations hereunder and thereunder and the consummation of the Transactions have been duly and validly authorized by all by all necessary action of the Seller Principals and the Representative.  This Agreement and each of the Transaction Documents to which the Seller Principals and the Representative are parties constitute, or will constitute, when executed and delivered, a valid and binding agreement of the Seller Principals and the Representative enforceable against the Seller Principals and the Representative in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws relating to or affecting the enforcement of creditors' rights and remedies generally and the availability of specific performance or other equitable remedies.

Section 3.3     No Conflict; Consents.  The execution and delivery by the Seller Principals and the Representative of the Transaction Documents and the consummation by the Seller Principals and the Representative of the Transactions do not and will not: (a) violate or result in the breach of the terms or provisions of any instrument, document or agreement to which the Seller Principals and/or the Representative are a party or by which the Seller Principals and/or the Representative or the Assets are bound, or be in conflict with, result in a breach of, constitute (upon the giving of notice or lapse of time or both) a default under or give rise to a right of termination under any such instrument, document or agreement or result in the creation of any Lien upon any of the Assets; or (b) violate any Law applicable to the Seller Principals and/or the Representative or relating to the Business.

Section 3.4     No Broker or Finder; Fees.  Except for MOK Capital Advisors, LLC, none of the Seller Principals nor the Representative has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the Transactions.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

In order to induce the Seller Parties and the Representative to enter into this Agreement and consummate the Transactions, the Purchaser represents and warrants to the Sellers and the Representative as follows:

Section 4.1     Organization and Authority of Purchaser.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Georgia.  The Purchaser has all necessary power and authority to execute and deliver the Transaction Documents to which it is or will be a party and to consummate the Transactions and to perform each of its obligations under the Transaction Documents.

Section 4.2     Due Authorization; Enforceability.  The execution and delivery of this Agreement and each of the other Transaction Documents by the Purchaser and the performance by the Purchaser of the obligations hereunder and thereunder and the consummation of the Transactions have been duly and validly

authorized by all by all necessary action of the Purchaser. This Agreement and each of the other Transaction Documents to which the Purchaser is a party constitutes, or will constitute, when executed and delivered, a valid and binding agreement of the Purchaser, as applicable, enforceable against the Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws relating to or affecting the enforcement of creditors' rights and remedies generally and the availability of specific performance or other equitable remedies.

Section 4.3    No Conflict; Consents.    The execution and delivery by the Purchaser of the Transaction Documents to which the Purchaser is a party and the consummation by the Purchaser of the Transactions do not and will not: (a) violate or result in a breach of any of the terms or provisions of any instrument, document or agreement to which the Purchaser is a party or by which the Purchaser is bound; (b) violate any order, writ, injunction, decree, judgment, ruling, law, rule or regulation of any federal, state, county, municipal or foreign court or governmental authority applicable to the Purchaser; or (c) violate or conflict with any provision of the organizational or other governing documents of the Purchaser.

Section 4.4    No Broker or Finder; Fees.    The Purchaser has not employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the Transactions.

Section 4.5    Litigation and Claims.    There is no litigation or proceeding, in law or in equity, pending or, to the Purchaser's knowledge, threatened against the Purchaser or its officers or directors: (a) with respect to or affecting the Purchaser's ability to perform its obligations hereunder, or (b) that are reasonably likely to prohibit, restrict or delay the performance of the Transactions by the Purchaser. To Purchaser's knowledge, no event has occurred and no claim, dispute or other condition or circumstance exists, that would reasonably be expected to, give rise to or serve as a basis for the commencement of any such litigation or proceeding.

**ARTICLE V**
**CERTAIN COVENANTS AND AGREEMENTS**

Section 5.1    Records.    The Sellers and the Purchaser hereby agree to preserve for a period of seven (7) years following the Closing, all records in their respective possession relating to any of the Assets, the Business or the Transactions.  If any of the Parties hereto need access to such records in the possession of any other Party hereto for the preparation of federal and state tax returns, each such Party will allow representatives of each other Party reasonable access to such records for the purpose of obtaining information for use as aforesaid, and will permit such other Party to make extracts and copies thereof as may be reasonably necessary or convenient and, if required for such purpose, to have access to and possession of original documents.  If the Purchaser desires access to the Purchased Records, the Sellers will allow representatives of the Purchaser reasonable access to such Purchased Records and will permit representatives of the Purchaser to make extracts and copies thereof as may be reasonably necessary or convenient and, if required, to have access to and possession of original documents.

Section 5.2    Vendors. With the exception of the Assumed Liabilities, the Sellers will remain liable for any vendor invoices subsequently received by the Sellers or the Purchaser relating to the ownership and/or operation of any of the Assets prior to the Effective Time, and the Purchaser will have no liability whatsoever for any invoices from vendors relating to the ownership and/or operation of any of the Assets prior to the Effective Time.  The Sellers will have no liability whatsoever for any invoices from vendors relating to the ownership and/or operation of any of the Assets from and after the Effective Time.

Section 5.3    Tax Matters.

(a)     Sellers are responsible for and will pay when due all Taxes levied with respect to the Business and Assets attributable to the Pre-Closing Tax Period.  All Property Taxes levied with respect to the Assets for the Straddle Period shall be apportioned between the Purchaser and Seller based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.  Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and the Purchaser will be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.

(b)     Any transfer, sales, use, stamp, registration or other Taxes or recording fees payable as a result of the Transactions or any other action contemplated by this Agreement (other than any federal, state, local or foreign Taxes measured by or based upon income or gains imposed upon the Purchaser) ("Transfer Taxes") will be borne and paid by the Sellers.  The Parties will cooperate in the preparation, execution and filing of all returns, questionnaires, applications or other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the Transactions contemplated hereby that are required or permitted to be filed on or before the Closing.

(c)     The Purchaser, on the one hand, and the Seller Parties and the Representative, on the other hand, will cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Agreement and any audit, litigation or other proceeding with respect to Taxes (a "Tax Contest").  Such cooperation will include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such Tax Contest and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided under this Agreement.

Section 5.4     Employees.

(a)     The Purchaser may offer employment to such Business Employees as the Purchaser may choose in its sole discretion. Individuals who accept employment with the Purchaser will be referred to herein as "Hired Employees", and the employment of such Hired Employees will be at-will, unless the Purchaser otherwise enters into written employment agreements with one or more of such Hired Employees (in the Purchaser's sole discretion).

(b)     Effective immediately prior to the Closing, the Sellers will (i) terminate the employment of all of the Hired Employees, and (ii) pay out to each Hired Employee all unused vacation and other paid personal leave time accrued by such Hired Employee and the employer portion of any Taxes in connection therewith.

(c)     The Sellers will be responsible for compliance with COBRA, including the provision of continuation coverage with respect to all employees of the Sellers and their qualified beneficiaries for whom a qualifying event occurs at or prior to the Effective Time, and all current and former employees of the Sellers and their Affiliates and their qualified beneficiaries, who are not Hired Employees or their qualified beneficiaries, for whom a qualifying event occurs at any time.  The Purchaser will be responsible for compliance with COBRA, including the provision of continuation coverage with respect to all Hired Employees and their qualified beneficiaries for whom a qualifying event occurs after the Effective Time.  The terms "continuation coverage," "qualified beneficiaries," and "qualifying event" are used herein with the meanings ascribed to them in COBRA. The Sellers will also be responsible for any and all severance obligations to employees of the Sellers.

Section 5.5    Further Action; Access to Records.  Each of the Parties will take such actions, do all things necessary, and execute such documents, certificates, instruments and other papers as may be reasonably required or desirable to carry out the provisions hereof and consummate the Transactions.

Section 5.6    Public Announcements.  None of the Parties nor their Affiliates may issue press releases or otherwise make public statements with respect to this Agreement or the Acquisition without the prior written consent of the other party (which consent will not be unreasonably withheld); provided, that any such press releases and public statements may not contain the financial terms of this Agreement or any financial information of a Party without the written consent of both Parties, which may be withheld in a Party's sole discretion. The foregoing will not restrict or prohibit any of the Parties hereto from making any release or announcement required by applicable Law (in which case, the Party required to make the release or announcement will allow the other Parties hereto reasonable time to comment on or seek a protective order with respect to such release or announcement in advance of such issuance), and any Party or any Party's Affiliates who is an investment fund may disclose in confidence the general terms of the transactions contemplated hereunder and this Agreement to its Affiliates and any current investor in such Party's fund(s) in connection with fundraising, marketing, informational or reporting activities.

Section 5.7    Non-Assignable Contracts.  The Seller Parties will, during the remaining term of each Non-Assignable Contract, use commercially reasonable efforts to (a) obtain the consent of the applicable third party, (b) make the benefit of each such Non-Assignable Contracts available to the Purchaser or any designee(s) thereof following the Closing, and (c) enforce following the Closing, at the request, expense and for the account of the Purchaser, any right of the Sellers arising from such Non-Assignable Contracts against the other party or parties thereto (including the right to elect or terminate any such Non-Assignable Contract in accordance with the terms thereof).  The Seller Parties will not take any action or suffer any omission that would limit or restrict or terminate the benefits to the Purchaser of any such Non-Assignable Contract.  With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to the Purchaser is obtained following the Closing, the Sellers will transfer such Non-Assignable Contract to the Purchaser (or its designee (as applicable)) by execution and delivery of an instrument of conveyance reasonably satisfactory to the Purchaser promptly following receipt of such approval or consent.

Section 5.8    Misdirected Payments; Transition Period.

(a)    With the exception of any payment(s) or amount(s) properly incorporated and accounted for in the calculation of the Post-Closing Adjustment Amount pursuant to Section 1.10 hereinabove, each of the Purchaser, the Seller Parties and the Representative hereby agrees that: (i) if the Seller Parties or any of their Affiliates receive any payment related to the Business or any Asset after the Effective Time (collectively, the "Purchaser Misdirected Funds"), the Seller Parties shall promptly remit (or cause to be promptly remitted) such Purchaser Misdirected Funds to the Purchaser; and (ii)  if the Purchaser or any Affiliate of the Purchaser receives any payment related to any Excluded Asset after the Effective Time, the Purchaser shall promptly remit (or cause to be promptly remitted) such funds to the Representative (for distribution to the appropriate Seller Party).

(b)    Without in any way limiting or detracting from the generality of Section 5.8(a) hereinabove, during the period commencing at the Effective Time and ending on the three (3) month anniversary of the Closing Date (the "Transition Period"):

(i)    each Seller shall deliver to the Purchaser a statement showing all Purchaser Misdirected Funds received by such Seller during the Transition Period; and

(ii)    the Sellers shall provide (or caused to be provided) to the Purchaser read-

only access to each of the Seller Bank Accounts.

Section 5.9    Confidential Information.  The Seller Parties and the Representative will hold in confidence at all times after the Closing all Confidential Information, and will not disclose, publish or make use of Confidential Information at any time after the Closing without the prior written consent of the Purchaser (except to the extent (a) disclosure of such information is required by a Governmental Entity with competent jurisdiction under applicable law, (b) such information becomes available to such Person after the Closing Date from a source (which is not known by such Person to have made the disclosure in violation of any confidentiality obligations), or (c) such information becomes publicly known except through the actions or inactions of any such Person in violation of this Section 5.9).  If the Seller Parties or the Representative are required to disclose Confidential Information, they will (to the extent permissible under applicable Laws) provide the Purchaser with prompt notice and, if requested by the Purchaser, reasonably cooperate with the Purchaser in obtaining a protective order (at the Purchaser's sole expense).

Section 5.10    Release of Guaranties.  If the Seller Parties have delivered personal guarantees under any Leases (each, individually, a "Lease Guaranty" and, collectively, the "Lease Guarantees"), the Purchaser shall use commercially reasonable efforts to assist such Seller Parties in obtaining releases for the Seller Parties under such Lease Guarantees. To the extent that, following the Closing, any Seller Party receives notice of an Action or is otherwise required to defend against an assertion that any payment is due by such Seller Party under any such Lease Guaranty relating to an act, occurrence or omission first arising subsequent to the Closing, the Purchaser shall indemnify such Seller Party for all documented out of pocket expenses, liabilities and losses (including, without limitation, attorneys' fees, judgments, fines, excise taxes or penalties) reasonably incurred by such Seller Party relating to the applicable Lease Guaranty.

Section 5.11    Release.

(a)    As a material inducement to the Purchaser's willingness to enter into and perform this Agreement and to purchase the Assets and assume the Assumed Liabilities pursuant hereto for the consideration to be paid or provided to the Sellers in connection herewith, each Seller Party and the Representative, on behalf of himself, herself and itself (as the case may be), and each of his, her or its directors, officers, employees, members, managers, Affiliates, representatives, heirs, successors and assigns, hereby releases and forever discharges the Purchaser, its Affiliates and each of their individual, joint or mutual, past, present and future members, managers, directors, officers, representatives, Affiliates, stockholders, controlling Persons, subsidiaries, successors and assigns (each, individually, a "Releasee" and, collectively, the "Releasees") from any and all actions, orders, obligations, contracts, agreements, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which any such Seller Party or the Representative or any of his, her or its (as the case may be) respective representatives now has, has ever had or may hereafter have against the respective Releasees arising out of, relating to, or resulting from the ownership or operation of the Business, the Assets, the Excluded Assets, the Excluded Liabilities, or the Transactions; provided, however, that nothing contained herein shall operate to release any obligation of the Purchaser arising under this Agreement and the other Transaction Documents.

(b)    Each Seller Party and the Representative hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any Action of any kind against any Releasee, based upon any matter purported to be released hereby.

(c)    Without in any way limiting any of the rights and remedies otherwise available to any Releasee, and notwithstanding anything in this Agreement to the contrary, each of the Seller Parties and the Representative shall, jointly and severally, indemnify and hold harmless each Releasee from and

against all loss, liability, claim, damage (including incidental and consequential damages) or expense (including costs of investigation and defense and reasonable attorney's fees) whether or not involving third party claims, arising directly or indirectly from or in connection with the assertion by or on behalf of the Seller Parties or the Representative of any claim or other matter purported to be released pursuant to this Section 5.11.

(d)     In the event that any provision of this Section 5.11 is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Section 5.11 will remain in full force and effect. Any provision of this Section 5.11 held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 5.12     Non-Competition, Non-Solicitation & Non-Disparagement.

(a)     Each of the Seller Parties and the Representative hereby understands, acknowledges and agrees that: (i) the Sellers are engaged in the Business through the operation of the Locations pursuant to the Franchise Agreements; (ii) each of the Seller Parties and the Representative will, directly or indirectly (as the case may be), receive significant consideration in connection with the Closing of the Transactions; (iii) as a direct or indirect (as applicable) owner of the Sellers, each of the Seller Parties and the Representative has obtained and will continue to obtain extensive and valuable knowledge, technical expertise, and confidential and proprietary information and data concerning the Business; and (iv) the Seller Parties' and the Representative's entry into the agreements set forth in this Section 5.12 is essential to preserve the value of the Business and the Assets of the Sellers.

(b)     During the period beginning on the date hereof and ending on the two (2) year anniversary Closing Date (the "Term"), none of the Seller Parties nor the Representative shall, anywhere in the Territory, for himself, herself or itself (as the case may be), or through or on behalf of any other Person, whether as an officer, director, member, manager, employee, seller, partner, consultant, advisor, creditor or otherwise, as applicable:

(i)     (A)     engage, participate or acquire any financial or beneficial interest in (which, for the avoidance of doubt, will include employment with or engagement as an independent contractor for), any Competitive Business; provided, however, that nothing in this Section 5.12(b)(i)(A) shall prevent any Seller Party or the Representative from owning as a passive investment less than five percent (5%) of the issued and outstanding shares of the capital stock (or other Equity Interests) of a publicly-held company engaged in a Competitive Business, so long as such Seller Party or the Representative, as applicable, is not otherwise directly or indirectly associated with, or involved in the operation, conduct and decision-making processes of, such company or any Affiliate(s) thereof; or (B) take any action intended to, or that would reasonably be expected to, negatively affect any commercial relationship related to the Business or the Assets with any other Person; or

(ii)     (A)     encourage, induce, attempt to induce, solicit or attempt to solicit any individual who is an employee of any Seller as of the date hereof, or becomes an employee of the Purchaser or any Affiliate(s) thereof at any time during the Term (each, a "Specified Employee") to leave his or her employment with the Purchaser or such Affiliate(s) (it being understood and agreed that the placement of general advertisements, or the initiation of a search by an executive recruiting firm, that are not targeted directly or indirectly towards a Specified Employee shall not be deemed to be a breach of this Section 5.12(b)(ii)), or (B) hire or attempt to hire any Specified Employee; or

(iii)     encourage, induce, attempt to induce, solicit or attempt to solicit, any customer, distributor, vendor, marketer or sponsor of the Purchaser or any Affiliate(s) thereof to cease its

customer, distributor, vendor, marketer or sponsor relationship with the Purchaser or any such Affiliate(s), as the case may be, with respect to the Business.

(c) During the Term, none of the Seller Parties nor the Representative shall publicly or privately disparage or defame the Purchaser or any of its Affiliates, or any product or service of the Purchaser or its Affiliates, or any past or present employee, officer or manager of the Purchaser or its Affiliates. Similarly, during the Term, the Purchaser and its Affiliates shall not publicly or privately disparage or defame any Seller Party or any of Affiliate(s) thereof. This Section 5.12(c) shall not be construed or applied so as to limit any Person from giving truthful testimony in any lawsuit, action or investigation by any Governmental Entity.

## ARTICLE VI
## CLOSING; CLOSING DELIVERABLES

Section 6.1 Closing. The closing of the Acquisition (the "Closing") will occur contemporaneously with the execution and delivery of this Agreement. The date of the Closing is referred to herein as the "Closing Date". The effective time of the Closing (the "Effective Time") will be as of 12:01 a.m. in Atlanta, Georgia on the Closing Date.

Section 6.2 Deliveries by the Seller Parties and the Representative. Contemporaneously with the execution and delivery of this Agreement, the Seller Parties and the Representative shall deliver or cause to be delivered to the Purchaser (unless previously delivered) the following:

(a) a Bill of Sale, substantially in the form attached hereto as Exhibit D (the "Bill of Sale"), duly executed by each Seller, and such other deeds of conveyance, assurances, transfers, assignments instruments as may be reasonably required by the Purchaser to complete the Transactions;

(b) written consent of the Franchisor to the Transactions, in a form reasonably satisfactory to the Parties (which such consent must be in full force and effect on and immediately following the Closing);

(c) written consents and notices (or waivers with respect thereto), in a form reasonably satisfactory to the Purchaser, as described on Schedule 2.4 and Schedule 3.3 (other than the Leases) (which such consents, notices and waivers must be in full force and effect on and immediately following the Closing);

(d) with respect to each Lease, written consent of each landlord in form and substance reasonably satisfactory to the Purchaser;

(e) evidence reasonably satisfactory to the Purchaser of the termination of each existing Franchise Agreement and the existing Area Representative Agreement;

(f) new franchise agreements, in the form attached hereto as Exhibit F (the "New Franchise Agreements"), with respect to the operation of the Business at each Location, duly executed by the Franchisor, and a new Area Representative Agreement in the form attached hereto as Exhibit G (the "New Area Representative Agreement");

(g) waiver and releases agreements, in form and substance reasonably satisfactory to the Purchaser and duly executed by each of S. James and M. Mahoney, waiving and releasing any claims, rights or entitlements of such Persons to any accrued, but unpaid, compensation for services rendered to any Seller prior to the Closing Date;

(h)  a properly completed and duly executed IRS Form W-9 from each Seller;

(i)  evidence reasonably satisfactory to the Purchaser that all Liens on or affecting any of the Assets have been released or will be released concurrently with the Closing;

(j)  an affidavit duly executed by each Seller sufficient to satisfy the withholding and other requirements of Sections 1445 of the Code, and any other similar federal, state or local taxation requirements, to the extent applicable;

(k)  an Assignment and Assumption of Intellectual Property Agreement, substantially in the form attached hereto and incorporated herein by reference as Exhibit E (the "IP Assignment"), duly executed by each Seller;

(l)  an Assignment and Assumption Agreement, substantially in the form attached hereto and incorporated herein by reference as Exhibit K (the "Assignment and Assumption Agreement"), duly executed by each Seller; and

(m)  a certificate, dated the Closing Date, of the secretary or other authorized officer of each Seller certifying, that attached or appended to such certificate: (A) is a true and correct copy of the certificate of organization, operating agreement or equivalent governing documents of such Seller and all amendments thereto; (B) is a true copy of all limited liability company actions taken by such Seller, including resolutions of the members or managers, as applicable, of such Seller, authorizing the consummation of the Acquisition and the execution, delivery and performance of this Agreement and each of the Transaction Documents to be delivered by such Seller pursuant to this Agreement or any Transaction Document; (C) is a certificate of good standing from the Secretary of State (or similar Governmental Entity) from such Seller's state of formation, certifying that such Seller is in good standing in the state of its formation; and (D) are the names, titles and signatures of the duly elected or appointed officers of such Seller who are authorized to execute and deliver this Agreement, the Transaction Documents to which such Seller is a party and any certificate, document or other instrument in connection herewith.

Section 6.3  Deliveries by the Purchaser.  Contemporaneously with the execution and delivery of this Agreement, the Purchaser shall deliver or cause to be delivered to the Representative (unless previously delivered) the following:

(a)  written consent of the Franchisor to the Transactions, in a form reasonably satisfactory to the Representative (which such consent must be in full force and effect on and following the Closing);

(b)  the IP Assignment, duly executed by the Purchaser;

(c)  the Assignment and Assumption Agreement, duly executed by the Purchaser; and

(d)  A certificate signed by an officer of the Purchaser, certifying as to the resolutions of the member of the Purchaser approving this Agreement and the Transactions contemplated hereby.

## ARTICLE VII
## INDEMNIFICATION

Section 7.1    Indemnification.

(a)    By the Seller Parties.  Provided that the Purchaser makes a written claim for indemnification, describing in commercially reasonable detail the facts and circumstances with respect to the subject matter of such claim within the applicable survival period set forth in Section 7.4 and subject to the limitations set forth in this Article VII, from and after the Closing, the Seller Parties shall, jointly and severally, indemnify the Purchaser and its direct and indirect subsidiaries, members, managers, directors, officers, agents, equityholders, employees, successors, assigns and Affiliates (each, individually, a "Purchaser Party" and, collectively, the "Purchaser Parties") from and against any and all Indemnifiable Losses suffered by the Purchaser Parties arising out of or due to:

(i)    the Excluded Assets or the Excluded Liabilities;

(ii)    any breach of any covenant, agreement or undertaking made by the Seller Parties or the Representative in this Agreement or any Transaction Document;

(iii)    any breach or inaccuracy of any representation or warranty made by the Seller Parties or the Representative in this Agreement or any Transaction Document;

(iv)    any claims made by any Person asserting any ownership interests in an Asset based on acts or omissions of the Seller Parties or the Business prior to the Closing; or

(v)    any Indebtedness of the Seller Parties or the Representative or any Seller Transaction Expenses, in each case, to the extent not paid on or prior to the Closing Date or reflected as current liability on the Final Schedule.

(b)    By Purchaser.  From and after the Closing, the Purchaser shall indemnify, defend and hold harmless the Seller Parties and the Representative and each of their respective, directors, officers, agents, shareholders, employees, representatives, agents, successors, assigns and Affiliates (each, individually, a "Seller Indemnified Party" and, collectively, the "Seller Indemnified Parties") from and against any and all Indemnifiable Losses arising out of or due to:

(i)    the Purchaser's failure to perform, discharge or satisfy the Assumed Liabilities;

(ii)    any breach of any covenant, agreement or undertaking made by the Purchaser in this Agreement;

(iii)    any liability under any Lease Guaranty pursuant to, and in accordance with, Section 5.10 hereinabove; or

(iv)    any breach or inaccuracy of any representation or warranty made by the Purchaser in this Agreement.

Section 7.2    Indemnification Procedure.  If an Indemnified Party claims a right to payment pursuant to this Agreement, such Indemnified Party will send written notice of such claim to the Indemnifying Party.  Such notice will specify in reasonable detail the basis for such claim.  The failure by any Indemnified Party to so notify the Indemnifying Party will not relieve the Indemnifying Party from any

liability that it may have to such Indemnified Party with respect to any such claim. If the Indemnifying Party does not notify the Indemnified Party within thirty (30) days following its receipt of such notice that the Indemnifying Party disputes its liability to the Indemnified Party under this Article VII or the amount thereof, the claim specified by the Indemnified Party in such notice will be conclusively deemed a liability of the Indemnifying Party under this Article VII and the Indemnifying Party will pay the amount of such liability to the Indemnified Party on demand, or, in the case of any notice in which the amount of the claim (or any portion of the claim) is estimated, on such later date when the amount of such claim (or portion of such claim) becomes finally determined. If the Indemnifying Party has timely disputed its liability with respect to such claim as provided above, as promptly as possible, such Indemnified Party and the Indemnifying Party will establish the merits and amount of such claim (by mutual agreement, litigation, arbitration or otherwise) and, within five (5) Business Days following the final determination of the merits and amount of such claim, the Indemnifying Party will pay to the Indemnified Party immediately available funds in an amount equal to such claim as determined hereunder.

Section 7.3    Defense of Claims.

(a)    In case any third party claim, action or proceeding is brought against any Indemnified Party in respect of which indemnification may be sought by the Indemnified Party pursuant to this Article VII (a "Claim"), the Indemnifying Party will have the right to assume, conduct and control the defense, compromise or settlement thereof, by written notice assuming full responsibility for any Indemnifiable Losses resulting from such Claim to the Indemnified Party of its intention to do so within fifteen (15) Business Days after receipt of the notice, at the Indemnifying Party's own expense, and thereupon to prosecute in the name and on behalf of the Indemnified Party any available cross-claims, counter claims or third-party claims arising with respect to the Claim; provided, however, that an Indemnifying Party will not be entitled to assume the defense of Claim if (i) such Claim involves criminal allegations against the Indemnified Party or seeks equitable remedies against the Indemnified Party; (ii) the resolution or defense of such Claim could reasonably be expected to adversely affect the Indemnified Party's or its Affiliates' business in any material respect; (iii) such Claim involves a current employee or material vendor of the Indemnified Party; (iv) the Indemnifying Party could not, based on the written opinion of legal counsel, adequately represent the interests of the Indemnified Party in such claim; or (v) the Indemnifiable Losses resulting from such Claim would reasonably be expected to exceed any applicable limitations on the Seller Parties' indemnification obligations set forth in Article VII; provided, further, that notwithstanding the foregoing, the Seller Parties shall be entitled to defend any Claims regarding Excluded Liabilities. If the Indemnifying Party assumes the defense of such Claim, it will not settle such Claim without the prior written consent of the Indemnified Party (which will not be unreasonably withheld, conditioned or delayed) unless such settlement includes as an unconditional term thereof the giving by the claimant or the plaintiff of a release of the Indemnified Party and its Affiliates, reasonably satisfactory to the Indemnified Party, from all liability with respect to such Claim. Notwithstanding the assumption by the Indemnifying Party of the defense of any Claim as provided in this Section 7.3, the Indemnified Party will be permitted to join in the defense of such Claim and to employ counsel at its own expense.

(b)    If the Indemnifying Party does not have the right to assume the defense of any such Claim, fails to notify the Indemnified Party of its desire to assume the defense of any such Claim within the thirty (30) days of receipt of a notice, or notifies the Indemnified Party that it will not assume the defense of any such Claim, or if the Indemnifying Party fails to conduct the defense of any such Claim in good faith and at its expense, and such failure continues for more than ten (10) days after written notice thereof from the Indemnified Party to the Indemnifying Party, then the Indemnified Party may assume the defense of any such Claim in the place of the Indemnifying Party, in which event the Indemnifying Party will be bound by any determinations made in any litigation with respect to such Claim or any settlement thereof effected by the Indemnified Party; provided, that the Indemnified Party and its counsel shall cooperate with the Indemnifying Party and its counsel.

Section 7.4    Survival; Limits.

(a)    The Claims Period hereunder will begin on the Closing Date and terminate as follows:

(i)    with respect to Indemnifiable Losses arising under Section 7.1(a)(iii) with respect to the Fundamental Representations, the Claims Period will continue for a period of seven (7) years following the Closing Date;

(ii)    with respect to Indemnifiable Losses arising under Section 7.1(a)(iii) with respect to representations and warranties that are not Fundamental Representations, the Claims Period will survive for a period of twelve (12) months following the Closing Date;

(iii)    with respect to Indemnifiable Losses arising under Section 7.1(a)(ii), the Claims Period will survive for thirty (30) days following the expiration of the applicable statute of limitations, or for such shorter period as will apply in accordance with their respective terms;

(iv)    with respect to Indemnifiable Losses arising under Section 7.1(a)(i), Section 7.1(a)(iv), and Section 7.1(a)(v), the Claims Period will survive for thirty (30) days following the expiration of the applicable statute of limitations;

(v)    with respect to Indemnifiable Losses arising under Section 7.1(b)(iv) with respect to representations and warranties that are not Fundamental Representations, the Claims Period of twelve (12) months following the Closing Date;

(vi)    with respect to Indemnifiable Losses arising under Section 7.1(b)(iv) with respect to the Fundamental Representations (as applicable), the Claims Period will continue for a period of seven (7) years following the Closing Date; and

(vii)    with respect to Indemnifiable Losses arising under Section 7.1(b)(i) and Section 7.1(b)(ii), the Claims Period will survive for thirty (30) days following the expiration of the applicable statute of limitations.

(viii)    with respect to Indemnifiable Losses arising under Section 7.1(b)(iii), the Claims Period will survive indefinitely.

(b)    Notwithstanding the foregoing, if, prior to the close of business on the last day of the applicable Claims Period, an Indemnifying Party has been properly delivered a written claim for indemnification, describing in commercially reasonable detail the facts and circumstances with respect to the subject matter of such claim, and such claim has not been finally resolved or disposed of at such date, such claim will continue to survive and will remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.

(c)    Notwithstanding anything to the contrary set forth herein, the Purchaser Parties will not make a claim against the Seller Parties for indemnification under Section 7.1(a)(iii) for Indemnifiable Losses unless and until the aggregate amount of such Indemnifiable Losses of the Purchaser Parties exceeds $62,500 (the "Deductible") in which event the Purchaser Parties may claim indemnification for all Indemnifiable Losses of the Purchaser Parties in excess of such amount; provided, however, that claims related to Fraud or the Fundamental Representations will not be subject to the Deductible.

(d)    The total aggregate amount of the liability of the Seller Parties for Indemnifiable

Losses of the Purchaser Parties arising under Section 7.1(a)(iii) will be an amount equal to $1,250,000 (the "Cap"); provided, however, claims related to Fraud or the Fundamental Representations will not be subject to the Cap.

(e)     Each Indemnified Party will use commercially reasonable efforts to pursue available insurance claims to which any of them may be entitled in connection with any Indemnifiable Losses it incurs; provided that in no event will an Indemnified Party be required to file a lawsuit, initiate an arbitration proceeding, or initiate any other legal proceeding. For all purposes of this Article VII, Indemnifiable Losses will be net of any insurance or other recoveries actually received by a Party, net of collection costs.

(f)     Subject to the limitations set forth in this Section 7.4 and the other provisions of this Agreement (including, without limitation, Exhibit J affixed hereto), any Indemnifiable Losses payable to a Purchaser Party under this Article VII shall be satisfied (i) *first*, by setoff against the Deferred Purchase Price Payment Amount to the extent funds are available therefor and (ii) *second*, by the Seller Parties via wire transfer of immediately available funds to the account designated by the applicable Purchaser Party.

(g)     For purposes of calculating (i) the amount of Indemnifiable Losses arising from a breach of or inaccuracy in any representation, warranty, covenant or obligation of any Seller Party or the Representative in this Agreement, and (ii) whether any such representation, warranty, covenant or obligation has been breached or is inaccurate, any reference to "*Material Adverse Effect*," "*materiality*" or similar qualifiers in such representations, warranties, warranties or obligations will be disregarded in all respects. Each Indemnified Party will take commercially reasonable steps to mitigate any Indemnifiable Loss upon becoming aware of any event or circumstance that gives rise to such Indemnifiable Loss to the extent required by Law.

Section 7.5     Exclusive Remedy.   The Parties agree that, excluding (a) any claim for injunctive or other equitable relief, or (b) any claim related to Fraud by a Seller Party, the Representative or the Purchaser in connection with the Transactions, the indemnification provisions of this Article VII are intended to provide the sole and exclusive remedy as to all claims that the Seller Parties and the Representative, on the one hand, or the Purchaser, on the other hand, may incur arising from or relating to this Agreement and the other Transaction Documents.  In addition, the Purchaser Parties will not be entitled to any indemnification pursuant to this Article VII to the extent such amounts were taken into account for the purposes of any adjustment pursuant to Section 1.10.

Section 7.6     Adjustment to Consideration.   Each of the Parties hereto agree to report any indemnification payments received pursuant to this Article VII as an adjustment to the consideration payable for the Assets for federal income tax purposes.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

Section 8.1     Construction.  Unless the context of this Agreement otherwise clearly requires, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to any gender include the other genders, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and will be deemed to be followed by the words "without limitation", (d) the term "or" has the inclusive meaning represented by the phrase "and/or", (e) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (f) the terms "day" and "days" mean and refer to calendar day(s), (g) the terms "year" and "years" mean and refer to calendar year(s), (h) the word "extent" in the phrase "to the extent" mean the degree to which a subject or other thing extends, and such phrase

will not mean simply "if", and (i) the word "threatened" or any variation thereof, unless otherwise described in the context in which it appears, means "threatened in writing, or, to the Representative's Knowledge, otherwise". Unless otherwise set forth herein, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law (as hereinafter defined) means such Law as amended, modified, supplemented or succeeded, from time to time and in effect at any given time. All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified. All accounting terms not specifically defined herein will be construed in accordance with the Accounting Principles. Unless otherwise set forth herein, the settlement of all payments hereunder will be made in Dollars. Where the term "made available" is used in this Agreement, it means, with respect to any document or information, that the same has been made available or otherwise accessible to the Purchaser by means of the virtual data room established by the Seller Parties not less than two (2) Business Days prior to the date of this Agreement. The headings in this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions

Section 8.2    Entire Agreement; Amendment; Waiver. This Agreement and the other Transaction Documents constitute the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior agreements, representations and understandings, both written and oral, of the Parties and the rights and remedies of the parties hereto with respect to the subject matter of this Agreement and the other Transaction Documents will be governed by the express terms hereof and thereof (as the case may be). No supplement, modification or amendment of this Agreement will be binding unless executed in writing by the Purchaser and the Representative. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver. No waiver will be binding unless executed in writing by the Party making the waiver. This Agreement will be binding on and will inure to the benefit of the parties hereto and their respective permitted legal representatives, heirs, successors and assigns.

Section 8.3    Counterparts; Copies. This Agreement and any amendments hereto may be executed by the Parties in one (1) or more counterparts, each of which shall (and shall be deemed to) constitute an original and all of which, taken together, shall constitute but one and the same instrument binding upon all parties hereto. Any signature delivered by a party by facsimile or PDF transmission will be deemed to be an original signature hereto and to any other Transaction Document.

Section 8.4    Expenses. Except as otherwise specifically provided herein, the Purchaser, on the one hand, and the Seller Parties and the Representative, on the other hand, shall each be responsible for their own fees and expenses regarding the Transactions (including, without limitation, all of the fees and expenses incurred by the Parties hereto in connection with the preparation, execution and delivery of this Agreement and the other Transaction Documents, and all legal, accounting and other professional fees incurred in connection therewith). All transfer fees payable to the Franchisor as a result of the termination of the Franchise Agreements or on account of the Transactions will be borne and paid by the Purchaser. All lease assignment fees incurred in connection with the transfer of the Leases will be borne and paid by the Sellers.

Section 8.5    Notices. Any notice or other communication required or permitted hereunder will be deemed to have been properly given and delivered if in writing by such Party and delivered personally or sent by email transmission or nationally recognized overnight courier service guaranteeing overnight delivery, addressed as follows:

|  |  |
|---|---|
| To Purchaser: | Honors Holdings, LLC<br>120 Interstate N Pkwy, Suite 444<br>Atlanta, GA 30339<br>Attn: Jamie Weeks; Ian K. Neubauer<br>Email: jweeks@honorsholdingsllc.com<br>ineubauer@honorsholdingsllc.com |
| with a copy (which will not constitute notice) to: | JWC Peach Holdings, L.P.<br>c/o Prospect Hill Growth Partners<br>500 Totten Pond Road, 6th Floor<br>Waltham, MA 02451<br>Attention: Jeffrey J. Teschke<br>Email: jteschke@phgrowth.com |
| To the Seller Parties or the Representative: | 875 Siesta Key Circle<br>Sarasota, Florida 34342<br>Attn: Robert Scot James |
| with a copy (which will not constitute notice) to: | Nelson Mullins<br>1905 NW Corporate Blvd., Suite 310<br>Boca Raton, FL 33431<br>Attn: Sean Langton, Esq.<br>Email: sean.langton@nelsonmullins.com |

or to such other representative or at such other address of a Party as such Party may furnish to the other Parties in writing. Any such notice, communication or delivery will be deemed given or made (a) on the date of delivery, if delivered in person or by email transmission, (b) on the first (1st) Business Day following timely delivery to a national overnight courier service, or (c) on the fifth (5th) Business Day following it being mailed by registered or certified mail.

Section 8.6        Governing Law; Consent to Jurisdiction.   This Agreement will be construed in accordance with, and governed by, the laws of the State of Delaware without regard to any rule(s) or conflict(s) of law principles thereof. Each Party hereby irrevocably submits to personal and exclusive jurisdiction in any federal court in the State of Delaware (assuming federal court diversity jurisdiction applies, and if not, then each Party submits to personal and exclusive jurisdiction in any state court in the State of Delaware), acknowledges that such jurisdiction is proper, and waives any and all objections as to venue, inconvenient forum and the like. Each Party hereby irrevocably agrees that any action, suit or proceeding shall be brought only to the exclusive jurisdiction of the courts of the State of Delaware or the federal courts located in the State of Delaware, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum. During the period an action, suit or proceeding that is filed in accordance with this Section 8.6 is pending before a court, all actions, suits or proceedings with respect to such action, suit or proceeding or any other action, suit or proceeding, including any counterclaim, cross-claim or interpleader, will be subject to the exclusive jurisdiction of such court. Each Party hereby waives, and will not assert as a defense in any action, suit or proceeding, that (a) such Party is not subject thereto, (b) such action, suit or proceeding may not be brought

or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum, or (e) the venue of such action, suit or proceeding is improper. A final judgment in any action, suit or proceeding described in this Section 8.6 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws.

Section 8.7    Waiver of Jury Trial.    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY LEGAL DISPUTE THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL DISPUTE.

Section 8.8    Prevailing Party Attorneys' Fees.  If any Party is required to engage in litigation or other legal proceeding against any other Party in order to enforce any rights under this Agreement and/or any of the other Transaction Documents, and such proceeding results in a final judgment or ruling in favor of such Party ("*Prevailing Party*"), then the Party or Parties against whom said final judgment or ruling is obtained shall reimburse the Prevailing Party for all direct, indirect, or incidental expenses incurred, including, but not limited to, all reasonable attorneys' fees (including paralegal fees), court costs, and other expenses incurred throughout all negotiations, proceedings, trials, or appeals undertaken in order to enforce the Prevailing Party's rights hereunder or thereunder (as applicable).

Section 8.9    Exhibits.    All exhibits, schedules and attachments to this Agreement and all exhibits, schedules and attachments thereto are hereby incorporated by reference into this Agreement and hereby made a part hereof (whether or not physically attached hereto or thereto).

Section 8.10    No Third-Party Beneficiary.  Except for the Seller Parties and Purchaser Parties as provided in Article VII, the Parties do not intend to confer any benefit under this Agreement on anyone other than the Parties hereto, and nothing contained in this Agreement will be deemed to confer any such benefit on any such other Person.

Section 8.11    Assignment.    No Party may assign its rights or delegate its duties under this Agreement without the prior written consent of the other Parties hereto; provided, however, that the Purchaser may (a) assign any or all of its rights hereunder to one or more of its subsidiaries or Affiliates, or (b) collaterally assign its rights hereunder to any financial institution providing financing to the Purchaser or its Affiliates; provided that, in the case of each of clause (a) and clause (b), no such assignment will relieve the Purchaser of its obligations hereunder. This Agreement will be binding upon and will inure to the benefit of the Parties and their respective successors and permitted assigns, and any reference to a Party will also be a reference to the successors and permitted assigns thereof.

Section 8.12    Severability.  If any provision of this Agreement is capable of two constructions, only one of which would render the provision valid, legal and enforceable, the provision will have the meaning which so renders it valid, legal and enforceable.  If any provision of this Agreement or the application of any provision hereof to any person or circumstance is determined to be invalid, unenforceable or illegal under present or future laws, such determination will not affect any other provision of this Agreement or the application of such provision to any other person or circumstance, all of which will remain in full force and effect. If any provision of this Agreement is deemed invalid, illegal or unenforceable, the Parties hereby agree to submit to as similar a provision as possible that is valid, legal and enforceable.

Section 8.13    No Recourse.  No past, present or future director, officer, employee, incorporator, member, partner, stockholder, subsidiary, Affiliate, controlling party, entity under common control,

ownership or management, vendor, service provider, agent, attorney or representative of the Purchaser or any of the Purchaser's Affiliates will have any liability for (a) any obligations or liabilities of the Purchaser relating to or arising from this Agreement or (b) any claim against the Purchaser based on, in respect of, or by reason of, the Transactions.

Section 8.14    Drafting.  The Parties acknowledge and confirm that they and/or their respective attorneys have participated jointly in the review and revision of this Agreement and that it has not been written solely by any one party or counsel for any one party.  The Parties therefore stipulate and agree that the rule of construction to the effect that any ambiguities are to be or may be resolved against the drafting party will not be employed in the interpretation of this Agreement to favor any party against another.

Section 8.15    Representative.

(a)    Appointment; Acceptance.  Each Seller Party shall be deemed to have agreed to, and hereby does, irrevocably constitute and appoint the Representative as its exclusive attorney-in-fact and agent in its name, place, and stead in connection with the Transactions contemplated by this Agreement and the other Transaction Documents and acknowledges that such appointment and the powers and rights to indemnification granted to the Representative hereunder are coupled with an interest and are intended to be durable and to survive the death, incompetence, bankruptcy or liquidation of each such Seller Party and shall be binding on any successor, heir, or representative thereto. By executing and delivering this Agreement under the heading "*Representative*," the Representative hereby (a) accepts the Seller Parties' appointment and authorization to act as an attorney-in-fact and agent on behalf of the Seller Parties in accordance with the terms of this Agreement, and (b) agrees to perform the obligations required of the Representative under this Agreement and any other agreements, documents, certificates, and instruments delivered to the Purchaser in connection with the transactions contemplated by this Agreement.

(b)    Authority.  Each Seller Party fully and completely, without restriction authorizes the Representative (i) to prepare, finalize, approve, and authorize all exhibits, schedules and other attachments to this Agreement, the other Transaction Documents and all other agreements and other documents (including, without limitation, the other Transaction Documents) to be delivered by the Seller Parties pursuant hereto and thereto (the "Seller Group Delivered Agreements") and such approval and authorization may be conclusively evidenced by the Representative's execution or delivery thereof, (ii) to execute and deliver, and to accept delivery of, on their behalf, such amendments as may be deemed by the Representative in his sole discretion to be appropriate under the Seller Group Delivered Agreements, (iii) to act for the Seller Parties with respect to all post-Closing matters, (iv)  to employ and obtain the advice of legal counsel, accountants and other professional advisors as the Representative, on behalf of the Seller Parties (in such the Representative's sole discretion), deems necessary or advisable in the performance of his duties as the Representative and to rely on their advice and counsel, (v) to terminate, amend, or waive any provision of this Agreement, (vi) to give and receive notices and communications on behalf of Seller Parties under this Agreement and the other Transaction Documents (it being agreed that, notwithstanding anything in this Agreement to the contrary, that notices and communications to Seller Parties which are provided to the Representative after the date hereof will be deemed for all purposes to have been given to all Seller Parties), and (vii) to do or refrain from doing any further act or deed on behalf of the Seller Parties which the Representative deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement as fully and completely as any of the Seller Parties could do if personally present and acting.

(c)    A decision, act, consent or instruction of the Representative hereunder or under any other Transaction Document(s), shall constitute a decision of all Seller Parties and shall be final, binding and conclusive upon each Seller Party and the Purchaser may conclusively rely upon any decision, act,

consent or instruction of the Representative as being the decision, act, consent or instruction of each and every Seller Party.

*[Signatures Appear on Following Page(s)]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed, under seal, by their respective duly authorized officers, effective on the date and year first above written.

PURCHASER:

HONORS HOLDINGS, LLC
a Georgia limited liability company

By: _____
    Name: James E. Weeks, III
    Title: President & Chief Executive Officer

*[Signatures Continue on Following Page]*

DocuSign Envelope ID: B83B6A2D-9E8B-48A2-B5E8-D8FD360AA893

**SELLERS:**


**PEGRAM2015, LLC**
a Mississippi limited liability company


By:
Name: Robert Scot James
Title: Authorized Signatory


**LJAMES FITNESS, LLC**
a Tennessee limited liability company


By:
Name: Robert Scot James
Title: Authorized Signatory


**LJAMES KNOXVILLE LLC**
a Tennessee limited liability company


By:
Name: Robert Scot James
Title: Authorized Signatory


**TYCMTJULIET, LLC**
a Tennessee limited liability company


By:
Name: Martine Mahoney
Title: Authorized Signatory


**CORE2000 LLC**
a Mississippi limited liability company


By:
Name: Robert Scot James
Title: Authorized Signatory



[*Signatures Continue on Following Page*]



*Signature Page to Asset Purchase Agreement*

DocuSign Envelope ID: B83B6A2D-9E8B-48A2-B5E8-D8FD360AA893

**SELLER PRINCIPALS:**

**"S. JAMES"**

*Scot James*
Robert Scot James

**"E. JAMES"**

*Elizabeth James*
Elizabeth McKnight James

**"M. MAHONEY"**

*Martine Mahoney*
Martine Mahoney

**"J. PEGRAM"**

*Joe Pegram*
Joseph D. Pegram

**REPRESENTATIVE:**

*Scot James*
Robert Scot James

[*Signatures End Here*]

*Signature Page to Asset Purchase Agreement*

## SCHEDULE I
Percentage Allocation Schedule

| Seller Name | Closing Date Payment | First Deferred Installment Percentage Allocation | Second Deferred Installment Percentage Allocation | Third Deferred Installment Percentage Allocation | Fourth Deferred Installment Percentage Allocation |
|---|---|---|---|---|---|
| *LJames Fitness, LLC* | $0.00 | 0% | 0% | 0% | 0% |
| *LJames Knoxville LLC* | $0.00 | 0% | 0% | 0% | 0% |
| *Pegram2015, LLC* | $250,000.00 | 50% | 50% | 0% | 0% |
| *TYCMTJULIET, LLC* | $250,000.00 | 50% | 50% | 0% | 0% |
| *Core2000 LLC* | $141,685.50 | 0% | 0% | 100% | 100% |

# SCHEDULE II
Net Working Capital


(See Attached)

Definitions. The following terms, as used herein, have the following meanings:

(a) "Accounting Principles" means the modified accrual basis of accounting, consistently applied using the same accounting principles, practices, procedures, policies, assumptions and methods (with consistent classifications, judgments, inclusions, exclusions and valuation and estimation methodologies) used in the preparation of the Financial Statements.

(b) "Action" means any action, suit, arbitration, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal.

(c) "Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

(d) "Allocation Schedule" shall have the meaning ascribed to such term in Section 1.11.

(e) "Anchor Premises" shall have the meaning ascribed to such term in Section 1.14(a).

(f) "Anchor Tenant" shall have the meaning ascribed to such term in Section 1.14(a).

(g) "Arbitrator" shall have the meaning ascribed to such term in Section 1.10(e).

(h) "Assets" shall have the meaning ascribed to such term in Section 1.2.

(i) "Assignment and Assumption Agreement" shall have the meaning ascribed to such term in Section 6.2(l).

(j) "Assumed Contracts" means any legally binding written or oral agreement, arrangement or other commitment to which a Seller is a party or is bound as of the Effective Time that is related to the Business and listed on Schedule 2.12(a).

(k) "Assumed Liabilities" shall have the meaning ascribed to such term in Section 1.4(a).

(l) "Bearden Ground Lease" shall mean that certain Ground Lease dated as of October 14, 1992, by and among Ground Tenant, Robert W. Monday and William Eugene Monday, III, as amended, restated, assigned, supplemented and otherwise revised from time to time.

(m) "Bearden Lease Payment Amount" shall mean an amount equal to One Million Dollars ($1,000,000).

(n) "Bearden Studio" shall mean the Location engaged in the operation and conduct of the Business at the Existing OTF Bearden Studio Address as of the Effective Time.

(o) "Bearden Studio Lease" shall mean that certain Shopping Center Lease Agreement dated as of September 9, 2016, by and between Ground Tenant and Knox2, LLC, a Tennessee limited

liability company, as assigned to OTF Farragut pursuant to that certain Assignment and Assumption of Lease Agreement dated June 30, 2021, and as amended by that certain Letter Agreement dated November 10, 2021, by and between Ground Tenant and OTF Farragut, pursuant to which Ground Tenant leases to OTF Farragut certain leasable real property more commonly known as 122 N Forest Park Blvd, Knoxville, TN 37919 (the "Existing OTF Bearden Studio Address").

(p)　　"Bill of Sale" shall have the meaning ascribed to such term in Section 6.2(a).

(q)　　"Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in the State of Delaware.

(r)　　"Business Employees" shall have the meaning ascribed to such term in Section 2.18(a).

(s)　　"Cap" shall have the meaning ascribed to such term in Section 7.4(d).

(t)　　"Cash and Cash Equivalents" means, with respect to each Seller, all cash (including, without limitation, checks received prior to the close of business on the date immediately preceding the Closing Date (as applicable), whether or not deposited or cleared prior to the close of business on such day), certificates of deposit and other bank deposits, treasury bills and other cash equivalents.

(u)　　"Change in Control" means, with respect to the Purchaser, the occurrence of any of the following:

(i)　　The acquisition, directly or indirectly, in one transaction or a series of related transactions, by any Person or group (within the meaning of Section 13(d)(3) of the Exchange Act) of the beneficial ownership of the Equity Interests of the Purchaser possessing more than fifty percent (50%) of the total combined voting power of all outstanding Equity Interests of the Purchaser;

(ii)　　A merger or consolidation in which the Purchaser is not the surviving entity, except for a transaction in which the holders of the outstanding voting Equity Interests of the Purchaser immediately prior to such merger or consolidation hold as a result of holding the Purchaser's Equity Interests prior to such transaction, in the aggregate, Equity Interests possessing more than fifty percent (50%) of the total combined voting power of all outstanding voting Equity Interests of the surviving entity (or the parent of the surviving entity) immediately after such merger or consolidation;

(iii)　　A reverse merger in which the Purchaser is the surviving entity but in which the holders of the outstanding voting Equity Interests of the Purchaser immediately prior to such merger hold, in the aggregate, Equity Interests possessing less than fifty percent (50%) of the total combined voting power of all outstanding voting Equity Interests of the Purchaser or of the acquiring entity immediately after such merger; or

(iv)　　The sale, transfer or other disposition (in one (1) transaction or a series of related transactions) of all or substantially all of the assets of the Purchaser, except for a transaction in which the holders of the outstanding voting Equity Interests of the Purchaser immediately prior to such transaction(s) receive as a distribution with respect to Equity Interests of the Purchaser, in the aggregate, Equity Interests possessing more than fifty percent (50%) of the total combined voting power of all outstanding voting Equity Interests of the acquiring entity immediately after such transaction(s).

(v)　　"Claim" shall have the meaning ascribed to such term in Section 7.3(a).

(w)     "Claims Period" means the period during which a claim for indemnification may be asserted hereunder by an Indemnified Party.

(x)     "Closing" shall have the meaning ascribed to such term in Section 6.1.

(y)     "Closing Cash" shall mean, as of the moment immediately preceding the Effective Time, the aggregate amount of Cash and Cash Equivalents of the Sellers prior to giving effect to the transactions contemplated hereby and determined in accordance with the Accounting Principles.

(z)     "Closing Date Indebtedness" means, with respect to the Business, all Indebtedness of the Seller Parties as of the Effective Time.

(aa)     "Closing Date Payment" shall have the meaning ascribed to such term in Section 1.9.

(bb)     "Closing Date Statement" shall have the meaning ascribed to such term in Section 1.8.

(cc)     "COBRA" shall have the meaning ascribed to such term in Section 2.18(e).

(dd)     "Code" means the United States Internal Revenue Code of 1986, as amended.

(ee)     "Competitive Business" means (i) any business activity involving any athletic or fitness center, health club, gymnasium, exercise or aerobics facility utilizing cardiovascular heart rate monitor equipment, an indoor or outdoor boot camp style fitness program, or one or more similar facilities or businesses offering health and fitness training to the public through access to classes, training personnel and/or fitness equipment, or an entity that grants franchises or licenses in any of these types of businesses, or (ii) any business in which Confidential Information could be used to the disadvantage of the Purchaser, its Affiliates, Franchisor or other ORANGE THEORY® franchisees; provided, however, that, notwithstanding the foregoing or any other provision(s) herein or in any other Transaction Document to the contrary, the term "Competitive Business" shall not include (and expressly excludes) (A) the Orangetheory® Fitness business owned and operated by ATHayes2016, LLC, a North Carolina limited liability company, at the address more commonly known as 1800 Skibo Rd, Fayetteville, North Carolina 28314 (Studio #0895), or as may be relocated during the Term, (B) the Orangetheory® Fitness business owned and operated by TYCEN, LLC, LLC, a Tennessee limited liability company, at the address more commonly known as 1214 Gallatin Ave, Suite 125, Nashville, Tennessee 37206 (Studio #1157), or as may be relocated during the Term, and (C) the Orangetheory® Fitness business owned and operated by TYC, LLC, a Tennessee limited liability company, at the address more commonly known as 281 Indian Lake Blvd, Suite 200, Hendersonville, Tennessee 37075 (Studio #0366), or as relocated during the Term.

(ff)     "Confidential Information" means any data or information of the Seller Parties or the Representative, as it relates to the Business (including trade secrets), that is not generally known to the public or competitors.

(gg)     "Control" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(hh)     "Data Activities" shall have the meaning ascribed to such term in Section 2.16(h).

(ii)     "Deductible" shall have the meaning ascribed to such term in Section 7.4(c).

(jj) "Deferred Purchase Price Payment" shall have the meaning ascribed to such term in Section 1.13.

(kk) "Deferred Purchase Price Payment Amount" shall mean an amount equal to Nine Million Dollars ($9,000,000).

(ll) "Effective Time" shall have the meaning ascribed to such term in Section 6.1.

(mm) "Employment Agreement" means any employment contract, consulting agreement, termination or severance agreement, salary continuation agreement, change of control agreement, non-compete agreement or any other agreement respecting the terms and conditions of employment or payment of compensation, or of a consulting or independent contractor relationship in respect to any current or former officer, employee, consultant or independent contractor for which a Seller has any obligation.

(nn) "Employee Benefit Plan" means, with respect to any Person, (i) each plan, fund, program, agreement, arrangement or scheme that is at any time sponsored or maintained or required to be sponsored or maintained by such Person or to which such Person makes or has made, or has or has had an obligation to make, contributions providing for employee benefits or for the remuneration, direct or indirect, of the employees, former employees, directors, officers, managers, consultants, independent contractors, contingent workers or leased employees of such Person or the dependents of any of them (whether written or oral), including each deferred compensation, bonus, incentive compensation, pension, retirement, stock purchase, stock option and other equity compensation plan, or "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA), (ii) each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is subject to ERISA), (iii) each severance, retention or change in control plan or agreement, each plan or agreement providing health, vacation, summer hours, supplemental unemployment benefit, hospitalization insurance, medical, dental, or legal benefit, and (iv) each other employee benefit plan, fund, program, agreement, arrangement or scheme.

(oo) "Employee Retention Credit" means, with respect to each Seller, any employee retention credit provided for by the Coronavirus Aid, Relief, and Economic Security Act (including as amended by the Consolidated Appropriations Act, 2021 and the American Rescue Plan Act of 2021) and to which such Seller is entitled in respect of any time period ending on or before the Effective Time.

(pp) "Environmental Laws" means all federal, state or local or foreign Laws relating to protection of any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air, health, fire code, transportation and safety, including pollution control, product registration and Hazardous Materials.

(qq) "Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, membership or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

(rr) "ERISA" means the United States Employee Retirement Income Security Act of

1974, as amended, and the rules and regulations promulgated thereunder.

(ss) "ERISA Affiliate" means any Person (whether incorporated or unincorporated) that together with the Sellers would be deemed a "single employer" within the meaning of Section 414 of the Code.

(tt) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(uu) "Excluded Assets" shall have the meaning ascribed to such term in Section 1.3.

(vv) "Excluded Liabilities" shall have the meaning ascribed to such term in Section 1.4(b).

(ww) "Final Closing Payment" means an amount equal to $3,500,000, plus the Net Working Capital Surplus (if any), minus the Closing Date Indebtedness, minus the Net Working Capital Deficit (if any), and minus the Seller Transaction Expenses, in each case, as finally determined in accordance with Section 1.10.

(xx) "Final Schedule" means the "*Final Schedule*" as finally determined pursuant to Section 1.10.

(yy) "Financial Statements" means the financial statements of the Sellers as at, and for the period ended, March 31, 2022.

(zz) "First Deferred Installment Percentage Allocation" shall mean the percentage of the First Deferred Installment (as defined in Exhibit J) allocable to each Seller as set forth on Schedule I hereto. The total sum of all First Deferred Installment Percentage Allocations of the Sellers shall be one hundred percent (100%).

(aaa) "Fourth Deferred Installment Percentage Allocation" shall mean the percentage of the Fourth Deferred Installment (as defined in Exhibit J) allocable to each Seller as set forth on Schedule I hereto. The total sum of all Fourth Deferred Installment Percentage Allocations of the Sellers shall be one hundred percent (100%).

(bbb) "Franchise Agreements" shall have the meaning ascribed to such term in Section 2.12(b).

(ccc) "Franchisor" means Ultimate Fitness Group, LLC, OTF Franchisor, LLC, and each of their Affiliates, predecessors, successors and assigns.

(ddd) "Franchisor Intellectual Property" means Intellectual Property licensed to the Sellers pursuant to the Franchise Agreements.

(eee) "Fraud" means actual, intentional, and knowing common law fraud under Delaware Law with respect to the representations and warranties set forth in this Agreement.

(fff) "Fundamental Representations" means those representations and warranties set forth in Section 2.1 (Organization and Power of the Sellers), Section 2.2 (Due Authorization; Enforceability); Section 2.6(a) (Title to the Assets), Section 2.13 (Tax Returns and Payments; Tax Liens); Section 2.14 (No Broker or Finder; Fees), Section 2.18 (Employees; Employee Benefit Plans); Section 2.19 (Related Party Transactions), Section 3.1 (Power and Authority), Section 3.2 (Enforceability), and Section

<u>3.4</u> (No Broker or Finder; Fees).

(ggg) "<u>GAAP</u>" means generally accepted accounting principles in the United States as applied consistently with the past practices of the Sellers in the preparation of the year-end compiled Financial Statements.

(hhh) "<u>Governmental Entity</u>" means any federal, state, local or foreign government, any political subdivision thereof, or any arbitrator, court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency, domestic or foreign.

(iii) "<u>Ground Tenant</u>" shall mean CH Forest Park Partners, a Tennessee general partnership.

(jjj) "<u>Hazardous Materials</u>" means (i) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, medical waste, biohazardous waste or infectious waste, special waste, or solid waste under applicable environmental Laws; (ii) petroleum and its refined products; (iii) polychlorinated biphenyls; (iv) any substance exhibiting a hazardous waste characteristic (as defined under Environmental Laws), including corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (v) asbestos-containing materials.

(kkk) "<u>Hired Employees</u>" shall have the meaning ascribed to such term in <u>Section 5.4(a)</u>.

(lll) "<u>Indebtedness</u>" means, with respect to the Business and without duplication, all obligations (including all obligations in respect of principal, accrued interest, penalties, breakage costs, fees and premiums) of any Person (i) for borrowed money, (ii) evidenced by notes, bonds, debentures, hedging or swap arrangements or similar contracts or instruments, (iii) for the deferred purchase price (including earn-out or similar payments) of assets, property, goods or services (other than trade payables, or accruals incurred in the Ordinary Course) or with respect to any conditional sale, title retention, consignment or similar arrangements, (iv) under capital leases or leases that are or will be required to be capitalized in accordance with GAAP, (v) for any unpaid severance owed to former employees, (vi) by which such Person assured a creditor against loss, including letters of credit and bankers' acceptances, in each case to the extent drawn upon or payable and not contingent, (vii) any unpaid sums due to, or accrued in favor of, the Franchisor or under any Franchise Agreement, (viii) an amount equal to the accrued costs or currently projected obligations or commitments related to the build-out, furnishing, opening of, and/or Franchisor-mandated upgrades to, the Locations, and (ix) obligations in the nature of guarantees of the obligations described in clauses (i) through (viii) above of any other Person. Indebtedness will not include any items treated as Excluded Liabilities and Excluded Liabilities will not include any items treated as Indebtedness.

(mmm) "<u>Indemnifiable Losses</u>" with respect to any claim by an Indemnified Party for indemnification pursuant to this Agreement, means any and all actual losses, liabilities, claims, penalties, damages, obligations, payments, fines, costs and expenses (including, without limitation, the costs and expenses of any and all Actions, demands, assessments, judgments, settlements and compromises relating thereto and costs of investigation and reasonable attorneys' fees actually incurred in connection therewith) suffered by such Indemnified Party, but specifically excluding any exemplary, special or punitive damages, except (i) in the case of Fraud or willful misconduct, or (ii) payable by a Party to a third party.

(nnn) "<u>Indemnified Party</u>" means the Seller Indemnified Parties having a right to be indemnified by the Purchaser, on the one hand, or the Purchaser Parties having a right to be indemnified by the Seller Parties and the Representative, on the other hand, as the case may be, pursuant to <u>Section 7.1</u>.

(ooo)   "<u>Indemnifying Party</u>" means the Seller Parties having an obligation to indemnify the Purchaser Parties on the one hand, or the Purchaser having an obligation to indemnify the Seller Indemnified Parties on the other hand, as the case may be, pursuant to <u>Section 7.1</u>.

(ppp)   "<u>Intellectual Property</u>" means any or all of the following (including, without limitation, all intellectual property and proprietary rights, registered or unregistered, arising out of or associated therewith): (i) all United States of America, international and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether patentable or not), invention disclosures, improvements, mask works, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the foregoing throughout the world; (iii) all works of authorship (whether copyrightable or not), all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world, including the goodwill connected with the use of and symbolized by the foregoing; (v) all internet uniform resource locators, domain names, social media profiles and identifiers, web addresses and websites, trade names, logos, slogans, designs, trade dress, common law trademarks and service marks, trademark and service mark and trade dress registrations and applications therefor throughout the world; (vi) all computer software, databases and data collections and all rights therein throughout the world; (vii) all moral and economic rights of authors and inventors, however denominated, throughout the world; and (viii) any similar or equivalent rights to any of the foregoing anywhere in the world.

(qqq)   "<u>IP Assignment</u>" shall have the meaning ascribed to such term in <u>Section 6.2(k)</u>.

(rrr)   "<u>IRCA</u>" shall have the meaning ascribed to such term in <u>Section 2.18(b)</u>.

(sss)   "<u>Knowledge</u>" means, with respect to the Seller Parties or the Representative, all facts known by any Seller Principal, after due inquiry of his or her direct reports.

(ttt)   "<u>Landlord</u>" means a landlord under one of the leases identified on <u>Schedule 2.17(b)</u>.

(uuu)   "<u>Laws</u>" mean all statutes, laws, rules, codes, regulations, rulings, restrictions, ordinances, orders, decrees, approvals, directives, judgments, injunctions, writs, awards and decrees of, or issued by, any Governmental Entity.

(vvv)   "<u>Leases</u>" shall have the meaning ascribed to such term in <u>Section 2.17(b)</u>.

(www)   "<u>Lease Deposits</u>" means any security deposits or similar cash amounts deposited in connection with any Leases.

(xxx)   "<u>Lease Guarantees</u>" shall have the meaning ascribed to such term in <u>Section 5.10</u>.

(yyy)   "<u>Leased Real Property</u>" shall have the meaning ascribed to such term in <u>Section 2.17(b)</u>.

(zzz)   "<u>Lenders</u>" means each of the lenders under the Indebtedness of the Sellers.

(aaaa)   "<u>Liens</u>" mean all mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever.

(bbbb) "<u>Material Adverse Effect</u>" means any event, circumstance, development, occurrence, state of facts, condition, change or effect that, when considered with other events, circumstances, developments, occurrences, states of fact, conditions, changes, or effects, is materially adverse to (a) the Assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or (b) the ability of Sellers to timely consummate the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that "*Material Adverse Effect*" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industry or the Business; (iii) any disruptive changes in the financial, banking or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism; (v) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation, or interpretation thereof; (vi) any natural or man-made disaster, pandemic (including COVID-19) or acts of God; or (vii) the announcement, pendency or completion of the transactions contemplated by this Agreement.

(cccc)   "<u>Net Working Capital</u>" means, as of immediately prior to Closing, the Sellers' "*current assets*" minus the Sellers' "*current liabilities*" as illustrated in <u>Schedule II</u> and in accordance with the Accounting Principles; <u>provided</u>, that in the event of a conflict between <u>Schedule II</u> and the Accounting Principles, <u>Schedule II</u> shall prevail; <u>provided</u>, <u>further</u>, that, any other provision(s) herein to the contrary notwithstanding, Net Working Capital shall not include, and shall be calculated without taking into account the effect of, (a) any Seller Transaction Expenses, (b) any current or deferred Tax assets, (c) the Closing Cash and/or (d) any Indebtedness.

(dddd)  "<u>Net Working Capital Deficit</u>" means, the excess, if any, of Target Net Working Capital over Net Working Capital.

(eeee)   "<u>Net Working Capital Surplus</u>" means the excess, if any, of Net Working Capital over Target Net Working Capital.

(ffff)   "<u>New Area Representative Agreement</u>" shall have the meaning ascribed to such term in <u>Section 6.2(f)</u>.

(gggg)  "<u>New Franchise Agreements</u>" shall have the meaning ascribed to such term in <u>Section 6.2(f)</u>.

(hhhh)   "<u>Non-Assignable Contracts</u>" means a contract included in the Assumed Contracts that requires third party consents for assignment that has not been obtained by the Sellers as of the Closing.

(iiii)    "<u>Open Source Software</u>" means Software that is licensed under a "free", "open source" or similar license (an "<u>Open Source License</u>").

(jjjj)    "<u>Ordinary Course</u>" means the ordinary course of business consistent with past practice of the Sellers with respect to the Business.

(kkkk)  "<u>Permits</u>" shall have the meaning ascribed to such term in <u>Section 2.7</u>.

(llll)    "<u>Permitted Liens</u>" means (i) Liens for Taxes not yet due and payable or being contested in good faith by appropriate proceedings, (ii) statutory Liens of landlords, (iii) Liens of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the Ordinary Course and not yet delinquent or are being contested in good faith by appropriate procedures, and (iv) in the case of the Leased Real Property, zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, (A)

interfere in any material respect with the present use of or occupancy of the affected parcel by any Company, (B) have more than an immaterial effect on the value thereof or its use or (C) would impair the ability of such parcel to be sold, leased or subleased for its present use.

(mmmm)     "Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization or Governmental Entity.

(nnnn) Personal Data" means all data relating to one or more individual(s) that is personally identifying (*i.e.*, data that identifies an individual or, in combination with any other information or data available to a Seller, is capable of identifying an individual or any data that is non-personally identifying, including aggregate or de-identified data and data collected automatically, including data collected through a mobile or other electronic device).

(oooo)  "Pinnacle Bank" means Pinnacle Bank, a Tennessee bank.

(pppp)  "Post-Closing Adjustment Amount" shall mean an amount equal to the Final Closing Payment, minus the Closing Date Payment.

(qqqq)  "Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

(rrrr)    "PPP Loans" means the loans obtained by the Sellers under the Paycheck Protection Program administered by the Small Business Administration.

(ssss)   "Pre-Closing Member Chargebacks" means any and all chargebacks or refunds initiated by any debit or credit card holder or card-issuing bank for Products sold, and/or Services rendered, prior to the Effective Time.

(tttt)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

(uuuu)  "Preliminary Schedule" shall have the meaning ascribed to such term in Section 1.10(a).

(vvvv)  "Privacy Agreements" shall have the meaning ascribed to such term in Section 2.16(i).

(wwww)     "Products" means any and all products developed, provided, marketed, or sold by, or on behalf or for the benefit of, the Sellers in connection with the Business.

(xxxx)  "Purchased Records" shall have the meaning ascribed to such term in Section 1.2(m).

(yyyy)  "Purchaser Misdirected Funds" shall have the meaning ascribed to such term in Section 5.8(a).

(zzzz)   "Purchaser Parties" shall have the meaning ascribed to such term in Section 7.1(a).

(aaaaa) "Releasees" shall have the meaning ascribed to such term in Section 5.11.

(bbbbb) "Second Deferred Installment Percentage Allocation" shall mean the percentage of the Second Deferred Installment (as defined in Exhibit J) allocable to each Seller as set forth on Schedule

I hereto. The total sum of all Second Deferred Installment Percentage Allocations of the Sellers shall be one hundred percent (100%).

(ccccc) "<u>Seller Bank Accounts</u>" shall have the meaning ascribed to such term in Section 1.3(b).

(ddddd) "<u>Seller Benefit Plan</u>" means each Employee Benefit Plan (i) sponsored or maintained or required to be sponsored or maintained at any time by the Sellers, and (ii) to which any Seller (*x*) currently makes, (*y*) has, in the past, made, or (*z*) has or has, in the past, had, an obligation to make, contributions at any time with respect to any Business Employee.

(eeeee) "<u>Seller Group Delivered Documents</u>" shall have the meaning ascribed to such term in <u>Section 8.14(b)</u>.

(fffff) "<u>Seller Indemnified Parties</u>" shall have the meaning ascribed to such term in <u>Section 7.1(b)</u>.

(ggggg) "<u>Seller Intellectual Property</u>" means all Intellectual Property owned by or purportedly owned by or licensed to a Seller.

(hhhhh) "<u>Seller Party</u>" or "<u>Seller Parties</u>" means, individually or collectively (as the context may require), the Sellers and the Seller Principals.

(iiiii) "<u>Seller Software</u>" means any software owned by or purportedly owned by or exclusively licensed to a Seller and used in the Business.

(jjjjj) "<u>Seller Transaction Expenses</u>" means (i) the legal, accounting, financial advisory, and other advisory, transaction or consulting fees and expenses incurred by the Seller Parties, the Representative and the other equityholders of the Sellers in connection with the transactions contemplated by this Agreement, the other Transaction Documents and the planning, negotiation and documentation thereof and thereof; and (ii) the aggregate amount payable (including "success fees" or bonuses, severance payments, and any amounts payable to offset any excise Taxes imposed under Section 4999 of the Code and any related income Taxes) by the Seller Parties or the Representative (A) to any third party as a result of the transactions contemplated by this Agreement or (B) to or for the benefit of current or former officers, directors or employees of any Seller, including, without limitation, (I) accrued and unpaid bonuses and unused vacation time as of the Closing Date, (II) amounts payable (whether prior to, on or following the Closing Date) pursuant to any applicable agreement (whether written or oral) or other governing document or policy as a result of the Transactions, and (III) employer-side payroll taxes. For the avoidance of any doubt, "<u>Seller Transaction Expenses</u>" shall (and shall be deemed to) (a) include any lease assignment fees incurred in connection with the assignment of the Leases to the Purchaser and (b) exclude any transfer fees payable to Franchisor in connection with the proposed Transactions.

(kkkkk) "<u>Services</u>" means any and all services performed, provided, offered or marketed by, or on behalf or for the benefit of, the Sellers in connection with the Business (including, without limitation, memberships).

(lllll) "<u>Software</u>" means all computer software programs, together with any error corrections, updates, modifications, or enhancements thereto, in both machine-readable form and human-readable form, including all Application Program Interfaces ("<u>APIs</u>"), technical specifications, design requirements, user guides, operation manuals, comments and any procedural code.

(mmmmm) "Specified Employee" shall have the meaning ascribed to such term in Section 5.12(b)(ii)(A).

(nnnnn) "Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

(ooooo) "Subsequent Purchaser Transaction" shall have the meaning ascribed to such term in Section 1.14(c).

(ppppp) "Target Working Capital" shall mean Zero and 00/100 Dollars ($0.00).

(qqqqq) "Tax Authority" or "Tax Authorities" means the IRS and any similar state, local or foreign authority having jurisdiction over Taxes.

(rrrrr) "Tax Contest" shall have the meaning ascribed to such term in Section 5.3(c).

(sssss) "Tax Return" means any report, return, claim for refund, declaration or other information return or statement required to be supplied to a Governmental Entity relating to Taxes, including any schedule or attachment thereto and any estimated returns and any amendment thereof.

(ttttt) "Taxes" means all taxes, assessments, charges, duties, fees, levies and other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, unclaimed property, disability, transfer, sales, use, excise, license, occupation, registration, stamp, premium, environmental, customs duties, alternative or add-on minimum, estimated, gross receipts, value-added and all other taxes of any kind imposed by any Tax Authority.

(uuuuu) "Term" shall have the meaning ascribed to such term in Section 5.12(b).

(vvvvv) "Transfer Taxes" shall have the meaning ascribed to such term in Section 5.3(b).

(wwwww) "Territory" shall mean the fifty (50) mile radius surrounding the Locations and each other Orangetheory® Fitness location operated by the Purchaser or its Affiliates.

(xxxxx) "Third Deferred Installment Percentage Allocation" shall mean the percentage of the Third Deferred Installment (as defined in Exhibit J) allocable to each Seller as set forth on Schedule I hereto. The total sum of all Third Deferred Installment Percentage Allocations of the Sellers shall be one hundred percent (100%).

(yyyyy) "Transactions" shall have the meaning ascribed to such term in Section 2.1.

(zzzzz) "Transaction Documents" shall have the meaning ascribed to such term in Section 2.1.

(aaaaaa) "Transition Period" shall have the meaning ascribed to such term in Section 5.8(b).

(bbbbbb) "Treasury Regulations" means the Treasury Regulations, promulgated under the Code.

(cccccc) "United States" means the United States of America.

**OTF Oxford**

1801 Jackson Ave West, Suite D115
Oxford, MS 38655

**OTF Mt. Juliet**

11199 Lebanon Rd, Suite 5D & 5E
Mt. Juliet, TN 37122

**OTF Farragut**

11674 Parkside Drive, Suite 674
Knoxville, Tennessee, 37934

**OTF Bearden**

122 N. Forest Park Blvd.
Knoxville, Tennessee 3791

<u>**EXHIBIT C**</u>


**[INTENTIONALLY OMITTED]**

*Exhibit C to Asset Purchase Agreement*

**EXHIBIT D**
Bill of Sale


(See Attached)

## BILL OF SALE

**THIS BILL OF SALE** (this "Bill of Sale") is made and entered into as of this 16th day of May 2022, by each of **LJAMES FITNESS, LLC,** a Tennessee limited liability company ("OTF Bearden"), **LJAMES KNOXVILLE LLC,** a Tennessee limited liability company ("OTF Farragut"), **PEGRAM2015, LLC**, a Mississippi limited liability company ("OTF Oxford"), **TYCMTJULIET, LLC**, a Tennessee limited liability company ("OTF Mt. Juliet"), and **CORE2000 LLC**, a Tennessee limited liability company ("Core2000" and, together with OTF Bearden, OTF Farragut, OTF Oxford and OTF Mt. Juliet, each, individually, a "Seller" and, collectively, the "Sellers").

## RECITALS:

**WHEREAS**, in connection with, and in furtherance of, the Transactions contemplated by that certain Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), by and among Honors Holdings, LLC, a Georgia limited liability company (the "Purchaser"), the Sellers, Robert Scot James, an individual, Elizabeth McKnight James, an individual, Joseph D. Pegram, an individual, Martine Mahoney, an individual, and Robert Scot James, in his capacity as "*Representative*" thereunder, the Sellers desire to sell, assign, transfer and convey unto the Purchaser, all of the Assets (excluding, for purposes of this Bill of Sale, any Assumed Contracts and Seller Intellectual Property); and

**WHEREAS**, any capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to such terms in the Purchase Agreement.

## AGREEMENT:

**NOW, THEREFORE**, pursuant to the Purchase Agreement, and in exchange for the consideration provided thereunder, the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree, as follows:

1.      Assignment. Effective as of the Effective Time, each Seller hereby irrevocably and unconditionally sells, grants, conveys, bargains, transfers, assigns and delivers unto the Purchaser, all of such Seller's rights, title and interests, legal and equitable, throughout the world, in, to and under the Assets (excluding, for purposes of this Bill of Sale, any Assumed Contracts and Seller Intellectual Property), to have and to hold forever, free and clear of all Liens (other than Permitted Liens). Subject to the conditions and limitations contained in the Purchase Agreement, each Seller hereby covenants and agrees to warrant and defend title to the Assets against any and all claims whatsoever to the extent represented and warranted to in the Purchase Agreement. For the avoidance of any doubt, the Assets sold, transferred, conveyed and assigned pursuant to this Bill of Sale do not include (and expressly exclude) any Excluded Assets.

2.      Further Assurances. Each Seller shall, at the Purchaser's reasonable request from time to time after the Closing and without further consideration, do, execute, acknowledge and deliver (or cause to be done, executed, acknowledged and delivered) all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and other instruments and assurances deemed by the Purchaser, its successors and assigns, to be necessary or proper to effectuate the sale, conveyance, transfer, assignment, assurance, confirmation and delivery of ownership of the Assets to the Purchaser, or to aid and assist in collecting and reducing to the possession of the Purchaser, any and all Assets.

3.      Amendment or Termination; Successors and Assigns. This Bill of Sale may not be amended or terminated except by a written instrument duly signed by each of the parties hereto. This Bill of Sale shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

*ACTIVE 55532009v1*

4.      No Third Parties. Nothing in this Bill of Sale, expressed or implied, is intended or shall be construed to confer upon or give to any Person other than the Sellers and the Purchaser, their successors and assigns, any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of the Purchaser and the Sellers, their successors and assigns.

5.      Construction. This Bill of Sale does not (nor shall this Bill of Sale be deemed to) supersede, amend, or modify any of the terms or provisions of the Purchase Agreement, nor does this Bill of Sale expand upon or limit the rights, obligations or warranties of the parties under the Purchase Agreement. In the event of any conflict or ambiguity between the provisions of this Bill of Sale and the Purchase Agreement, the provisions of the Purchase Agreement shall govern and control in all respects.

6.      Governing Law. The rights and obligations of the parties under this Bill of Sale will be governed by, and construed in accordance with, the laws of the State of Delaware (without reference or regard to any rule(s) or conflict(s) of law principles thereof).

7.      Counterparts. This Bill of Sale may be executed in one or more counterparts (including, without limitation, via facsimile or any form of electronic transmission), each of which shall be deemed an original and all of which, taken together, shall constitute but one and the same instrument.

[*Signatures Appear on Following Page*]

        **IN WITNESS WHEREOF**, each Seller has executed this Bill of Sale, effective as of the Effective Time.

                                            **SELLERS:**

                                            **LJAMES FITNESS, LLC**
                                            a Tennessee limited liability company


                                            By: _____
                                            Name:  Robert Scot James
                                            Title:    Authorized Signatory


                                            **LJAMES KNOXVILLE LLC**
                                            a Tennessee limited liability company


                                            By: _____
                                            Name:  Robert Scot James
                                            Title:    Authorized Signatory


                                            **PEGRAM2015, LLC**
                                            a Mississippi limited liability company


                                            By: _____
                                            Name:  Robert Scot James
                                            Title:    Authorized Signatory


                                            **CORE2000 LLC**
                                            a Tennessee limited liability company


                                            By: _____
                                            Name:  Robert Scot James
                                            Title:    Authorized Signatory


                                            **TYCMTJULIET, LLC**
                                            a Tennessee limited liability company


                                            By: _____
                                            Name:  Robert Scot James
                                            Title:    Authorized Signatory

**EXHIBIT E**
IP Assignment


(See Attached)

### ASSIGNMENT AND ASSUMPTION OF INTELLECTUAL
### PROPERTY AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION OF INTELLECTUAL PROPERTY AGREEMENT** (this "Agreement") dated as of this 16th day of May 2022, is entered into and made by and among **LJAMES FITNESS, LLC,** a Tennessee limited liability company ("OTF Bearden"), **LJAMES KNOXVILLE LLC,** a Tennessee limited liability company ("OTF Farragut"), **PEGRAM2015, LLC**, a Mississippi limited liability company ("OTF Oxford"), **TYCMTJULIET, LLC**, a Tennessee limited liability company ("OTF Mt. Juliet"), **CORE2000 LLC**, a Tennessee limited liability company ("Core2000" and, together with OTF Bearden, OTF Farragut, OTF Oxford and OTF Mt. Juliet, each, individually, a "Seller" and, collectively, the "Sellers"), and **HONORS HOLDINGS, LLC**, a Georgia limited liability company (the "Purchaser").

### RECITALS:

**WHEREAS**, the Sellers own certain rights, title and interest in, to and under the Seller Intellectual Property;

**WHEREAS**, in connection with, and in furtherance of, the Transactions contemplated by that certain Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), by and among the Purchaser, the Sellers, Robert Scot James, an individual, Elizabeth McKnight James, an individual, Joseph D. Pegram, an individual, Martine Mahoney, an individual, and Robert Scot James, in his capacity as "*Representative*" thereunder, the Sellers desire to sell, assign, transfer and convey unto the Purchaser, and the Purchaser desires to acquire, accept and assume from the Sellers, all of the Seller Intellectual Property; and

**WHEREAS**, any capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed thereto in the Purchase Agreement.

### AGREEMENT:

**NOW, THEREFORE**, pursuant to the Purchase Agreement, and in exchange for the consideration provided thereunder, the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, as follows:

1.      Assignment & Assumption of Seller Intellectual Property.  Effective as of the Effective Time, each Seller hereby sells, assigns, transfers, coveys and delivers unto Purchaser, and Purchaser hereby acquires, accepts and assumes from each Seller, such Seller's entire right, title and interest (for all countries) in, to and under (a) the Seller Intellectual Property, and all the rights and privileges under any Seller Intellectual Property that may be granted therefor, together with the goodwill of the business associated with the Seller Intellectual Property; (b) all applications for intellectual property protection for the Seller Intellectual Property (including, without limitation, all applications for Seller Intellectual Property which may hereafter be filed for any Seller Intellectual Property in any country or countries, together with the right to file such applications and the right to claim for the same the priority rights derived from the Seller Intellectual Property under the laws of the United States, or any international agreement or the domestic laws of the country in which any such application is filed, as applicable); (c) all applications for intellectual property protection for the Seller Intellectual Property, (including, without limitation, all applications for marks, which may hereafter be filed for said Seller Intellectual Property in any country or countries, together with the right to file such applications); and (d) all forms of intellectual

property protection for the Seller Intellectual Property, which may be granted for said Seller Intellectual Property in any country.

2. <u>Seller Domain Names</u>. Each Seller shall, within five (5) Business Days after the parties' execution of this Agreement, transfer to the Purchaser ownership of any domain name including all sub-domain names included in the Seller Intellectual Property, which domain and sub-domain names are more particularly described on <u>Exhibit A</u> attached hereto (collectively, the "<u>Domain Names</u>"), in accordance with the online procedures provided by the registrar of the Domain Names. Purchaser shall cooperate with each Seller and provide any information reasonably requested by a Seller for such Seller to complete the ownership transfer. Each Seller shall provide written acknowledgement confirming completion of the transfer of ownership to the Purchaser of such Domain Names within ten (10) days of the date of this Agreement or as soon as reasonably practicable thereafter.

3. <u>Further Assurances</u>. Each Seller agrees that, upon the reasonable written request of the Purchaser, such Seller shall (a) take all rightful oaths, (b) do and take all acts, and (c) execute and deliver all such additional instruments of conveyance, transfer and assumption, which may be necessary or desirable to secure and maintain the Purchaser's protection of the Seller Intellectual Property throughout all countries of the world and to vest in the Purchaser, its successors, assigns, legal representatives or designees all title and rights in, to and under the Seller Intellectual Property.

4. <u>Purchase Agreement</u>. This Agreement is executed and delivered pursuant to the Purchase Agreement and is (and shall be deemed) subject in all respects to the covenants, representations, warranties and other provisions thereof. No provision set forth in this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of this Agreement and the provisions of the Purchase Agreement. In the event of any conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the provisions of the Purchase Agreement shall control.

5. <u>Successors and Assigns</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

6. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute but one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission, e-mail or other electronic delivery shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.

7. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

[*Signatures Appear on Following Page(s)*]

2

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement, effective as of the date first above written.

PURCHASER:

**HONORS HOLDINGS, LLC**
a Georgia limited liability company

By: _____
Name: James E. Weeks, III
Title: Authorized Signatory

[*Signatures Continue on Following Page*]

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement, effective as of the date first above written.

**SELLERS:**

**LJAMES FITNESS, LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:    Authorized Signatory

**LJAMES KNOXVILLE LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:    Authorized Signatory

**PEGRAM2015, LLC**
a Mississippi limited liability company

By: _____
Name:  Robert Scot James
Title:    Authorized Signatory

**CORE2000 LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:    Authorized Signatory

**TYCMTJULIET, LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:    Authorized Signatory

[*Signatures End Here*]

https://www.facebook.com/pages/category/Gym-Physical-Fitness-Center/Orangetheory-Fitness-Oxford-810595335689674/

https://www.facebook.com/groups/176180723814783

https://www.facebook.com/otfmtjuliet/

https://www.facebook.com/otfknoxville/

https://www.facebook.com/otffarragut

**<u>EXHIBIT F</u>**
New Franchise Agreements


(See Attached)

**EXHIBIT G**
New Area Representative Agreement


(See Attached)

<u>**EXHIBIT H**</u>

**[INTENTIONALLY OMITTED]**

**EXHIBIT I**
Purchase Price Allocation Principles


(See Attached)

| Project | | Project Thanos | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | DRAFT | | | | | | |
| DRAFT Allocation | | | Total | Core2000, LLC/ AR | TYCMT Juliet LLC | Pegram 2015 LLC | LJames Fitness, LLC | LJames Knoxville, LLC |
| Purchase price | | | 12,500,000 | 6,000,000 | 2,000,000 | 2,000,000 | 1,000,000 | 1,500,000 |
| Working capital assets | | | 81,000 | 1,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Working capital liabilities incl. leases | | | 186,059 | 21,663 | (7,264) | 51,806 | 58,430 | 61,423 |
| Fixed Assets and Other Assets | | | 646,573 | - | 228,703 | 219,797 | 37,451 | 160,622 |
| Intangibles/Goodwill | | | 11,958,486 | 6,020,663 | 1,744,034 | 1,812,009 | 1,000,980 | 1,380,800 |
| thereof Intangibles | | | tbd | | | | | |
| thereof Goodwill | | | tbd | | | | | |

<u>**EXHIBIT J**</u>
Deferred Purchase Price Payment

MAY 16, 2022

1.        <u>Deferred Purchase Price</u>. **HONORS HOLDINGS, LLC**, a Georgia limited liability company (the "<u>Purchaser</u>"), agrees to pay to the Representative, on behalf of and for distribution to the Sellers, the amount of Nine Million Dollars ($9,000,000.00) (the "<u>Deferred Purchase Price Payment Amount</u>"), together with interest thereon, if any, in accordance with the provisions of this <u>Exhibit J</u>. All amounts paid under this <u>Exhibit J</u> shall constitute and be treated as the payment of the Deferred Purchase Price Payment contemplated by that certain Asset Purchase Agreement, dated as of even date herewith (the "<u>Purchase Agreement</u>"), by and among (a) the Purchaser, (b) Pegram2015, LLC, a Mississippi limited liability company ("<u>OTF Oxford</u>"), LJames Fitness, LLC, a Tennessee limited liability company ("<u>OTF Bearden</u>"), LJames Knoxville LLC, a Tennessee limited liability company ("<u>OTF Farragut</u>"), TYCMTJULIET, LLC, a Tennessee limited liability company ("<u>OTF Mt. Juliet</u>"), Core2000 LLC, a Tennessee limited liability company ("<u>Core2000</u>" and, together with OTF Oxford, OTF Bearden, OTF Farragut and OTF Mt. Juliet, each, individually, a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>"), (c) Robert Scot James, an individual ("<u>S. James</u>"), Elizabeth McKnight James, an individual ("<u>E. James</u>"), Joseph D. Pegram, an individual ("<u>J. Pegram</u>"), and Martine Mahoney, an individual ("<u>M. Mahoney</u>" and, together with S. James, E. James and J. Pegram, each, individually, a "<u>Seller Principal</u>" and, collectively, the "<u>Seller Principals</u>"), and (d) Robert Scot James, in his capacity as "*Representative*" thereunder (in such capacity, the "<u>Representative</u>"). Any capitalized term(s) used, but not otherwise defined, herein shall have the respective meaning ascribed to such term(s) in the Purchase Agreement.

2.        <u>Interest Rate and Accrual</u>.

(a)        <u>Interest on Deferred Purchase Price Payment Amount</u>. Interest on the outstanding principal balance of the Deferred Purchase Price Payment Amount shall accrue on a daily basis at the rate per annum equal to 5.0% until payment in full of the Deferred Purchase Price Payment Amount. All accrued, but unpaid, interest shall be payable by the Purchaser to the Representative (for distribution to the Sellers) on a monthly basis via wire transfer of immediately available funds to an account designated by the Representative.

(b)        <u>Default Interest Rate</u>.  Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, interest shall accrue on the outstanding Deferred Purchase Price Payment Amount at a rate of fifteen percent (15.00%) per annum until the earlier of (a) such Event of Default is no longer continuing, (b) such amount that is due and payable is paid in full or (c) such amount that is due and payable is otherwise set off in accordance with the terms set forth herein. Interest, if any, on the Deferred Purchase Price Payment Amount shall be due and payable in cash on the date upon which the next Deferred Installment Payment is required to be paid hereunder.

3.        <u>Payment of Deferred Purchase Price Payment</u>.

(a)        <u>Scheduled Payment</u>. Until such time as the Deferred Purchase Price Payment Amount is paid in full or otherwise setoff in accordance with the terms set forth herein and in the Purchase Agreement, the Deferred Purchase Price Payment Amount, together with all accrued and unpaid interest thereon, shall be payable by the Purchaser to the Representative (for distribution to the Sellers in accordance with <u>Section 3(c)</u> hereinbelow) in four (4) installments consisting of:

(i)        One Million Dollars ($1,000,000.00) (the "<u>First Deferred Installment</u>") on August 15, 2022 (the "<u>First Payment Date</u>");

(ii)     Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the "Second Deferred Installment") on November 16, 2022 (the "Second  Payment Date");

(ii)     Three Million Five Hundred Thousand Dollars ($3,500,000.00) (the "Third Deferred Installment") on March 16, 2023 (the "Third Payment Date"); and

(iii)     Two Million Dollars ($2,000,000.00) (the "Fourth Deferred Installment" and, together with the First Deferred Installment, the Second Deferred Installment and the Third Deferred Installment, each, individually, a "Deferred Installment Payment" and, collectively, the "Deferred Installment Payments") on May 16, 2023 (the "Final Payment Date").

(b)     Optional Prepayments. The Purchaser may, at any time and from time to time, without premium or penalty, prepay all or any portion of the outstanding Deferred Purchase Price Payment Amount, together with any accrued, but unpaid, interest thereon.

(c)     Payments. Each Deferred Installment Payment shall be paid by the Purchaser to the Representative (for distribution to the Sellers in accordance with this Section 3(c)) via wire transfer of immediately available funds to an account designated by the Representative on or prior to the date upon which such Deferred Installment Payment is required to be paid. Each Deferred Installment Payment shall, when paid, be credited first to any accrued, but unpaid, interest on the outstanding Deferred Purchase Price Payment Amount, with the remainder credited to the outstanding Deferred Purchase Price Payment Amount. For the avoidance of any doubt, it is the express intent of the Parties that: (i) the First Deferred Installment shall be paid and distributed by the Representative to the Sellers based upon each such Seller's respective First Deferred Installment Percentage Allocation; (ii) the Second Deferred Installment shall be paid and distributed by the Representative to the Sellers based upon each such Seller's respective Second Deferred Installment Percentage Allocation; (iii) the Third Deferred Installment shall be paid and distributed by the Representative to the Sellers based upon each such Seller's respective Third Deferred Installment Percentage Allocation; and (iv) the Fourth Deferred Installment shall be paid and distributed by the Representative to the Sellers based upon each such Seller's respective Fourth Deferred Installment Percentage Allocation. The Representative shall distribute each Deferred Installment Payment to the Sellers in accordance with this Section 3(c) within ten (10) Business Days after the Purchaser's payment thereof.

(d)     Right of Setoff.

(i)     The Purchaser shall setoff on a dollar-for-dollar basis any amounts owed to the Purchaser pursuant to Section 1.10 of the Purchase Agreement, subject to the terms and conditions prescribed therein.

(ii)     In the event that, prior to the Final Payment Date, the Purchaser or any other Purchaser Party is entitled to indemnification for Indemnifiable Losses pursuant to Section 7.1(a) of the Purchase Agreement (such amount, an "Indemnity Amount"), then, after taking into account the Cap, the Deductible and any other limitations set forth in Article VII of the Purchase Agreement and solely to the extent that adequate funds remain available therefor, an amount equal to such Indemnity Amount shall be setoff against the outstanding Deferred Purchase Price Payment Amount and, upon such setoff, no longer be owing or payable by the Purchaser hereunder or under the Purchase Agreement.

(iii)     Notwithstanding anything to the contrary contained this Exhibit J or the Purchase Agreement:

(A)     subject to the Cap, the Deductible and any other limitations set forth in the Purchase Agreement, any claim for setoff pursuant to the Purchase Agreement and this Exhibit

J asserted in writing by the Purchaser to the Representative, in good faith, on or prior to the First Payment Date, the Second Payment Date, the Third Payment Date or the Final Payment Date, as applicable (as may be accelerated as provided in this Exhibit J), which remains unresolved as of the First Payment Date, the Second Payment Date, the Third Payment Date and/or Final Payment Date, as applicable (collectively, "Unresolved Claims"), shall survive and remain outstanding until finally resolved in accordance with this Exhibit J and the Purchase Agreement;

(B)     the amount of each Unresolved Claim, as reasonably estimated by the Purchaser and claimed in good faith in accordance with the Purchase Agreement, shall be withheld by the Purchaser from payment of the next Deferred Installment Payment, as applicable (such amount the "Unresolved Claims Amount") and shall not be payable to the Representative unless and except to the extent (y) that the Unresolved Claim Amount is finally determined by the decision of a court of competent jurisdiction to be owed to the Representative (for distribution to the Sellers in accordance with this Exhibit J), or (z) that the Unresolved Claim Amount has been agreed in writing by each of the Purchaser and the Representative to be owed to the Representative (for distribution to the Sellers in accordance with this Exhibit J);

(C)     if any Unresolved Claim Amount is finally determined by the decision of a court of competent jurisdiction or by the written agreement between the Purchaser and the Representative to be owed to the Purchaser or any other Purchaser Party, the Unresolved Claim Amount shall not be owing or payable by the Purchaser hereunder, unless such Unresolved Claim Amount shall have been sooner satisfied by any or all of the Sellers pursuant to, and in accordance with, Article VII (subject to the limitations set forth therein). For the avoidance of doubt, no interest shall accrue on any Unresolved Claim Amount; and

(D)     notwithstanding the foregoing, should a court of competent jurisdiction determine that an Unresolved Claim asserted by the Purchaser under this section was made in bad faith, interest shall accrue on the Unresolved Claim Amount so asserted in the amount set forth in Paragraph 2 herein.

4.     Events of Default. The occurrence and continuance of any of the following shall constitute an "Event of Default" hereunder:

(a)     The Purchaser fails to pay any amount due under this Exhibit J within five (5) Business Days of the date upon which same shall have become due and payable the Representative (for distribution to the Sellers in accordance with this Exhibit J) hereunder;

(b)     The Purchaser shall materially fail to observe or perform any covenant or agreement contained in this Exhibit J or permit to exist any agreement that would prohibit the payment of any amount payable under this Exhibit J, and such failure shall continue for thirty (30) days after delivery of written notice to the Purchaser by the Representative; and/or

(c)     (i)     The Purchaser shall commence any case, proceeding or other action (A) under any existing or future law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Purchaser shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against the Purchaser any case, proceeding or other action of a nature referred to in Section 4(c)(i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains

undismissed, undischarged or unbonded for a period of sixty (60) calendar days; (iii) there shall be commenced against the Purchaser any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) calendar days from the entry thereof; (iv) the Purchaser shall take any action indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 4(c)(i) – (iii); or (v) the Purchaser shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Representative may by written notice to the Purchaser (a) declare the outstanding Deferred Purchase Price Payment Amount, together with any accrued, but unpaid, interest thereon, immediately due and payable; and/or (b) exercise any or all of its rights, powers or remedies under applicable law; provided, however, that if an Event of Default described in Section 4(c) shall have occurred, the outstanding Deferred Purchase Price Payment Amount, together with any accrued, but unpaid interest thereon, shall become immediately due and payable without any notice, declaration or other act on the part of the Representative.

5. Business Days. If any Deferred Installment Payment is due, or any time period for giving notice or taking action expires, on a day which is not a Business Day, the Deferred Installment Payment shall be due and payable on, and the time period shall automatically be extended to, the next Business Day.

**<u>EXHIBIT K</u>**
Assignment and Assumption Agreement


(See Attached)

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "<u>Agreement</u>") dated as of this 16th day of May 2022, is entered into and made effective by and among **LJAMES FITNESS, LLC,** a Tennessee limited liability company ("<u>OTF Bearden</u>"), **LJAMES KNOXVILLE LLC,** a Tennessee limited liability company ("<u>OTF Farragut</u>"), **PEGRAM2015, LLC**, a Mississippi limited liability company ("<u>OTF Oxford</u>"), **TYCMTJULIET, LLC**, a Tennessee limited liability company ("<u>OTF Mt. Juliet</u>"), **CORE2000 LLC**, a Tennessee limited liability company ("<u>Core2000</u>" and, together with OTF Bearden, OTF Farragut, OTF Oxford and OTF Mt. Juliet, each, individually, a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>"), and **HONORS HOLDINGS, LLC**, a Georgia limited liability company (the "<u>Purchaser</u>").

### RECITALS:

**WHEREAS**, each Seller is a party to one (1) or more of the Assumed Contracts;

**WHEREAS**, pursuant to, and in accordance with, the terms of that certain Asset Purchase Agreement, dated as of even date herewith (the "<u>Purchase Agreement</u>"), by and among the Purchaser, the Sellers, Robert Scot James, an individual, Elizabeth McKnight James, an individual, Joseph D. Pegram, an individual, Martine Mahoney, an individual, and Robert Scot James, in his capacity as "*Representative*" thereunder, the Purchaser and the Sellers desire to effectuate (a) the assignment by the Sellers to the Purchaser of each Seller's right, title and interest in, to and under the Assumed Contracts from and after the Closing, (b) the acceptance by the Purchaser from the Sellers of the assignment of such Assumed Contracts, and (iii) the assumption by the Purchaser of (i) all obligations to be performed under the Assumed Contracts from and after the Closing and (ii) the other Assumed Liabilities; and

**WHEREAS**, any capitalized terms used, but not otherwise defined, herein shall have the respective meanings ascribed to such terms in the Purchase Agreement.

### AGREEMENT:

**NOW, THEREFORE**, pursuant to the Purchase Agreement, and in exchange for the consideration provided under the Purchase Agreement, the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree, as follows:

1.      <u>Assignment</u>. Effective as of the Effective Time, each Seller hereby sells, assigns, transfers and conveys unto the Purchaser (solely to the extent legally assignable and any necessary consents to assignment have been obtained as of the Effective Time), all of such Seller's right, title and interest in, to and under the Assumed Contracts and the Assumed Liabilities. For the avoidance of any doubt, the foregoing sale, transfer, conveyance and assignment of the Assumed Contracts and Assumed Liabilities does not include (and expressly excludes) all Excluded Assets and Excluded Liabilities.

2.      <u>Acceptance and Assumption</u>. Effective as of the Effective Time, the Purchaser hereby unconditionally and irrevocably (a) purchases and accepts from each Seller the assignment, transfer and conveyance (solely to the extent legally assignable and any necessary consents to assignment have been obtained as of the Effective Time) of such Seller's right, title and interests in, to and under the Assumed Contracts, and (b) assumes, undertakes and agrees to pay, satisfy, perform and discharge, in full, as and when due, the Assumed Liabilities. For the avoidance of any doubt, the foregoing purchase, acceptance and assumption of the Assumed Contracts and Assumed Liabilities does not include (and expressly excludes) any Excluded Assets or Excluded Liabilities.

3.      Further Assurances. The parties hereby covenant and agree to do all such further acts and execute and deliver all such additional instruments, as may be reasonably requested by the other parties to effectuate (a) each Seller's sale, transfer, conveyance and assignment of the Assumed Contracts to the Purchaser, (b) the vesting of the Purchaser's right, title and interest in, to and under the Assumed Contracts, and (c) the Purchaser's assumption and agreement to pay, satisfy, perform and discharge, the Assumed Liabilities.

4.      Purchase Agreement. This Agreement is subject in all respects to the covenants, representations, warranties and other provisions of the Purchase Agreement. No provision set forth in this Agreement shall (nor shall any such provision be deemed to) enlarge, alter or amend the terms or provisions of the Purchase Agreement. In the event of any conflict between the provisions of this Agreement and those set forth in the Purchase Agreement, the Purchase Agreement shall govern and control in all respects.

5.      Successors and Assigns. Neither this Agreement, nor any party's rights, interests or obligations hereunder, shall be assigned by any party without the prior written consent of the other parties hereto. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

6.      Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute but one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission, e-mail or other electronic delivery shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.

7.      Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without regard or the giving of any effect to any choice or conflict of law provision thereof (whether of the State of Delaware or any other jurisdiction).

[*Signatures Appear on Following Page(s)*]

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement, effective as of the Effective Time.

PURCHASER:

**HONORS HOLDINGS, LLC**
a Georgia limited liability company

By: _____
Name:  James E. Weeks, III
Title:   Authorized Signatory

[*Signatures Continue on Following Page*]

[*Signature Page to Assignment and Assumption Agreement*]

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement, effective as of the Effective Time.

**SELLERS:**

**LJAMES FITNESS, LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:   Authorized Signatory

**LJAMES KNOXVILLE LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:   Authorized Signatory

**PEGRAM2015, LLC**
a Mississippi limited liability company

By: _____
Name:  Robert Scot James
Title:   Authorized Signatory

**CORE2000 LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:   Authorized Signatory

**TYCMTJULIET, LLC**
a Tennessee limited liability company

By: _____
Name:  Robert Scot James
Title:   Authorized Signatory

[*Signatures End Here*]

[*Signature Page to Assignment and Assumption Agreement*]

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT SCOT JAMES
and CORE2000 LLC,

                Plaintiffs,

    v.

HONORS HOLDINGS, LLC,

                Defendant.

C.A. No. 1:23-cv-00591-GBW

## [PROPOSED] STIPULATED FINAL JUDGMENT

WHEREAS, on May 31, 2023, Plaintiffs Robert Scot James and Core2000 LLC (collectively, "Plaintiffs") filed their Complaint against Defendant Honors Holdings, LLC ("Honors") in the above-captioned action, alleging breach of an asset purchase agreement dated as of May 16, 2022 (the "Agreement"), and seeking damages in the principal amount of $5,500,000, as well as pre- and post-judgment interest pursuant to the parties' contractually agreed-upon rate, and Plaintiffs' attorneys' fees (D.I. 1);

WHEREAS, on July 21, 2023, Honors filed its Answer and Affirmative Defenses to Complaint (D.I. 8);

WHEREAS, on August 22, 2023, following discussions between the parties regarding resolution of this matter, Honors provided Plaintiffs with a draft offer of judgment, which was intended to provide a basis for discussion of an entry of judgment in this matter and was not intended to be a formal offer of judgment pursuant to Federal Rule of Civil Procedure 68;

WHEREAS, on August 23, 2023, Plaintiffs provided comments to the draft offer of judgment, and the parties further discussed resolution of this action via a stipulated final judgment;

WHEREAS, the parties, through their respective counsel, hereby agree to the entry of this Stipulated Final Judgment, subject to the approval of the Court;

**NOW, THEREFORE, IT IS HEREBY STIPULATED, ORDERED AND ADJUDGED:**

1. Judgment is entered for Plaintiffs and against Honors on the claims asserted in Plaintiffs' Complaint, in the amount of $5,947,533.00 (five million, nine-hundred and forty-seven thousand, five-hundred and thirty-three dollars), which shall constitute the principal amount of Plaintiffs' claim, plus pre-judgment interest accrued as of September 28, 2023.

2. Judgment is also entered for Plaintiffs and against Honors with regard to Plaintiffs' attorneys' fees, to which Plaintiffs are entitled pursuant to the parties' Agreement, in the additional amount of $85,000.00 (eighty-five thousand dollars).

3. Post-judgment interest shall continue to accrue on the amount set forth in Paragraph 1 above at the contractual rate of 15% per annum until paid in full.

4. This Stipulated Final Judgment resolves all claims that were asserted, or could have been asserted, by Plaintiffs against Honors, and all claims that could have been asserted by Honors against Plaintiffs, in this action or in connection with the underlying transaction.

5. Honors waives any right to appeal from this Stipulated Final Judgment.

6. Honors waives the 30-day automatic stay of proceedings set forth in Fed. R. Civ. P. 62 for Plaintiffs to enforce this Stipulated Final Judgment.

7. Upon entry of this Stipulated Final Judgment, this action is dismissed with prejudice, provided, however, that this Court shall retain jurisdiction to enforce the terms and conditions of this Stipulated Final Judgment.

POTTER ANDERSON & CORROON LLP

By: */s/ John A. Sensing*
    John A. Sensing (#5232)
    Hannah L. Paxton (#7096)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    jsensing@potteranderson.com
    hpaxton@potteranderson.com

*Attorneys for Plaintiffs*

Dated: September 28, 2023

BERGER HARRIS LLP

By: */s/ Richard I.G. Jones, Jr.*
    Richard I.G. Jones, Jr. (#3301)
    Peter C. McGivney (#5579)
    1105 Market Street, 11th Floor
    Wilmington, DE 19801
    Tel: (302) 655-1140
    rjones@bergerharris.com
    pmcgivney@bergerharris.com

*Attorneys for Defendant*

SO ORDERED this 29th day of September, 2023.

_____
The Honorable Gregory B. Williams

CERTIFIED: OCT 0 3 2023
AS A TRUE COPY: OCT 0 3 2023
    ATTEST:
RANDALL C. LOHAN, CLERK
BY_____
    Deputy Clerk

3

Exhibit C

Execution Version

**LIMITED WAIVER AND EIGHTH AMENDMENT TO CREDIT AGREEMENT**

This LIMITED WAIVER AND EIGHTH AMENDMENT TO CREDIT AGREEMENT (this "Amendment"), dated as of July 11, 2023, by and among HONORS HOLDINGS, LLC, a Georgia limited liability company (the "Borrower"), HH HOLDCO, INC., a Delaware corporation ("Holdings"), the other Persons party hereto that are designated as a "Credit Party" on the signature pages hereof, WHITEHORSE CAPITAL MANAGEMENT, LLC (in its individual capacity, "WhiteHorse"), as agent (the "Agent") and for itself as a Lender, and the Lenders signatory hereto.

W I T N E S S E T H:

**WHEREAS**, the Borrower, Holdings, the other Credit Parties, the Agent and the other lenders from time to time party thereto (the "Lenders") are parties to that certain Credit Agreement, dated as of September 6, 2019 (as amended by that certain First Amendment to Credit Agreement, dated as of December 2, 2019, as amended by that certain Limited Consent No. 1 and Second Amendment to Credit Agreement, dated as of December 19, 2019, as supplemented by that certain Limited Consent No. 2 to Credit Agreement, dated as of February 28, 2020, as supplemented by that certain Forbearance Agreement, dated as of June 5, 2020, as amended by that certain Limited Waiver and Third Amendment to Credit Agreement, dated as of July 6, 2020, as amended by that certain Limited Waiver and Fourth Amendment to Credit Agreement, dated as of February 19, 2021, as supplemented by that certain Limited Consent No. 3 to Credit Agreement, dated as of April 14, 2021, as amended by that certain Fifth Amendment to Credit Agreement, dated as of April 20, 2021, as amended by that certain Sixth Amendment to Credit Agreement, dated as of April 29, 2022, as amended by that certain Seventh Amendment, dated as of September 29, 2022, and as supplemented by that certain Temporary Waiver Agreement, dated as of May 19, 2023  (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"; together with this Amendment and as it may further be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement");

**WHEREAS**, the Borrower has requested that the Agent and the Lenders party hereto (which such Lenders comprise the Required Lenders) agree to make certain amendments to the Credit Agreement; and

**WHEREAS**, the Borrower has requested that the Lenders and the Agent waive the Specified Event of Default (as defined herein).

**NOW, THEREFORE**, in consideration of the mutual agreements, provisions, and covenants contained herein, the parties agree as follows:

1.      Limited Waiver to Credit Agreement.  In reliance upon the representations and warranties set forth in Section 6 below, and subject to the satisfaction or waiver of the conditions to effectiveness set forth in Section 4 below, the Agent and the Lenders hereby waive the Defaults

138771322v4

and Events of Default that have occurred and are continuing as a result of a breach of the covenants, conditions and/or agreements contained in,

      a.    Section 8.1(d) of the Credit Agreement as a result of the failure of the Borrower to (i) meet the required Total Leverage Ratio as of the Fiscal Quarter ended March 31, 2023 and (ii) deliver the audited consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Year ending December 31, 2022, and the other materials required by Sections 5.1(a) and 5.1(d) of the Credit Agreement;

      b.    Section 8.1(f) of the Credit Agreement as a result of the failure of the Borrower to make certain Contingent Acquisition Consideration Payments on or before May 22, 2023 with respect to (i) the Permitted Acquisition pursuant to that certain Asset Purchase Agreement, dated as of May 16, 2022, and as identified by the Borrower to the Agent as the "Thanos Acquisition" and (ii) the Permitted Acquisition pursuant to that certain Interest Purchase Agreement, dated as of April 29, 2021, and as identified by the Borrower to the Agent as the "Pegasus Acquisition"; and

      c.    Section 8.1(d) of the Credit Agreement as a result of the failure to notify the Agent of the foregoing events under Section 5.6(a) (clauses (i) through (iii) collectively, any such Default or Event of Default, the "Specified Events of Default").

The waiver set forth in this Section 1 is a limited waiver and shall not be deemed to (x) waive, release, modify or limit any Credit Party's obligations to otherwise comply with all terms and conditions of the Credit Agreement and the other Loan Documents, (y) consent to any other deviation from the terms of the Credit Agreement or (z) prejudice any rights or remedies that the Agent or any Lender may have or may have in the future under or in connection with the Credit Agreement or any other Loan Document (all of which rights and remedies are expressly reserved), in each case, except as expressly provided herein..

      2.    Defined Terms.  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement (after giving effect to this Amendment).

      3.    Amendments to the Existing Credit Agreement.  In reliance upon the representations and warranties set forth in Section 6 below and upon satisfaction of the conditions to effectiveness set forth in Section 4 below, the Existing Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold and double-underlined text (indicated textually in the same manner as the following example: double underlined text) as set forth in the pages of the Credit Agreement attached as Exhibit A hereto.

      4.    Conditions Precedent to Effectiveness of this Amendment.  The effectiveness of this Amendment shall be subject to the satisfaction of the following conditions (the date upon which this Amendment becomes effective, the "Eighth Amendment Effective Date"):

      a.    The Agent shall have received one or more counterparts of this Amendment, duly executed and delivered by the Borrower, the other Credit Parties and the Required Lenders;

2

b.      The Agent shall have received one or more counterparts of that certain Fee Letter, dated as of the Eighth Amendment Effective Date, duly executed and delivered by the Borrower;

c.      The Agent shall have received one or more counterparts of that certain Capital Call Agreement, dated as of the Eighth Amendment Effective Date, duly executed and delivered by the Sponsor, Holdings and the Borrower; and

d.      The representations and warranties set forth in <u>Section 6</u> hereof shall be true and correct in all material respects.

5.      <u>Conditions Subsequent to Effectiveness of this Amendment</u>.  Within fourteen (14) days following the Eighth Amendment Effective Date (or such longer period as Agent may agree to in its sole discretion), Borrower agrees to deliver to the Agent the audited consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Year ending December 31, 2022, in accordance with Section 5.1(a) of the Credit Agreement.

6.      <u>Representations and Warranties</u>.  Each Credit Party hereby represents and warrants to Agent and each Lender as follows:

a.      each Credit Party duly organized or formed and validly existing in good standing under the laws of the jurisdiction of its incorporation or formation;

b.      each Credit Party has the full legal power and authority to enter into, execute, deliver and perform the terms of this Amendment and any Loan Documents to which it is a party;

c.      the execution, delivery, and performance by the Credit Parties of this Amendment and any Loan Documents executed and delivered in connection therewith has been duly authorized by all proper and necessary corporate, limited liability company, partnership or other applicable action;

d.      this Amendment and any Loan Document executed and delivered in connection therewith each constitute the valid and legally binding obligations of the Credit Parties that are party thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in an action of law or in equity);

e.      no consent, authorization, or approval of, filing with, notice to, or exemption by, members, stockholders or holders of any other equity interest, any Governmental Authority or any other Person is required to authorize, or is required in connection with the execution, delivery and performance of this Amendment and the Loan Documents to which any Credit Party is a party or is required as a condition to the validity or enforceability of the Loan Documents to which any of the same is a party, except for any consent, authorization or other action as has previously been obtained or take;

3

f.       other than with respect to the Specified Events of Default, immediately before giving effect to this Amendment and the transactions contemplated hereby, no Default or Event of Default exists and remains continuing; and

g.       after giving effect to this Amendment and the transactions contemplated hereby, the Credit Parties and their Subsidiaries, on a consolidated basis, are Solvent.

7.       <u>Miscellaneous</u>.

a.       <u>No Modification; Reaffirmation</u>.  Except as expressly set forth herein, nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Credit Agreement or any of the other Loan Documents or constitute a course of conduct or dealing among the parties.  Except as expressly stated herein, the Agent and Lenders reserve all rights, privileges and remedies under the Loan Documents.  Except as amended or consented to hereby, the Credit Agreement and other Loan Documents remain unmodified and in full force and effect.  All references in the Loan Documents to the Credit Agreement shall be deemed to be references to the Credit Agreement as modified hereby.  This Amendment shall constitute a Loan Document.  Each of the Credit Parties as debtor, grantor, pledgor, guarantor, assignor, or in any other similar capacity in which such Credit Party grants liens or security interests in its property or otherwise acts as accommodation party or guarantor, as the case may be, hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party (after giving effect hereto) and (ii) to the extent such Credit Party granted liens on or security interests in any of its property pursuant to any such Loan Document as security for or otherwise guaranteed the Borrower's Obligations under or with respect to the Loan Documents, ratifies and reaffirms such guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Obligations as amended hereby.  Each of the Credit Parties hereby consents to this Amendment and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed.  Except as set forth in <u>Section 3</u> hereto, the execution of this Amendment shall not operate as a waiver of any right, power or remedy of the Agent or Lenders, constitute a waiver of any provision of any of the Loan Documents or serve to effect a novation of the Obligations.

b.       <u>Release</u>. Each Credit Party unconditionally and irrevocably acquits and releases and discharges the Agent and the Lenders and all of their respective affiliates, and their respective affiliates' members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and its respective heirs, legal representatives, successors and assigns (collectively, the "<u>Releasees</u>") on the Eighth Amendment Effective Date from any and all claims, demands, causes of action, obligations, remedies, suits, damages, debts and sums of money and liabilities of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which such party hereto ever had or now has against any of the Releasees that arose at any time prior to the Eighth Amendment Effective Date out of this Amendment, the Credit Agreement or any other the other Loan Documents or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse related thereto (collectively, the "<u>Released Claims</u>") (but in each case referred to in this Section, excluding any claims, demands, causes of actions, obligations, remedies, suits, damages or liabilities to the extent same occurred by reason of the

4

gross negligence or willful misconduct of the Releasee to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).

        c.     <u>Proxy and Attorney-In-Fact</u>. The validity and enforceability of any appointment of the Agent as proxy or attorney-in-fact under any Loan Document is ratified and reaffirmed as of the date hereof, and each Credit Party hereby reappoints the Administrative Agent as its proxy and attorney-in-fact in accordance with the terms of the Loan Documents, as applicable, which appointment is **IRREVOCABLE** and coupled with an interest until the Maturity Date, for the purpose of carrying out the provisions of the Loan Documents, as applicable.

        d.     <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Amendment by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

        e.     <u>Successors and Assigns</u>. The provisions of this Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that none of the Credit Parties may assign or transfer any of its rights or obligations under this Amendment without the prior written consent of the Agent.

        f.     <u>Governing Law and Jurisdiction; Waiver of Jury Trial</u>. The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Amendment, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest). Sections 10.16 and 10.17 of the Credit Agreement are hereby incorporated by reference in their entirety herein *mutatis mutandis.*

        g.     <u>Severability</u>. The illegality or unenforceability of any provision of this Amendment or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Amendment or any instrument or agreement required hereunder.

        h.     <u>Captions</u>. The captions and headings of this Amendment are for convenience of reference only and shall not affect the interpretation of this Amendment.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

5

IN WITNESS WHEREOF, each of the undersigned has executed this Amendment as of the date set forth above.

CREDIT PARTIES:

**HH HOLDCO, INC**.

By: *Jeffrey J Teschke*
Name:  Jeffrey J Teschke
Title:  Authorized Person

**HONORS HOLDINGS, LLC**

By: _____
Name:  Mirko Schueppel
Title:  Chief Financial Officer

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

IN WITNESS WHEREOF, each of the undersigned has executed this Amendment as of the date set forth above.

CREDIT PARTIES:

**HH HOLDCO, INC**.

By: _____
Name:  Jeffrey J Teschke
Title:  Authorized Person

**HONORS HOLDINGS, LLC**

By: _Mirko Schueppel_____
Name:  Mirko Schueppel
Title:  Chief Financial Officer

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

GUARANTORS:

**3 KINGS HOLDINGS, LLC**
**BLACKBERRY VISION, LLC**
**BLUEBERRY VISION INVESTMENTS, LLC**
**CRANBERRY VISION LLC**
**HONORS HOLDINGS MANAGEMENT LLC**
**JM ACWORTH LLC**
**JM ARNOLD CREEK, LLC**
**JM AUGUSTA LLC**
**JM BUFORD LLC**
**JM CHATTANOOGA, LLC**
**JM CLEMSON, LLC**
**JM CLEVELAND, LLC**
**JM DULUTH, LLC**
**JM EAST BEAVERTON, LLC**
**JM FOREST ACRES LLC**
**JM GREENVILLE DOWNTOWN, LLC**
**JM GREENVILLE, LLC**
**JM GREER LLC**
**JM GRESHAM, LLC**
**JM HIXSON, LLC**
**JM IRMO FITNESS LLC**
**JM KENNESAW, LLC**
**JM LEX LLC**
**JM LLOYD DISTRICT, LLC**
**JM MARIETTA, LLC**
**JM MEDFORD LLC**
**JM MT PLEASANT, LLC**
**JM MYRTLE BEACH LLC**
**JM NE COLUMBIA LLC**
**JM NORCROSS, LLC**
**JM NORTH MT. PLEASANT, LLC**
**JM NORTHSHORE, LLC**

By: _Mirko Schueppel_____
Name:  Mirko Schueppel
Title:  Chief Financial Officer

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**JM NW 23RD, LLC**
**JM NW 23RD LLC**
**JM PEARL DISTRICT, LLC**
**JM SE PORTLAND, LLC**
**JM SOUTH WATERFRONT, LLC**
**JM SPARTANBURG FITNESS LLC**
**JM SPECIAL VENUE LLC**
**JM SUGAR HILL, LLC**
**JM SUMMERVILLE LLC**
**JM VANCOUVER, LLC**
**JM VININGS LLC**
**JM WEST ASHLEY LLC**
**JM WEST BEAVERTON, LLC**
**JM WEST COBB, LLC**
**JM WILSONVILLE, LLC**
**JM WOODSTOCK, LLC**
**JW CANTON, LLC**
**OREGON HOLDINGS LLC**
**RASBERRY VISION LLC**
**SIMPLE BERRY LLC**
**SOUTH CAROLINA AR HOLDINGS, LLC**
**STRAWBERRY VISION LLC**
**VAILLANTINO LS, LLC**
**VAILLANTINO, LLC**
**VAILLANTINO JC, LLC**
**VVDC CHAMBLEE, LLC**
**VVDC DUNWOODY, LLC**
**VVDC LAWRENCEVILLE, LLC**
**VVDC MILTON, LLC**
**VVDC NORTHLAKE, LLC**
**VVDC POOLER, LLC**
**VVDC SANDY PLAINS, LLC**
**VVDC SAVANNAH, LLC**
**VVDC WEBB GIN, LLC**
**VVDC, LLC**
**JM HASSLO LLC**

By: *Mirko Schueppel*
_____
Name:  Mirko Schueppel
Title:  Chief Financial Officer

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**SIMPLE VENTURES, LLC**
**SIMPLE VENTURES 2, LLC**
**QIG FITNESS NATICK LLC**
**QIG FITNESS WALTHAM LLC**
**BURLINGTON FITNESS ACQUISITION, LLC**
**SOMERVILLE FITNESS ACQUISITION, LLC**
**BRAINTREE FITNESS LLC**
**BISH VENTURE MERGE, LLC**
**BISH ONE MERGE, LLC**
**BISH 2 MERGE, LLC**
**BISH THREE, LLC**
**BISH FIVE, LLC**
**LEO INVESTMENTS, LLC**
**FITNESS CAPITAL VENTURES, LLC**
**FITNESS CAPITAL VENTURES #2, LLC**
**FITNESS CAPITAL VENTURES #3, LLC**
**FITNESS CAPITAL VENTURES #4, LLC**
**JM FLORENCE LLC**
**JM GAINESVILLE LLC**
**JM SIMPSONVILLE LLC**
**JM SE POWELL LLC**
**JM SOUTH BUCKHEAD LLC**
**JM VALDOSTA LLC**

By: **HONORS HOLDINGS, LLC**
the sole equity owner of each of the entities listed above


By: *Mirko Schueppel*
_____
Name:  Mirko Schueppel
Title:  Chief Financial Officer


[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**BA MANAGEMENT, LLC**
**BAA MANAGEMENT, LLC**
**BAMCARLYLE LLC**
**BAMFREDERICKSBURG LLC**
**BAM SAFFORD LLC**
**BAMWESTSPRINGFILED LLC**
**BBAB MANAGEMENT, LLC**
**BMA MANAGEMENT, LLC**
**BOTK1 LLC**
**BOTK2 LLC**
**BOTK3 LLC**
**CBVRG, LLC**
**CENTENNIAL FITNESS LLC**
**CONFLUENCE GROUP LLC**
**CONFLUENCE GROUP II LLC**
**G3 FITNESS GROUP DC1, LLC**
**G3 FITNESS GROUP DCII, LLC**
**G3 FITNESS GROUP III, LLC**
**G3 FITNESS GROUP IV LLC**
**G3 FITNESS GROUP VI LLC**
**HH FITNESS BROOKLAND LLC**
**HH FITNESS CAPITOL HILL LLC**
**HH FITNESS DANVERS, LLC**
**HH FITNESS DUNN LORING, LLC**
**HH FITNESS FAIRFAX, LLC**
**HH FITNESS FALLS CHURCH LLC**
**HH FITNESS NORTH READING, LLC**
**HH FITNESS OREGON CITY, LLC**
**HH FITNES SALEM, LLC**
**HH FITNESS SEVEN CORNERS LLC**
**HH FITNESS THOMAS CIRCLE LLC**
**HH FITNESS WEST LINN, LLC**
**HH LYNCHBURG LLC**
**HH MT. VERNON LLC**
**HH NW RENO LLC**
**HH SOUTH RENO LLC**
**HH SPARKS LLC**
**HH WEST SAHARA, LLC**
**HH YORK LLC**

By: _Mirko Schueppel_____
Name:  Mirko Schueppel
Title:  Chief Financial Officer

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**INTERVAL ZONE FITNESS, LLC**
**JCM MACON, LLC**
**JCM MCDONOUGH, LLC**
**JD FAMILY FITNESS ENTERPRISES 1 LLC**
**JK FIT LLC**
**JM AIKEN LLC**
**JM ASTOR PLACE FITNESS LLC**
**JM INMAN PARK LLC**
**JM JOHNSON CITY LLC**
**JM LEXINGTON LLC**
**JM MABLETON LLC**
**JM PEARL DISTRICT LLC**
**JM ROME FITNESS, LLC**
**JM VANCOUVER WATERFRONT LLC**
**JM WEST MIDTOWN LLC**
**KELLY O, LLC**
**LV FITNESS FLAMINGO, LLC**
**LVE FITNESS LLC**
**MAB MANAGEMENT LLC**
**MAB2 MANAGEMENT LLC**
**MAB3 MANAGEMENT LLC**
**MOUNTAINS EDGE FITNESS LLC**
**OTB1NY LLC**
**OTB2NY LLC**
**OTLV REGION, LLC**
**OTLV1, LLC**
**OTLV2, LLC**
**OTLV3, LLC**
**RIVER5 FITNESS 3, LLC**

By: _____*Mirko Schueppel*_____
Name:  Mirko Schueppel
Title:    Chief Financial Officer

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By: _____
Name: Richard Siegel
Title:  Authorized Signatory

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**BCSSS Holdco UK Limited**,
as a Lender
By: H.I.G. IMA Advisors, LLC, its Investment Manager

By: _____
Name: Richard Siegel
Title:    Authorized Signatory

**H.I.G. Global Credit Holdings, LLC**,
as a Lender
By: H.I.G.-GPII, Inc., as its Manager

By: _____
Name:   Richard Siegel
Title:      Authorized Signatory

**H.I.G. WHITEHORSE SMA, L.P.**,
as a Lender

By: _____
Name:   Richard Siegel
Title:      Authorized Signatory

**H.I.G. WHITEHORSE TRINITY CREDIT, LLC**,
as a Lender
By: H.I.G.-GPII, Inc., as its Manager

By: _____
Name:   Richard Siegel
Title:      Authorized Signatory

**H.I.G. WHITEHORSE TRISTAR CREDIT, LLC**,
as a Lender
By: H.I.G.-GPII, Inc., as its Manager

By: _____
Name:   Richard Siegel
Title:      Authorized Signatory

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**SWISS CAPITAL HYS PRIVATE DEBT FUND L.P.**,
as a Lender
By: Whitehorse Capital Management, LLC, its Investment Advisor

By: _____
Name: Richard Siegel
Title:    Authorized Signatory

**SWISS CAPITAL HYS PRIVATE DEBT OFFSHORE SP**,
as a Lender
By: Whitehorse Capital Management, LLC, its Investment Advisor

By: _____
Name: Richard Siegel
Title:    Authorized Signatory

**Thorney Island Limited Partnership**,
as a Lender
By: H.I.G. Capital, LLC, its Investment Manager

By: _____
Name: Richard Siegel
Title:    Authorized Signatory

**TMPSL Investments Limited**,
as a Lender
By: H.I.G. IMA Advisors, LLC, its Investment Manager

By: _____
Name: Richard Siegel
Title:    Authorized Signatory

**WHITEHORSE FINANCE CREDIT I, LLC**,
as a Lender
By:  Whitehorse Finance, Inc., its designated manager

By: _____
Name:  Joyson Thomas
Title:      Authorized Signatory

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**Whitehorse Offshore Credit Opportunities I, LLC**
as a Lender

By: _____

Name:   Richard Siegel
Title:     Authorized Signatory

**WHITEHORSE ONSHORE CREDIT OPPORTUNITIES I, LLC**,
as a Lender

By: _____

Name:   Richard Siegel
Title:     Authorized Signatory

**WHITEHORSE PRINCIPAL LENDING CLO 2022-1, LTD.**
as a Lender

By: _____
Name: Richard Siegel
Title:   Authorized Signatory

**WHPL SPV I Class A, LLC**,
as a Lender

By: _____
Name: Richard Siegel
Title:   Authorized Signatory

**WHPL SPV I Offshore, LLC**,
as a Lender

By: _____
Name: Richard Siegel
Title:   Authorized Signatory

**WHPL SPV I, LLC**,
as a Lender

By: _____
Name: Richard Siegel
Title:   Authorized Signatory

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**WEBSTER BANK, NATIONAL ASSOCIATION**, as an L/C Issuer, as Swing Lender and as a Lender

By: *Esther Catandella*
Name: Esther Catandella
Title:   Director

[Signature Page to Limited Waiver and Eighth Amendment to Credit Agreement]

**EXHIBIT A**

Credit Agreement

[Attached]

ANNEX A
**CONFORMED THROUGH ~~SEVENTH~~EIGHTH AMENDMENT**

_____

**$116,750,000 CREDIT FACILITY**

**CREDIT AGREEMENT**

**Dated as of September 6, 2019**

**by and among**

**HONORS HOLDINGS, LLC,**
as Borrower,

**HH HOLDCO, INC.,**
as Holdings

**THE OTHER PERSONS PARTY HERETO THAT ARE
DESIGNATED AS CREDIT PARTIES,**

**WHITEHORSE CAPITAL MANAGEMENT, LLC**
for itself and as Agent for all Lenders,

**THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO,**
as Lenders,

**and**

**WHITEHORSE CAPITAL MANAGEMENT, LLC**
as Sole Lead Arranger and Bookrunner

_____

**TABLE OF CONTENTS**

1.    DEFINITIONS ..................................................................................................... 1

     1.1    Defined Terms ............................................................................................ 1
     1.2    Other Interpretive Provisions ................................................................ 48
     1.3    Pro Forma Calculations; Limited Condition Acquisitions; Basket and
            Ratio Compliance Fair Market Value ............................................. ~~48~~49
     1.4    Accounting Terms and Principles ............................................................ 51
     1.5    Payments ............................................................................................. ~~51~~52
     1.6    Divisions .............................................................................................. ~~51~~52
     1.7    Rates .................................................................................................... ~~51~~52

2.    THE CREDITS ............................................................................................ ~~52~~53

     2.1    Amounts and Terms of Commitments ................................................ ~~52~~53
     2.2    Evidence of Loans; Notes ................................................................... ~~60~~61
     2.3    Interest ................................................................................................ ~~60~~61
     2.4    Loan Accounts; Register .................................................................... ~~61~~62
     2.5    Procedure for Revolving Credit Borrowing ........................................ ~~62~~63
     2.6    Conversion and Continuation Elections .............................................. ~~63~~64
     2.7    Optional Prepayments and Reductions in Revolving Loan Commitments ........... ~~63~~65
     2.8    Mandatory Prepayments of Loans and Commitment Reductions ........... ~~64~~65
     2.9    Fees ..................................................................................................... ~~69~~70
     2.10   Payments by Borrower ....................................................................... ~~71~~72
     2.11   Payments by the Lenders to Agent; Settlement .................................. ~~73~~74
     2.12   Use of Proceeds. ................................................................................ ~~76~~77
     2.13   Uncommitted Incremental Facility ..................................................... ~~77~~78
     2.14   Protective Advances. .......................................................................... ~~81~~82
     2.15   Benchmark Replacement Setting. ....................................................... ~~82~~83

3.    CONDITIONS PRECEDENT ....................................................................... ~~83~~84

     3.1    Conditions of Initial Loans ................................................................. ~~83~~84
     3.2    Conditions to All Borrowings ............................................................. ~~86~~87

4.    REPRESENTATIONS AND WARRANTIES ............................................... ~~87~~88

     4.1    Capitalization ..................................................................................... ~~87~~88
     4.2    Existence and Power ........................................................................... ~~87~~88
     4.3    Authority and Execution ..................................................................... ~~87~~88
     4.4    Binding Agreement ............................................................................. ~~87~~88
     4.5    Litigation ............................................................................................ ~~88~~89
     4.6    Required Consents .............................................................................. ~~88~~89
     4.7    Absence of Defaults; No Conflicting Agreements .............................. ~~88~~89
     4.8    Compliance with Applicable Laws ..................................................... ~~88~~89
     4.9    Taxes .................................................................................................. ~~88~~89

4.10   Governmental Regulations .................................................................... 8990

4.11   Federal Reserve Regulations; Use of Revolving Loan Proceeds .......... 8990

4.12   ERISA ..................................................................................................... 8990

4.13   Financial Diligence ............................................................................... 8990

4.14   Property .................................................................................................. 9091

4.15   Authorizations ....................................................................................... 9091

4.16   Environmental Matters ......................................................................... 9091

4.17   Insurance ................................................................................................ 9192

4.18   Solvency ................................................................................................. 9192

4.19   [Reserved] .............................................................................................. 9192

4.20   No Misrepresentation ............................................................................ 9192

4.21   Security Interest and Liens .................................................................... 9293

4.22   Subsidiaries ........................................................................................... 9293

4.23   OFAC, USA PATRIOT Act, Anti-Corruption and Other Regulations ... 9293

5.      AFFIRMATIVE COVENANTS ............................................................... 9293

5.1    Financial Reports and Other Information .............................................. 9294

5.2    Maintenance of Legal Existence ........................................................... 9596

5.3    Maintenance of Properties ..................................................................... 9596

5.4    Insurance ................................................................................................ 9697

5.5    Inspection of Property, Books and Records .......................................... 9697

5.6    Notice of Material Events ...................................................................... 9697

5.7    Payment of Taxes ................................................................................... 9798

5.8    Compliance with Laws .......................................................................... 9798

5.9    Use of Proceeds ..................................................................................... 9798

5.10   Governmental Consents and Approvals ................................................ 9798

5.11   Environmental Matters .......................................................................... 9798

5.12   Notice of Certain Changes .................................................................... 9798

5.13   Additional Collateral ............................................................................. 9899

5.14   Further Assurances ................................................................................ 9899

5.15   Cash Management .................................................................................. 99100

5.16   Interest Rate Protection ......................................................................... 99100

5.17   Post-Closing Obligations ...................................................................... 99100

5.18   Lenders' Calls ........................................................................................ 99100

6.      NEGATIVE COVENANTS ..................................................................... 100101

6.1    Limitation on Indebtedness. .................................................................. 100101

6.2    Limitation on Guarantees ...................................................................... 102103

6.3    Limitation on Liens ................................................................................ 102103

6.4    Fundamental Changes ............................................................................ 103105

6.5    Limitation on Certain Transactions with Affiliates .............................. 104105

6.6    Asset Sales. ............................................................................................ 105106

6.7    Sale and Leaseback Transactions .......................................................... 106107

6.8    Investments, Loans, Advances, Guarantees and Acquisitions .............. 106107

6.9   CARES Indebtedness. The Borrower shall not and shall not permit any of its Subsidiaries to repay any CARES Indebtedness or repurchase, redeem, retire or otherwise acquire such CARES Indebtedness, provided, that, notwithstanding the foregoing, to the extent such CARES Indebtedness is not forgiven in accordance with the CARES Act—Title I, the Credit Parties and their Subsidiaries may, directly or indirectly, to the extent required under the terms of the CARES Indebtedness, pay interest payable in respect of the CARES Indebtedness as and when due, at a rate not exceeding 1.0% per annum in respect thereof, in accordance with the terms thereof. ....................................................................... 108 109

6.10   Modifications of Certain Agreements. No Credit Party shall, nor shall it permit any Subsidiary to (except as otherwise required by applicable law), directly or indirectly, amend, terminate, or otherwise modify (or permit any amendment, termination or modification of), including, without limitation, waivers of compliance, material rights or remedies thereunder, or consent to noncompliance in any material respect with, any documents entered into in connection with the CARES Indebtedness without the prior written consent of the Agent. ....................................................................... 108 109

6.11   Restrictive Agreements .................................................................. 108109

6.12   Amendment of Organizational Documents ...................................... 110111

6.13   Total Leverage Ratio ....................................................................... 110111

6.14   Fixed Charge Coverage Ratio .......................................................... 111112

6.15   Restricted Payments and Earnouts ................................................... 111112

6.16   Subsidiaries .................................................................................... 113115

6.17   Compliance with Anti-Terrorism Laws, Money Laundering Laws, Etc ........ 114115

6.18   Holding Company ........................................................................... 114116

6.19   Liquidity ........................................................................................ 115116

6.20   Contingent Acquisition Consideration Claims. ................................ 116

7.   [Reserved] ........................................................................................ 115117

8.   EVENTS OF DEFAULT ...................................................................... 115117

8.1   Event of Default .............................................................................. 115117

8.2   Contract Remedies .......................................................................... 118119

8.3   Equity Cure .................................................................................... 118120

9.   AGENT .............................................................................................. 119121

9.1   Appointment and Duties .................................................................. 119121

9.2   Binding Effect ................................................................................ 120122

9.3   Use of Discretion ............................................................................ 120122

9.4   Delegation of Rights and Duties ...................................................... 121123

9.5   Reliance and Liability ..................................................................... 121123

9.6   Agent Individually .......................................................................... 122124

9.7   Lender Credit Decision ................................................................... 122124

9.8     Expenses; Indemnities; Withholding ............................................ ~~123~~125
9.9     Resignation of Agent or L/C Issuer ............................................ ~~124~~126
9.10    Release of Collateral or Guarantors ........................................... ~~124~~126
9.11    Additional Secured Parties ...................................................... ~~125~~127
9.12    Lead Arranger ..................................................................... ~~126~~127
9.13    Credit Bid ......................................................................... ~~126~~128
9.14    Erroneous Payments .............................................................. ~~127~~129

10.   MISCELLANEOUS .......................................................................... ~~128~~130

10.1    Amendments and Waivers ...................................................... ~~128~~130
10.2    Notices ............................................................................. ~~131~~133
10.3    Electronic Transmissions ....................................................... ~~132~~134
10.4    No Waiver; Cumulative Remedies ............................................ ~~133~~135
10.5    Costs and Expenses ............................................................. ~~133~~135
10.6    Indemnity ......................................................................... ~~134~~136
10.7    Marshaling; Payments Set Aside .............................................. ~~135~~137
10.8    Successors and Assigns ........................................................ ~~135~~137
10.9    Binding Effect; Assignments and Participations ........................... ~~136~~138
10.10   Non-Public Information; Confidentiality .................................... ~~139~~141
10.11   Set-off; Sharing of Payments ................................................. ~~141~~143
10.12   Counterparts; Facsimile Signature ........................................... ~~142~~144
10.13   Severability; Captions; Independence of Provisions ...................... ~~142~~144
10.14   Interpretation .................................................................... ~~142~~144
10.15   No Third Parties Benefited .................................................... ~~143~~145
10.16   Governing Law and Jurisdiction .............................................. ~~143~~145
10.17   Waiver of Jury Trial ............................................................ ~~143~~145
10.18   Entire Agreement; Release; Survival ......................................... ~~144~~146
10.19   USA Patriot Act ................................................................. ~~145~~146
10.20   Replacement of Lender ......................................................... ~~145~~147
10.21   Joint and Several ................................................................ ~~146~~148
10.22   Creditor-Debtor Relationship ................................................. ~~146~~148
10.23   Keepwell .......................................................................... ~~146~~148
10.24   Secured Swap Providers and Secured Cash Management Banks ........ ~~146~~148
10.25   Special Oregon Statute of Frauds Provision ................................ ~~147~~149

11.   TAXES, YIELD PROTECTION AND ILLEGALITY ................................... ~~147~~149

11.1    Taxes .............................................................................. ~~147~~149
11.2    Illegality .......................................................................... ~~150~~152
11.3    Increased Costs and Reduction of Return ................................... ~~151~~153
11.4    Funding Losses .................................................................. ~~152~~154
11.5    Inability to Determine Rates .................................................. ~~152~~154
11.6    Reserves on SOFR Loans ...................................................... ~~153~~155
11.7    Certificates of Lenders ......................................................... ~~153~~155
11.8    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ~~153~~155

11.9    Acknowledgement Regarding Any Supported QFCs. ................................................ ~~153~~155

**SCHEDULES**

Schedule 1.1          Prior Indebtedness
Schedule 2.1(a)       Term Loan Commitments
Schedule 2.1(b)       Revolving Loan Commitments
Schedule 4.1          Capitalization
Schedule 4.9          Taxes
Schedule 4.17         Insurance
Schedule 4.22         Subsidiaries
Schedule 5.13         Landlord Waivers
Schedule 5.17         Post-Closing Matters
Schedule 6.1(e)       Indebtedness
Schedule 6.2          Guarantees
Schedule 6.3(k)       Liens
Schedule 6.5(i)       Existing Transactions with Affiliates
Schedule 6.11         Restrictive Agreements
Schedule 6.12         Existing Lease Defaults

**EXHIBITS**

Exhibit 1.1(a)        Form of Assignment
Exhibit 1.1(b)        Form of Notice of Borrowing
Exhibit 1.1(c)        Form of Note
Exhibit 1.1(e)        Form of Delayed Draw Term Note
Exhibit 2.1(c)        Form of L/C Request
Exhibit 2.1(d)        Form of Swing Loan Request
Exhibit 2.6           Form of Notice of Conversion/Continuation
Exhibit 5.1(~~d~~e)   Form of Compliance Certificate

**CREDIT AGREEMENT**

This CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "**Agreement**") is entered into as of September 6, 2019, by and among Honors Holdings, LLC, a Georgia limited liability company (referred to herein as "**Borrower**"), HH Holdco, Inc., a Delaware corporation, ("**Holdings**") (solely with respect to Section 6.18), the other Persons party hereto that are designated as a "**Credit Party**", WhiteHorse Capital Management, LLC (in its individual capacity, "**WhiteHorse**"), as Agent for the several financial institutions from time to time party to this Agreement (collectively, the "**Lenders**" and individually each a "**Lender**"), Webster Bank, National Association, a national banking association ("**Webster Bank**") as a Lender (including as Swing Lender) and L/C Issuer, and the other Lenders.

W I T N E S S E T H:

**WHEREAS**, Borrower has requested, and the Lenders have agreed to make available to Borrower, a revolving credit facility (including a letter of credit subfacility) and a term loan (including pursuant to the Cashless Rollover) upon and subject to the terms and conditions set forth in this Agreement to (a) fund the Closing Date Distribution, (b) refinance Prior Indebtedness, (c) provide for working capital, capital expenditures, Permitted Acquisitions and other general corporate purposes of the Credit Parties, (d) fund certain fees and expenses associated with the funding of the Loans and making of the Closing Date Distribution and (e) to pay dividends or other distributions with respect to any shares of the Borrower's Stock as permitted herein;

**WHEREAS**, Borrower desires to secure all of its Obligations under the Loan Documents by granting to Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its Property;

**WHEREAS**, Holdings owns all of the Stock of Borrower and is willing to pledge to Agent, for the benefit of the Secured Parties, all of the Stock of Borrower;

**WHEREAS**, subject to the terms hereof, each Subsidiary of the Borrower is willing to guaranty all of the Obligations of Borrower and to grant to Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its Property;

**NOW, THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

1.      DEFINITIONS

1.1      Defined Terms

. The following terms have the following meanings:

"**2019 Audit**" means the audited consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Year ending December 31, 2019, and the other materials required by Sections 5.1(a) and 5.1(d).

"**2020 Audit**" means the audited consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Year ending December 31, 2020, and the other materials required by Sections 5.1(a) and 5.1(d).

|US-DOCS\~~122553549.2~~143398915.4||

"**Accountants**" means RSM US LLP or another firm of certified independent public accountants of recognized regional standing selected by the Borrower or another firm of certified independent public accountants reasonably acceptable to the Agent.

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person comprising a business or division of such Person, (b) the acquisition of Stock of any Person that causes such Person to become a Subsidiary of Borrower, or (c) a merger or consolidation or any other combination with another Person.

"**Acquisition Consideration**" has the meaning assigned to such term in the definition of Permitted Acquisition.

"**Adjusted Term SOFR**" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment (if applicable); provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Affected Lender**" as defined in Section 10.20.

"**Affected Person**" means the Borrower, any Subsidiary or Affiliate thereof, or any officer, director, trustee, employee, broker or agent of the Borrower or any such Subsidiary or Affiliate.

"**Affected SVP/Participant**" as defined in Section 10.20.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; provided, however, that no Secured Party shall be an Affiliate of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents.  For purposes of this definition, "**control**" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" means WhiteHorse in its capacity as administrative agent for the Lenders hereunder, and any successor Agent.

"**Aggregate Closing Date Delayed Draw Term Commitment**" means the combined Closing Date Delayed Draw Term Commitments of the Lenders, which shall initially be in the amount of $15,000,000, as such amount may be adjusted as permitted by this Agreement.

"**Aggregate Excess Funding Amount**" as defined in Section 2.11(e)(iv).

"**Aggregate First Amendment Delayed Draw Term Commitment**" means the combined First Amendment Delayed Draw Term Commitments of the Lenders, which shall initially be in the amount of $18,750,000, as such amount may be adjusted as permitted by this Agreement.

"**Aggregate Revolving Loan Commitment**" means the combined Revolving Loan Commitments of the Lenders, which shall initially be in the amount of $5,000,000, as such amount may be adjusted as permitted by this Agreement.

"**Aggregate Term Loan Commitment**" means the combined Term Loan Commitments (including Closing Delayed Draw Term Commitments and First Amendment Delayed Draw Term Commitments) of the Lenders, which shall initially be in the amount of $111,750,000, as such amount may be adjusted as permitted by this Agreement.

"**Agreement**" as defined in the preamble hereto.

"**Agreement Among Lenders**" means that certain Agreement Among Lenders, dated as of even date herewith, in form and substance reasonably acceptable to Agent by and among the Initial Last Out Lenders (as defined therein), the Initial First Out Lenders (as defined therein), the Agent and the Last Out Lender Representative (as defined therein).

"**Anti-Corruption Law**" means, with respect to any Person, any Law of any jurisdiction concerning or relating to bribery or corruption that is applicable to such Person.

"**Anti-Terrorism Law**" means any Law related to money laundering or financing terrorism including, without limitation, (a) the Patriot Act, (b) The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) (also known as the "Bank Secrecy Act"), (c) the Trading With the Enemy Act (50 U.S.C. § 1 et seq.), and (d) Executive Order 13224 (effective September 24, 2001).

"**Apollo Acquisition**" means the acquisition by the Borrower of all or substantially all of the equity interests of the Apollo Companies pursuant to the Apollo Acquisition Agreements.

"**Apollo Acquisition Agreements**" means those certain Unit Purchase Agreements, dated as of on or around the First Amendment Effective Date, by and among the Borrower and each of the Apollo Companies and the Apollo Sellers, as in effect on the First Amendment Effective Date.

"**Apollo Companies**" means, collectively, Simple Ventures, LLC, Simple Ventures 2, LLC, QIG Fitness Natick LLC, QIG Fitness Waltham, LLC, Burlington Fitness Acquisition LLC, Somerville Fitness Acquisition LLC and Braintree Fitness LLC.

"**Apollo Sellers**" means each Person identified as a "Seller" under the Apollo Acquisition Agreements.

"**Applicable Margin**" means with respect to Revolving Loans, Swing Loans and Term Loans, (x) prior to and until the Fifth Amendment Effective Date, the percentage per annum as set forth in the table below under the caption "Term SOFR Margin" or "Base Rate Margin", as the case may be, based upon the Total Leverage Ratio as set forth in the financial required to be delivered pursuant to Section 5.1(b); *provided*, (i) if for the First Applicable Period of 2021 the PIK Option is selected such applicable percentage shall be increased by 1.00% solely with respect to the applicable Whitehorse Loans and (ii) if for the Second Applicable Period of 2021 the PIK Option is selected such applicable percentage shall be increase by 1.50% solely with respect to the applicable Whitehorse Loans:

| Pricing Level | Total Leverage Ratio | Term SOFR Margin | Base Rate Margin |
|---|---|---|---|
| I | Greater than 5.50 to 1.00 | 7.00% | 6.00% |
| II | Less than or equal to 5.50 to 1.00 and greater than or equal to 5.00 to 1.00 | 6.50% | 5.50% |
| III | Less than 5.00 to 1.00 | 6.00% | 5.00% |

, (y) from the Fifth Amendment Effective Date until the Eighth Amendment Effective Date, the percentage per annum as set forth in the table below under the caption "Term SOFR Margin" or "Base Rate Margin", as the case may be, based upon the Total Leverage Ratio as set forth in the financial required to be delivered pursuant to Section 5.1(b):

| Pricing Level | Total Leverage Ratio | Term SOFR Margin | Base Rate Margin |
|---|---|---|---|
| I | Greater than 5.75 to 1.00 | 7.00% | 6.00% |
| II | Less than or equal to 5.75 to 1.00 and greater than or equal to 5.00 to 1.00 | 6.50% | 5.50% |
| III | Less than 5.00 to 1.00 | 6.00% | 5.00% |

and (yz) from and after the FifthEight Amendment Effective Date, the percentage per annum as set forth in the table below under the caption "Term SOFR Margin" or "Base Rate Margin", as the case may be, based upon the Total Leverage Ratio as set forth in the financial required to be delivered pursuant to Section 5.1(b):

| Pricing Level | Total Leverage Ratio | Term SOFR Margin | Base Rate Margin |
|---|---|---|---|
| I | Greater than 5.75or equal to 5.50 to 1.00 | 7.00%7.50% | 6.00% |
| II | Less than or equal to 5.755.50 to 1.00 and greater than or equal to 5.00 to 1.00 | 6.50%7.00% | 5.50% |
| III | Less than 5.00 to 1.00 | 6.00% | 5.00% |

Any increase or decrease in the Applicable Margin resulting from a change in the Total Leverage Ratio shall become effective as of the first Business Day immediately following the date the financial statements and Compliance Certificate are delivered in respect of any period ending on or after the fiscal quarter of Borrower ending December 31, 2019 pursuant to Section 5.1(b); provided, however, that if any such financial statements or Compliance Certificate are not delivered when due in accordance with such Section, then Pricing Level I shall apply, in each case as of the first day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the date on which such financial statements and Compliance Certificate are delivered and would require a change in the Applicable Margin; provided further, that for each Interest Payment Date occurring from and after the Third Amendment Effective Date until the Eight Amendment Effective Date, up to 0.50% of the interest accrued at Pricing Level I shall be paid in kind by being capitalized to the outstanding principal amount of the Loans on the applicable Interest Payment Date, and which thereafter shall be treated as principal of the Loans for all purposes of this Agreement, including, without limitation, calculation of interest on subsequent Interest Payment Date; provided, further, that for each Interest Payment Date occurring from and after the Eight Amendment Effective Date, (i) 0.50% of the interest accrued at Pricing Level II shall be paid in kind by being capitalized to the outstanding principal amount of the Loans on the applicable Interest Payment Date and (ii) 1.00% of the interest accrued at Pricing Level I shall be paid in kind by being capitalized to the outstanding principal amount of the Loans on the applicable Interest Payment Date, and, in each case, which thereafter shall be treated as principal of the Loans for all purposes of this Agreement, including, without limitation, calculation of interest on subsequent Interest Payment Date. In the event that the certified calculation of the Total Leverage Ratio previously delivered pursuant to Section 5.01(b) was inaccurate, and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin for the Revolving Loans, Swing Loans and Term Loans for any period (an "**Applicable Period**") than the Applicable Margin applied for such Applicable Period, then, (i) the Borrower shall as soon as practicable deliver to the Agent the correct certified calculation of the Total Leverage Ratio for such Applicable Period, (ii) the Applicable Margin for the Revolving Loans, Swing Loans and Term Loans shall be determined as if the Level for such higher Applicable Margin for the

Revolving Loans, Swing Loans and Term Loans were applicable for such Applicable Period, and (iii) the Borrower shall within ten (10) Business Days of written demand thereof by the Agent pay to the Agent the accrued additional interest with respect to the Revolving Loans, Swing Loans and Term Loans owing as a result of such increased Applicable Margin for the Revolving Loans, Swing Loans and Term Loans for such Applicable Period, which payment shall be promptly applied by the Agent in accordance with this Agreement.  Notwithstanding anything herein to the contrary, Swing Loans may not be SOFR Loans.

"**Applicable Period**" shall have the meaning assigned to such term in the definition of "Applicable Margin".

"**Approved Fund**" means, with respect to any Lender, any Person (other than a natural Person) that (a)(i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"**Assignment**" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, substantially in the form of Exhibit 1.1(a) or any other form approved by Agent.

"**Attorney Costs**" means and includes all reasonable fees and disbursements of (a) one external counsel, (b) to the extent necessary, one local counsel in each relevant jurisdiction, (c) regulatory counsel if reasonably required and (d) solely in the event of a conflict of interest, one additional counsel (and, if necessary, one local counsel in each relevant jurisdiction and one regulatory counsel) to each group (which may be a single Person) of similarly situated affected Persons.

"**Authorized Signatory**" means, as to (a) any Person which is a corporation, the chairman of the board, the president, any vice president, the chief financial officer or any other officer of such Person and (b) any Person which is not a corporation, the general partner or other Managing Person thereof or any other duly appointed officer, manager or representative of such Person or a duly authorized representative of such Managing Person.

"**Availability**" means, as of any date of determination, the amount by which (a) the Maximum Revolving Loan Balance available to be borrowed upon the satisfaction of the conditions to borrowing set forth in Section 3.2 exceeds (b) the aggregate outstanding principal balance of Revolving Loans.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.15.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

|US-DOCS\~~122553549.2~~143398915.4||

"**Bankruptcy Code**" means the Federal Bankruptcy Reform Act of 1978.

"**Base Rate**" means, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent), (b) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate, and (c) the sum of (x) Adjusted Term SOFR calculated for each such day based on an Interest Period of one month determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than one percent (1.00%) per annum), plus (y) the excess of the Applicable Margin for SOFR Loans over the Applicable Margin for Base Rate Loans, in each instance, as of such day.  Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, the Federal Funds Rate or Adjusted Term SOFR for an Interest Period of one month.  Notwithstanding anything contained herein to the contrary, to the extent that the provisions of Section 11.5 shall be in effect in determining Adjusted Term SOFR pursuant to clause (c) hereof, the Base Rate shall be the greater of (i) the Prime Rate in effect on such day and (ii) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Base Rate Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Benchmark**" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.15(a).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event: the sum of: (a) the alternate benchmark rate that has been selected by the Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" means a date and time determined by the Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.15 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.15.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party or any Subsidiary of a Credit Party incurs or otherwise has any Liabilities.

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Borrower**" as defined in the preamble hereto.

"**Borrower Materials**" as defined in Section 10.10(a)(i).

"**Borrowing**" means a borrowing hereunder consisting of Loans made to or for the benefit of Borrower on the same day by the Lenders pursuant to Article II.

"**Business Day**" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York City and, when determined in connection with notices and determinations in respect of Adjusted Term SOFR or any SOFR Loan or any funding, conversion, continuation, Interest Period or payment of any SOFR Loan, any U.S. Government Securities Business Day.

"**Capital Adequacy Regulation**" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"**Capital Call Agreement**" means that certain (i) Capital Call Agreement, dated as of July 6, 2020, by and among the Sponsor, Holdings, the Borrower and the Agent, as amended by that certain First

Amendment to Capital Call Agreement, dated as of the Fourth Amendment Effective Date, and as the same may be amended, restated, supplemented or otherwise modified from time to time and (ii) Capital Call Agreement, dated as of the Eighth Amendment Effective Date, by and among the Sponsor, Holdings, the Borrower and the Agent, and as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Capital Expenditures**" means, for any period, with respect to any Person, any expenditure made or liability incurred by such Person which, in conformity with GAAP, is accounted for as a capital expenditure on the balance sheet of such person, but excluding

(a)      expenditures made (i) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored, (ii) with cash awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (iii) with cash proceeds of Dispositions, (iv) with an exchange for, or to the extent the purchase price therefor is credited against, trade in value or a concurrent sale of assets, or (v) with Capital Leases or with the proceeds of Indebtedness (other than revolving drawings) or equity issuances by the Borrower;

(b)      expenditures made to fund purchase price for assets acquired in Permitted Acquisitions or other Acquisitions permitted hereunder; and

(c)      expenditures paid for (or, directly or indirectly, reimbursed or reimbursable) by a Person that is not a Credit Party or one of its Subsidiaries, including any leasehold improvements with respect to which the Borrower or a Subsidiary has been reimbursed or received a credit (provided, such amount shall constitute Capital Expenditures to the extent such reimbursement is not received when due).

"**Capital Lease**" means, with respect to any Person, any lease of property (whether real, personal or mixed) by such Person as lessee which, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Person; provided that all obligations of any Person that are or would be characterized as operating lease obligations in accordance with GAAP as in effect immediately prior to the Closing Date (whether or not such operating lease obligations were in effect on such date) shall be accounted for as operating lease obligations (and not as Capital Leases) for the purposes of this Agreement regardless of any change in GAAP following the date that would require such obligations to be characterized as Capital Lease.

"**Capital Lease Obligations**" means, at any time, with respect to any Capital Lease, obligations of such Person under Capital Leases accounted for as liabilities in accordance with GAAP.

"**Cash Management Agreement**" means any agreement to provide one or more of the following types of services or facilities, including (a) Automated Clearing House (ACH) transactions, (b) cash management services, including controlled disbursement services, treasury, depository, overdraft, credit or debit card, stored value card, electronic funds transfer services, and (c) foreign exchange facilities or other cash management arrangements in the ordinary course of business.  For the avoidance of doubt, Cash Management Agreements do not include Rate Contracts.

"**CARES Act – Title I**" means Title 1 of the Coronavirus Aid, Relief and Economic Security Act, as amended (including any successor thereto), and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, regardless of the date enacted, adopted, issued or implemented.

"**CARES Indebtedness**" has the meaning set forth in Section 6.1(n) of this Agreement.

"**CARES Indebtedness Cap**" has the meaning set forth in Section 6.1(n) of this Agreement.

"**CARES Forgiveness Date**" means the date that is five (5) Business Days after the date that Borrowers obtain a final determination by the lender of the CARES Indebtedness (and, to the extent required, the Small Business Administration) (or such longer period as determined by Agent in its sole discretion) regarding the principal amount of CARES Indebtedness that will be forgiven pursuant to the provisions of the CARES Act – Title I.

"**CARES Unforgiven Indebtedness**" means that amount of the CARES Indebtedness that has been finally determined by the lender of the CARES Indebtedness (and, to the extent required, the Small Business Administration) to be ineligible for forgiveness pursuant to the provisions of the CARES Act – Title I; provided that, if at any time prior to such determination any Credit Party or any of its Subsidiaries takes any action (or fails to take any action) that could reasonably be expected to result in such CARES Indebtedness being ineligible for forgiveness pursuant to the provisions of the CARES Act – Title I, the CARES Unforgiven Indebtedness shall be the amount of CARES Indebtedness that has been reasonably determined by the Agent to be ineligible for forgiveness pursuant to the provisions of the CARES Act – Title I, until such time as the final determination by the lender of the CARES Indebtedness (and, to the extent required, the Small Business Administration) is made; provided further that, if a final determination by the lender of the CARES Indebtedness (and, to the extent required, the Small Business Administration) has not been made on or before the date that is twelve (12) months after the date of incurrence of the CARES Indebtedness (or such longer period as determined by Agent in its sole discretion), notwithstanding any determination that may have been made by the Agent pursuant to the preceding proviso, all such CARES Indebtedness shall be deemed CARES Unforgiven Indebtedness until such time as such final determination is made by the lender of the CARES Indebtedness (and, to the extent required, the Small Business Administration).

"**Cashless Rollover**" as defined in Section 2.1(a).

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Code, as amended.

"**CFC Holdco**" means any Domestic Subsidiary that has no material assets other than the equity interests (or equity and debt interests) or one or more foreign subsidiaries that are CFCs or any other Domestic Subsidiary that itself is a CFC Holdco.

"**Certain Funds Term Loan**" as defined in Section 2.13(b).

"**Change of Control**" means, at any time on or after the Closing Date,

(a)     the Permitted Holders shall fail to have, directly or indirectly, beneficial ownership of Stock of Holdings representing a majority of the aggregate ordinary voting power and economic interests represented by the outstanding equity interests of Holdings, or

(b)     Holdings shall fail to have legal and beneficial title to Stock of the Borrower representing one hundred percent (100%) of the aggregate ordinary voting power and economic interests represented by the outstanding equity interests of the Borrower.

As used herein, "**control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Stock by contract or otherwise and "beneficial ownership" shall be determined pursuant to Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended.

"**Class**" (a) when used with respect to Lenders, refers to whether such Lenders have a Loan or Commitment with respect to a particular "class" (as described in clauses (b) or (c) of this definition) of Loans or Commitments, (b) when used with respect to Commitments, refers to whether such Commitments are Revolving Loan Commitments or Term Loan Commitments or Closing Date Delayed Draw Term Commitments or First Amendment Delayed Draw Term Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Revolving Loans or Term Loans or Closing Date Delayed Draw Term Loans or First Amendment Delayed Draw Term Loans or Incremental Term Loans, in each case, under this Agreement as originally in effect or amended pursuant to Section 10.1), of which such Loans, Borrowing or Commitments shall be a part.  Revolving Loan Commitments, Closing Date Delayed Draw Term Commitments, First Amendment Delayed Draw Term Commitments and Term Loan Commitments (and in each case, the Loans made pursuant to such Commitments) that have different terms and conditions shall be construed to be in different Classes.  Notwithstanding the foregoing, Commitments (and in each case, the Loans made pursuant to such Commitments), intended to be fungible with any existing Revolving Loan Commitment or Term Loan Commitments or Closing Date Delayed Draw Term Commitments or First Amendment Delayed Draw Term Commitments) that have identical terms and conditions shall be construed to be in the same Class.

"**Closing Date**" means September 6, 2019.

"**Closing Date Delayed Draw Term Amortization Amount**" means an amount equal to (i) the aggregate outstanding principal amount of Closing Date Delayed Draw Term Loans on the Closing Date Delayed Draw Term Commitment Expiry Date, <u>multiplied by</u> (ii) 0.625%.

"**Closing Date Delayed Draw Term Availability Period**" means the period following the Closing Date to the earliest of (i) the date upon which all of the Closing Date Delayed Draw Term Commitment has been funded, (ii) the Closing Date Delayed Draw Term Commitment Expiry Date, and (iii) the date on which Agent or Required Lenders elect to terminate the Revolving Loan Commitment and the Closing Date Delayed Draw Term Commitment pursuant to Section 8.2.

"**Closing Date Delayed Draw Term Borrowing**" means a borrowing of a Closing Date Delayed Draw Term Loan.

"**Closing Date Delayed Draw Term Commitment**" means, with respect to each Lender, such Lender's Closing Date Delayed Draw Term Commitment, as amended to reflect Assignments and as such amount may be reduced or increased pursuant to this Agreement.

"**Closing Date Delayed Draw Term Commitment Expiry Date**" means September 6, 2020.

"**Closing Date Delayed Draw Term Lender**" means each Lender having a Closing Date Delayed Draw Term Commitment or Closing Date Delayed Draw Term Loan Outstandings in excess of zero (or, in the event the Closing Date Delayed Draw Term Commitment shall have been terminated or reduced to zero at any time, each Lender at such time having Closing Date Delayed Draw Term Loan Outstandings in excess of zero).

"**Closing Date Delayed Draw Term Loan Limit**" means, at any time of determination, the lesser of (i) the unfunded Closing Date Delayed Draw Term Commitment at such time and (ii) the amount of Closing Date Delayed Draw Term Loans that, if made, would not cause Borrower's Total Leverage Ratio (after giving effect to such Closing Date Delayed Draw Term Loans and the application of the proceeds thereof), recomputed on a Pro Forma Basis as of the last day of the month for which financial statements have been delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was

most recently delivered to Agent), to exceed the lesser of (x) 4.25 to 1.00 and (y) the Total Leverage Ratio required by Section 6.13 for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered pursuant to Section 5.1.

"**Closing Date Delayed Draw Term Loan Outstandings**" means at any time of calculation the sum of the then existing aggregate outstanding principal amount of Closing Date Delayed Draw Term Loans.

"**Closing Date Delayed Draw Term Loans**" has the meaning set forth in Section 2.1(e)(i).

"**Closing Date Delayed Draw Term Note(s)**" means a promissory note of Borrower payable to a Lender, in substantially the form of Exhibit 1.1(e) hereto, evidencing the Indebtedness of Borrower to such Lender resulting from the Closing Delayed Draw Term Loan made to Borrower by such Lender or its predecessor(s).

"**Closing Date Distribution**" means the cash dividend to the equity holders of Holdings in an aggregate amount equal to $19,902,421.21 made on the Closing Date.

"**Code**" means the Internal Revenue Code of 1986, as the same has been or may be amended from time to time, or any successor thereto, and the rules and regulations issued thereunder, as from time to time in effect.

"**Collateral**" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party, in or upon which a Lien is granted, purported to be granted, or now or hereafter exists in favor of any Lender or Agent for the benefit of Agent, Lenders and other Secured Parties, under any Loan Document; provided, that the Collateral shall not include any Excluded Asset (as defined in any Collateral Document); provided, further, that to the extent material and adverse tax consequences would reasonably be expected to arise in the absence of such exclusion as a result of a change in law relating to Section 956 of the Code and regulations thereunder after the date hereof, Excluded Assets shall include voting equity interests in any Subsidiary that is a CFC or CFC Holdco representing in excess of 65% of the voting equity interests of such CFC or CFC Holdco.

"**Collateral Documents**" means, collectively, the Security Agreement, the Holding Company Security Agreement, the Subsidiary Guaranty Agreement, the mortgages, each Control Agreement and all other security agreements, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, and any Lender or Agent for the benefit of Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or Agent for the benefit of Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Commitment**" means, for each Lender, the sum of its Revolving Loan Commitment and Term Loan Commitment, if the Closing Date Delayed Draw Term Commitment Expiry Date has not already occurred, its Closing Date Delayed Draw Term Commitment, and if the First Amendment Delayed Draw Term Commitment Expiry Date has not already occurred, its First Amendment Delayed Draw Term Commitment.

"**Commitment Percentage**" means, as to any Lender, the percentage equivalent of such Lender's Revolving Loan Commitment or Term Loan Commitment or Closing Date Delayed Draw Term

Commitment or First Amendment Delayed Draw Term Commitment divided by the Aggregate Revolving Loan Commitment or Aggregate Term Loan Commitment or Aggregate Closing Date Delayed Draw Term Commitment or Aggregate First Amendment Delayed Draw Term Commitment, as applicable; provided that after the Initial Term Loan or First Amendment Term Loan or Closing Date Delayed Draw Term Loan or First Amendment Delayed Draw Term Loan or Incremental Term Loan has been funded, Commitment Percentages shall be determined for the Term Loan or Closing Date Delayed Draw Term Loan or First Amendment Delayed Draw Term Loan, as applicable, by reference to the outstanding principal balance thereof as of any date of determination rather than the Commitments therefor; provided, further, that following acceleration of the Loans, such term means, as to any Lender, the percentage equivalent of the principal amount of the Loans held by such Lender, divided by the aggregate principal amount of the Loans held by all Lenders.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Compliance Certificate**" as defined in Section 5.1(d̶e).

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.15 and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes.

"**Consolidated Adjusted Indebtedness**" means as of any date of determination, the sum of (a) Funded Indebtedness of the Borrower and its Subsidiaries on a consolidated basis (but excluding any issued but unfunded letters of credit) plus (b) the ~~product of~~ Consolidated Cash Rent Expense for the four Fiscal Quarters of the Borrower most recently ended ~~multiplied by eight~~, all as determined in accordance with GAAP.

"**Consolidated Cash Rent Expense**" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, the aggregate amount of rent expense (for the avoidance of doubt, excluding all rental taxes, insurance expenses, property taxes and common-area maintenance expenses, but including all capitalized rent and leases as included on the balance sheet of the Borrower and its Subsidiaries) paid in cash (or required to be paid in cash) during such period with respect to leases of real property; provided that all obligations of any Person that are or would be characterized as capitalized rent and lease obligations in accordance with GAAP as in effect immediately prior to the Closing Date (whether or not such capitalized rent or lease obligations were in effect on such date) shall be accounted for as capitalized rent and lease obligations for the purposes of this Agreement regardless of any change in GAAP.

"**Consolidated Current Assets**" means, with respect to any Person at any date, all assets (other than cash, Permitted Investments) of such Person and its Subsidiaries at such date that would, in conformity with GAAP, be classified as current assets on a consolidated balance sheet of such Person at such date.

"**Consolidated Current Liabilities**" means, with respect to any Person at any date, all liabilities of such Person and its Subsidiaries at such date that would, in conformity with GAAP, be classified as current liabilities on a consolidated balance sheet of such Person and its Subsidiaries at such date; provided, however, that "Consolidated Current Liabilities" shall exclude, to the extent otherwise included therein, (a) Revolving Loans, (b) Swing Loans, and (c) the current portion of any Indebtedness (including but not limited to, for purposes of clarification, the Term Loans) then outstanding.

"**Consolidated EBITDAR**" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, an amount equal to the sum of (a) EBITDA for such period plus (b) Consolidated Cash Rent Expense for such period.

"**Consolidated Studio Opening Synergies**" means synergies resulting from the acquisition, opening, conversion and organizing of new and converted studios.

"**Consolidated Total Assets**" mean the total assets of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower and its Subsidiaries for the most recently completed Fiscal Quarter for which financial statements have been delivered pursuant to the terms of this Agreement.

"**Contingent Acquisition Consideration**" means (x) any holdback obligation in connection with the Apollo Acquisition, the Legend Acquisition or the Zeus Acquisition and (y) any holdback obligation, earnout obligation or similar deferred or contingent obligation of Borrower or any of its Subsidiaries incurred or created in connection with a Permitted Acquisition or other investment.

"**Contingent Acquisition Consideration Claims**" means any action or proceeding that has been threatened, commenced or pending in connection with the failure of the Borrower to make certain Contingent Acquisition Consideration Payments with respect to any Permitted Acquisition, including (i) that certain litigation initiated by Robert Scot James and Core2000 LLC, as plaintiffs, against the Borrower, as filed in the United States District Court for the District of Delaware on May 30, 2023 and (ii) any prospective or future litigation initiated against the Borrower by any Person holding rights as a Pegasus Seller in connection with the Pegasus Acquisition.

"**Contingent Acquisition Consideration Payments**" means (x) any holdback payment in connection with the Apollo Acquisition, the Legend Acquisition or, the Zeus Acquisition, the Thanos Acquisition or the Pegasus Acquisition, and (y) any payment of any earnout obligation or similar deferred or contingent obligation of Borrower or any of its Subsidiaries incurred or created in connection with a Permitted Acquisition or other investment, which payments shall be made in accordance with the terms of the documentation governing such Contingent Acquisition Consideration (which documentation, plus all amendments and modifications of such documentation entered into from time to time, shall be in form and substance reasonably satisfactory to the Agent).

"**Contingent Liquidity Equity Contribution**" means a Liquidity Advance (as defined in theeach Capital Call Agreement) made by Sponsor in accordance with Section 2 of theeach applicable Capital Call Agreement.

"**Contractual Obligations**" means, as to any Person, any provision of any security (whether in the nature of Stock, or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document agreement (other than a Loan Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"**Control Agreement**" means, with respect to any deposit account, securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to Agent, among Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried (if applicable, any holder of any Lien, or any representative therefor) and the Credit Party maintaining such account or owning such entitlement or contract, effective to grant "control" (within the meaning of Articles 8 and 9 under the applicable UCC) over such account to Agent (and, if applicable, such holder or representative).

"**Conversion Date**" means any date on which Borrower converts a Base Rate Loan to a SOFR Loan or a SOFR Loan to a Base Rate Loan.

"**Cost Savings**" has the meaning assigned to such term in clause (xiii) of the definition of EBITDA.

"**Covered Entity**" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Credit Parties**" means Borrower and each of the Guarantors.

"**Cure Amount**" has the meaning set forth in Section 8.3(b).

"**Cure Right**" has the meaning set forth in Section 8.3.

"**Default**" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defaulting Lender**" means any Lender that has:

(a)        failed to (i) fund any payments required to be made by it under the Loan Documents within two (2) Business Days after any such payment is due (excluding expense and similar reimbursements that are subject to good faith disputes) unless such Lender notifies Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or (ii) pay to Agent, any L/C Issuer, any Swing Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swing Loans) within two (2) Business Days of the date when due,

(b)        given written notice (and Agent has not received a revocation in writing), to Borrower, Agent, any Lender, or any L/C Issuer or has otherwise publicly announced (and Agent has not received notice of a public retraction) that such Lender believes it will fail to fund payments or purchases of participations required to be funded by it under the Loan Documents or one or more other syndicated credit facilities (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), or

(c)        has, or any Person that directly or indirectly controls such Lender has, (i) become subject to a voluntary or involuntary case under the Bankruptcy Code or any similar bankruptcy laws, (ii) had a custodian, conservator, receiver or similar official appointed for it or any substantial part of such Person's assets, (iii) made a general assignment for the benefit of creditors, been liquidated, or otherwise been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt, or (iv) become the subject of a Bail-in Action, and for this clause (c), Agent has determined that such Lender is reasonably likely to fail to fund any payments required to be made by it under the Loan Documents.

"**Disposition**" means the sale, lease, conveyance or other disposition of Property by any Credit Party or Subsidiary of a Credit Party.

"**Disqualified Institution**" means, on any date, (a) any Person designated by the Borrower as a "Disqualified Institution" by written notice delivered to the Agent on or prior to the date hereof, (b) any Person that is a competitor of the Borrower or any of its Subsidiaries identified by the Borrower to the Agent by written notice delivered to the Agent on or prior to the date hereof, (c) any Person that is a competitor of the Borrower or any of its Subsidiaries identified by the Borrower to the Agent by written notice delivered to the Agent from time to time after the Closing Date as a "Disqualified Institution" for purposes of this Agreement and such competitors shall be reasonably acceptable to the Agent and (d) any direct or indirect owner of an Orange Theory franchisee; provided that "Disqualified Institution" shall exclude (i) any Person that the Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to the Agent from time to time and (ii) bona fide debt funds or investment vehicles that are engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business.

"**Disqualified Stock**" means any Stock that, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (except as a result of a change in control or asset sale so long as any rights of the holders thereof upon the occurrence of a change in control or asset sale event shall be subject to the prior repayment in full of the Obligations that are accrued and payable and the termination of the Revolving Commitment), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is or becomes convertible into or exchangeable, automatically or at the option of any holder thereof, for Indebtedness or any other Stock that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"**Dollars**", "**dollars**" and "**$**" each mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.