"**EBITDA**" means, for any Measurement Period, Net Income for such period, plus the sum of (without duplication) the following, in each case to the extent deducted and not otherwise added back, or otherwise excluded, in determining Net Income for such period (except in the case of clauses (xi), (xiii) and (xiv) below),

    (i)     interest expense;

    (ii)    taxes based on income, profits or capital, franchise, excise or similar taxes, and foreign withholding taxes for such period, including (A) penalties and interest and (B) tax distributions made to any direct or indirect holders of equity interests in respect of any such taxes;

    (iii)    depreciation and amortization;

    (iv)    non-cash losses, expenses and other items reducing Net Income, but excluding any noncash loss or expense that is an accrual of a reserve for a cash expenditure or payment to be made, or anticipated to be made, in a future period;

    (v)    unusual, extraordinary, infrequent or non-recurring items ("**Non-Ordinary Expenses**"); provided that, for purposes of clarity, no Non-Ordinary Expenses related to COVID-19 may be added back pursuant to this clause (v) or otherwise, without the prior written consent of the Agent in its sole discretion; provided, further, that with respect to any litigation, attorney fees and costs, settlement payments and payments of court ordered judgements shall only be added back pursuant to this clause (v), in an amount not to exceed $1,000,000 in the aggregate;

    (vi)    (i) management fees to the extent permitted by this Agreement and (ii) reasonable board of director and Sponsor expenses (including compensation to Sponsor's operating partners);

    (vii)    transaction fees and expenses incurred in connection with the Loan Documents;

    (viii)    costs, fees and expenses (such costs, fees and expenses collectively, "**Transaction Fees**") incurred in connection with any consummated, contemplated or proposed (A) Permitted Acquisition or other permitted investment hereunder, (B) Restricted Payment, (C) asset sale, recapitalization or other Disposition, (D) issuance, repayment or modification of Indebtedness permitted under this Agreement, or (E) issuance, modification or buyout of equity permitted under this Agreement;

    (ix)    charges, losses, or expenses incurred to the extent covered by indemnification or refunding provisions in any agreement or document, any insurance, or any purchase price adjustments in connection with any Permitted Acquisition or other permitted investment hereunder, in each case, to the extent actually reimbursed during such period by Persons other than a Credit Party or its Subsidiaries or for which insurance or indemnity recovery is actually received in cash during such period;

    (x)    the effects of purchase accounting, fair value accounting or recapitalization accounting;

    (xi)    proceeds of business interruption insurance received during such period;

(xii)    reasonable fees, expenses or charges relating to curtailments or modifications to employee benefit plans, management equity plans, profits interest or stock option plan or any other management or employee benefit plan or agreement or any stock subscription, stockholders or partnership agreement and any reasonable payments in the nature of compensation or expense reimbursement made to independent board members;

(xiii)    the amount of "run-rate" savings, operating expense reductions and synergies (the "**Cost Savings**") that are projected by the Borrower in good faith to result from actions taken, committed to be taken, or expected to be taken no later than twelve (12) months after the end of such period (which amounts will be determined by the Borrower in good faith and calculated on a pro forma basis as though such amounts had been realized on the first day of the period for which EBITDA is being determined), net of the amount of actual benefits realized during such period from such actions; <u>provided</u> that a Financial Officer of the Borrower shall have provided a reasonably detailed statement or schedule of such Cost Savings and shall have certified to the Agent and the Lenders that (x) such cost savings are reasonably identifiable, reasonably attributable to the actions specified and reasonably anticipated to result from such actions and (y) such actions have been taken and are ongoing (or are expected to be taken within twelve (12) months of the end of such period), and the benefits resulting therefrom are anticipated by a Credit Party to be realized within twelve (12) months of the end of such period;

(xiv)    to the extent incurred prior the opening of a fitness studio, pre-opening expenses incurred in any period in an aggregate amount not to exceed $175,000 for each fitness studio; and

(xv)    Consolidated Studio Opening Synergies in an amount not to exceed $230,000 in the aggregate per studio for the first year following the date on which credit cards were first charged for membership fees for such studio (the "<u>Tap Date</u>"), which amounts will be determined by the Borrower in good faith and calculated on a pro forma basis as though such amounts had been realized on the first day of the period for which EBITDA is being determined, net of the amount of actual benefits realized during such period from such actions;

(xvi)    such other addbacks for such period as my be agreed to by the Required Lenders;

<u>minus</u>

(i)    to the extent any Franchise Agreement is canceled or is not renewed during such period, the amount of any royalty fees that would have been payable to the Borrower or any of its Subsidiaries under such agreement during such period;

<u>provided</u>, that (A) the aggregate amount of all Transaction Fees relating to proposed or contemplated transactions that are not consummated, Non-Ordinary Expenses, Cost Savings and Consolidated Studio Opening Synergies added back to Net Income during any such period plus any adjustments to Pro Forma EBITDA shall not exceed twenty percent (20.0%) of EBITDA calculated before giving effect to the add-back or adjustment for any such item (but, for the avoidance of doubt, after giving effect to each other addback and adjustment not subject to such cap).  For purposes of determining EBITDA for any period that includes the quarterly periods ending December 31, 2018, March 31, 2019 and June 30, 2018, EBITDA for each such quarterly period shall be deemed to be $2,809,929, $5,246,985 and $6,209,388, respectively; *provided*, that, such deemed EBITDA figures exclude the Consolidated Studio Opening Synergies adjustment.  For purposes of determining the Consolidated Studio Opening Synergies adjustment for the twelve (12) month periods ending on each of June 30, 2019, December 31, 2018 and March 31, 2019, the Consolidated Studio Opening Synergies

adjustment shall be deemed to be $963,780, $1,124,763 and $1,143,244, respectively.  For the avoidance of doubt, the proceeds of CARES Indebtedness and any portion of the CARES Indebtedness forgiven pursuant to the provisions of the CARES Act – Title I shall not be included in the calculation of EBITDA.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**E-Fax**" means any system used to receive or transmit faxes electronically.

"**Effective Yield**" shall mean, as to any Indebtedness, the effective yield on such Indebtedness in the reasonable determination of Agent in consultation with Borrower and consistent with generally accepted financial practices, taking into account the applicable interest rate margins, any interest rate floors (the effect of which floors shall be determined in a manner set forth in the proviso below), or similar devices and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (i) the remaining Weighted Average Life to Maturity of such Indebtedness and (ii) the four years following the date of incurrence thereof) payable generally to Lenders or other institutions providing such Indebtedness, but excluding any customary arrangement, structuring, underwriting, commitment, or other similar fees payable in connection therewith that are not generally shared with the relevant Lenders and, if applicable, consent fees for an amendment paid generally to consenting Lenders; *provided* that with respect to any Indebtedness that includes a "SOFR floor" or "Base Rate floor," (a) to the extent that Adjusted Term SOFR or the Base Rate (without giving effect to any floors in such definitions), as applicable, on the date that the Effective Yield is being calculated is less than such floor, the amount of such difference shall be deemed added to the interest rate margin for such Indebtedness for the purpose of calculating the Effective Yield and (b) to the extent that Adjusted Term SOFR or the Base Rate (without giving effect to any floors in such definitions), as applicable, on the date that the Effective Yield is being calculated is greater than such floor, then the floor shall be disregarded in calculating the Effective Yield.

"**Eighth Amendment**" means that certain Limited Waiver and Eighth Amendment to Credit Agreement, dated as of the Eighth Amendment Effective Date, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**Eighth Amendment Effective Date**" means July 11, 2023.

"**Eighth Amendment Fee Letter Agreement**" means that letter agreement, dated as of the Eighth Amendment Effective Date, between Borrower and Agent.

"**E-Signature**" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an

abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"**E-System**" means any electronic system approved by Agent, including Syndtrak®, Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"**Electronic Transmission**" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System.

"**Environmental Laws**" means all Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"**Environmental Liabilities**" means all Liabilities (including costs of removal and remedial actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and Attorneys' Costs) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, collectively, any Credit Party, any Subsidiary of a Credit Party, and any Person under common control or treated as a single employer with, any Credit Party or any Subsidiary of a Credit Party, within the meaning of Section 414(b) or (c) of the Code, and solely with respect to Section 302 of ERISA and/or Sections 412, 430 through 433, 436, 4971, 4977 and/or each "applicable section" under 414(t)(2) of the Code, within the meaning of Section 414(m) or (o) of the Code.

"**ERISA Event**" means any of the following:  (a) a Reportable Event; (b) the withdrawal of any ERISA Affiliate from a Pension Plan (other than a Multiemployer Plan) subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of insolvency or termination, or treatment of a plan amendment as termination, under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Pension Plan (other than a Multiemployer Plan), or treatment of a plan amendment as termination, under Section 4041 of ERISA; (f) the institution of proceedings to terminate, or appoint a trustee to administer, a Pension Plan by the PBGC; (g) the failure to make any required contribution to any Pension Plan or Multiemployer Plan when due; (h) the imposition of a Lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; (j) a Pension Plan (other than a Multiemployer Plan) is in "at risk" status within the meaning of Code Section 430(i); (k) a Multiemployer Plan is in "endangered status" or "critical status"

within the meaning of Section 432(b) of the Code; and (l) any other event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or for the imposition of any liability upon any ERISA Affiliate under Title IV of ERISA other than for contributions to Pension Plans in the ordinary course and PBGC premiums due but not delinquent.

"**Erroneous Payment**" as defined in Section 9.14(a).

"**Erroneous Payment Notice"** as defined in Section 9.14(b).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurocurrency liabilities**" as defined in Section 11.6.

"**Event of Default**" as defined in Section 8.1.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; or (b) any condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"**Excess Cash Flow**" shall mean for any period:

(1)         EBITDA for such period, less

(2)         without duplication, and to the extent actually paid in cash, during such period, in each case to the extent not financed with proceeds of Stock issuances or Indebtedness (other than drawings under the Revolving Loan Commitment or Swingline Commitment ), the sum of the following for Borrower and its Subsidiaries:

(a)         scheduled principal payments with respect to Indebtedness and optional principal payments with respect to Indebtedness permitted by this Agreement (excluding any payments with respect to revolving debt obligations),

(b)         interest expense,

(c)         Capital Expenditures,

(d)         taxes based on income, profits or capital, franchise, excise or similar taxes, and foreign withholding taxes for such period, including (A) penalties and interest and (B) tax distributions made to any direct or indirect holders of equity interests in respect of any such taxes,

(e)         depreciation, amortization and other non-cash items increasing EBITDA,

(f)         Non-Ordinary Expenses,

(g)         Restricted Payments and investments permitted by Sections 6.8(h), (n) and (o), Investments permitted by Section 6.8, and amounts paid in connection with Acquisitions, in each case, to the extent not funded with Indebtedness,

(h)             (i) management fees to the extent permitted by this Agreement and (ii) reasonable board of director and Sponsor expenses (including compensation to Sponsor's operating partners) to the extent permitted by this Agreement and taken into account in the calculation of EBITDA,

(i)             any increase in Working Capital of Borrower and its Subsidiaries (measured as the excess of such Working Capital at the end of such period over such Working Capital at the beginning of such period),

(j)             transaction fees and expenses incurred in connection with the Loan Documents to the extent taken into account in the calculation of EBITDA,

(k)             Transaction Fees to the extent taken into account in the calculation of EBITDA,

(l)             cash add-backs to net income specified in clauses (ix), (x), (xii), (xiii), (xiv), (xv) and (xvi) of the definition and taken into account in the calculation of EBITDA

plus

(3)             without duplication, any decrease in the Working Capital of Borrower and its Subsidiaries (measured as the excess of such Working Capital at the beginning of such period over such Working Capital at the end thereof).

"**Excluded Accounts**" as defined in Section 5.15.

"**Excluded Prepayment Amount**" as defined in Section 2.8(h).

"**Excluded Rate Contract Obligation**" means, with respect to any Guarantor, any guarantee of any Swap Obligations under a Secured Rate Contract if, and only to the extent that and for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation under a Secured Rate Contract (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract.  If a Swap Obligation under a Secured Rate Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Secured Rate Contract that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Subsidiary**" means, any direct or indirect Subsidiary of the Borrower (i) that is not a wholly-owned operating Domestic Subsidiary, (ii) to the extent (and for so long as) it is prohibited by applicable law, rule, regulation or contract existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would (and for so long as it would) require consent, approval, license or authorization of any Governmental Authority (including regulatory) (unless such consent, approval, license or authorization has been obtained), (iii) where Agent and the Borrower reasonably agree that the cost of obtaining a guarantee by such Subsidiary would be excessive in light of the practical benefit to the Lenders afforded thereby, (iv) the obtaining of a guarantee with respect to which would result in material adverse Tax consequences as reasonably determined by the

Borrower in consultation with the Agent or (v) that is an Immaterial Subsidiary; *provided*, that at the election of either the Agent or the Borrower, clause (i) above shall apply to Subsidiaries that are not wholly-owned, regardless of whether such Subsidiaries are Domestic Subsidiaries.

"**Excluded Tax**" means any of the following Taxes imposed on or with respect to any Secured Party or required to be withheld or deducted from a payment to a Secured Party: (a) Taxes imposed on or measured by net income, branch profit Taxes, and franchise Taxes, in each case (i) imposed on any Secured Party as a result of being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) withholding Taxes imposed on amounts payable to or for the account of a Secured Party with respect to an applicable interest in the Loans or L/C Reimbursement Obligations pursuant to a law in effect on the date on which (i) such Secured Party acquires such interest in a Loan or L/C Reimbursement Obligation (other than pursuant to an assignment request pursuant to Section 10.20) or (ii) such Secured Party changes its Lending Office, except in each case to the extent that, pursuant to Section 11.1, amounts with respect to such Taxes were payable either to such Secured Party's assignor immediately before such Secured Party became a party to this Agreement or to such Secured Party before it changed its Lending Office; (c) Taxes that are attributable to the failure by any Secured Party to comply with Section 11.1(h); and (d) any Taxes imposed under FATCA.

"**Existing Lease Defaults**" means certain defaults of the Borrower and its Subsidiaries under Capital Leases as of the Third Amendment Effective Date, as previously disclosed to the Agent and specified on Schedule 6.12 hereto.

"**Facility Termination Date**" means the date on which (a) the Revolving Loan Commitments, the Closing Date Delayed Draw Term Commitment and the First Amendment Delayed Draw Commitments have terminated, (b) all Loans, all L/C Reimbursement Obligations and all other Obligations (excluding contingent indemnification Obligations as to which no claim has been asserted and Secured Swap Obligations and Secured Cash Management Obligations unless Agent has theretofore been notified in writing by the holder thereof that such Secured Swap Obligations or Secured Cash Management Obligations are then due and payable) have been paid and satisfied in full and (C) there shall have been deposited cash collateral with respect to all contingent Obligations (or, as an alternative to cash collateral, in the case of any Letter of Credit Obligation, Agent shall have received a back-up letter of credit) in amounts and on terms and conditions and with parties reasonably satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding contingent Obligations (other than L/C Reimbursement Obligations) as to which no claim has been asserted, Secured Swap Obligations and Secured Cash Management Obligations).

"**FATCA**" means Sections 1471, 1472, 1473 and 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury Regulations promulgated thereunder, official interpretations thereof and published guidance with respect thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation or applicable intergovernmental agreements with respect thereto and any rule, law, regulation or practice adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as determined by Agent in a commercially reasonable manner, but in no event less than 0.0% per annum.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"**Fee Letter Agreement**" means that letter agreement dated as of the Closing Date related to fees, between Borrower and Agent.

"**Fifth Amendment**" means that certain Fifth Amendment to Credit Agreement, dated as of April 20, 2021, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**Fifth Amendment Distribution**" means the cash dividend to the equity holders of Holdings in an aggregate amount equal to $15,100,000 made on the Fifth Amendment Effective Date.

"**Fifth Amendment Effective Date**" means April 20, 2021.

"**Final Availability Date**" means the earlier of (a) the date specified in clause (a) of the definition of Revolving Termination Date and (b) the date on which the Aggregate Revolving Loan Commitment shall terminate in accordance with the provisions of this Agreement.

"**Financial Officer**" means, as to any Person, the chief executive officer, chief financial officer or controller of such Person or such other officer as shall be satisfactory to the Agent.

"**Financial Projections**" means the financial projections from calendar year 2019 through calendar year 2023, delivered by the Borrower to the Agent on or about the Closing Date.

"**First Amendment**" means that certain First Amendment to Credit Agreement, dated as of December 2, 2019, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**First Amendment Delayed Draw Term Amortization Amount**" means an amount equal to (i) the aggregate outstanding principal amount of First Amendment Delayed Draw Term Loans on the First Amendment Delayed Draw Term Commitment Expiry Date, <u>multiplied by</u> (ii) 0.625%.

"**First Amendment Delayed Draw Term Availability Period**" means the period following the First Amendment Effective Date to the earliest of (i) the date upon which all of the First Amendment Delayed Draw Term Commitment has been funded, (ii) the First Amendment Delayed Draw Term Commitment Expiry Date, and (iii) the date on which Agent or Required Lenders elect to terminate the Revolving Loan Commitment and the First Amendment Delayed Draw Term Commitment pursuant to Section 8.2.

"**First Amendment Delayed Draw Term Borrowing**" means a borrowing of a First Amendment Delayed Draw Term Loan.

"**First Amendment Delayed Draw Term Commitment**" means with respect to each Lender, such Lender's First Amendment Delayed Draw Commitment, as amended to reflect Assignments and as such amount may be reduced or increased pursuant to this Agreement.

"**First Amendment Delayed Draw Term Commitment Expiry Date**" means January 31, 2020.

"**First Amendment Delayed Draw Term Lender**" means each Lender having a First Amendment Delayed Draw Term Commitment or First Amendment Delayed Draw Term Loan Outstandings in excess of zero (or, in the event the First Amendment Delayed Draw Term Commitment

shall have been terminated or reduced to zero at any time, each Lender at such time having First Amendment Delayed Draw Term Loan Outstandings in excess of zero).

"**First Amendment Delayed Draw Term Loan Limit**" means, at any time of determination, the lesser of (i) the unfunded First Amendment Delayed Draw Term Commitment at such time and (ii) the amount of First Amendment Delayed Draw Term Loans that, if made, would not cause Borrower's Total Leverage Ratio (after giving effect to such First Amendment Delayed Draw Term Loans and the application of the proceeds thereof), recomputed on a Pro Forma Basis as of the last day of the month for which financial statements have been delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was most recently delivered to Agent), to exceed the lesser of (x) 4.25 to 1.00 and (y) the Total Leverage Ratio required by Section 6.13 for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered pursuant to Section 5.1.

"**First Amendment Delayed Draw Term Loan Outstandings**" means at any time of calculation the sum of the then existing aggregate outstanding principal amount of First Amendment Delayed Draw Term Loans.

"**First Amendment Delayed Draw Term Loans**" means any term loan made here under pursuant to Section 2.1(e)(i)(B).

"**First Amendment Delayed Draw Term Note(s)**" means a promissory note of Borrower payable to a Lender, in substantially the form of Exhibit 1.1(e) hereto, evidencing the Indebtedness of Borrower to such Lender resulting from the First Amendment Delayed Draw Term Loan made to Borrower by such Lender or its predecessor(s).

"**First Amendment Effective Date**" means December 2, 2019.

"**First Amendment Fee Letter Agreement**" means that letter agreement, dated as of the First Amendment Effective Date, between Borrower and Agent.

"**First Amendment Term Loan**" means any term loan made here under pursuant to Section 2.1(a).

"**First Amendment Term Loan Commitment**" means with respect to each Lender, such Lender's First Amendment Term Loan Commitment, as amended to reflect Assignments and as such amount may be reduced or increased pursuant to this Agreement.

"**First Amendment Term Loan Lender**" means each Lender who holds First Amendment Term Loans.

"**First Amendment Term Note(s)**" means a promissory note of Borrower payable to a Lender, in substantially the form of Exhibit 1.1(c) hereto, evidencing the Indebtedness of Borrower to such Lender resulting from the First Amendment Term Loan made to Borrower by such Lender or its predecessor(s).

"**Fiscal Quarter**" means any of the quarterly accounting periods of Borrower and its Subsidiaries ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means any of the annual accounting periods of Borrower and its Subsidiaries ending on December 31 of each year.

"**Fixed Charge Coverage Ratio**" means, on any date of determination, for the Borrower and its Subsidiaries on a consolidated basis, the ratio of

(a)      (i)      Consolidated EBITDAR for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered pursuant to Section 5.1, <u>minus</u>

(ii)      the sum of (without duplication) the following, in case for the Measurement Period ending on or most recently prior to such date:

(A)      Maintenance Capital Expenditures made in cash,

(B)      all Federal, state, local and foreign income Taxes paid in cash by the Borrower or its Subsidiaries and cash dividends or distributions made by the Borrower or its Subsidiaries to its shareholders or members, as the case may be, for the payment of any such Taxes,

(C)      Restricted Payments paid in cash consisting of distributions made by the Borrower to the Parent during such period to the extent permitted under Section 6.15(d),

(D)      the aggregate amount of investments made in Foreign Subsidiaries following the Closing Date in excess of $500,000 (other than investments funded by new equity issuances (<u>provided</u> that, any such new equity issuances that are not common equity are on terms reasonably satisfactory to the Agent), including without limitation, for the Fiscal Year ending December 31, 2018, $523,000 funded by the Borrower and reimbursed by the Sponsor through an equity issuance in January of 2019) to

(b)      Fixed Charges paid or payable in cash for such Measurement Period.

Notwithstanding the foregoing, for purposes of calculating the Fixed Charge Coverage Ratio for the first, second and third Fiscal Quarters ending after the Closing Date, the components of the Fixed Charge Coverage Ratio attributable to (1) interest expense and (2) amortization payments paid or payable on Funded Indebtedness during such period ((1) and (2) collectively, the "**Annualized Fixed Charges**") shall be annualized during such Fiscal Quarters such that (I) for the calculation of the Fixed Charge Coverage Ratio as of the first Fiscal Quarter ending after the Closing Date, Annualized Fixed Charges for the Fiscal Quarter then ending will be multiplied by four (4), (II) for the calculation of the Fixed Charge Coverage Ratio as of the second Fiscal Quarter ending after the Closing Date, Annualized Fixed Charges for the two Fiscal Quarter period then ending will be multiplied by two (2) and (III) for the calculation of the Fixed Charge Coverage Ratio as of the third Fiscal Quarter ending after the Closing Date, Annualized Fixed Charges for the three Fiscal Quarter period then ending will be multiplied by one and one third (1 1/3).

"**Fixed Charges**" means, for any Measurement Period, the sum of (without duplication), for the Borrower and its Subsidiaries on a consolidated basis (a) interest expense for such period (including interest on Capital Leases, commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Rate Contracts, but excluding any origination fees), in each case, to the extent paid or payable during such Measurement Period in cash, (b) amortization payments paid or payable on Funded Indebtedness during such period and (c) Consolidated Cash Rent Expense.

"**Floor**" means a rate of interest equal to 1.00% per annum.

"**Foreign Subsidiary**" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"**Fourth Amendment**" means that certain Limited Waiver and Fourth Amendment to Credit Agreement, dated as of February 19, 2021, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**Fourth Amendment Effective Date**" means February 19, 2021.

"**Fourth Amendment Fee**" as defined in Section 2.9(i).

"**Franchise Agreements**" means, individually and collectively as the context may require, the franchise agreements and any related area developments or similar agreements with, by or for the benefit of a Credit Party or its Subsidiary, which grants such Credit Party or its Subsidiary the right to develop and operate sites as an Orange Theory, together with all amendments, extensions, supplements, and exhibits to any of those agreements, as in effect now or in the future.

"**Funded Indebtedness**" means, as of any date of determination, all Indebtedness of the Borrower and its Subsidiaries as of such date in each case in the amount that would be set forth on a consolidated balance sheet of the Borrower and its Subsidiaries in accordance with GAAP of the type described in clauses (a), (b), (d), (e) and (f)(ii) and guaranties of Indebtedness of others of the type not described in clauses (c), (f)(i), (g) and (h) of the definition of Indebtedness) and CARES Indebtedness (excluding the portion of CARES Indebtedness that is forgiven or reasonably expected to be forgiven pursuant to the provisions of the CARES Act – Title I).

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination.  Subject to Section 1.4, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements described in Section 5.1.

"**Governmental Authority**" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Guarantee**" of or by any Person (the "**guarantor**") means, any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect,

(a)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof,

(b)     to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof,

(c)     to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor as to enable the primary obligor to pay such Indebtedness or other obligation, or

(d)     as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term "Guarantee" shall not include

endorsements for collection or deposits in the ordinary course of business.   The term "**Guaranteed**" has a meaning correlative thereto.

"**Guarantors**" means, each direct and indirect Wholly-Owned Subsidiary of the Borrower, other than Excluded Subsidiaries.

"**Hazardous Substance**" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"**Holding Company Security Agreement**" means that certain Holding Company Security Agreement, dated as of even date herewith, in form and substance reasonably acceptable to Agent and Borrower, by and between Holdings and Agent, for the benefit of the Secured Parties.

"**Holdings**" as defined in the preamble hereto.

"**Immaterial Subsidiary**" means, any direct or indirect Subsidiary of the Borrower (i) with EBITDA not exceeding, on an individual basis, 2.5% of the consolidated EBITDA of Borrower and its Subsidiaries, each as measured as of the last day of the most recently ended Measurement Period or (ii) which owns, on an individual basis, not more than 2.5% of Consolidated Total Assets as of the last day of the most recently ended Measurement Period; provided, that the aggregate EBITDA of all Immaterial Subsidiaries shall not exceed 5.0% of the consolidated EBITDA of the Borrower and its Subsidiaries at any time, measured as aforesaid, and the aggregate assets owned by all Immaterial Subsidiaries shall not exceed 5.0% of Consolidated Total Assets.

"**Incremental Amendment**" has the meaning set forth in Section 2.13(f).

"**Incremental Effective Date**" has the meaning set forth in Section 2.13(a).

"**Incremental Facility**" has the meaning set forth in Section 2.13(a).

"**Incremental Lender(s)**" has the meaning set forth in Section 2.13(e).

"**Incremental Loan Commitment Percentage**" means, as to any Lender, on any date, the percentage equal to the principal amount of Incremental Loans held by such Lender on such date *divided* by the aggregate principal amount of Incremental Loans outstanding on such date.

"**Incremental Term Loan**" has the meaning set forth in Section 2.13(a).

"**Incremental Term Loan Commitment**" has the meaning set forth in Section 2.13(a).

"**Indebtedness**" means, as to any Person, at a particular time, all items which constitute, without duplication,

(a)      obligations for borrowed money;

(b)      obligations representing the deferred purchase price (including earn-outs, but only to the extent that such earn outs are then due and payable but not yet paid) of property or services, other than accounts payable arising in connection with the purchase of goods or services customary in the trade;

(c)      obligations, whether or not assumed, secured by liens or a pledge of or an encumbrance on the proceeds or production from property now or hereafter owned or acquired;

(d)      obligations which are evidenced by notes (including seller notes), acceptances or other similar instruments;

(e)      all Capital Lease Obligations;

(f)      (i) indebtedness arising under acceptance facilities and the amount available to be drawn under all letters of credit issued for the account of such Person and (ii) without duplication, all drafts drawn thereunder to the extent such Person shall not have reimbursed the issuer in respect of the issuer's payment thereof;

(g)      liabilities secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person (other than landlords', laborers', shippers', carriers', warehousemen's, mechanics', repairmen's or other like non-consensual statutory Liens arising in the ordinary course of business), even though such Person has not assumed or otherwise become liable for the payment thereof;

(h)      obligations under any Rate Contracts or arrangements therefor; and

(i)      all Guarantees by such Person of Indebtedness of others.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnified Matter**" as defined in Section 10.6.

"**Indemnified Tax**" means (a) any Tax, other than an Excluded Tax, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" as defined in Section 10.6(a).

"**Initial Term Loan**" means any term loan made hereunder pursuant to Section 2.1(a).

"**Initial Term Loan Commitment**" means, with respect to each Lender, such Lender's Initial Term Loan Commitment, as amended to reflect Assignments and as such amount may be reduced or increased pursuant to this Agreement.

"**Initial Term Note**" means a promissory note of Borrower payable to a Lender, in substantially the form of Exhibit 1.1(c) hereto, evidencing the Indebtedness of Borrower to such Lender resulting from the Initial Term Loan made to Borrower by such Lender or its predecessor(s).

"**Interest Payment Date**" means, (a) with respect to any SOFR Loan (other than a SOFR Loan having an Interest Period of six (6) months) the last day of each Interest Period applicable to such Loan, (b) with respect to any SOFR Loan having an Interest Period of six (6) months), the last day of each three (3) month interval and, without duplication, the last day of such Interest Period, and (c) with respect to Base Rate Loans (including Swing Loans) the first day of each calendar quarter.

"**Interest Period**" means, with respect to any SOFR Loan, the period commencing on the Business Day such Loan is disbursed or continued or on the Conversion Date on which a Base Rate Loan is converted to the SOFR Loan and ending on the date one, three or six months thereafter, as selected by Borrower in its Notice of Borrowing or Notice of Conversion/Continuation; provided that:

(a)         if any Interest Period pertaining to a SOFR Loan would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)         any Interest Period pertaining to a SOFR Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)         no Interest Period for a Term Loan or any portion thereof shall extend beyond the last scheduled payment date therefor and no Interest Period for any Revolving Loan shall extend beyond the Revolving Termination Date; and

(d)         no Interest Period applicable to a Term Loan or portion thereof shall extend beyond any date upon which is due any scheduled principal payment in respect of such Term Loan unless the aggregate principal amount of such Term Loan represented by Base Rate Loans or by SOFR Loans having Interest Periods that will expire on or before such date is equal to or in excess of the amount of such principal payment.

"**Inventory**" means all "inventory" (as such term is defined in the UCC) of Borrower and its Subsidiaries.

"**Investment Availability**" means, Availability plus unrestricted cash and Permitted Investments of the Credit Parties.

"**IRS**" means the Internal Revenue Service of the United States and any successor thereto.

"**Issue**" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing.  The terms "**Issued**" and "**Issuance**" have correlative meanings.

"**Landlord Agreement**" means a landlord waiver, consent, and agreement that provides the Agent with, among other things and to the extent obtainable in the circumstances, an acknowledgment by the landlord of the Liens securing the Obligations, access to the applicable leased real property of any Credit Party, notice of default and cure rights, and the right of the Agent or its designees to assume or assign the applicable lease, in form and substance reasonably satisfactory to the Agent.

"**LCA Election**" has the meaning set forth in Section 1.3(g).

"**LCA Test Date**" has the meaning set forth in Section 1.3(g).

"**L/C Issuer**" means (a) Webster Bank and (b) any Lender or an Affiliate thereof or a bank or other legally authorized Person, in each case, reasonably acceptable to Agent, in such Person's capacity as an issuer of Letters of Credit by it hereunder.

"**L/C Reimbursement Agreement**" as defined in Section 2.1(c)(i)(C).

"**L/C Reimbursement Date**" as defined in Section 2.1(c)(i)(C)(v).

"**L/C Reimbursement Obligation**" means, for any Letter of Credit, the obligation of Borrower to the L/C Issuer thereof or to Agent, as and when matured, to pay all amounts drawn under such Letter of Credit.

"**L/C Request**" as defined in Section 2.1(c)(i)(C)(ii).

"**L/C Sublimit**" as defined in Section 2.1(c)(i)(A).

"**Lead Arranger**" as defined in Section 9.12.

"**Legend Acquisition**" means the acquisition by the Borrower of all or substantially all of the equity interests of the Legend Companies pursuant to the Legend Acquisition Agreement.

"**Legend Acquisition Agreement**" means that certain Unit Purchase Agreement, dated as of the Subsequent First Amendment Funding Date, by and among the Borrower, the Legend Companies and the Legend Sellers, as in effect on the Subsequent First Amendment Funding Date.

"**Legend Companies**" means, collectively, Bish One Merge LLC, Bish 2 Merge, LLC, Bish Three, LLC, Bish Venture Merge LLC and Bish Five, LLC.

"**Legend Sellers**" means each Person identified as a "Seller" under the Legend Acquisition Agreement.

"**Lender**" as defined in the preamble hereto.  For the avoidance of doubt, "Lender" shall include all Lenders of the Initial Term Loans, First Amendment Term Loans, the Incremental Term Loans, all Closing Date Delayed Draw Term Lenders, First Amendment Delayed Draw Term Lenders, all Revolving Lenders, and the respective successors and assignees of all of the foregoing, and "Lenders" means all of the foregoing.

"**Lending Office**" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" to Agent, or such other office or offices of such Lender as it may from time to time notify Borrower and Agent.

"**Letter of Credit**" means documentary or standby letters of credit Issued for the account of Borrower by L/C Issuers, and bankers' acceptances issued by Borrower in connection therewith, for which Agent and Lenders have incurred Letter of Credit Obligations.

"**Letter of Credit Fee**" as defined in Section 2.9(c).

"**Letter of Credit Obligations**" means all outstanding obligations incurred by Agent and Lenders at the request of Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of Letters of Credit by L/C Issuers or the purchase of a participation as set forth in Section 2.1(c) with respect to any Letter of Credit.  The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses (including those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

|US-DOCS\~~122553549.2~~143398915.4||

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit creating setoff rights, encumbrance, lien (statutory or other), or other security agreement or security interest of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement and any capital or financing lease having substantially the same economic effect as any of the foregoing.

"**Limited Condition Acquisition**" any Permitted Acquisition whose consummation is not conditioned on the availability of, or on obtaining, third party financing and such Permitted Acquisition shall have been consummated on or prior to the date that is sixty (60) days (or such later date as approved by the Agent) following the signing of the applicable Acquisition agreement.

"**Line of Business**" means the ownership and operation of fitness studios.

"**Liquidity**" means, as of any date, (a) the sum as of such dates of (x) the Revolving Loan Commitment, minus, (y) the Revolving Loans, plus (b) unrestricted cash and cash equivalents of the Credit Parties, in each case, in an account that is subject to a Control Agreement.

"**Loan**" means any loan made or deemed made by any Lender hereunder.

"**Loan Documents**" means this Agreement, the Notes, the Agreement Among Lenders, the Collateral Documents, the Fee Letter Agreement, the First Amendment Fee Letter Agreement, the Eighth Amendment Fee Letter Agreement, the Capital Call Agreement and all documents delivered by any Credit Party in favor of Agent and/or any Lender in connection with any of the foregoing (excluding any Secured Rate Contract or any Secured Cash Management Agreement).

"**Maintenance Capital Expenditures**" means the portion of Capital Expenditures for maintenance, repairs and required replacement of property, plant or equipment in the ordinary course of business of the Borrower and its Subsidiaries that are not made in connection with Acquisitions.

"**Managing Person**" means, with respect to any Person that is (a) a corporation, its board of directors, (b) a limited liability company, its board of control, board of directors, manager(s), managing member or members, (c) a limited partnership, its general partner, (d) a general partnership or a limited liability partnership, its managing partner or executive committee or (e) any other Person, the managing body thereof or other Person analogous to the foregoing.

"**Margin Stock**" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"**Material Adverse Effect**" means a material adverse change in (a) the financial condition, operations, business or Property of the Credit Parties, taken as a whole, (b) the ability of each of the Credit Parties to perform its respective obligations under the Loan Documents to which it is a party or (c) the ability of the Agent or any Lender to enforce the Loan Documents.

"**Maturity Date**" means September 6, 2024.

"**Maximum Lawful Rate**" as defined in Section 2.3(d).

"**Maximum Revolving Loan Balance**" as defined in Section 2.1(b).

"**Measurement Period**" means, at any date of determination, the most recently completed four consecutive Fiscal Quarters of the Borrower and its Subsidiaries ending on or prior to such date.

"**MNPI**" as defined in Section 10.10(a)(i).

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or Liabilities.

"**Net Income**" means, for any period, net income (or loss) of the Borrower and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in accordance with GAAP for the four Fiscal Quarter period most recently completed as of the end of such period.

"**Net Issuance Proceeds**" means, in respect of any issuance of equity or incurrence of Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of underwriting discounts and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of Borrower.

"**Net Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Permitted Investments) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to Borrower or any Affiliate of Borrower, (ii) sales, use or other Taxes paid or payable as a result thereof, (iii) amounts required to be applied to pay principal, interest and prepayment premiums and penalties on Indebtedness (other than the Obligations) secured by a Lien on the asset which is the subject of such Disposition and (iv) and any escrow or reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of the applicable Disposition undertaken by Holdings, Borrower or any of their respective Subsidiaries or other liabilities in connection with such Disposition (provided that upon release of any such escrow or reserve, the amount released shall be considered Net Proceeds) and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

"**Non-Ordinary Expenses**" has the meaning assigned to such term in clause (v) of the definition of EBITDA.

"**Non-U.S. Lender Party**" means each of Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"**Note**" means any Revolving Note, Swingline Note, Closing Date Delayed Draw Term Note, First Amendment Delayed Draw Term Note, Initial Term Note or First Amendment Term Note and "**Notes**" means all such Notes.

"**Notice of Borrowing**" means a notice given by Borrower to Agent pursuant to Section 2.5, in substantially the form of Exhibit 1.1(b) hereto.

"**Notice of Conversion/Continuation**" as defined in Section 2.6(a).

"**Obligations**" means all Loans, and other Indebtedness, advances (including, without limitation, Protective Advances), debts (including interest and fees (including, without limitation, any Prepayment Fee)), liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, Agent, any

L/C Issuer, any Secured Swap Provider, any Secured Cash Management Bank or any other Indemnitee, that arises under any Loan Document, any Secured Rate Contract or any Secured Cash Management Agreement, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired; provided, that Obligations of any Guarantor shall not include any Excluded Rate Contract Obligations solely of such Guarantor.

"**Ordinary Course Debt**" means Indebtedness incurred in the ordinary course of business in respect of (i) overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements, and in connection with securities and commodities accounts, (ii) performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees, return of money and similar obligations not in connection with money borrowed, including those incurred to secure health, safety and environmental obligations, (iii) any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims), in each case entered into in the ordinary course of business, (iv) the endorsement of instruments for deposit or the financing of insurance premiums, (v) obligations to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, (vi) deferred compensation or similar arrangements to employees of the Borrower, any Subsidiary of the Borrower or any direct or indirect parent thereof, (vii) obligations to pay insurance premiums or take or pay obligations contained in supply agreements, (viii) indebtedness owed to any Person providing property, casualty, business interruption or liability insurance to Holdings, Borrower or any of their respective Subsidiaries, so long as such Indebtedness shall not be in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such incurrence for the annual price in which such Indebtedness is incurred; and (ix) Guarantee obligations incurred in respect of obligations to suppliers, customers, franchisees, lessors and licensees.

"**Ordinary Course Liens**" means Liens created in the ordinary course of business and described in any of the following clauses: (i) Liens that are imposed by law and do not secure Indebtedness for borrowed money (such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens, Liens in respect of unemployment insurance and other types of social security legislation, and other similar Liens arising in the ordinary course of business); (ii) Liens to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of Indebtedness); (iii) Liens on deposits to secure liability for premiums to insurance carriers or securing insurance premium financing arrangements entered into in the ordinary course of business; (iv) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods; (v) Liens that are bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and cash equivalents on deposit in one or more accounts maintained by any Credit Party in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements or otherwise arising by virtue of any statutory or common law regarding banker's Liens; and (vi) Liens that are licenses of intellectual property granted by any Credit Party in the ordinary course of business; provided in each case that such Liens (A) do not in the aggregate materially detract from the value of the property of the Credit Parties, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Credit Parties, taken as a whole and (B) if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP.

"**Organization Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) for any other entity, any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of such entity.

"**Other Connection Taxes**" means, with respect to any Secured Party, Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Tax, other than any such connection arising from the Secured Party having executed, delivered, become a party to, performed its obligations or received a payment under, received or perfected as a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document or sold or assigned an interest in any Loan or Loan Document.

"**Other Taxes**" means all present and future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.20).

"**Participant Register**" as defined in Section 10.9(f).

"**Participating Lender**" as defined in Section 10.20.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation or any successor thereto.

"**Pegasus Acquisition**" means the acquisition by the Borrower of all or substantially all of the equity interests of the Pegasus Companies pursuant to the Pegasus Acquisition Agreement.

"**Pegasus Acquisition Agreement**" means that certain Interest Purchase Agreement, dated April 29, 2021, by and among the Borrower, Barbara Bianucci as the Seller Representative and the Pegasus Sellers.

"**Pegasus Companies**" means each Person identified as a "Company Entity" under the Pegasus Acquisition Agreement.

"**Pegasus Sellers**" means each Person identified as a "Seller" under the Pegasus Acquisition Agreement.

"**Pension Plan**" means, at any date of determination, any "employee benefit plan" as defined in Section 3 of ERISA subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA (including a Multiemployer Plan), the funding requirements of which (under Section 302 of ERISA or Section 412 of the Code) are, or at any time within the six years immediately preceding such date, were in whole or in part, the responsibility of any Credit Party, any Subsidiary of a Credit Party or any ERISA Affiliate.

"**Permits**" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other

|US-DOCS\~~122553549.2~~143398915.4||

Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permitted Acquisition**" means any Acquisition after the Closing Date that meets all of the following requirements:

(a)      no less than three (3) Business Days prior to the proposed closing date of such Acquisition (or such start time as agreed by Agent), the Borrower shall have delivered written notice of such Acquisition to the Agent, which notice shall include the proposed closing date of such Acquisition;

(b)      the Borrower shall have certified on or before the closing date of such Acquisition, in writing, that such Acquisition has been approved by a Responsible Officer of the Person to be acquired, that such Acquisition is not hostile and that, except if otherwise agreed to by the Agent in its reasonable discretion, the Person to be acquired (if such Acquisition is an Acquisition of Stock) had positive pro forma EBITDA (and for this purpose EBITDA shall have the same definition of EBITDA contained in this Agreement but the references therein to the Borrower and its Subsidiaries shall be to the Person to be acquired) for the four (4) Fiscal Quarter period ended immediately prior to the proposed closing date of such Acquisition;

(c)      the Person or business to be acquired shall be in the same or substantially similar Line of Business as a Credit Party;

(d)      no later than three (3) Business Days prior to the proposed date of the execution of definitive purchase or merger agreements for such Acquisition (or such start time as agreed by Agent), the Borrower shall have delivered to the Agent a Compliance Certificate signed by a Responsible Officer of the Borrower demonstrating, on a Pro Forma Basis (as of the date of the Acquisition and after giving effect thereto and any Indebtedness incurred in connection therewith) compliance with each covenant contained in (i) Sections 6.13 and 6.14 for the most recent Fiscal Quarter end preceding such date for which financial statements are available and (ii) Section 6.19;

(e)      not less than three (3) Business Days prior to the consummation of any Permitted Acquisition (or such lesser period as agreed to by the Agent) with a purchase price in excess of $5,000,000, Agent and the Lenders shall have received (i) audited financial statements (or, if unavailable, management-prepared financial statements) of the Person or business acquired for its two most recent fiscal years and for any fiscal quarters ended within the fiscal year to date, (ii) consolidated projected income statements of the Credit Parties and their Subsidiaries (giving effect to such acquisition) including pro forma financial covenant calculations demonstrating compliance with the financial covenants set forth in Sections 6.13, 6.14 and 6.19 in connection with such pro forma projections (with each of the pro forma balance sheet, pro forma projections and pro forma financial covenant calculations certified by the chief financial officer or, if there is no chief financial officer, another Responsible Officer of the Borrower), and (iii) a due diligence package (including any third party due diligence reports and, solely for any Permitted Acquisition with a purchase price in excess of $10,000,000, a quality of earnings report (which shall cover periods commencing with the fiscal year ended 2019 and thereafter), in each case, to the extent inclusion of such reports complies with the internal guidelines of such report's authors, including with respect to the delivery of any required non-reliance letters) with respect to such Permitted Acquisition;

(f)       no Default shall have occurred and be continuing both immediately before and after giving effect to the execution of the purchase agreement, merger agreement or similar document for such Acquisition; and

(g)       the total consideration paid or payable (including all seller notes, Contingent Acquisition Consideration and other Indebtedness incurred or assumed and including, for the avoidance of doubt, any interest thereon) for all Acquisitions, in the aggregate, consummated during the term of this Agreement shall not exceed $80,000,000; provided that all Acquisitions of a target that will not become a Credit Party shall not exceed $1,000,000 during the term of this Agreement, as such amount may be increased by the proceeds of additional equity of the Borrower.

"**Permitted Cure Securities**": any Stock of the Borrower other than Disqualified Stock.

"**Permitted Holders**" means (a) the Sponsor, any fund or investment vehicle that is organized by Sponsor for the purpose of making equity or debt investments in one or more companies and is controlled by, or under common control with, the Sponsor or with respect to which the Sponsor is an investment advisor, and each Affiliate and partner of and in the Sponsor or any of the foregoing entities, and (b) present, future and former officers and directors of the Borrower, any direct or indirect parent of the Borrower, or any of their respective Subsidiaries who are investors in the Borrower or any direct or indirect parent of the Borrower, family members of such officers and directors and trusts, partnerships or limited liability companies for the benefit of any of such officers, directors and family members, and their respective heirs, executors, estates, successors and legal representatives; provided, however, that in no event shall Permitted Holders under clause (b) of this definition own more than 20% of the aggregate ordinary voting power and economic interests of the outstanding equity interests of Holdings.

"**Permitted Indebtedness**" as defined in Section 6.1.

"**Permitted Investments**" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"**Permitted Liens**" as defined in Section 6.3.

"**Person**" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"**PIK Option**" as defined in Section 2.3(b).

"**Prepayment Fee**" means, as of the date of the occurrence of a Prepayment Fee Trigger Event:

(a)         during the period of time from and after the Closing Date up to (but not including) the date that is the first anniversary of the Closing Date, an amount equal to 2.00% (two percent) of the principal amount of the Term Loan prepaid (or in the case of a Prepayment Fee Trigger Event occurring under clause (b) of the definition thereof, deemed to be prepaid) on such date in cash to Agent for the ratable account of the Lenders; provided, that such Prepayment Fee shall not apply to the mandatory or voluntary prepayment of the original principal amount of the First Out Term Loans (as defined in the Agreement Among Lenders);

(b)         during the period of time from and after the date that is the first anniversary of the Closing Date up to (but not including) the date that is the second anniversary of the Closing Date, an amount equal to 1.00% (one percent) of the principal amount of the Term Loan prepaid (or in the case of a Prepayment Fee Trigger Event occurring under clause (b) of the definition thereof, deemed to be prepaid) on such date in cash to Agent for the ratable account of the Lenders; provided, that such Prepayment Fee shall not apply to the mandatory or voluntary prepayment of the original principal amount of the First Out Term Loans (as defined in the Agreement Among Lenders); and

(c)         from and after the second anniversary of the Closing Date, zero.

"**Prepayment Fee Trigger Event**" means

(a)         any optional prepayment by any Credit Party of all, or any part, of the principal balance of any Term Loan, whether before or after (i) the occurrence of an Event of Default, or (ii) the commencement of any case or other proceeding by any Credit Party seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or such Credit Party shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or such Credit Party shall make a general assignment for the benefit of creditors, or formally admits in writing its inability or shall fail generally to pay its debts as they become due, or such Credit Party shall take any corporate action to authorize any of the foregoing (any of the forgoing items set forth in this clause (ii), an "**Insolvency Proceeding**"), and notwithstanding any acceleration (for any reason) of the Obligations;

(b)         the acceleration of the Obligations for any reason, including, but not limited to, acceleration in accordance with Section 8.2, including as a result of the commencement of an Insolvency Proceeding;

(c)         the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to Agent, for the account of the Lenders in full or partial satisfaction of the Obligations; or

(d)         the termination of this Agreement for any reason.

For purposes of the definition of the term Prepayment Fee, if a Prepayment Fee Trigger Event occurs under clause (b), (c) or (d), the entire outstanding principal amount of the Term Loan shall be deemed to have been prepaid on the date on which such Prepayment Fee Trigger Event occurs.

"**Principal Increase**" as defined in Section 2.3(b).

"**Prior Credit Agreement**" means that certain Credit Agreement, dated as of July 17, 2018 by and among the Borrower, Holdings, the other Credit Parties party thereto, the Agent (as defined therein) and the other lenders from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"**Prior Indebtedness**" means the Indebtedness and obligations specified on Schedule 1.1 hereto list any debt to be paid off at Closing.

"**Prior WhiteHorse Lenders**" as defined in Section 2.1(a).

"**Private Side Information**" as defined in Section 10.10(a)(iii).

"**Pro Forma Basis**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.3.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Protective Advances**" as defined in Section 2.14.

"**Public Lender**" as defined in Section 10.10(a)(i).

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation under a Secured Rate Contract, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Rate Contracts**" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) designed to provide protection against fluctuations in interest or currency exchange rates and any other agreements or arrangements designed to provide such protection.

"**Real Estate**" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"**Refunding Capital Stock**" as defined in Section 6.15(k).

"**Register**" as defined in Section 2.4(b).

"**Related Persons**" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article III) and other consultants and agents of or to such Person or any of its Affiliates.

"**Releases**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Substance into or through the environment.

"**Relevant Governmental Body**" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York , or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"**Repatriation**" as defined in Section 2.8(h).

"**Replacement Lender**" as defined in Section 10.20.

"**Reportable Event**" means with respect to any Pension Plan, any event set forth in Sections 4043(c) (other than a Reportable Event as to which the 30-day notice requirement is waived by the PBGC under applicable regulations) or 4063(a) of ERISA or the regulations thereunder.

"**Required Closing Date Delayed Draw Term Lenders**" means, subject to the provisions of Section 10.1(d), (a) at any time prior to the termination of the Closing Date Delayed Draw Term Commitment in accordance with this Agreement, Closing Date Delayed Draw Term Lenders holding in excess of fifty percent (50.0%) of the sum of (i) the unfunded Closing Date Delayed Draw Term Commitment plus the then aggregate outstanding principal balance of the Closing Date Delayed Draw Term Loans, and (b) at any time after the termination of the Closing Date Delayed Draw Term Commitment in accordance with this Agreement, Closing Date Delayed Draw Term Lenders holding in excess of fifty percent (50.0%) of the then aggregate outstanding principal balance of the Closing Date Delayed Draw Term Loans; provided, (x) at any time that there are two (2) Lenders (who are not Affiliates of one another), then "Required Closing Date Delayed Draw Term Lenders" means two (2) Lenders (who are not Affiliates of one another) and (y) at any time that there are three (3) or more Lenders (who are not Affiliates of one another), then "Required Closing Date Delayed Draw Term Lenders" means at least two (2) Lenders (who are not Affiliates of one another).  Such portion of the Aggregate Closing Date Delayed Draw Term Commitment (or Closing Date Delayed Draw Term Loans, as applicable) and the sum of the aggregate unpaid principal amount of the Term Loans then outstanding, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Closing Date Delayed Draw Term Lenders at any time.  For purposes of determining the number of non-Affiliated Closing Date Delayed Draw Term Lenders under this definition, a Closing Date Delayed Draw Term Lender and any other Closing Date Delayed Draw Term Lenders that are Affiliates or Approved Funds of such Closing Date Delayed Draw Term Lender shall be counted as a single Closing Date Delayed Draw Term Lender.

"**Required First Amendment Delayed Draw Term Lenders**" means, subject to the provisions of Section 10.1(d), (a) at any time prior to the termination of the First Amendment Delayed Draw Term Commitment in accordance with this Agreement, First Amendment Delayed Draw Term Lenders holding in excess of fifty percent (50.0%) of the sum of (i) the unfunded First Amendment Delayed Draw Term Commitment plus the then aggregate outstanding principal balance of the First Amendment Delayed Draw Term Loans, and (b) at any time after the termination of the First Amendment Delayed Draw Term Commitment in accordance with this Agreement, First Amendment Delayed Draw Term Lenders holding in excess of fifty percent (50.0%) of the then aggregate outstanding principal balance of the First Amendment Delayed Draw Term Loans; provided, (x) at any time that there are two (2) Lenders (who are not Affiliates of one another), then "Required First Amendment Delayed Draw Term Lenders" means two (2) Lenders (who are not Affiliates of one another) and (y) at any time that there are three (3) or more Lenders (who are not Affiliates of one another), then "Required First Amendment Delayed Draw

Term Lenders" means at least two (2) Lenders (who are not Affiliates of one another). Such portion of the Aggregate First Amendment Delayed Draw Term Commitment (or First Amendment Delayed Draw Term Loans, as applicable) and the sum of the aggregate unpaid principal amount of the Term Loans then outstanding, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required First Amendment Delayed Draw Term Lenders at any time. For purposes of determining the number of non-Affiliated First Amendment Delayed Draw Term Lenders under this definition, a First Amendment Delayed Draw Term Lender and any other First Amendment Delayed Draw Term Lenders that are Affiliates or Approved Funds of such First Amendment Delayed Draw Term Lender shall be counted as a single First Amendment Delayed Draw Term Lender.

"**Required Lenders**" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Aggregate Revolving Loan Commitment then in effect, the Aggregate Closing Date Delayed Draw Term Commitment then in effect, the Aggregate First Amendment Delayed Draw Term Commitment then in effect, plus the aggregate unpaid principal balance of the Term Loans then outstanding, or (b) if the Aggregate Revolving Loan Commitments have terminated, but prior to the termination of the Closing Date Delayed Draw Term Commitment and prior to the termination of the First Amendment Delayed Draw Term Commitment, Lenders then holding more than fifty percent (50%) of the sum of the aggregate unpaid principal amount of Loans (other than Swing Loans) and then outstanding Letter of Credit Obligations, amounts of participations in Swing Loans and the principal amount of unparticipated portions of Swing Loans plus Lenders then holding more than fifty percent (50%) of the sum of the Aggregate Closing Date Delayed Draw Term Commitment and Lenders then holding more than fifty percent (50%) of the sum of the Aggregate First Amendment Delayed Draw Term Commitment, or (c) if the Aggregate Closing Date Delayed Draw Term Commitments and the Aggregate First Amendment Delayed Draw Term Commitments have terminated, but prior to the termination of the Aggregate Revolving Loan Commitments, Lenders then holding more than fifty percent (50%) of the sum of the aggregate unpaid principal amount of Loans (other than Swing Loans) and then outstanding Letter of Credit Obligations, amounts of participations in Swing Loans and the principal amount of unparticipated portions of Swing Loans plus Lenders then holding more than fifty percent (50%) of the sum of the Aggregate Closing Date Delayed Draw Term Commitment, Lenders then holding more than fifty percent (50%) of the sum of the Aggregate First Amendment Delayed Draw Term Commitment and the Aggregate Revolving Loan Commitments then outstanding; provided, (x) at any time that there are two (2) Lenders (who are not Affiliates of one another), then "Required Lenders" means two (2) Lenders (who are not Affiliates of one another) and (y) at any time that there are three (3) or more Lenders (who are not Affiliates of one another), then "Required Lenders" means at least two (2) Lenders (who are not Affiliates of one another). Such portion of the Aggregate Revolving Loan Commitment (or Revolving Loans, as applicable) and the sum of the aggregate unpaid principal amount of the Term Loans then outstanding, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders at any time.

"**Required Revolving Lenders**" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Aggregate Revolving Loan Commitments then in effect, or (b) if the Aggregate Revolving Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate outstanding amount of Revolving Loans, and then outstanding Letter of Credit Obligations, amounts of participations in Swing Loans and the principal amount of unparticipated portions of Swing Loans; provided, at any time that there are two (2) or more of such Lenders (who are not Affiliates of one another), then "Revolving Required Lenders" means at least two (2) such Lenders (who are not Affiliates of one another). Such portion of the Aggregate Revolving Loan Commitment (or Revolving Loans, as applicable) and the sum of the aggregate unpaid principal amount of the Revolving Loans then outstanding, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Lenders at any time.

"**Requirement of Law**" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Responsible Officer**" means the chief executive officer or the president of Borrower, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of Borrower, or any other officer having substantially the same authority and responsibility.

"**Restricted Payments**" means with respect to any Person, (a) the declaration or payment of any dividends or distributions in respect of its Stock (whether in cash, securities or other property) by such Person, (b) the purchase, redemption, retirement or other acquisition for value of any of its Stock now or hereafter outstanding, including, without limitation, pursuant to any put or similar right, (c) the allocation or other setting apart of any sum for the payment of any dividend or distribution on, or for the purchase, redemption or retirement of any shares of its Stock or (d) any and all payments in respect of Subordinated Debt.

"**Retired Capital Stock**" as defined in Section 6.15(k).

"**Revolving Lender**" means each Lender with a Revolving Loan Commitment (or if the Revolving Loan Commitments have terminated, who hold Revolving Loans or participations in Swing Loans or Letter of Credit Obligations).

"**Revolving Loan**" means a Loan made or deemed to have been made pursuant to Section 2.1(b), Section 2.1(c)(vi)(B), Section 2.1(d)(iii)(B).

"**Revolving Loan Commitment**" means, with respect to each Revolving Lender, the commitment of such Revolving Lender to make Revolving Loans and acquire interests in Letter of Credit Obligations and Swing Loans, which initial commitments are set forth opposite such Lender's name in Schedule 2.1(b) under the heading "Revolving Loan Commitments", as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to assignments by or to such Revolving Lender pursuant to an Assignment.

"**Revolving Note**" means a promissory note of Borrower payable to a Lender in substantially the form of Exhibit 1.1(c) hereto, evidencing Indebtedness of Borrower under the Revolving Loan Commitment of such Lender.

"**Revolving Termination Date**" means the earlier to occur of: (a) September 6, 2024; and (b) the date on which the Aggregate Revolving Loan Commitment shall terminate in accordance with the provisions of this Agreement.

"**S&P**" means Standard & Poor's Rating Services.

"**Sale**" as defined in Section 10.9(b).

"**Sale and Leaseback Transaction**" means any transaction or series of related transactions pursuant to which a Person sells or transfers any Property consisting of real property or equipment in

connection with the leasing, or the resale against installment payments, of such Property to the seller or transferor.

"**Sanctioned Jurisdiction**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanction.

"**Sanctioned Person**" means, at any time, any Person that is the subject or the target of any Sanction.

"**Sanctions**" means sanctions administered or enforced by (a) the US Department of the Treasury's Office of Foreign Assets Control, (b) the US Department of State, (c) the United Nations Security Council, (d) the European Union, (e) Her Majesty's Treasury of the United Kingdom, and (f) other relevant sanctions authority.

"**Secured Cash Management Agreement**" means any Cash Management Agreement between any Credit Party and a Secured Cash Management Bank, in effect on the Closing Date or entered into thereafter, to the extent that (x) Webster Bank or any of its Affiliates is the Secured Cash Management Bank or (y) the Borrower and such Secured Cash Management Bank have notified Agent in writing of the intent to include the obligations of such Credit Party arising under such Cash Management Agreement as Secured Cash Management Obligations, and such Secured Cash Management Bank shall have acknowledged and agreed to the terms contained herein applicable to Secured Cash Management Obligations, including the provisions of Sections 2.10, 10.1 and 10.24.

"**Secured Cash Management Bank**" means a Lender or an Affiliate of a Lender (or a Person who was a Lender or an Affiliate of a Lender at the time of execution and delivery of a Cash Management Agreement) who has entered into a Cash Management Agreement with a Credit Party

"**Secured Party**" means Agent, each Lender, each L/C Issuer, each other Indemnitee and each other holder of any Obligation of a Credit Party including each Secured Swap Provider and each Secured Cash Management Bank

"**Secured Rate Contract**" means any Rate Contract between a Credit Party and a Secured Swap Provider, in effect on the Closing Date or entered into thereafter, to the extent that (x) Webster Bank or any of its Affiliates is the Secured Swap Provider or (y) the Borrower and such Secured Swap Provider have notified Agent in writing of the intent to include the obligations of such Credit Party arising under such Rate Contract as Secured Rate Contract Obligations, and such Secured Swap Provider shall have acknowledged and agreed to the terms contained herein applicable to Secured Rate Contract Obligations, including the provisions of Sections 2.10, 10.1 and 10.24.

"**Secured Rate Contract Obligations**" means as to any Person, all obligations, whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), of a Credit Party arising under any Secured Rate Contract.

"**Secured Swap Provider**" means a Lender or an Affiliate of a Lender (or a Person who was a Lender or an Affiliate of a Lender at the time of execution and delivery of a Rate Contract) who has entered into a Rate Contract with a Credit Party.

"**Security Agreement**" means that certain Security Agreement, dated as of even date herewith, in form and substance reasonably acceptable to Agent and Borrower, by and among Credit Parties and Agent, for the benefit of the Secured Parties.

"**Seventh Amendment**" means that certain Seventh Amendment to Credit Agreement, dated as of the Seventh Amendment Effective Date, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**Seventh Amendment Effective Date**" has the meaning assigned to such term in the Seventh Amendment.

"**Sixth Amendment**" means that certain Sixth Amendment to Credit Agreement, dated as of April April 29, 2022, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**Sixth Amendment Effective Date**" means April 29, 2022.

"**Small Business Administration**" means the U.S. Small Business Administration.

"**Solvent**" means, with respect to any Person on a particular date, the condition that on such date, (a) the fair value of the Property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's Property would constitute an unreasonably small amount of capital.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability after taking into account probable payments by co-obligors.

"**Specified Transaction Adjustments**" as defined in Section 1.3(d).

"**Specified Transactions**" means any investment that results in a Person becoming a Subsidiary of the Borrower, any Permitted Acquisition, any Disposition that results in a Subsidiary ceasing to be a Subsidiary of the Borrower, any investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a facility or any Disposition of a business unit, line of business or division or a facility of the Borrower or a Subsidiary of the Borrower, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), or Restricted Payment that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving pro forma effect.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Borrowing**" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"**SOFR Loan**" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate".

"**Sponsor**" means Prospect Hill Growth Partners.

"**SPV**" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"**Stock**" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting; and (b) all securities convertible into or exchangeable for any other Stock and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any other Stock, whether or not presently convertible, exchangeable or exercisable.

"**Subordinated Debt**" means the collective reference to any Indebtedness of the Borrower or any of its Subsidiaries subordinated in right and time of payment to the Obligations pursuant to a Subordination Agreement.

"**Subordination Agreement**" means any note, indenture, note purchase agreement or similar instrument or agreement, pursuant to which the Indebtedness evidenced thereby or issued thereunder is subordinated in right and time of payment to the Obligations by the express terms of such note, indenture, note purchase agreement or similar instrument or agreement, in each case in form and substance reasonably satisfactory to the Required Lenders and each as amended, supplemented or otherwise modified from time to time.

"**Subsequent First Amendment Funding Date**" means the date upon which the conditions precedent to funding the First Amendment Delayed Draw Term Loans have been met pursuant to Section 4 of the First Amendment.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than fifty percent (50%) of the voting Stock is, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"**Subsidiary Guaranty Agreement**" means, that certain Subsidiary Guaranty Agreement, dated as of even date herewith, in form and substance reasonably acceptable to Agent and Borrower, by and among each of the Subsidiaries of the Borrower and Agent, for the benefit of the Secured Parties.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swingline Commitment**" means $1,000,000.

"**Swing Lender**" means, each in its capacity as Swing Lender hereunder, Webster Bank or any Lender (or Affiliate or Approved Fund of any Lender) that agrees, with the approval of successor Agent (or, if there is no such successor Agent, the Required Lenders) and Borrower, to act as the Swing Lender hereunder.

"**Swing Loan**" as defined in Section 2.1(d)(i).

"**Swingline Note**" means a promissory note of Borrower payable to the Swing Lender, in substantially the form of Exhibit 1.1(c) hereto, evidencing the Indebtedness of Borrower to the Swing Lender resulting from the Swing Loans made to Borrower by the Swing Lender.

"**Swingline Request**" as defined in Section 2.1(d)(ii).

"**Target**" means any other Person or business unit or asset group of any other Person acquired or proposed to be acquired in an Acquisition.

"**Tax Affiliate**" means, (a) Borrower and its Subsidiaries, (b) each other Credit Party and (c) any Affiliate of Borrower with which such Borrower files or is eligible to file consolidated, combined or unitary Tax returns.

"**Taxes**" as defined in Section 11.1(a).

"**Term Lender**" means each Lender who holds Term Loans.

"**Term Loan**" means any Initial Term Loan, First Amendment Term Loan, Closing Date Delayed Draw Term Loan, First Amendment Delayed Draw Term Loan, and any Incremental Loan made pursuant to Section 2.13 collectively.

"**Term Loan Commitment**" means, with respect to each Lender, such Lender's Term Loan Commitment, as amended to reflect Assignments and as such amount may be reduced or increased pursuant to this Agreement.

"**Term SOFR**" means,

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; and

(b)      for any calculation with respect to an Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**Base Rate Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"**Term SOFR Adjustment**" means a percentage equal to, (a) with respect to an Interest Period of six months, 0.25%, (b) with respect to an Interest Period of three months, 0.15%, and (c) with respect to an Interest Period of one month, 0.10%.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Thanos Acquisition**" means the acquisition by the Borrower of all or substantially all of the "Assets" identified in the Thanos Acquisition Agreement.

"**Thanos Acquisition Agreement**" means that certain Asset Purchase Agreement, dated May 16, 2022, by and among the Borrower, Robert Scot James as Representative, the "Seller Principals" identified therein and the Thanos Sellers.

"**Thanos Sellers**" means each Person identified as a "Seller" under the Thanos Acquisition Agreement.

"**Third Amendment**" means that certain Limited Waiver and Third Amendment to Credit Agreement, dated as of July 6, 2020, by and among the Borrower, Holdings, the Guarantors, the Lenders party thereto and the Agent.

"**Third Amendment Effective Date**" means July 6, 2020.

"**Third Amendment Fee**" as defined in Section 2.9(h).

"**Third Amendment Leverage Period**" means from the Third Amendment Effective Date until the date on which the Agent receives a Compliance Certificate in accordance with Section 5.1(~~d~~e) in connection with the most recent fiscal quarter for which financial statements have been delivered to Agent pursuant to Section 5.1(a) or (b) (whichever was most recently delivered to Agent) demonstrating that Total Leverage Ratio is greater than 5.00 to 1.00.

"**Total Leverage Ratio**" means, on any date of determination, for the Borrower and its Subsidiaries on a consolidated basis, the ratio of (a) Consolidated Adjusted Indebtedness to (b) Consolidated EBITDAR for the Measurement Period ending on such date or most recently completed.

"**Transaction Fees**" has the meaning assigned to such term in clause (viii) of the definition of EBITDA.

"**UCC**" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"**United States**" and "**U.S.**" each means the United States of America.

"**Unused Commitment Fee**" as defined in Section 2.9(b).

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Lender Party**" means each of Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"**Webster Bank**" as defined in the preamble hereto.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; provided that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended (the "**Applicable Indebtedness**"), the effects of any prepayments made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"**WhiteHorse**" as defined in the preamble hereto.

"**WhiteHorse Lenders**" means those Lenders of the WhiteHorse Loans.

"**WhiteHorse Loans**" Loans held by SWISS CAPITAL HYS PRIVATE DEBT OFFSHORE SP; H.I.G. WHITEHORSE TRINITY CREDIT, LLC; WHITEHORSE ONSHORE CREDIT OPPORTUNITIES I, LLC; H.I.G. WHITEHORSE SMA, L.P.; THORNEY ISLAND LIMITED PARTNERSHIP; WHITEHORSE OFFSHORE CREDIT OPPORTUNITIES I, LLC; BCSSS HOLDCO UK LIMITED; MPS HOLDCO UK LIMITED; H.I.G. WHITEHORSE TRISTAR CREDIT, LLC; WHPL SPV I, LLC; WHPL SPV I OFFSHORE, LLC; WHPL SPV I CLASS A, LLC; HGC SPV, LLC; H.I.G. GLOBAL CREDIT HOLDINGS, LLC; and WHITEHORSE FINANCE CREDIT I, LLC.

"**Wholly-Owned Subsidiary**" of a Person means any Subsidiary of such Person, all of the Stock of which (other than directors' qualifying shares required by law) are owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

"**Working Capital**" means, for any Person at any date, its Consolidated Current Assets at such date minus its Consolidated Current Liabilities at such date; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in Working Capital shall exclude, without duplication, (a) the impact of any of the items adjusted for in the definition of "EBITDA" and (b) any changes in current assets or current liabilities as a result of (y) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (z) the effects of purchase accounting adjustments; and provided that, to the extent or any of its Subsidiaries consummates an Acquisition during such period, beginning of period working capital shall be recalculated on a Pro Forma Basis to include working capital acquired in such Acquisition.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**Zeus Acquisition**" means the acquisition by the Borrower of all or substantially all of the equity interests of the Zeus Companies pursuant to the Zeus Acquisition Agreement.

|US-DOCS\~~122553549.2~~143398915.4||

"**Zeus Acquisition Agreement**" means that certain Unit Purchase Agreement, dated November 25, 2019, by and among the Borrower, the Zeus Companies and the Zeus Sellers, as in effect on the First Amendment Effective Date.

"**Zeus Companies**" means, collectively, Leo Investments, LLC, Fitness Capital Ventures, LLC, Fitness Capital Ventures #2, LLC, Fitness Capital Ventures #3, LLC, and Fitness Capital Ventures #4, LLC.

"**Zeus Sellers**" means each Person identified as a "Seller" under the Zeus Acquisition Agreement.

### 1.2    Other Interpretive Provisions

.

(a)    Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    The Agreement.  The words "**hereof**", "**herein**", "**hereunder**" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)    Certain Common Terms.  The term "**documents**" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "**including**" is not limiting and means "including without limitation."

(d)    Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  For the avoidance of doubt, the initial payments of interest and fees relating to the Obligations (other than amounts due on the Closing Date) shall be due and paid on the first day of the first month or quarter, as applicable, following the entry of the Obligations onto the operations systems of Agent, but in no event later than the first day of the second month or quarter, as applicable, following the Closing Date.  In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "from and including"; the words "**to**" and "**until**" each mean "to but excluding", and the word "**through**" means "to and including."  All references to the time of day shall be a reference to New York time.  If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)    Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

|US-DOCS\~~122553549.2~~143398915.4||

(f)      Laws.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

1.3      Pro Forma Calculations; Limited Condition Acquisitions; Basket and Ratio Compliance Fair Market Value

.

(a)      All determinations of fair market value under a Loan Document shall be made by the Borrower in good faith and if such determination is consistent with a valuation or opinion of an independent financial advisor, such determination shall be conclusive for all purposes under the Loan Documents or related to the Obligations.

(b)      Notwithstanding anything to the contrary herein, the Total Leverage Ratio and the Fixed Charge Coverage Ratio shall be calculated in the manner prescribed by this Section 1.3.

(c)      For purposes of calculating the Total Leverage Ratio and the Fixed Charge Coverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made during the applicable Measurement Period shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in EBITDA, Funded Indebtedness, and/or Fixed Charges and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Measurement Period.  If since the beginning of any applicable Measurement Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Measurement Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.3, then the Total Leverage Ratio and the Fixed Charge Coverage Ratio shall be calculated to give pro forma effect thereto in accordance with this Section 1.3.

(d)      Whenever pro forma effect is to be given to a Specified Transaction, the pro forma calculations shall be made in good faith by a Responsible Officer of the Borrower and may include, for the avoidance of doubt, the amount of cost savings, operating expense reductions and, synergies projected by the Borrower in good faith to be realized as a result of specified actions taken, committed to be taken or expected to be taken (calculated on a pro forma basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such Measurement Period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period) relating to such Specified Transaction, net of the amount of actual benefits realized during such period from such actions (such cost savings and synergies, "**Specified Transaction Adjustments**"); _provided_ that such Specified Transaction Adjustments are reasonably identifiable, quantifiable and factually supportable in the good faith judgment of the Borrower (it being agreed such determination need not be made in compliance with Regulation S-X or other applicable securities laws).

(e)      In the event that the Borrower or any Subsidiary thereof incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Total Leverage Ratio and the Fixed Charge Coverage Ratio, as the case may be (in each case, other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes),

|US-DOCS\~~122553549.2~~143398915.4||

during the applicable Measurement Period shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Measurement Period with respect to leverage ratios or the first day of such Measurement Period with respect to the Fixed Charge Coverage Ratio.

(f)        Notwithstanding anything in this Agreement or any other Loan Document to the contrary (i) unless the Borrower elects otherwise, if the Borrower or its Subsidiaries in connection with any transaction or series of such related transaction (A) incurs Indebtedness, creates Liens, makes Dispositions, makes investments, or repays any Indebtedness or takes any other action under or as permitted by a ratio-based basket and (B) incurs Indebtedness, creates Liens, makes Dispositions, makes investments, or repays any Indebtedness or takes any other action under a non-ratio-based basket (which shall occur within five Business Days of the events in clause (A) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based basket without regard to any such action under such non-ratio-based basket made in connection with such transaction or series of related transactions, (ii) if the Borrower or its Subsidiaries enters into any revolving, delayed draw or other committed debt facility, the Borrower may elect to determine compliance of such debt facility (including the incurrence of Indebtedness and Liens from time to time in connection therewith) with this Agreement and each other Loan Document on the date commitments with respect thereto are first received, assuming the full amount of such facility is incurred (and any applicable Liens are granted) on such date, in lieu of determining such compliance on any subsequent date (including any date on which Indebtedness is incurred pursuant to such facility) and (iii) if the Borrower or any Subsidiary incurs Indebtedness under a ratio-based basket, such ratio-based basket (together with any other ratio-based basket utilized in connection therewith, including in respect of other Indebtedness, Liens, Dispositions, investments, or Restricted Payments) will be calculated excluding the cash proceeds of such Indebtedness for netting purposes (*i.e.*, such cash proceeds shall not reduce Funded Indebtedness).

(g)        Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (i) calculating any applicable ratio in connection with the incurrence of Indebtedness, the creation of Liens, the making of any Disposition, the making of an investment, the making of a Restricted Payment, or the repayment of Indebtedness or (ii) determining compliance with any provision of this Agreement which requires that no Default or Event of Default has occurred, is continuing or would result therefrom, in each case of (i) and (ii) in connection with a Limited Condition Acquisition, the date of determination of such ratio and determination of whether any Default or Event of Default has occurred, is continuing or would result therefrom, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "***LCA Election***"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "***LCA Test Date***") (it being understood that no Event of Default under Section 8.1(a), 8.1(f) or 8.1(g) shall exist on the date such Limited Condition Acquisition is consummated).  If on a Pro Forma Basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Measurement Period ending prior to the LCA Test Date for which financial statements are available, the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in EBITDA) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition and any related transactions is permitted hereunder and (ii) such ratios and

|US-DOCS\~~122553549.2~~143398915.4||

compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or basket availability with respect to any other Specified Transaction or otherwise on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or basket shall be calculated on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated. For purposes of any calculation pursuant to this clause (g) of the Fixed Charge Coverage Ratio, interest expense may be calculated using an assumed interest rate for the Indebtedness to be incurred in connection with such Limited Condition Acquisition based on the indicative interest margin contained in any financing commitment documentation with respect to such Indebtedness or, if no such indicative interest margin exists, as reasonably determined by the Borrower in good faith.

### 1.4 Accounting Terms and Principles

.

(a) All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP; provided that if the Borrower notifies Agent that the Borrower wishes to amend Sections 6.13 or 6.14 (or any related definition) to eliminate or take into account the effect of any change in GAAP on the operation of such covenant or definition or provision, as applicable (or if Agent notifies the Borrower that the Required Lenders wish to amend Sections 6.13 or 6.14 (or any related definition for such purpose), then the Borrower's compliance with such covenants shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenants (or related definition) are amended in a manner reasonably satisfactory to the Borrower and the Required Lenders. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article VI and Article VII shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other Liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value." A breach of a financial covenant contained in Article VII shall be deemed to have occurred as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Agent.

### 1.5 Payments

. Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party or any L/C Issuer. Any such determination or redetermination by Agent shall be conclusive and binding for all purposes, absent manifest error. No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted. Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable *de minimis* payment thresholds.

1.6     Divisions

.

Any restriction, condition or prohibition applicable to a merger, transfer, consolidation, amalgamation, assignment, restricted payment, investment, disposition, sale, transfer, or similar term set forth in the Loan Documents shall be deemed to apply to a division of or by a limited liability company or a limited partnership, or an allocation of assets to a series of a limited liability company or a limited partnership (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, restricted payment, investment, disposition, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company or a limited partnership shall constitute a separate Person under the Loan Documents (and (i) each division of any limited liability company or a limited partnership that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity and (ii) shall be subject to Section 5.14 (and each similar covenant in this Agreement and in each other Loan Document) to the same extent as such limited liability company or a limited partnership, immediately prior to giving effect to such division).

1.7     Rates

.

The Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Agent may select information sources or services in its reasonable discretion to ascertain Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

2.      THE CREDITS

2.1     Amounts and Terms of Commitments

.

(a)          The Term Loan.

(i)             Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender with an Initial Term Loan Commitment severally and not jointly agrees to lend to Borrower on the Closing Date, the amount set forth opposite such Lender's name in Schedule 2.1(a) under the heading "Initial Term Loan Commitment" (such amount being referred to herein as such Lender's "**Initial Term Loan Commitment**").  Amounts borrowed under this Section 2.1(a)(i) are referred to as the "Initial Term Loan."

(ii)            Amounts borrowed as an Initial Term Loan which are repaid or prepaid may not be reborrowed.

(iii)           Substantially simultaneously with the borrowing of Initial Term Loans, the Term Loans (as defined in the Prior Credit Agreement) provided by WhiteHorse and its Affiliates (collectively, the "**Prior WhiteHorse Lenders**") pursuant to the Prior Credit Agreement shall be converted into, or replaced by, Initial Term Loans; provided, that each Prior WhiteHorse Lender irrevocably agrees to accept, in lieu of cash for the outstanding principal amount of its Term Loan (as defined in the Prior Credit Agreement) so converted or replaced, and any accrued and unpaid interest thereon, delivery from the Borrower on the Closing Date of an equal principal amount of Initial Term Loans as set forth on Schedule 2.1(a) (the "**Cashless Rollover**"), it being understood that the Obligations (as defined in the Prior Credit Agreement) under the Prior Credit Agreement shall be deemed satisfied in full contemporaneously with the funding of the Initial Term Loans hereunder, and that all the security interests, mortgages, liens, pledges, charges and other encumbrances in favor of the Agent (as defined in the Prior Credit Agreement) and the Lenders (as defined in the Prior Credit Agreement) to secure the Obligations (as defined in the Prior Credit Agreement) shall be deemed automatically and irrevocably discharged, terminated and released with no further action on the part of the parties to the Prior Credit Agreement, and that the Cashless Rollover is being effectuated solely for the administrative convenience of the parties to the Prior Credit Agreement and this Agreement.

(iv)            To the extent that all or any portion of the Cashless Rollover is subsequently invalidated, declared to be fraudulent or a fraudulent conveyance or preferential set aside or required to be repaid to a trustee, receiver, debtor-in-possession or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then the Obligations (as defined in the Prior Credit Agreement) that were intended to be satisfied by any such Cashless Rollover shall be revived and reinstated and continue to be in full force and effect as if such Cashless Rollover had never been consummated, and this Agreement shall in no way impair the claims of such Lenders (as defined in the Prior Credit Agreement) with respect thereto.

(v)             Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender with a First Amendment Term Loan Commitment severally and not jointly agrees to lend to Borrower on the First Amendment Effective Date, the amount set forth opposite such Lender's name in Schedule 2.1(a) under the heading "First Amendment Term Loan Commitment" (such amount being referred to herein as such Lender's "**First Amendment Term Loan Commitment**").  Amounts borrowed under this Section 2.1(a)(v) are referred to as the "First Amendment Term Loan."

(vi)            Amounts borrowed as a First Amendment Term Loan which are repaid or prepaid may not be reborrowed.

(b)         The Revolving Credit.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Revolving Lender severally and not jointly agrees to make Loans to Borrower (each such Loan, a "**Revolving Loan**") from time to time on any Business Day during the period from the Closing Date through the Final Availability Date, in an aggregate amount not to exceed at any time outstanding such Lender's Revolving Loan Commitment, which Revolving Loan Commitments, as of the Closing Date, are set forth opposite such Lender's name in Schedule 2.1(b) under the heading "Revolving Loan Commitments"; provided, however, that, after giving effect to any Borrowing of Revolving Loans, the aggregate principal amount of all outstanding Revolving Loans shall not exceed the Maximum Revolving Loan Balance.  Subject to the other terms and conditions hereof, amounts borrowed under this Section 2.1(b) may be repaid and reborrowed from time to time.  The "**Maximum Revolving Loan Balance**" from time to time will be the Aggregate Revolving Loan Commitment then in effect, less the sum of (I) the aggregate amount of Letter of Credit Obligations plus (II) the aggregate principal amount of outstanding Swing Loans.  If at any time the then outstanding principal balance of Revolving Loans exceeds the Maximum Revolving Loan Balance, then Borrower shall immediately prepay outstanding Revolving Loans in an amount sufficient to eliminate such excess.

(c)         Letters of Credit.

(i)         Conditions.  On the terms and subject to the conditions contained herein, Borrower may request that one or more L/C Issuers Issue, in accordance with such L/C Issuer's usual and customary business practices, and for the account of any Credit Party, Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the earlier of (x) seven (7) days prior to the date specified in clause (a) of the definition of Revolving Termination Date and (y) the date on which the Aggregate Revolving Loan Commitment shall terminate in accordance with the provisions of this Agreement; provided, however, that no L/C Issuer shall Issue any Letter of Credit upon the occurrence of any of the following or, if after giving effect to such Issuance:

(A)         Availability would be less than zero, or (ii) the Letter of Credit Obligations for all Letters of Credit would exceed $1,000,000 (the "**L/C Sublimit**");

(B)         the expiration date of such Letter of Credit (i) is not a Business Day, (ii) is more than one year after the date of Issuance thereof or (iii) is later than seven (7) days prior to the date specified in clause (a) of the definition of Revolving Termination Date; provided, however, that any Letter of Credit with a term not exceeding one year may provide for its renewal for additional periods not exceeding one year as long as (x) each of Borrower and such L/C Issuer have the option to prevent such renewal before the expiration of such term or any such period and (y) neither such L/C Issuer nor Borrower shall permit any such renewal to extend such expiration date beyond the date set forth in clause (iii) above; provided further that notwithstanding the foregoing, Agent and the L/C Issuer, in their respective sole discretion, may agree to extend such Letter of Credit beyond the date set forth in clause (iii) above upon Borrower either (A) delivering to Agent for the benefit of the L/C Issuer cash equal to 103% (or such greater percentage as the L/C Issuer may require in the case of any Letter of Credit with an expiration date later than one year after the date of providing such cash collateral) of the sum of (1) the aggregate undrawn amount of such Letter of Credit at such time plus (2) the aggregate principal amount of all L/C Reimbursement Obligations outstanding at such time with respect to such Letter of Credit that have matured, in each instance, on and as of the date of such extension, or (B) delivering to the L/C Issuer on the date of such extension one or more letters of credit for the benefit of the L/C Issuer, issued by a bank reasonably acceptable to the L/C Issuer in its sole discretion, each in form and substance reasonably acceptable to the L/C Issuer in its sole discretion and in an amount equal to the sum of (1) and (2) above.

(C)          (i) any fee due in connection with, and on or prior to, such Issuance has not been paid, (ii) such Letter of Credit is requested to be Issued in a form that is not acceptable to such L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by Borrower on behalf of the Credit Parties, the documents that such L/C Issuer generally uses in the ordinary course of business for the Issuance of letters of credit of the type of such Letter of Credit (collectively, the "**L/C Reimbursement Agreement**").

For each Issuance, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in Section 3.2 have been satisfied or waived in connection with the Issuance of any Letter of Credit; provided, however, that no Letters of Credit shall be Issued during the period starting on the date that any condition precedent contained in Section 3.2 is not satisfied and ending on the date all such conditions are satisfied or duly waived.

Notwithstanding anything else to the contrary herein, if any Lender is a Defaulting Lender, no L/C Issuer shall be obligated to Issue any Letter of Credit unless (w) the Defaulting Lender has been replaced in accordance with Section 10.9 or 10.20, (x) the Letter of Credit Obligations of such Defaulting Lender have been cash collateralized, (y) the Revolving Loan Commitments of the other Lenders have been increased by an amount sufficient to satisfy Agent that all future Letter of Credit Obligations will be covered by all Revolving Lenders that are not Defaulting Lenders, or (z) the Letter of Credit Obligations of such Defaulting Lender have been reallocated to other Revolving Lenders in a manner consistent with Section 2.11(e)(ii).

(ii)          Notice of Issuance.  Borrower shall give the relevant L/C Issuer and Agent a notice of any requested Issuance of any Letter of Credit, which shall be effective only if received by such L/C Issuer and Agent not later than 2:00 p.m. ET on the third Business Day prior to the date of such requested Issuance.  Such notice shall be made in a writing or Electronic Transmission substantially in the form of Exhibit 2.1(c) duly completed or in any other written form acceptable to such L/C Issuer (an "**L/C Request**").

(iii)          Reporting Obligations of L/C Issuers.  Each L/C Issuer agrees to provide Agent, in form and substance reasonably satisfactory to Agent, each of the following on the following dates: (A) (i) on or prior to any Issuance of any Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by Borrower of any related L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment and Agent shall provide copies of such notices to each Revolving Lender reasonably promptly after receipt thereof; (B) upon the request of Agent (or any Revolving Lender through Agent), copies of any Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by Agent; and (C) together with the delivery of each Compliance Certificate, a schedule of the Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to Agent, setting forth the Letter of Credit Obligations for such Letters of Credit outstanding on the last Business Day of the financial period with respect to which such Compliance Certificate speaks.

(iv)          Acquisition of Participations.  Upon any Issuance of a Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the Letter of Credit Obligations, each Revolving Lender shall be deemed to have acquired, without recourse or

warranty, an undivided interest and participation in such Letter of Credit and the related Letter of Credit Obligations in an amount equal to its Commitment Percentage of such Letter of Credit Obligations.

(v)　　　　Reimbursement Obligations of Borrower.　Borrower agrees to pay to the L/C Issuer of any Letter of Credit, or to Agent for the benefit of such L/C Issuer, each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after Borrower receives notice from such L/C Issuer or from Agent that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "**L/C Reimbursement Date**") with interest thereon computed as set forth in clause (A) below.　In the event that any L/C Reimbursement Obligation is not repaid by Borrower as provided in this clause (v) (or any such payment by Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify Agent of such failure (and, upon receipt of such notice, Agent shall notify each Revolving Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable by Borrower on demand with interest thereon computed (A) from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the interest rate applicable during such period to Revolving Loans that are Base Rate Loans and (B) thereafter until payment in full, at the interest rate specified in Section 2.3(c) to past due Revolving Loans that are Base Rate Loans (regardless of whether or not an election is made under such Section).

(vi)　　　　Reimbursement Obligations of the Revolving Lenders.

(A)　　　　Upon receipt of the notice described in clause (v) above from Agent, each Revolving Lender shall pay to Agent for the account of such L/C Issuer its Commitment Percentage of such Letter of Credit Obligations (as such amount may be increased pursuant to Section 2.11(e)(ii)).

(B)　　　　By making any payment described in clause (A) above (other than during the continuation of an Event of Default under Section 8.1(f) or 8.1(g)), such Lender shall be deemed to have made a Revolving Loan to Borrower, which, upon receipt thereof by Agent for the benefit of such L/C Issuer, Borrower shall be deemed to have used in whole to repay such L/C Reimbursement Obligation.　Any such payment that is not deemed a Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable Letter of Credit and the Letter of Credit Obligation in respect of the related L/C Reimbursement Obligations.　Such participation shall not otherwise be required to be funded.　Following receipt by any L/C Issuer of any payment from any Lender pursuant to this clause (vi) with respect to any portion of any L/C Reimbursement Obligation, such L/C Issuer shall promptly pay to Agent, for the benefit of such Lender, all amounts received by such L/C Issuer (or to the extent such amounts shall have been received by Agent for the benefit of such L/C Issuer, Agent shall promptly pay to such Lender all amounts received by Agent for the benefit of such L/C Issuer) with respect to such portion.

(vii)　　　　Obligations Absolute.　The obligations of Borrower and the Revolving Lenders pursuant to clauses (iv), (v) and (vi) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the

terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Credit Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Revolving Lender, (i) the failure of any condition precedent set forth in Section 3.2 to be satisfied (each of which conditions precedent the Revolving Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Credit Party and (D) any other act or omission to act or delay of any kind of L/C Issuer, Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this clause (vii), constitute a legal or equitable discharge of any obligation of Borrower or any Revolving Lender hereunder.  No provision hereof shall be deemed to waive or limit Borrower's right to seek repayment of any payment of any L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

(d)  Swing Loans.

(i)  Availability.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, the Swing Lender shall make Loans (each a "**Swing Loan**") available to Borrower under the Revolving Loan Commitments from time to time on any Business Day during the period from the Closing Date through the Final Availability Date in an aggregate principal amount at any time outstanding not to exceed its Swingline Commitment; provided, however, that the Swing Lender may not make any Swing Loan (x) to the extent that after giving effect to such Swing Loan, the aggregate principal amount of all Revolving Loans would exceed the Maximum Revolving Loan Balance (y) to the extent that after giving effect to such Swing Loan, the aggregate principal amount of all Revolving Loans and Swing Loans held by the Swing Lender (and if the Swing Lender is not also a Revolving Lender, by each of its Affiliates that is a Revolving Lender) would exceed the Revolving Loan Commitment of such Swing Lender (and such Affiliates, if any) and (z) during the period commencing on the date that one or more of the conditions precedent contained in Section 3.2 are not satisfied and ending when such conditions are satisfied or duly waived.  In connection with the making of any Swing Loan, the Swing Lender may but shall not be required to determine that, or take notice whether, the conditions precedent set forth in Section 3.2 have been satisfied or waived.  Each Swing Loan shall be a Base Rate Loan and must be repaid as provided herein, but in any event must be repaid in full on the Revolving Termination Date.  Within the limits set forth in the first sentence of this clause (i), amounts of Swing Loans repaid may be reborrowed under this clause (i).

(ii)  Borrowing Procedures.  In order to request a Swing Loan, Borrower shall give to Agent a notice to be received not later than 1:00 p.m. ET on the day of the proposed Borrowing, which shall be made in a writing or in an Electronic Transmission substantially in the form of Exhibit 2.1(d) or in a writing in any other form acceptable to Agent duly completed (a "**Swingline Request**").  In addition, if any Notice of Borrowing of Revolving Loans requests a Borrowing of Base Rate Loans, the Swing Lender may, notwithstanding anything else to the contrary herein, make a Swing Loan to Borrower in an aggregate amount not to exceed such proposed Borrowing, and the aggregate amount of the corresponding proposed Borrowing shall be reduced accordingly by the principal amount of such Swing Loan.  Agent shall promptly notify the Swing Lender of the details of the requested Swing Loan.  Upon receipt of such notice and subject to the terms of this Agreement, the Swing Lender may make a Swing Loan available to Borrower by making the proceeds thereof available to Agent and, in turn,

Agent shall make such proceeds available to Borrower on the date set forth in the relevant Swingline Request or Notice of Borrowing.

(iii)     Refinancing Swing Loans.

(A)     The Swing Lender may at any time forward a demand to Agent (which demand Agent shall, upon receipt, forward to each Revolving Lender) that each Revolving Lender pay to Agent, for the account of the Swing Lender, such Revolving Lender's Commitment Percentage of the outstanding Swing Loans (as such amount may be increased pursuant to Section 2.11(e)(ii)).

(B)     Each Revolving Lender shall pay the amount owing by it to Agent for the account of the Swing Lender on the Business Day following receipt of the notice or demand therefor.  Payments received by Agent after 1:00 p.m. ET may, in Agent's discretion, be deemed to be received on the next Business Day.  Upon receipt by Agent of such payment (other than during the continuation of any Event of Default under Section 8.1(f) or 8.1(g)), such Revolving Lender shall be deemed to have made a Revolving Loan to Borrower, which, upon receipt of such payment by the Swing Lender from Agent, Borrower shall be deemed to have used in whole to refinance such Swing Loan.  In addition, regardless of whether any such demand is made, upon the occurrence of any Event of Default under Section 8.1(f) or 8.1(g), each Revolving Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in each Swing Loan in an amount equal to such Lender's Commitment Percentage of such Swing Loan.  If any payment made by any Revolving Lender as a result of any such demand is not deemed a Revolving Loan, such payment shall be deemed a funding by such Lender of such participation.  Such participation shall not be otherwise required to be funded.  Upon receipt by the Swing Lender of any payment from any Revolving Lender pursuant to this clause (iii) with respect to any portion of any Swing Loan, the Swing Lender shall promptly pay over to such Revolving Lender all payments of principal (to the extent received after such payment by such Lender) and interest (to the extent accrued with respect to periods after such payment) on account of such Swing Loan received by the Swing Lender with respect to such portion.

(iv)     Obligation to Fund Absolute.     Each Revolving Lender's obligations pursuant to clause (iii) above shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including (A) the existence of any setoff, claim, abatement, recoupment, defense or other right that such Lender, any Affiliate thereof or any other Person may have against the Swing Lender, Agent, any other Lender or L/C Issuer or any other Person, (B) the failure of any condition precedent set forth in Section 3.2 to be satisfied or the failure of Borrower to deliver a Notice of Borrowing (each of which requirements the Revolving Lenders hereby irrevocably waive) and (C) any adverse change in the condition (financial or otherwise) of any Credit Party.

(e)     Delayed Draw Term Loans.

(i)     Closing Date Delayed Draw Term Loan Commitment.  From time to time during the Closing Date Delayed Draw Term Availability Period and on the terms and subject to the conditions set forth herein (including, without limitation, Section 3.2), Lenders hereby severally agree to make term loans to Borrower equal to each such Lender's Closing Date Delayed Draw Term Commitment (if any) of the term loans requested by Borrower at such time pursuant to this Section 2.1(e)(i) ("**Closing Date Delayed Draw Term Loans**"); provided that

(i) the amount of the Closing Date Delayed Draw Term Loans requested by Borrower at such time shall not exceed the Closing Date Delayed Draw Term Loan Limit at such time, (ii) each Closing Date Delayed Draw Term Borrowing shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof and (iii) the Borrower may not make more than four (4) such requests during the Closing Date Delayed Draw Term Availability Period.  Each Lender's obligation to fund the Closing Date Delayed Draw Term Loans shall be limited to such Lender's Closing Date Delayed Draw Term Commitment, and no Lender shall have any obligation to fund any portion of any Closing Date Delayed Draw Term Loan required to be funded by any other Lender, but not so funded.  Borrowers shall not have any right to reborrow any portion of the Closing Date Delayed Draw Term Loans which are repaid or prepaid from time to time.

(ii)       Advancing Closing Delayed Draw Term Loans.

(A)       Borrower shall deliver to Agent a Notice of Borrowing with respect to each proposed Closing Date Delayed Draw Term Borrowing, such Notice of Borrowing to be delivered no later than 11:00 A.M. (New York City time) ten (10) Business Days prior to the date of such proposed borrowing. For the avoidance of doubt, once given, a Notice of Borrowing shall be revocable and Borrower shall not be bound thereby.

(B)       Borrower hereby authorizes Lenders and Agent to make Closing Date Delayed Draw Term Loans based on telephonic notices made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower.  Borrower agrees to deliver to Agent a Notice of Borrowing in respect of each Closing Date Delayed Draw Term Loan requested by telephone no later than one (1) Business Day following such request.  If the Notice of Borrowing differs in any respect from the action taken by Agent and Lenders, the records of the Agent shall govern absent manifest error.  Borrower further hereby authorizes Lenders and Agent to make Closing Date Delayed Draw Term Loans based on an Electronic Transmission made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower, but only after Agent shall have established procedures acceptable to Agent for accepting electronic Notices of Borrowing, as indicated by Agent's written confirmation thereof.

(iii)       Termination or Reduction of Closing Date Delayed Draw Term Commitment.  Borrower may, upon notice to Agent, terminate the Closing Date Delayed Draw Term Commitment, or from time to time permanently reduce the Aggregate Closing Date Delayed Draw Term Commitments; provided that (i) any such notice will be irrevocable and received by the Agent not later than 1:00 P.M. (New York City time) three (3) Business Days prior to the requested effective date of such termination or reduction; and (ii) any such partial reduction will be in an aggregate amount of $1,000,000 or any whole multiple of $100,000. Agent will promptly notify Lenders of any such notice of termination or reduction of the Closing Date Delayed Draw Term Commitment.  Any reduction of the Closing Date Delayed Draw Term Commitment will be applied to the commitment of each Lender according to its pro rata share of the Aggregate Closing Date Delayed Draw Term Commitment.  All unused line fees payable pursuant to Section 2.9(e) accrued until the effective date of any termination of the Closing Date Delayed Draw Term Commitment will be paid on the effective date of such termination.

(iv)       First Amendment Delayed Draw Term Loan Commitment.  From time to time during the First Amendment Delayed Draw Term Availability Period and on the terms and subject to the conditions set forth herein (including, without limitation, Section 3.2), Lenders hereby severally agree to make term loans to Borrower equal to each such Lender's First Amendment Delayed Draw Term Commitment (if any) of the term loans requested by

Borrower at such time pursuant to this Section 2.1(e)(iv) ("**First Amendment Delayed Draw Term Loans**"); provided that (i) the amount of the First Amendment Delayed Draw Term Loans requested by Borrower at such time shall not exceed the First Amendment Delayed Draw Term Loan Limit at such time, (ii) each First Amendment Delayed Draw Term Borrowing shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof and (iii) the Borrower may not make more than four (4) such requests during the First Amendment Delayed Draw Term Availability Period.  Each Lender's obligation to fund the First Amendment Delayed Draw Term Loans shall be limited to such Lender's First Amendment Delayed Draw Term Commitment, and no Lender shall have any obligation to fund any portion of any First Amendment Delayed Draw Term Loan required to be funded by any other Lender, but not so funded.  Borrowers shall not have any right to reborrow any portion of the First Amendment Delayed Draw Term Loans which are repaid or prepaid from time to time.

(v)        Advancing First Amendment Draw Term Loans.

(A)        Borrower shall deliver to Agent a Notice of Borrowing with respect to each proposed First Amendment Delayed Draw Term Borrowing, such Notice of Borrowing to be delivered no later than 11:00 A.M. (New York City time) ten (10) Business Days prior to the date of such proposed borrowing. For the avoidance of doubt, once given, a Notice of Borrowing shall be revocable and Borrower shall not be bound thereby.

(B)        Borrower hereby authorizes Lenders and Agent to make First Amendment Delayed Draw Term Loans based on telephonic notices made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower.  Borrower agrees to deliver to Agent a Notice of Borrowing in respect of each First Amendment Delayed Draw Term Loan requested by telephone no later than one (1) Business Day following such request.  If the Notice of Borrowing differs in any respect from the action taken by Agent and Lenders, the records of the Agent shall govern absent manifest error.  Borrower further hereby authorizes Lenders and Agent to make First Amendment Delayed Draw Term Loans based on an Electronic Transmission made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower, but only after Agent shall have established procedures acceptable to Agent for accepting electronic Notices of Borrowing, as indicated by Agent's written confirmation thereof.

(vi)        Termination or Reduction of First Amendment Delayed Draw Term Commitment.  Borrower may, upon notice to Agent, terminate the First Amendment Delayed Draw Term Commitment, or from time to time permanently reduce the Aggregate First Amendment Delayed Draw Term Commitments; provided that (i) any such notice will be irrevocable and received by the Agent not later than 1:00 P.M. (New York City time) three (3) Business Days prior to the requested effective date of such termination or reduction; and (ii) any such partial reduction will be in an aggregate amount of $1,000,000 or any whole multiple of $100,000.  Agent will promptly notify Lenders of any such notice of termination or reduction of the First Amendment Delayed Draw Term Commitment.  Any reduction of the First Amendment Delayed Draw Term Commitment will be applied to the commitment of each Lender according to its pro rata share of the Aggregate First Amendment Delayed Draw Term Commitment.  All unused line fees payable pursuant to Section 2.9(e) accrued until the effective date of any termination of the First Amendment Delayed Draw Term Commitment will be paid on the effective date of such termination.

2.2    Evidence of Loans; Notes

.

(a)        The Term Loans made by any Lender are evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to the unpaid balance of the Term Loans held by such Lender.

(b)        The Revolving Loans and Swing Loans made by each Revolving Lender and the Swing Lender, respectively, are evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to such Lender's Revolving Loan Commitment or Swingline Commitment.

(c)        The Closing Date Delayed Draw Term Loans made by any Lender are evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to the unpaid balance of the Closing Date Delayed Draw Term Loans held by such Lender.

(d)        The First Amendment Delayed Draw Term Loans made by any Lender are evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to the unpaid balance of the First Amendment Delayed Draw Term Loans held by such Lender.

2.3    Interest

.

(a)        Subject to Sections 2.3(c) and 2.3(d), each Loan shall bear interest on the outstanding principal amount thereof from the date when made, and all interest which is not paid when due shall bear interest, at a rate per annum equal to Adjusted Term SOFR or the Base Rate, as the case may be, plus the Applicable Margin; provided Swing Loans may not be SOFR Loans.  Each determination of an interest rate by Agent shall be conclusive and binding on Borrower and the Lenders in the absence of manifest error.  All computations of fees and interest (other than interest accruing on Base Rate Loans) payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed.  All computations of interest accruing on Base Rate Loans payable under this Agreement shall be made on the basis of a 365-day year (366 days in the case of a leap year) and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)        Interest on each Loan shall be paid in arrears on each Interest Payment Date; provided further, that for each Interest Payment Date occurring from and after the Third Amendment Effective Date, up to 0.50% of the interest accrued at Pricing Level I (as set forth in "Applicable Margin") shall be paid in kind by being capitalized to the outstanding principal amount of the Loans on the applicable Interest Payment Date.   In addition to the foregoing,  at the Borrower's option, for the fiscal quarter ending March 31, 2021, 100% of such accrued interest on the WhiteHorse Loans may be paid in kind and capitalized to the principal amount of the outstanding WhiteHorse Loans (such option, a "**PIK Option**" and such payment in kind, a "**Principal Increase**") so long as the Borrower has provided written notice to the Agent and WhiteHorse Lenders of their election to pay such interest through a Principal Increase prior to the applicable Interest Payment Date.  Interest shall also be paid on the date of any payment or prepayment of Term Loans in full and Revolving Loans on the Revolving Termination Date.

(c)        At the election of Agent or the Required Lenders while any Event of Default exists (or automatically while any Event of Default under Section 8.1(a), 8.1(f) or 8.1(g) exists), Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Loans and past due interest thereon, if any, from and after the date of occurrence of such

Event of Default, at a rate per annum which is determined by adding two percent (2.0%) per annum to the Applicable Margin then in effect for such Loans (plus Adjusted Term SOFR or the Base Rate, as the case may be). All such interest shall be payable in cash on demand of Agent or the Required Lenders.

(d)         Anything herein to the contrary notwithstanding, the obligations of Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event Borrower shall pay such Lender interest at the highest rate permitted by applicable law ("**Maximum Lawful Rate**"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

(e)         Notwithstanding anything set forth in this Agreement to the contrary (and, for the avoidance of doubt, automatically and without any further required action by any party hereto), if the Seventh Amendment Effective Date falls prior to the last day of an Interest Period for any LIBOR Rate Loan (as defined in this Agreement immediately prior to giving effect to the Seventh Amendment) outstanding on the Seventh Amendment Effective Date, (i) LIBOR (as defined in this Agreement immediately prior to giving effect to the Seventh Amendment) and the Applicable Margin (as defined in this Agreement immediately prior to giving effect to the Seventh Amendment) applicable to such LIBOR Rate Loan immediately prior to giving effect to the Seventh Amendment shall continue to apply to such LIBOR Rate Loan through the end of the Interest Period in effect in respect of such LIBOR Rate Loan immediately prior to giving effect to the Seventh Amendment and (ii) from and after the first day of the immediately succeeding Interest Period (if any) for such Loan, such Loan shall be a SOFR Loan or Base Rate Loan, as determined in accordance with the terms of this Agreement.

2.4     Loan Accounts; Register

.

(a)         Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and stated interest thereon and the principal balance thereof from time to time outstanding. Agent shall deliver to Borrower on a monthly basis a loan statement setting forth such record for the immediately preceding calendar month. Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to Borrower and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against Agent.

(b)         Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall establish and maintain at its address referred to in Section 10.2 (or at such other address as Agent may notify Borrower) (A) a record of ownership (the "**Register**") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent, each Lender and each L/C Issuer in the Term Loans, Revolving Loans, Swing Loans, L/C Reimbursement Obligations and Letter of Credit Obligations, each of their obligations under this Agreement to participate in each Loan, Letter of Credit, Letter of Credit Obligations and L/C Reimbursement

Obligations, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders and the L/C Issuers (and each change thereto pursuant to Sections 10.9 and 10.20), (2) the Commitments of each Lender, (3) the principal amount (and the stated interest thereon) of each Loan and each funding of any participation described in clause (A) above, and for SOFR Loans, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid, (5) the amount of the L/C Reimbursement Obligations due and payable or paid in respect of Letters of Credit and (6) any other payment received by Agent from Borrower and its application to the Obligations.

(c)      Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans and, in the case of Revolving Loans, the corresponding obligations to participate in Letter of Credit Obligations and Swing Loans) and the L/C Reimbursement Obligations are registered obligations, the right, title and interest of the Lenders and the L/C Issuers and their assignees in and to such Loans or L/C Reimbursement Obligations, as the case may be, shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein.  This Section 2.4 and Section 10.9 shall be construed so that the Loans and L/C Reimbursement Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)      The Credit Parties, Agent, the Lenders and the L/C Issuers shall treat each Person whose name is recorded in the Register as a Lender or L/C Issuer, as applicable, for all purposes of this Agreement absent manifest error.  Information contained in the Register with respect to any Lender or any L/C Issuer shall be available for access by Borrower, Agent, such Lender or such L/C Issuer during normal business hours and from time to time upon at least one Business Day's prior notice. No Lender or L/C Issuer shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender or L/C Issuer unless otherwise agreed by the Agent.

2.5      Procedure for Revolving Credit Borrowing

.

(a)      Each Borrowing of a Revolving Loan shall be made upon Borrower's irrevocable (subject to Section 11.5) written notice delivered to Agent substantially in the form of a Notice of Borrowing or in a writing in any other form acceptable to Agent, which notice must be received by Agent prior to 12:00 p.m. ET (i) on the date which is three (3) Business Days prior to the requested Borrowing date in the case of each SOFR Loan, and (ii) one (1) Business Day prior to the requested Borrowing date in the case of each Base Rate Loan.  Such Notice of Borrowing shall specify:

(i)      the amount of the Borrowing (which shall be in an aggregate minimum principal amount of $100,000);

(ii)      the requested Borrowing date, which shall be a Business Day;

(iii)      whether the Borrowing is to be comprised of SOFR Loans or Base Rate Loans; and

(iv)      if the Borrowing is to be SOFR Loans, the Interest Period applicable to such Loans.

(b)        Upon receipt of a Notice of Borrowing, Agent will promptly notify each Revolving Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(c)        Unless Agent is otherwise directed in writing by Borrower, the proceeds of each requested Borrowing after the Closing Date will be made available to Borrower by Agent by wire transfer of such amount to Borrower pursuant to the wire transfer instructions specified on the signature page hereto.

2.6        Conversion and Continuation Elections

.

(a)        Borrower shall have the option to (i) request that any Revolving Loan be made as a SOFR Loan, (ii) convert at any time all or any part of outstanding Loans (other than Swing Loans) from Base Rate Loans to SOFR Loans, (iii) convert any SOFR Loan to a Base Rate Loan, subject to Section 11.4 if such conversion is made prior to the expiration of the Interest Period applicable thereto, or (iv) continue all or any portion of any Loan as a SOFR Loan upon the expiration of the applicable Interest Period.  Any such election must be made by Borrower by 12:00 p.m. ET on the third Business Day prior to (1) the date of any proposed Loan which is to bear interest at Adjusted Term SOFR, (2) the end of each Interest Period with respect to any SOFR Loans to be continued as such, or (3) the date on which Borrower wish to convert any Base Rate Loan to a SOFR Loan for an Interest Period designated by Borrower in such election.  If no election is received with respect to a SOFR Loan by 12:00 p.m. ET on the third Business Day prior to the end of the Interest Period with respect thereto, that SOFR Loan shall be converted to a Base Rate Loan at the end of its Interest Period.  Borrower must make such election by notice to Agent in writing, including by Electronic Transmission.  In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "**Notice of Conversion/Continuation**") substantially in the form of Exhibit 2.6 or in a writing in any other form acceptable to Agent.  No Loan shall be made, converted into or continued as a SOFR Loan, if (x) an Event of Default has occurred and is continuing and Agent or Required Lenders have determined not to make or continue any Loan as a SOFR Loan as a result thereof or (y) Agent is or Required Lenders are stayed by the Bankruptcy Code from making such determination.

(b)        Upon receipt of a Notice of Conversion/Continuation, Agent will promptly notify each Lender thereof.  In addition, Agent will, with reasonable promptness, notify Borrower and the Lenders of each determination of Adjusted Term SOFR; provided that any failure to do so shall not relieve Borrower of any liability hereunder or provide the basis for any claim against Agent.  All conversions and continuations shall be made pro rata according to the respective outstanding principal amounts of the Loans held by each Lender with respect to which the notice was given.

(c)        Notwithstanding any other provision contained in this Agreement, after giving effect to any Borrowing, or to any continuation or conversion of any Loans, there shall not be more than seven (7) different Interest Periods in effect.

2.7        Optional Prepayments and Reductions in Revolving Loan Commitments

.

(a)        Optional Prepayments Generally.  Borrower may at any time upon at least two (2) Business Days' (or such shorter period as is acceptable to Agent) prior written notice by Borrower to Agent, prepay the Loans in whole or in part in an amount greater than or equal to $100,000

(other than Revolving Loans and Swing Loans for which prior written notice is not required and for which no minimum shall apply), in each instance, without penalty or premium, except the applicable Prepayment Fee, and except as otherwise provided in Sections 2.9 and 11.4. Optional partial prepayments of Revolving Loans shall be applied in accordance with Section 2.10(a). Optional partial prepayments of Term Loans shall, subject to Section 2.10(a), be applied to scheduled installments thereof, if any, as specified by Borrower in such notice of prepayment and, in the absence of such direction, in the manner set forth in Section 2.8(f).

(b)        Reductions in Revolving Loan Commitments. Borrower may at any time upon at least two (2) Business Days' (or such shorter period as is acceptable to Agent) prior written notice by Borrower to Agent permanently reduce the Aggregate Revolving Loan Commitment. All reductions of the Aggregate Revolving Loan Commitment shall be allocated pro rata among all Lenders with a Revolving Loan Commitment. A permanent reduction of the Aggregate Revolving Loan Commitment shall not require a corresponding pro rata reduction in the L/C Sublimit or the Swingline Commitment; provided that the L/C Sublimit and/or the Swingline Commitment, as applicable, shall be permanently reduced by the amount thereof in excess of the Aggregate Revolving Loan Commitment.

(c)        Notices. Notice of prepayment or commitment reduction pursuant to clauses (a) and (b) above shall not thereafter be revocable by Borrower (unless such notice expressly conditions such prepayment upon consummation of a transaction which is contemplated to result in prepayment of the Loans, in which event such notice may be revocable or conditioned upon such consummation) and Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such prepayment or reduction. The payment amount specified in a notice of prepayment shall be due and payable on the date specified therein. Together with each prepayment under this Section 2.7, Borrower shall pay any amounts required pursuant to Sections 2.9 and 11.4.

2.8     Mandatory Prepayments of Loans and Commitment Reductions

.

(a)        Scheduled Term Loan Payments.

(i)        The principal amount of the Term Loans shall be paid in installments on the dates and in the respective amounts shown below; provided, that the installments due on June 1, 2020, September 1, 2020, December 1, 2020 and March 1, 2021 shall be permitted to be paid on or before the Maturity Date:

| Date of Payment | Amount of Term Loan Payment |
|---|---|
| December 1, 2019 | $468,750 |
| March 1, 2020 | $468,750 |
| June 1, 2020 | $468,750 |
| September 1, 2020 | $468,750 |
| December 1, 2020 | $468,750 |
| March 1, 2021 | $468,750 |
| June 1, 2021 | $468,750 |
| September 1, 2021 | $468,750 |
| December 1, 2021 | $468,750 |
| March 1, 2022 | $468,750 |
| June 1, 2022 | $468,750 |

| | |
|---|---|
| September 1, 2022 | $468,750 |
| December 1, 2022 | $468,750 |
| March 1, 2023 | $468,750 |
| June 1, 2023 | $468,750 |
| September 1, 2023 | $468,750 |
| December 1, 2023 | $468,750 |
| March 1, 2024 | $468,750 |
| June 1, 2024 | $468,750 |
| September 1, 2024 | $468,750 |
| | |
| Maturity Date | Remaining principal amount |

The final scheduled installment of each such Term Loan shall, in any event, be in an amount equal to the entire remaining principal balance of such Term Loan.

(ii)     As of the Third Amendment Effective Date, the principal amount of the First Amendment Term Loans shall be paid in installments on the dates and in the respective amounts shown below; provided, that the installments due on July 1, 2020, October 1, 2020, January 1, 2021 and April 1, 2021 shall be permitted to be paid on or before the Maturity Date:

| | Amount of First Amendment |
|---|---|
| Date of Payment | Term Loan Payment |
| | |
| July 1, 2020 | $18,750 |
| October 1, 2020 | $18,750 |
| January 1, 2021 | $18,750 |
| April 1, 2021 | $18,750 |
| July 1, 2021 | $18,750 |
| October 1, 2021 | $18,750 |
| January 1, 2022 | $18,750 |
| April 1, 2022 | $18,750 |
| July 1, 2022 | $18,750 |
| October 1, 2022 | $18,750 |
| January 1, 2023 | $18,750 |
| April 1, 2023 | $18,750 |
| July 1, 2023 | $18,750 |
| October 1, 2023 | $18,750 |
| January 1, 2024 | $18,750 |
| April 1, 2024 | $18,750 |
| June 1, 2024 | $18,750 |
| October 1, 2024 | $18,750 |
| | |
| Maturity Date | Remaining principal amount |

The final scheduled installment of each such First Amendment Term Loans shall, in any event, be in an amount equal to the entire remaining principal balance of such First Amendment Term Loans.

(iii)     As of the Third Amendment Effective Date, the principal amount of the Closing Date Delayed Draw Term Loans shall be paid in installments on the dates and in the respective amounts shown below; provided, that the installments due on July 1, 2020, October 1, 2020, January 1, 2021 and April 1, 2021 shall be permitted to be paid on or before the Maturity Date:

| Date of Payment | Amount of Closing Date Delayed Draw Term Loan Payment |
|---|---|
| July 1, 2020 | $93,750 |
| October 1, 2020 | $93,750 |
| January 1, 2021 | $93,750 |
| April 1, 2021 | $93,750 |
| July 1, 2021 | $93,750 |
| October 1, 2021 | $93,750 |
| January 1, 2022 | $93,750 |
| April 1, 2022 | $93,750 |
| July 1, 2022 | $93,750 |
| October 1, 2022 | $93,750 |
| January 1, 2023 | $93,750 |
| April 1, 2023 | $93,750 |
| July 1, 2023 | $93,750 |
| October 1, 2023 | $93,750 |
| January 1, 2024 | $93,750 |
| April 1, 2024 | $93,750 |
| June 1, 2024 | $93,750 |
| October 1, 2024 | $93,750 |
| Maturity Date | Remaining principal amount |

The final scheduled installment of each such Closing Date Delayed Draw Term Loans shall, in any event, be in an amount equal to the entire remaining principal balance of such Closing Date Delayed Draw Term Loans.

(iv)     As of the Third Amendment Effective Date, the principal amount of the First Amendment Delayed Draw Term Loans shall be paid in installments on the dates and in the respective amounts shown below; provided, that the installments due on July 1, 2020, October 1, 2020, January 1, 2021 and April 1, 2021 shall be permitted to be paid on or before the Maturity Date:

| Date of Payment | Amount of First Amendment Delayed Draw Term Loan Payment |
|---|---|
| July 1, 2020 | $117,187.50 |
| October 1, 2020 | $117,187.50 |
| January 1, 2021 | $117,187.50 |
| April 1, 2021 | $117,187.50 |
| July 1, 2021 | $117,187.50 |
| October 1, 2021 | $117,187.50 |

|US-DOCS\~~122553549.2~~143398915.4||

| | |
|---|---|
| January 1, 2022 | $117,187.50 |
| April 1, 2022 | $117,187.50 |
| July 1, 2022 | $117,187.50 |
| October 1, 2022 | $117,187.50 |
| January 1, 2023 | $117,187.50 |
| April 1, 2023 | $117,187.50 |
| July 1, 2023 | $117,187.50 |
| October 1, 2023 | $117,187.50 |
| January 1, 2024 | $117,187.50 |
| April 1, 2024 | $117,187.50 |
| June 1, 2024 | $117,187.50 |
| October 1, 2024 | $117,187.50 |
| | |
| Maturity Date | Remaining principal amount |

The final scheduled installment of each such First Amendment Delayed Draw Term Loans shall, in any event, be in an amount equal to the entire remaining principal balance of such Closing First Amendment Delayed Draw Term Loans.

(v)     Notwithstanding, and in addition to, the foregoing scheduled payments in respect of the Term Loans required pursuant to this Section 2.8(a), on the Fifth Amendment Effective Date, the Borrower shall repay the Term Loans in an aggregate principal amount of $2,800,000; provided, that for the avoidance of doubt, it is understood and agreed that no Prepayment Fee is applicable to such repayment.

(b)     Revolving Loan.  Borrower shall repay to the Lenders in full on the date specified in clause (a) of the definition of "Revolving Termination Date" the aggregate principal amount of the Revolving Loans and Swing Loans outstanding on the Revolving Termination Date.

(c)     Asset Dispositions; Events of Loss.  If a Credit Party shall at any time or from time to time:

(i)     make a Disposition under Section 6.6(q); or

(ii)    suffer an Event of Loss;

and the aggregate amount of the Net Proceeds received by the Credit Parties in connection with such Disposition or Event of Loss and all other such Dispositions and Events of Loss occurring during the Fiscal Year exceeds $1,500,000, then (A) Borrower shall promptly notify Agent of such Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party in respect thereof) and (B) promptly upon receipt by a Credit Party of the Net Proceeds of such Disposition or Event of Loss, Borrower shall deliver, or cause to be delivered, such excess Net Proceeds to Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with Section 2.8(f) hereof.  Notwithstanding the foregoing and provided no Event of Default has occurred and is continuing, such prepayment shall not be required to the extent a Credit Party reinvests the Net Proceeds of such Disposition or Event of Loss in assets of a kind then used or usable in the business of the Credit Parties within three hundred sixty-five (365) days after the date of such Disposition or Event of Loss, or enters into a binding commitment thereof within said

three hundred sixty-five (365) day period and subsequently makes such reinvestment within an additional one hundred eighty (180) days thereafter; provided that Borrower notifies Agent of such Credit Party's intent to reinvest and of the completion of such reinvestment at the time such proceeds are received and when such reinvestment occurs, respectively.

(d)     Incurrence of Debt. Immediately upon receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the incurrence of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted hereunder), Borrower shall deliver, or cause to be delivered, to Agent an amount equal to such Net Issuance Proceeds, in each instance, for application to the Loans in accordance with Section 2.8(f).

(e)     Excess Cash Flow.  Within five (5) days after the annual financial statements and corresponding Compliance Certificate are required to be delivered pursuant to Section 5.1 hereof, commencing with such annual financial statements for the Fiscal Year ending December 31, 2019, Borrower shall deliver to Agent, for distribution to the Lenders, an amount equal to (i) (x) 50% of such Excess Cash Flow if the Total Leverage Ratio as of the last day of such Fiscal Year is 3.00 to 1.00 or greater, (y) 25% of such Excess Cash Flow if the Total Leverage Ratio as of the last day of such Fiscal Year is less than 3.00 but greater than or equal to 2.50 to 1.00 and (z) 0% of the Total Leverage Ratio as of the last day of such Fiscal Year is less than 2.50 to 1.00, less (ii) the aggregate amount of voluntary prepayments of the Term Loans and voluntary prepayments of the Revolving Loans (to the extent accompanied by a permanent reduction in the Aggregate Revolving Loan Commitment made during such Fiscal Year, for application to the Loans in accordance with the provisions of Section 2.8(f) hereof.

(f)     Application of Prepayments.  Subject to Section 2.10, any prepayments pursuant to Section 2.8(c), 2.8(d) or 2.8(e) shall be applied first to prepay the next eight (8) installments of each such Class of Term Loan, if any, in direct order of maturity and then to prepay all remaining installments thereof, if any, pro rata against all such scheduled installments based upon the respective amounts thereof, second to prepay outstanding Swing Loans, third to prepay outstanding Revolving Loans without permanent reduction of the Aggregate Revolving Loan Commitment and fourth to cash collateralize Letters of Credit in an amount determined in accordance with Section 8.2 and fifth any amount remaining shall be returned to the Borrower. To the extent permitted by the foregoing, amounts prepaid shall be applied first to any Base Rate Loans then outstanding and then to outstanding SOFR Loans with the shortest Interest Periods remaining.  Together with each prepayment under this Section 2.8, Borrower shall pay any amounts required pursuant to Section 11.4 hereof.

(g)     No Implied Consent.  Provisions contained in this Section 2.8 for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

(h)     Foreign Subsidiaries.  Notwithstanding the foregoing, to the extent any or all of the Net Proceeds of any Disposition by, or Event of Loss of, a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.8(c) or Excess Cash Flow attributable to Foreign Subsidiaries, is prohibited or delayed by any applicable local Requirements of Law from being repatriated to any of Borrower or any Domestic Subsidiary including through the repayment of intercompany Indebtedness (each, a "**Repatriation**"; with "**Repatriated**" having a correlative meaning) (Borrower hereby agreeing to cause the applicable Foreign Subsidiary to take promptly all actions reasonably required by such Requirements of

Law to permit such Repatriation), or if Borrower has determined in good faith that Repatriation of any such amount would reasonably be expected to have material adverse non-U.S. (or material adverse U.S., as a result of a change in law relating to Section 956 of the Code and regulations thereunder after the date hereof) tax consequences with respect to Holdings or its Subsidiaries, taking into account any foreign tax credit or benefit actually received in connection with such Repatriation, the portion of such Net Proceeds or Excess Cash Flow so affected (such amount, the "**Excluded Prepayment Amount**"), will not be required to be applied to prepay Loans at the times provided in this Section 2.8; provided, that if and to the extent any such Repatriation ceases to be prohibited or delayed by applicable local Requirements of Law at any time during the one (1) year period immediately following the date on which the applicable mandatory prepayment pursuant to Section 2.8 was required to be made, the Credit Parties shall reasonably promptly Repatriate, or cause to be Repatriated, an amount equal to such portion of the Excluded Prepayment Amount, and the Credit Parties shall reasonably promptly pay such portion of the Excluded Prepayment Amount to the Lenders, which payment shall be applied in accordance with Section 2.8(f).  For the avoidance of doubt, the non-application of any Excluded Prepayment Amount pursuant to this Section 2.8(h) shall not constitute a Default or an Event of Default.

        2.9     <u>Fees</u>

.

        (a)     <u>Fees</u>.  Borrower shall pay to Agent, for Agent's own account or as otherwise provided therein, fees in the amounts and at the times set forth in the Fee Letter Agreement.

        (b)     <u>Unused Commitment Fee</u>.  Borrower shall pay to Agent a fee (the "**Unused Commitment Fee**") for the account of each Revolving Lender in an amount equal to:

        (i)     the daily balance of the Revolving Loan Commitment of such Revolving Lender during the preceding calendar quarter, less

        (ii)     the sum of (x) the daily balance of all Revolving Loans held by such Revolving Lender plus (y) the daily amount of Letter of Credit Obligations held by such Revolving Lender,

        (iii)     multiplied by one half of one percent (0.50%) per annum.

The total Unused Commitment Fee paid by Borrower will be equal to the sum of all of the Unused Commitment Fees due to the Lenders, subject to Section 2.11(e)(vi).  Such fee shall be payable quarterly in arrears on the first day of each calendar quarter following the date hereof.  The Unused Commitment Fee provided in this Section 2.9(b) shall accrue at all times from and after the execution and delivery of this Agreement.

        (c)     <u>Letter of Credit Fee</u>.  Borrower agrees to pay to Agent for the ratable benefit of the Revolving Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, (i) without duplication of costs and expenses otherwise payable to Agent or Lenders hereunder or fees otherwise paid by Borrower, all reasonable costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each calendar quarter during which any Letter of Credit Obligation shall remain outstanding, a fee (the "**Letter of Credit Fee**") in an amount equal to the product of the daily

undrawn face amount of all Letters of Credit Issued, guaranteed or supported by risk participation agreements multiplied by a per annum rate equal to the Applicable Margin with respect to Revolving Loans which are SOFR Loans; provided, however, at Required Revolving Lenders' option, while an Event of Default exists (or automatically while an Event of Default under Section 8.1(a), 8.1(f) or 8.1(g) exists), such rate shall be increased by two percent (2.00%) per annum.  Such fee shall be paid to Agent for the benefit of the Revolving Lenders in arrears, on the first day of each calendar quarter and on the date on which all L/C Reimbursement Obligations have been discharged.  In addition, Borrower shall pay to Agent, any L/C Issuer or any prospective L/C Issuer, as appropriate, on demand, such L/C Issuer's or prospective L/C Issuer's customary fees at then prevailing rates, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer or prospective L/C Issuer in respect of the application for, and the Issuance, negotiation, acceptance, amendment, transfer and payment of, each Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is Issued.

(d) Prepayment Fee.  Upon the occurrence of a Prepayment Fee Trigger Event, the Borrower shall pay to Agent, for the account of the Lenders, the Prepayment Fee.  Without limiting the generality of the foregoing Sections 2.7 and 2.8 and notwithstanding anything to the contrary in this Agreement or any other Loan Document, it is understood and agreed that if the Obligations are accelerated as a result of the occurrence and continuance of any Event of Default (including by operation of law or otherwise), the Prepayment Fee, if any, determined as of the date of acceleration, will also be due and payable and will be treated and deemed as though the Term Loans were prepaid as of such date and shall constitute part of the Obligations for all purposes herein.  Any Prepayment Fee payable in accordance with this Section 2.9(d) shall be presumed to be equal to the liquidated damages sustained by the Lenders as the result of the occurrence of the Prepayment Fee Trigger Event, and the Borrower and the other Credit Parties agree that it is reasonable under the circumstances currently existing. The Prepayment Fee, if any, shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. THE BORROWER AND THE OTHER CREDIT PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT FEE IN CONNECTION WITH ANY SUCH ACCELERATION. The Borrower and the other Credit Parties expressly agree that (A) the Prepayment Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (B) the Prepayment Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made, (C) there has been a course of conduct between Lenders and the Credit Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Fee, (D) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 2.9(d), (E) their agreement to pay the Prepayment Fee is a material inducement to the Lenders to provide the Commitments and make the Loans, and (F) the Prepayment Fee represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such Prepayment Fee Trigger Event.

(e) Closing Date Delayed Draw Term Unused Line Fee.  From and following the Closing Date and until the last day of the Closing Date Delayed Draw Availability Period, Borrower shall pay Agent, for the benefit of all Lenders with a Closing Date Delayed Draw Term Commitment, in accordance with their respective pro rata share, a fee in an amount equal to (1) the average daily amount of the Closing Date Delayed Draw Term Commitment

minus the Closing Date Delayed Draw Term Loan Outstandings during the preceding month multiplied by (2) one percent (1.00%) per annum; provided that, notwithstanding the foregoing, no Defaulting Lender shall be entitled to receive its pro rata share of the fee payable in accordance with this Section 2.9(e) and the fee payable by Borrower pursuant to this clause (e) shall be reduced by an amount equal to such Defaulting Lender's Pro Rata Share thereof. Such fee is to be paid quarterly in arrears on the first (1st) day of each fiscal quarter and on the last day of the Closing Date Delayed Draw Availability Period.

(f)   First Amendment Delayed Draw Term Unused Line Fee. From and following the First Amendment Effective Date and until the last day of the First Amendment Delayed Draw Availability Period, Borrower shall pay Agent, for the benefit of all Lenders with a Closing Date Delayed Draw Term Commitment, in accordance with their respective pro rata share, a fee in an amount equal to (1) the average daily amount of the First Amendment Delayed Draw Term Commitment minus the First Amendment Delayed Draw Term Loan Outstandings during the preceding month multiplied by (2) one percent (1.00%) per annum; provided that, notwithstanding the foregoing, no Defaulting Lender shall be entitled to receive its pro rata share of the fee payable in accordance with this Section 2.9(e) and the fee payable by Borrower pursuant to this clause (e) shall be reduced by an amount equal to such Defaulting Lender's Pro Rata Share thereof. Such fee is to be paid quarterly in arrears on the first (1st) day of each fiscal quarter and on the last day of the First Amendment Delayed Draw Availability Period.

(g)   All fees payable pursuant to this Section 2.9 shall be applied in accordance with Section 2.10(a).

(h)   Third Amendment Fee. The Borrower shall pay (or cause to be paid) to Agent (or the account of its designee), a one-time non-refundable amendment fee (the "**Third Amendment Fee**") in an amount equal to 0.50% of the sum of (x) the aggregate principal amount of the Term Loans funded prior to the Third Amendment Effective Date and (y) the aggregate principal amount of the Revolving Loan Commitment on the Closing Date (i.e., $577,914.06). The Third Amendment Fee shall be fully-earned on the Third Amendment Effective Date and due and payable in full in cash at the earlier of (x) the Maturity Date or (y) the date on which the Loans are refinanced in full.

(i)   Fourth Amendment Fee. The Borrower shall pay (or cause to be paid) to Agent (or the account of its designee), a one-time non-refundable amendment fee (the "**Fourth Amendment Fee**") in an amount equal to 0.25% of the sum of (x) the aggregate principal amount of the Term Loans funded prior to the Fourth Amendment Effective Date and (y) the aggregate principal amount of the Revolving Loan Commitment on the Closing Date (i.e., $289,346.97). The Fourth Amendment Fee shall be fully-earned on the Fourth Amendment Effective Date and due and payable in full in cash at the earlier of (x) the Maturity Date or (y) the date on which the Loans are refinanced in full.

2.10   Payments by Borrower

.

(a)   All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent and for the ratable account of the Persons holding the applicable Obligations at the address for payment specified in the signature page hereof in

relation to Agent (or such other address, including wire instructions, as Agent may from time to time specify in accordance with Section 10.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 1:00 p.m. ET on the date due. Any payment which is received by Agent later than 1:00 p.m. ET may in Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  Borrower and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral. Borrower hereby authorizes Agent and each Lender to make a Revolving Loan (which shall be a Base Rate Loan and which may be a Swing Loan) to pay interest, principal (including Swing Loans), L/C Reimbursement Obligations, fees payable under the Fee Letter Agreement, Unused Commitment Fees and Letter of Credit Fees, in each instance, on the date due.

(b)      Subject to the provisions set forth in the definition of "Interest Period" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be excluded in the computation, and if applicable, payment, of interest or fees, as the case may be, on such next succeeding Business Day; provided that such extension of time shall be included in the next succeeding computation and payment of interest and fees; provided further that if the scheduled payment date is the maturity date of any Loan such extension of time shall include such interest and fees, which shall be payable on such next succeeding Business Day.

(c)      (i) During the continuance of an Event of Default, Agent may, and shall upon the direction of Required Lenders apply any and all payments received by Agent in respect of any Obligation in accordance with clauses first through sixth below; and (ii) notwithstanding any provision herein to the contrary, all payments made by Credit Parties to Agent after any or all of the Obligations have been accelerated (so long as such acceleration has not been rescinded), including proceeds of Collateral, shall be applied as follows:

first, to payment of costs and expenses of Agent and Attorney Costs payable or reimbursable by the Credit Parties under the Loan Documents;

second, to payment of all accrued unpaid interest on the Protective Advances;

third, to payment of principal of Protective Advances then due and payable;

fourth, to payment of costs and expenses of the Lenders payable or reimbursable by the Credit Parties under the Loan Documents;

fifth, to payment of all accrued unpaid interest on the Obligations and fees owed to Agent, Lenders and L/C Issuers;

sixth, to payment of principal of the Obligations including L/C Reimbursement Obligations then due and payable, any Secured Rate Contract Obligations and Secured Cash Management Obligations, and cash collateralization of unmatured L/C Reimbursement Obligations to the extent not then due and payable;

seventh, to payment of any other amounts owing constituting Obligations; and

eighth, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received to each category shall be applied in the numerical order provided until exhausted prior to the application to the immediately succeeding category, (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses second, third and fourth above and (iii) no payments by a Guarantor and no proceeds of Collateral of a Guarantor shall be applied to Excluded Rate Contract Obligations of such Guarantor.  Notwithstanding the foregoing, Secured Rate Contract Obligations and Secured Cash Management Obligations with parties that are not Agent or Affiliates of Agent shall be excluded from the application described above unless at least three Business Days prior to any distribution, Agent has received written notice from the applicable Secured Swap Provider or Secured Cash Management Bank of the amount of Secured Rate Contract Obligations or Secured Cash Management Obligations then due and payable, together with such supporting documentation as Agent may request.

2.11    Payments by the Lenders to Agent; Settlement

.

(a)    Agent may, on behalf of Lenders, disburse funds to Borrower for Loans requested.  Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to Borrower.  If Agent elects to require that each Lender make funds available to Agent prior to disbursement by Agent to Borrower, Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of the Loan requested by Borrower no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account, as designated in writing by the Agent to Borrower from time to time, no later than 1:00 p.m. ET on such scheduled Borrowing date.  Nothing in this Section 2.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 2.11, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent any Lender or Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)    Agent shall pay to each Lender such Lender's Commitment Percentage (except as otherwise provided in Section 2.1(c)(vi) and Section 2.11(e)(iv)) of principal, interest and fees paid by Borrower since the previous settlement date for the benefit of such Lender on the Loans held by it; provided, however, that in the case of any payment of principal received by Agent from Borrower in respect of any Term Loan prior to 1:00 p.m. ET on any Business Day, Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on such Business Day, and, in the case of any payment of principal received by Agent from Borrower in respect of any Term Loan later than 1:00 p.m. ET on any Business Day, Agent shall pay to each applicable Lender such Lender's Commitment Percentage of such payment on

|US-DOCS\~~122553549.2~~143398915.4||

the next Business Day.  Except as provided in the preceding proviso with respect to Term Loan payments, such payments shall be made by wire transfer to such Lender) not later than 2:00 p.m. ET on the next Business Day following each settlement date.

(c)      Availability of Lender's Commitment Percentage.  Agent may assume that each Revolving Lender will make its Commitment Percentage of each Revolving Loan available to Agent on each Borrowing date.  If such Commitment Percentage is not, in fact, paid to Agent by such Revolving Lender when due, Agent will be entitled to recover such amount on demand from such Revolving Lender without setoff, counterclaim or deduction of any kind.  If any Revolving Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify Borrower and Borrower shall immediately repay such amount to Agent.  Nothing in this Section 2.11(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Revolving Lender or to relieve any Revolving Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Revolving Lender as a result of any default by such Revolving Lender hereunder.  Without limiting the provisions of Section 2.11(b), to the extent that Agent advances funds to Borrower on behalf of any Revolving Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable Revolving Lender.

(d)      Return of Payments.

(i)      If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)      If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrower or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)      Defaulting Lenders.

(i)      Responsibility.  The failure of any Defaulting Lender to make any Revolving Loan, Closing Date Delayed Draw Term Loan or First Amendment Delayed Draw Term Loan, or to fund any purchase of any participation to be made or funded by it (including with respect to any Letter of Credit or Swing Loan), or to make any payment required by it under any Loan Document on the date specified therefor shall not relieve any other Lender of its obligations to make such loan, fund the purchase of any such participation, or make any other such required payment on such date, and neither Agent nor, other than as expressly set forth herein, any other Lender shall be

responsible for the failure of any Defaulting Lender to make a loan, fund the purchase of a participation or make any other required payment under any Loan Document.

(ii)   Reallocation.  If any Revolving Lender is a Defaulting Lender, all or a portion of such Defaulting Lender's Letter of Credit Obligations (unless such Lender is the L/C Issuer that Issued such Letter of Credit) and reimbursement obligations with respect to Swing Loans shall, at Agent's election at any time or upon any L/C Issuer's or Swing Lender's, as applicable, written request delivered to Agent (whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the Revolving Lenders that are not Defaulting Lenders pro rata in accordance with their Commitment Percentages of the Aggregate Revolving Loan Commitment (calculated as if the Defaulting Lender's Commitment Percentage was reduced to zero and each other Revolving Lender's (other than any other Defaulting Lender's) Commitment Percentage had been increased proportionately), provided that no Revolving Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Revolving Loans, outstanding Letter of Credit Obligations, amounts of its participations in Swing Loans and its pro rata share of unparticipated amounts in Swing Loans to exceed its Revolving Loan Commitment. Subject to Section 11.8, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(iii)   Voting Rights.  Notwithstanding anything set forth herein to the contrary, including Section 10.1, a Defaulting Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Revolving Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders", "Required Revolving Lenders" or "Lenders directly affected" pursuant to Section 10.1) for any voting or consent rights under or with respect to any Loan Document, provided that (A) the Commitment of a Defaulting Lender may not be increased, extended or reinstated, (B) the principal of a Defaulting Lender's Loans may not be reduced or forgiven, and (C) the interest rate applicable to Obligations owing to a Defaulting Lender may not be reduced, in each case, without the consent of such Defaulting Lender.  Moreover, for the purposes of determining Required Lenders and Required Revolving Lenders, the Loans, Letter of Credit Obligations, and Commitments held by Defaulting Lenders shall be excluded from the total Loans and Commitments outstanding.

(iv)   Borrower Payments to a Defaulting Lender.  Agent shall be authorized to use all payments received by Agent for the benefit of any Defaulting Lender pursuant to this Agreement to pay in full the Aggregate Excess Funding Amount to the appropriate Secured Parties.  Agent shall be entitled to hold as cash collateral in a non-interest bearing account up to an amount equal to such Defaulting Lender's pro rata share, without giving effect to any reallocation pursuant to Section 2.11(e)(ii), of all Letter of Credit Obligations until the Facility Termination Date.  Upon any such unfunded obligations owing by a Defaulting Lender becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Defaulting Lender.  With respect to such Defaulting Lender's failure to fund Revolving Loans or purchase participations in Letters of Credit or Letter of Credit Obligations, any amounts applied by Agent to satisfy such funding shortfalls shall be deemed to constitute

a Revolving Loan or amount of the participation required to be funded and, if necessary to effectuate the foregoing with respect to Revolving Loans, the other Revolving Lenders shall be deemed to have sold, and such Defaulting Lender shall be deemed to have purchased, Revolving Loans or Letter of Credit participation interests from the other Revolving Lenders until such time as the aggregate amount of the Revolving Loans and participations in Letters of Credit and Letter of Credit Obligations are held by the Revolving Lenders in accordance with their Commitment Percentages of the Aggregate Revolving Loan Commitment.  Any amounts owing by a Defaulting Lender to Agent which are not paid when due shall accrue interest at the interest rate applicable during such period to Revolving Loans that are Base Rate Loans.  In the event that Agent is holding cash collateral of a Defaulting Lender that cures pursuant to clause (v) below or ceases to be a Defaulting Lender pursuant to the definition of Defaulting Lender, Agent shall return the unused portion of such cash collateral to such Lender. The "**Aggregate Excess Funding Amount**" of a Defaulting Lender shall be the aggregate amount of (A) all unpaid obligations owing by such Lender to Agent, L/C Issuers, Swing Lender, and other Lenders under the Loan Documents, including such Lender's pro rata share of all Revolving Loans, Letter of Credit Obligations and Swing Loans, plus, without duplication, (B) all amounts of such Defaulting Lender's Letter of Credit Obligations and reimbursement obligations with respect to Swing Loans reallocated to other Lenders pursuant to Section 2.11(e)(ii).

(v)     Cure.  A Lender may cure its status as a Defaulting Lender under clause (a) of the definition of Defaulting Lender if such Lender fully pays to Agent, on behalf of the applicable Secured Parties, the Aggregate Excess Funding Amount, plus all interest due thereon.  Any such cure shall not relieve any Lender from liability for breaching its contractual obligations hereunder and shall not constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(vi)    Fees.  A Lender that is a Defaulting Lender pursuant to clause (a) of the definition of Defaulting Lender shall not earn and shall not be entitled to receive, and Borrower shall not be required to pay, such Lender's portion of the Unused Commitment Fee during the time such Lender is a Defaulting Lender pursuant to clause (a) thereof.  In the event that any reallocation of Letter of Credit Obligations occurs pursuant to Section 2.11(e)(ii), during the period of time that such reallocation remains in effect, the Letter of Credit Fee payable with respect to such reallocated portion shall be payable to (A) all Revolving Lenders based on their pro rata share of such reallocation or (B) to the L/C Issuer for any remaining portion not reallocated to any other Revolving Lenders.  So long as a Lender is a Defaulting Lender, the Letter of Credit Fee payable with respect to any Letter of Credit Obligation of such Defaulting Lender that has not been reallocated pursuant to Section 2.11(e)(ii) shall be payable to the L/C Issuer.

(f)     Procedures.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion, on E-Systems.

(g)      Cashless Settlement.     Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or roll over all or a portion of its Loans or Commitments in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by Borrower, Agent and such Lender.

2.12    Use of Proceeds.

(a)      the Term Loan on the Closing Date will be used (i) to, first, repay all amounts owing under the Borrower's and the target's existing Indebtedness (other than Indebtedness permitted by Section 6.1), (ii) to pay the Closing Date Distribution and (iii) to pay fees and expenses incurred in connection with the transactions contemplated by this term sheet and (b) the Revolving Credit Facility may be used to finance capital expenditures, working capital, and other general corporate or limited liability company purposes of the Borrower and the Credit Parties, including to finance transactions (such as Acquisitions) not prohibited by this Agreement.

(b)      Letters of Credit shall be used to provide security deposits with respect to the Borrower's real property leases and other contracts made by the Borrower and the Guarantors for general corporate or limited liability company purposes of the Borrower and the Guarantors, including to the extent such purposes are permitted under the Borrower's and the Guarantors' Organization Documents.

(c)      Notwithstanding anything to the contrary contained in any Loan Document, no part of the proceeds of the Loans shall be used, directly or indirectly, for a purpose which violates any law, including, without limitation, the provisions of Regulations T, U or X of the Board, as amended.

(d)      Borrowers will use the proceeds of the Closing Date Delayed Draw Term Loans (i) pay dividends or other distributions with respect to any shares of the its Stock as permitted herein and (ii) for Permitted Acquisitions and any acquisition related expenditures and payment of earnouts in connection therewith and any fees and expenses in connection therewith, subject in each case to any restrictions in this Agreement.

(e)      Borrowers will use the proceeds of any Incremental Term Loan (i) (1) at any time prior to the first anniversary of the Closing Date, to pay dividends or other distributions with respect to any shares of its Stock as permitted herein, so long as after giving effect to such borrowing and the application of the proceeds thereof, Total Leverage Ratio, recomputed on a Pro Forma Basis as of the last day of the month for which financial statements were most recently delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was most recently delivered to Agent) prior to such borrowing, does not exceed the lesser of (x) 4.25 to 1.00 and (y) the Total Leverage Ratio required by Section 6.13 for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered pursuant to Section 5.1 and (2) from and after the first anniversary of the Closing Date, to pay dividends or other distributions with respect to any shares of its Stock as permitted herein, so long as after giving effect to such borrowing and the application of the proceeds thereof, Total Leverage Ratio, recomputed on a Pro Forma Basis as of the last day of the month for which financial statements were most recently delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was most recently delivered to Agent) prior to such borrowing, does not exceed the lesser of (x) 3.50 to 1.00 and (y) the Total Leverage Ratio required by Section 6.13 for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered

pursuant to Section 5.1, and (ii) for Permitted Acquisitions and any acquisition related expenditures in connection therewith and any fees and expenses in connection therewith, subject in each case to any restrictions in this Agreement.

(f)  Borrowers will use the proceeds of the First Amendment Delayed Draw Term Loans for the Legend Acquisition and any acquisition related expenditures and payment of earnouts in connection therewith and any fees and expenses in connection therewith, subject in each case to any restrictions in this Agreement.

2.13  Uncommitted Incremental Facility

.

(a)  Requests.  After the last day of the Delayed Draw Availability Period, the Borrower may, by written notice to Agent, request increases in the commitments for Term Loans under a new term loan tranche or under any existing term loan tranche (each, an "**Incremental Term Loan Commitmen**t" and the term loans thereunder, an "**Incremental Term Loan**"); each Incremental Term Loan Commitment are each sometimes referred to herein individually as an "**Incremental Facility**" and collectively as the "**Incremental Facilities**") in an aggregate amount not to exceed $10,000,000 for all such Incremental Facilities; provided that no commitment of any Lender shall be increased without the consent of such Lender (which shall be provided in such Lender's sole discretion).  Such notice shall set forth (A) the amount of the Incremental Term Loan Commitment being requested (which shall be in a minimum amount of $1,000,000 and multiples of $500,000 in excess thereof) and (B) the date (an "**Incremental Effective Date**") on which such Incremental Facility is requested to become effective (which, unless otherwise agreed by Agent, shall not be less than 10 Business Days (nor more than 60 days) after the date of such notice).

(b)  Conditions Applicable to Any Incremental Facility.  In addition to the other conditions set forth in this Section 2.13 that may be applicable thereto, no Incremental Facility shall become effective under this Section 2.13 unless, after giving effect to such Incremental Facility, the Loans to be made thereunder, and the application of the proceeds therefrom:

(i)  no Default or Event of Default shall exist at the time of funding; provided that, solely with respect to an Incremental Term Loan the proceeds of which are intended to and shall be used to finance substantially contemporaneously a Limited Condition Acquisition (a "**Certain Funds Term Loan**"), such Incremental Lender with respect to such Certain Funds Term Loan may, in their sole discretion, waive the absence of a Default or Event of Default as a condition to funding thereof so long as on the LCA Test Date, no Default or Event of Default has occurred or is continuing and so long as no Event of Default under Section 8.1(a), 8.1(f) or 8.1(g) exists on the date such transaction is consummated;

(ii)  upon giving effect to such Incremental Loan, on a Pro Forma Basis, Borrower would have a Total Leverage Ratio not in excess of the lower of (x) 4.25:1.00  and (y) the applicable financial covenant set forth in Section 6.13, in each case, as of the most recent fiscal quarter for which financial statements have been delivered to Agent pursuant to Section 5.1(a) or (b) (whichever was most recently delivered to Agent); provided that, solely with respect to a Certain Funds Term Loan, such Incremental Lender with respect to such Certain Funds Term Loan may, in their

sole discretion, waive compliance with the forgoing leverage ratio test as a condition to funding thereof so long as on the LCA Test Date with respect to such applicable Permitted Acquisition, the Borrower is in compliance with the foregoing leverage ratio test;

(iii)    the representations and warranties contained in Article 4 and the other Loan Documents are true and correct in all material respects (except to the extent that such representation and warranty is qualified by materiality or a Material Adverse Effect standard in which case it shall be true and correct in all respects) on and as of the effective date of such funding, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct (in compliance with the foregoing standard) as of such earlier date; provided that, solely with respect to Certain Funds Term Loan, such Incremental Lender with respect to such Incremental Term Loan may, in their sole discretion, agree that the only representations and warranties the making of which shall be a condition to such Incremental Term Loan shall be (x) certain customary specified representations to be agreed and (y) the representations and warranties made by or on behalf of the applicable target in the purchase, acquisition or similar agreement governing such acquisition as are material to the interests of the Lenders, but only to the extent that Borrower (or Borrower's applicable Affiliates or Subsidiaries) has the right not to consummate or the right to terminate (or cause the termination of) Borrower's (or their Affiliates' or Subsidiaries') obligations under such purchase, acquisition or other agreement as a result of a breach of such representations or warranties in such purchase, acquisition or other agreement (or the failure of such representations or warranties to be accurate or to satisfy the closing conditions in such purchase, acquisition or other agreement applicable to such representations or warranties);

(iv)    Agent shall have received a certificate of a Responsible Officer of Borrower certifying as to the foregoing;

(v)    each Loan under any Incremental Facility shall be used solely for purposes permitted under Section 2.12(d); and

(vi)    Agent shall have received, to the extent Agent shall have required or requested, customary legal opinions from Borrower's counsel, customary evidence of authorization with respect to any of the officers executing the Incremental Facility and related documentation on behalf of the Borrower, Organization Documents and good standing certificates from Borrower in its jurisdictions of organization and a secretary certificate and officer's certificate from Borrower, in each case, in form and substance satisfactory to Agent in its reasonable discretion.

(c)    Terms Applicable to Incremental Term Loans.  In addition to the other conditions set forth in this Section 2.13 that may be applicable thereto, no Incremental Term Loans under any Incremental Facility shall become effective under this Section 2.13 unless:

(i)    (x) the final maturity of any Incremental Term Loan shall not be earlier than the Maturity Date and (y) the Weighted Average Life to Maturity of any Incremental Term Loan shall not be shorter than the remaining Weighted Average Life to Maturity of the Term Loans existing immediately prior to the Incremental Effective Date;

(ii)　　　the Effective Yield applicable to such Incremental Loans shall be determined by Borrower and the applicable Incremental Lenders and shall be set forth in each applicable Incremental Amendment; provided, however, that the Effective Yield applicable to such Incremental Loans shall not be greater than the applicable Effective Yield payable pursuant to the terms of this Agreement as amended through the date of such calculation with respect to Term Loans outstanding on the Closing Date, plus 50 basis points per annum unless (x) the interest rate (together with, as provided in the proviso below, the SOFR or Base Rate floor) with respect to the Term Loans issued on the Closing Date, any Closing Date Delayed Draw Term Loans, any First Amendment Delayed Draw Term Loans and any prior Incremental Loans is increased so as to cause the then applicable Effective Yield under this Agreement on the Term Loans issued on the Closing Date, any Closing Date Delayed Draw Term Loans, any First Amendment Delayed Draw Term loans and any prior Incremental Loans to equal the Effective Yield then applicable to such Incremental Loans minus 50 basis points and (y) the interest rate (together with, as provided in the proviso below, the SOFR or Base Rate floor) with respect to the Revolving Loans issued pursuant to the Revolving Loan Commitments is increased so as to cause the then applicable Effective Yield under this Agreement on such Revolving Loans to be increased by an amount equal to the increase in the Effective Yield of the Terms Loans pursuant to clause (ii)(x) above; provided further that if such Incremental Loan includes a SOFR floor greater than 1.00% per annum or a Base Rate floor greater than 2.00% per annum, such differential between the SOFR or Base Rate floors shall be equated to the applicable Effective Yield for purposes of determining whether an increase to the interest rate margin under the Terms Loans outstanding on the Closing Date, any Closing Date Delayed Draw Term Loans, any First Amendment Delayed Draw Term Loans, any prior Incremental Loans and the Revolving Loans issued pursuant to the Revolving Loan Commitments shall be required, but only to the extent an increase in the SOFR or Base Rate floor in the Terms Loans outstanding on the Closing Date would cause an increase in the interest rate then in effect thereunder, and in such case, the SOFR or Base Rate floor (but not the interest rate margin) applicable to the Terms Loans outstanding on the Closing Date, any Closing Date Delayed Draw Term Loans, any First Amendment Delayed Draw Term Loans, any prior Incremental Loans and the Revolving Loans issued pursuant to the Revolving Loan Commitments shall be increased to the extent of such differential between the SOFR or Base Rate floors;

(iii)　　　such Incremental Term Loans: (x) subject to clause (c)(i), shall have amortization determined by Borrower and the applicable Incremental Lenders each Incremental Term Loan and (y) may share in (on no more than a pari passu basis), repayments and prepayments of the Term Loans in accordance with Sections 2.8 and 2.10, as specified in any applicable definitive documentation with respect to such Incremental Facility; provided that, for purposes of clarity, no mandatory prepayments of an Incremental Term Loan may be imposed if the events giving rise to such prepayments do not also give rise to a prepayment of the Initial Term Loan and First Amendment Term Loan;

(iv)　　　such Incremental Term Loans (A) shall rank pari passu in right of payment and security with the Term Loans existing immediately prior to the Incremental Effective Date and (B)(x) shall not be secured by any Lien on any property or asset of Borrower or any other Credit Party that does not also secure the Term Loans existing immediately prior to the Incremental Effective Date and (y) shall not be guaranteed by any Person other than the Credit Parties;

(v)      the other covenants and terms of such Incremental Term Loan that are not substantially the same and/or consistent with the Term Loans existing immediately prior to the Incremental Effective Date (other than as required and/or permitted pursuant to clauses (i) through (iv) above) shall be no less favorable (taken as a whole) to Term Loan Lenders under the Term Loans existing immediately prior to the Incremental Effective Date (as determined by the Agent in its reasonable discretion) unless such covenants and/or terms are acceptable to Agent in its reasonable discretion (except for (x) covenants or other provisions applicable only to periods after the Maturity Date and (y) any financial maintenance covenant to the extent such covenant is also added for the benefit of Lenders under the Term Loans issued on the Closing Date hereunder).

(d)      Offer to Lenders.  Each Incremental Facility shall first be offered to the Lenders prior to any other non-Lender Person and the Agent shall promptly (and in any event not later than three (3) Business Days after receiving notification from Borrower) notify each Lender of the proposed Incremental Facility and of the proposed terms and conditions therefor agreed between Borrower and Agent.  Each such Lender may, in its sole discretion, commit to participate in such Incremental Facility by forwarding its commitment thereto to Agent within ten (10) Business Days after receiving notification from the Agent, in form and substance satisfactory to Agent.  In consultation with Borrower, the Agent shall allocate the commitments to be made as part of the Incremental Facility to the Lenders from which it has received commitments; provided that, each participating Lender shall be entitled to at least its pro rata share of the proposed Incremental Facility.  If Agent does not receive sufficient commitments from existing Lenders to effectuate the Incremental Facility within ten (10) Business Days after providing notice to the existing Lenders of the proposed Incremental Facility, it may allocate unsubscribed amounts to any other Person reasonably acceptable to Agent that would be a permitted assignee pursuant to Section 10.9 from which it has received commitments (each Person acting as a Lender under an Incremental Facility is referred to herein as a "**Incremental Lender**" and collectively, as the "**Incremental Lenders**").  Nothing in this Agreement shall be construed to obligate any Lender to participate in any Incremental Facility (each Lender's decision to be made in its own discretion).

(e)      Required Amendments; Documentation; Rights of Incremental Lenders.

(i)      The Incremental Facilities shall be evidenced by an amendment or supplement to this Agreement executed by Borrower (and consented to by all other Credit Parties), Agent and the applicable Incremental Lenders (such amendment or supplement, an "**Incremental Amendment**") and such Incremental Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent and the Borrower, to effect the provisions of this Section 2.13; provided, however, that no such Incremental Amendment shall effect any change that, pursuant to Section 10.1, requires the consent of all Lenders or the consent of each Lender directly affected thereby without the consent of each such Lender (it being agreed, however, that Loan under an Incremental Facility will not, of itself, be deemed to effect any of the changes described in Section 10.1 and that modifications to the definition of "Required Lenders" or other provisions relating to voting provisions to provide the Persons providing the applicable Incremental Loan with the benefit of such provisions will not, by themselves, be deemed to effect any of the changes described in Section 10.1).  Agent shall promptly notify each Lender as to the effectiveness of each such amendment.

(ii)     Upon closing of a Term Loan under an Incremental Facility, the Incremental Lenders thereof shall be deemed to be Lenders and Loans made pursuant to the Incremental Term Loans shall for all purposes be deemed to be Term Loans hereunder.

(iii)     Each Incremental Lender, in each case, shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the guarantees and security interests created by the Collateral Documents.

(f)     Controlling Provision.  This Section 2.13 shall supersede any provisions in Section 10.1 to the contrary.

2.14     Protective Advances.

At any time an Event of Default or a Default shall have occurred and be continuing, Webster Bank is authorized by the Borrower and the Lenders, from time to time in Webster Bank's sole discretion (but Webster Bank shall have no obligation to), to make disbursements or advances to Borrower, which Webster Bank, in consultation with the Agent, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by Borrower pursuant to the terms of this Agreement and the other Loan Documents, including, without limitation, payments of principal, interest, fees and reimbursable expenses (any of such disbursements or advances are in this Section 2.14 referred to as "**Protective Advances**"). Protective Advances may be made even if the conditions precedent set forth in Section 3.2 have not been satisfied.  The interest rate on all Protective Advances shall be at the Base Rate plus the Applicable Margin for the Loans.  Each Protective Advance shall be secured by the Liens in favor of Agent in and to the Collateral and shall constitute Obligations hereunder.  Borrower shall pay the unpaid principal amount and all unpaid and accrued interest of each Protective Advance on the earlier of the Revolving Termination Date and the date on which demand for payment is made by the Agent in accordance with the terms herein.  The Agent shall notify each Lender and the Borrower in writing of each such Protective Advance, which notice shall include a description of the purpose of such Protective Advance. Without limitation to its obligations pursuant to Section 9.8, subject to any other agreement among the Agent and the Lenders, each Lender agrees that it shall make available to the Agent, upon the Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's *pro rata* share of each such Protective Advance made by Webster Bank.  If such funds are not made available to the Agent (as the case may be) by such Lender, Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Agent, at the Federal Funds Effective Rate for three (3) Business Days and thereafter at the Base Rate.

2.15     Benchmark Replacement Setting.

Notwithstanding anything to the contrary herein or in any other Loan Document:

(a)     Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Agent has not received, by

such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.20(a)(i) will occur prior to the applicable Benchmark Transition Start Date.

(b)     <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     <u>Notices; Standards for Decisions and Determinations</u>.  The Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.15(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.15, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.15.

(d)     <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

3.     CONDITIONS PRECEDENT

3.1     Conditions of Initial Loans

. The obligation of each Lender to make its initial Loans and of each L/C Issuer to Issue, or cause to be Issued, the initial Letters of Credit (if any) hereunder is subject to satisfaction of the following conditions in a manner satisfactory to Agent:

(a)     Corporate Documents.  The Agent shall have received a certificate from the president, secretary, treasurer or other duly authorized officer or representative of each Credit Party attaching (i) a true and complete copy of the resolutions and of all documents evidencing all necessary company action taken by it to authorize the Loan Documents to which it is a party and the transactions contemplated thereby, (ii) attaching a true and complete copy of its Organization Documents, (iii) setting forth the incumbency of its officer or officers or other analogous counterpart who may sign such Loan Documents, including therein a signature specimen of such officer or officers or other analogous counterpart; and (iv) attaching a certificate of good standing, dated as of a recent date reasonably acceptable to the Agent, of the Secretary of State, as applicable, of the jurisdiction of its formation or incorporation.

(b)     Credit Agreement.  The Agent shall have received a counterpart of this Agreement, duly executed by an Authorized Signatory of the Borrower.

(c)     Notes.  To the extent requested by a Lender, such Lender shall have received the Notes, duly executed by an Authorized Signatory of the Borrower.

(d)     Agreement Among Lenders.  The Agent shall have received the Agreement Among Lenders, duly executed by each of the parties thereto.

(e)     Collateral Documents.  The Agent shall have received (i) the Collateral Documents, each duly executed by an Authorized Signatory of each Credit Party and (ii) grants of security interests for intellectual property (if any) owned by any Credit Party, duly executed by an Authorized Signatory of the applicable Credit Party, together with the following:

(i)     Instruments constituting Collateral (including membership interest and stock certificates if any evidencing ownership of Stock), each duly indorsed in blank by an Authorized Signatory of the applicable Credit Party or Holdings, as the case may be; and

(ii)     such UCC Financing Statements and United States Patent and Trademark Office recordation forms (if applicable) naming the applicable Credit Party or the Parent, as debtor, as shall be reasonably requested by the Agent in order to maintain the perfection of the security interests in any collateral security granted under the Collateral Documents.

(f)     Legal Opinion.  The Agent shall have received (i) an opinion of Latham & Watkins LLP special New York counsel for the Credit Parties, (ii) an opinion of local Oregon counsel for the Credit Parties, (iii) an opinion of local Georgia counsel for the Credit Parties, and (iv) an opinion of local South Carolina counsel for the Credit Parties, in each case, addressed to the Agent and the Lenders, and dated the Closing Date, in form and substance reasonably satisfactory to the Agent.

(g)     UCC Searches.  The Agent shall have received Uniform Commercial Code, tax, bankruptcy and judgment lien search reports with respect to each applicable public office where Liens are or may be filed disclosing that there are no Liens of record in such official's office covering any Collateral or showing each Credit Party as debtor thereunder (other than Permitted Liens).

(h)     Litigation.  No action or proceeding by or before any Governmental Authority shall have been commenced and be pending or, to the knowledge of the Borrower, threatened, seeking to prevent or delay the transactions contemplated by the Loan Documents or challenging any other terms and provisions hereof or thereof or seeking any damages in connection therewith.

(i)     Closing Certificate.  The Agent shall have received a certificate of a Responsible Officer of the Borrower, dated the Closing Date:

(i)     certifying that immediately after giving effect to the transactions contemplated by the Loan Documents, no Default exists or will exist,

(ii)     certifying that after giving effect to the transactions contemplated hereby including any Loans made on the Closing Date, the Borrower and its Subsidiaries are Solvent on a consolidated basis, and

(iii)     certifying that immediately after giving effect to the transactions contemplated by the Loan Documents, the representations and warranties contained in each Loan Document shall be true and correct in all material respects, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

(j)     Financial Statements.  The Agent shall have received the financial statements and the Financial Projections required by the Agent and no Material Adverse Change since the date of such financial statements shall have occurred.

(k)     Lender Fees.  The fees and expenses set forth in the Fee Letter Agreement shall have been paid by the Borrower and all filing fees shall have been paid by the Borrower.

(l)     Other Fees.  The reasonable fees and expenses of Proskauer Rose LLP in connection with the preparation, negotiation and closing of the Loan Documents shall have been paid by the Borrower to the extent invoiced in reasonable detail on or prior to the closing date.

(m)     [Reserved].

(n)     Leverage; EBITDA.  Borrower shall have delivered evidence to the satisfaction of Agent demonstrating that (i) the Total Leverage Ratio after giving effect to the consummation of the Closing Date Distribution, payment of all costs and expenses in connection therewith, funding of the initial Loans and Issuance of the initial Letters of Credit for the twelve (12) month period ending June 30, 2019, shall not exceed 4.90 to 1.00 and (ii) the EBITDA after giving effect to the consummation of the Closing Date Distribution, payment of all costs and expenses in connection therewith, funding of the initial Loans and Issuance of the initial Letters of Credit for the twelve (12) month period ending June 30, 2019, shall not be less than $16,100,000.

(o)     Liability, Casualty, Property and Business Interruption Insurance.  The Agent shall have received copies of insurance policies or certificates and endorsements of insurance evidencing liability, casualty, property and business interruption insurance meeting the requirements set forth herein or in the Collateral Documents.  The Agent shall be named (i) as

|US-DOCS\122553549.2143398915.4||

lenders' loss payee, as its interest may appear, with respect to any such insurance providing coverage in respect of any Collateral and (ii) as additional insured, as its interest may appear, with respect to any such insurance providing liability coverage, and the Credit Parties will use their commercially reasonable efforts to have each provider of any such insurance agree, by endorsement upon the policy or policies issued by it or by independent instruments to be furnished to the Agent, that it will give the Agent thirty (30) days prior written notice before any such policy or policies shall be altered or cancelled.

(p)     [Reserved].

(q)     [Reserved].

(r)     KYC.  The Agent shall have received at least three (3) Business Days prior to the Closing Date, all documentation and other information about the Credit Parties that shall have been reasonably requested by any Lender and that any Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(s)     Beneficial Ownership.  At least three (3) Business Days prior to the Closing Date, to the extent Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, Borrower shall deliver a Beneficial Ownership Certification.

For the purpose of determining satisfaction with the conditions specified in this Section 3.1, each Lender that has signed and delivered this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 3.1 unless Agent shall have received written notice from such Lender prior to the Closing Date specifying its objection thereto.

3.2     Conditions to All Borrowings

.  Except as otherwise expressly provided herein, no Lender or L/C Issuer shall be obligated to fund any Loan or incur any Letter of Credit Obligation, if, as of the date thereof:

(a)     any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date), and with respect to Revolving Loans or Issuances of Letters of Credit, Agent or Required Revolving Lenders have determined not to make such Loan or incur such Letter of Credit Obligation as a result of the fact that such representation or warranty is untrue or incorrect; or

(b)     any Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any Loan (or the incurrence of any Letter of Credit Obligation), and Agent or Required Revolving Lenders shall have determined not to make such Loan or incur such Letter of Credit Obligation as a result of that Default or Event of Default;

(c)     after giving effect to any Revolving Loan (or the incurrence of any Letter of Credit Obligations), the aggregate outstanding amount of the Revolving Loans would exceed the Maximum Revolving Loan Balance;

(d)      in the case of a Closing Date Delayed Draw Term Borrowing, after giving effect to such borrowing and the application of the proceeds thereof, Total Leverage Ratio, recomputed on a Pro Forma Basis as of the last day of the month for which financial statements were most recently delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was most recently delivered to Agent) prior to such borrowing, does not exceed the lesser of (x) 4.25 to 1.00 and (y) the Total Leverage Ratio required by Section 6.13 for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered pursuant to Section 5.1;

(e)      in the case of a First Amendment Delayed Draw Term Borrowing, after giving effect to such borrowing and the application of the proceeds thereof, Total Leverage Ratio, recomputed on a Pro Forma Basis as of the last day of the month for which financial statements were most recently delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was most recently delivered to Agent) prior to such borrowing, does not exceed the 5.10 to 1.00 for the Measurement Period ending on or most recently prior to such date for which financial statements have been delivered pursuant to Section 5.1; or

(f)      in the case of a First Amendment Delayed Draw Term Borrowing, the conditions set forth in Section 4 of the First Amendment shall have been satisfied.

The request by Borrower and acceptance by Borrower of the proceeds of any Loan or the incurrence of any Letter of Credit Obligations shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that each representation and warranty by any Credit Party contained herein or in any other Loan Document is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date) and (y) the conditions in this Section 3.2 (without regard to any determination or agreement made or to be made by Agent, Required Revolving Lenders) have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the Collateral Documents.

## 4.      REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to Agent and each Lender that the following are, and after giving effect to the Closing Date Distribution will be, true, correct and complete:

4.1      Capitalization

.

Schedule 4.1 sets forth, as of the Closing Date, (a) the authorized, issued and outstanding Stock and beneficial and record ownership structure of each Credit Party and (b) the exact legal name and jurisdiction of formation or incorporation of each Credit Party.  All outstanding Stock of each Credit Party is free and clear of all Liens (other than Permitted Liens and Liens in favor of the Agent), and is duly authorized, validly issued, fully paid and nonassessable.  As of the Closing Date, (i) none of the Credit Parties has issued any securities convertible into, or options or warrants for, any common or preferred equity securities thereof and (ii) except as set forth on Schedule 4.1, there are no agreements, voting trusts or

understandings binding upon any of the Credit Parties with respect to the voting securities of any of the Credit Parties or affecting in any manner the sale, pledge, assignment or other disposition thereof, including any right of first refusal, option, redemption, call or other right with respect thereto, whether similar or dissimilar to any of the foregoing.

4.2    Existence and Power

.

Each Credit Party is duly organized or formed and validly existing in good standing under the laws of the jurisdiction of its incorporation or formation, has all requisite power and authority to own its Property and to carry on its business as now conducted, and is in good standing and authorized to do business in each jurisdiction in which the nature of the business conducted therein or the Property owned by it therein makes such qualification necessary, except in each case where such failure to qualify could not reasonably be expected to have a Material Adverse Effect.

4.3    Authority and Execution

.

Each Credit Party has full legal power and authority to enter into, execute, deliver and perform the terms of the Loan Documents to which it is a party, all of which have been duly authorized by all proper and necessary corporate, limited liability company, partnership or other applicable action and are in compliance with its Organization Documents. Each Credit Party has duly executed and delivered the Loan Documents to which it is a party.

4.4    Binding Agreement

.

The Loan Documents (other than the Notes) constitute, and the Notes, when issued and delivered pursuant hereto for value received, will constitute, the valid and legally binding obligations of the Credit Parties that are party thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in an action of law or in equity).

4.5    Litigation

.

There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending or, to the knowledge of the Borrower, threatened, against any Credit Party that could, if adversely determined, reasonably be expected to (a) have, individually or in the aggregate, a Material Adverse Effect, or (b) call into question the validity or enforceability of, or otherwise seek to invalidate, any Loan Document.

4.6    Required Consents

.

Except for the filing of financing statements, no consent, authorization or approval of, filing with, notice to, or exemption by, members, stockholders or holders of any other equity interest, any Governmental Authority or any other Person is required to authorize, or is required in connection with the execution, delivery and performance of the Loan Documents to which any Credit Party is a party or is required as a condition to the validity or enforceability of the Loan Documents to which any of the same is a party, except for any consent, authorization or other action as has previously been obtained or taken.

4.7     Absence of Defaults; No Conflicting Agreements

.

(a)     No Credit Party is in material default, and no event has occurred that with the passage of time would constitute a material default, under any mortgage, indenture, contract or agreement to which it is a party (including any Franchise Agreement) or by which it or any of its Property is bound, which such default has had, or could reasonably be expected to have, a Material Adverse Effect.  The execution, delivery or carrying out of the terms of the Loan Documents will not constitute a default under, or result in the creation or imposition of, or obligation to create, any Lien (other than a Permitted Lien or a Lien in favor of the Agent) upon any Property of any Credit Party or result in a breach of or require the mandatory repayment of or other acceleration of payment under or pursuant to the terms of any such mortgage, indenture, contract or agreement to which a Credit Party is a party or by which it or any of its Property is bound.

(b)     None of the Credit Parties is in default with respect to any judgment, order, writ, injunction, decree or decision of any Governmental Authority that would reasonably be expected to have a Material Adverse Effect.

4.8     Compliance with Applicable Laws

.

Each of the Credit Parties is in compliance in all material respects with all statutes, regulations, rules and orders of all Governmental Authorities which are applicable to each such Credit Party, except where such failure to comply would not reasonably be expected to have a Material Adverse Effect.

4.9     Taxes

.

Each of the Credit Parties has filed or caused to be filed all U.S. federal income and other material tax returns required to be filed by it and has paid, or has made adequate provision for the payment of, all U.S. federal income and other material Taxes shown to be due and payable on said returns or in any assessments made against it (other than those being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside on its books in accordance with GAAP) except as would not reasonably be expected to have a Material Adverse Effect, and, except as set forth on Schedule 4.9, no undischarged tax Liens (other than Permitted Liens) have been filed with respect thereto.  The charges, accruals and reserves on the books of the Credit Parties with respect to all Taxes are, to the best knowledge of the Borrower, adequate for the payment of such Taxes, and the Borrower

knows of no unpaid assessment in respect of Taxes which is due and payable against any of the Credit Parties except such thereof as are being contested in good faith by appropriate proceedings and for which adequate reserves have been set aside in accordance with GAAP or as would not reasonably be expected to have a Material Adverse Effect.

4.10    Governmental Regulations

.

None of the Credit Parties or any Person controlled by, controlling, or under common control with, any of the Credit Parties, is subject to regulation under the Federal Power Act, as amended, or the Investment Company Act of 1940, as amended.

4.11    Federal Reserve Regulations; Use of Revolving Loan Proceeds

.

None of the Credit Parties is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  After giving effect to the making of the Loans, Margin Stock will constitute less than 25% of the assets (as determined by any reasonable method) of the Credit Parties in the aggregate.  No part of the proceeds of the Loans shall be used, directly or indirectly, for a purpose which violates any law, including, without limitation, the provisions of Regulation T, U or X of the Board, as amended.

4.12    ERISA

.

No Reportable Event nor ERISA Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Pension Plan other than a Multiemployer Plan, except as would not reasonably be expected to have a Material Adverse Effect.  Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code, where the liability which could be reasonably expected to result from non-compliance would have a Material Adverse Effect.  No termination of a Pension Plan pursuant to Section 4041(c) or 4042 of ERISA has occurred, and no Lien in favor of the PBGC or a Pension Plan has arisen, during such five-year period, except as would not reasonably be expected to have a Material Adverse Effect.  The present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Pension Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Pension Plan allocable to such accrued benefits by a material amount.  Neither the Borrower nor any ERISA Affiliate has had a complete or partial withdrawal from any Multiemployer Plan and to the knowledge of the Borrower, neither the Borrower nor any ERISA Affiliate would become subject to any liability under ERISA if the Borrower or any such ERISA Affiliate were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made.  No such Multiemployer Plan is insolvent.

4.13    Financial Diligence

.

(a)      The Borrower heretofore has furnished to the Agent true copies of (i) the audited balance sheets of the Borrower as of December 31, 2018 and related audited statements of operations, cash flows and stockholders' (or members') equity for each such entity, and (ii) the unaudited balance sheets of the Borrower and related unaudited statements of operations, cash flows and stockholders' (or members') equity for such entities for the period ended June 30, 2019. The foregoing financial statements have been prepared in good faith, are complete and correct in all material respects and fairly present in all material respects the financial condition of the applicable entities as at the respective dates thereof, subject to, in the case of the unaudited financial statements, normal year-end audit adjustments.

(b)      Since December 31, 2017, there has been no Material Adverse Change.

(c)      [Reserved].

(d)      The Borrower heretofore has furnished to the Agent the Financial Projections.  The Financial Projections are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agent and the Lenders that such projections as to future events are not to be viewed as facts, and that actual results during the periods covered thereby may differ materially from projected results.

4.14    Property

.

Each of the Credit Parties has good and marketable title to all of its Property, title to which is material to such Credit Party and a valid leasehold interest in all Property, a leasehold interest in which is material to any such Credit Party, in each case subject to no Liens, except Permitted Liens and Liens in favor of the Agent.

4.15    Authorizations

.

Each of the Credit Parties possesses or has the right to use all franchises, licenses and other rights as are material and necessary for the conduct of the business of Borrower and its Subsidiaries as now conducted by them and as presently contemplated to be conducted by them after the Closing Date, and with respect to which it is in compliance, with no known material conflict with the valid rights of others.  No event has occurred which permits or, to the best knowledge of the Borrower, after notice or the lapse of time or both, could reasonably be expected to permit, the revocation or termination of any such material franchise, license or other right.

4.16    Environmental Matters

.

(a)      Except, in each case, as would not reasonably be expected to have a Material Adverse Effect, no Hazardous Substances have been generated or manufactured on, transported to or from, treated at, stored at or discharged by the Borrower or, to the best of the Borrower's actual knowledge, by any current or former owner or leaseholder, from any real property owned by any Credit Party in violation of any Environmental Laws; no Hazardous Substances have been discharged by any Credit Party or, to the best of the Borrower's actual

knowledge, by any current or former owner or leaseholder, into subsurface waters under any real property owned by any Credit Party in violation of any Environmental Laws; no Hazardous Substances have been discharged by any Credit Party or, to the Borrower's actual knowledge, by any current or former owner or leaseholder, from any real property owned by any Credit Party on or into Property or waters (including subsurface waters) adjacent to any real property owned by any Credit Party in violation of any Environmental Laws; and there are not now, nor ever have been, on any real property owned by any Credit Party any underground or above ground storage tanks regulated under any Environmental Laws that are not in compliance with all Environmental Laws.

(b)     No Credit Party (i) has received written notice of any claim, demand, suit, action, proceeding, event, condition, report, directive, Lien, violation, non-compliance or investigation indicating or concerning any potential or actual liability (including, without limitation, potential liability for enforcement, investigatory costs, cleanup costs, government response costs, removal costs, remedial costs, natural resources damages, Property damages, personal injuries or penalties) arising in connection with: (x) any non-compliance with or violation of the requirements of any applicable Environmental Laws, or (y) the presence of any Hazardous Substance on any real property owned by any Credit Party (or any real property previously owned by any Credit Party) in violation of any Environmental Laws or the release or threatened release of any Hazardous Substance into the environment in violation of any Environmental Laws, (ii) has received written notice that it has any threatened or actual liability in connection with the presence of any Hazardous Substance on any real property owned by any Credit Party (or any real property previously owned by any Credit Party) or the release or threatened release of any Hazardous Substance into the environment in violation of any Environmental Laws, (iii) has received written notice of any federal or state investigation evaluating whether any remedial action is needed to respond to the presence of any Hazardous Substance on any real property owned by any Credit Party (or any real property previously owned by any Credit Party) or a release or threatened release of any Hazardous Substance into the environment for which any Credit Party is or may be liable, or (iv) has received written notice that any Credit Party is or may be liable to any Person under any Environmental Law, in each case that could reasonably be expected to have a Material Adverse Effect.

4.17    Insurance

.

Schedule 4.17 sets forth a description of all property, casualty and liability insurance maintained by or on behalf of the Credit Parties as of the Closing Date.

4.18    Solvency

.

(a)     Immediately after giving effect to the transactions contemplated by the Loan Documents on the Closing Date, the Borrower and its Subsidiaries are and will be Solvent on a consolidated basis.

(b)     After the incurrence of any Revolving Loan, Swingline Loan or the issuance of any Letter of Credit, the Borrower and its Subsidiaries are and will be Solvent on a consolidated basis on such date.

4.19    [Reserved]

.

4.20     No Misrepresentation

.

No representation or warranty contained in any Loan Document and no certificate or report from time to time furnished by the Borrower in connection with the transactions contemplated thereby, contains or will contain a misstatement of material fact, or, to the best knowledge of the Borrower, omits or will omit to state a material fact required to be stated in order to make the statements therein contained not misleading in the light of the circumstances under which made; it being recognized by the Agent and the Lenders that any projections delivered by the Borrower to the Agent as to future events are not to be viewed as facts, and that actual results during the periods covered thereby may differ materially from projected results.

4.21     Security Interest and Liens

.

The Collateral Documents (as applicable) create, as security for the obligations of the Credit Parties to the Agent under the Loan Documents, valid and enforceable security interests in and Liens on all of the Collateral described in the applicable Collateral Document in favor of the Agent, subject to no other Liens other than Permitted Liens, and such security interests in and Liens on the Collateral shall be superior to and prior to the rights of all third parties (other than for such Permitted Liens or Liens arising by operation of law under the UCC or other applicable law) and, other than the recordations and filings contemplated by Section 5.1(e), no further recordings or filings are or will be required under the Uniform Commercial Code in effect in any state in connection with the creation, perfection or enforcement of such security interests and Liens (to the extent the perfection thereof is achieved through the filing of financing statements under the UCC), other than the filing of continuation statements in accordance with applicable law.

4.22     Subsidiaries

.

Except as set forth on Schedule 4.22, on the Closing Date, the Borrower has no Subsidiaries.

4.23     OFAC, USA PATRIOT Act, Anti-Corruption and Other Regulations

.

(a)     No Affected Person is, or is owned or controlled (directly or indirectly) by one or more Persons that are (i) Sanctioned Persons or (ii) located, organized or resident in a Sanctioned Jurisdiction.

(b)     No Affected Person or any Person that owns or controls (directly or indirectly) the Borrower or receives (directly or indirectly) any proceeds of any Revolving Loan (i) conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any Sanctioned Person or in any Sanctioned Jurisdiction, (ii)

deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(c)     No Affected Person or any Person that owns or controls (directly or indirectly) the Borrower or receives (directly or indirectly) any proceeds of any Revolving Loan (i) has violated any Anti-Terrorism Law, or (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(d)     The Borrower and each Subsidiary thereof, if any, has implemented, maintains and complies with policies and procedures designed to ensure compliance, in all material respects, by each Affected Person with Anti-Corruption Laws and Sanctions.

## 5.     AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that until the Facility Termination Date:

5.1     <u>Financial Reports and Other Information</u>

.

The Borrower shall and shall cause each of its Subsidiaries to keep proper books of record and account in which full, true and correct entries shall be made in accordance with GAAP consistently applied throughout the periods involved, and the Borrower shall furnish to the Agent:

(a)     As soon as available but in any event not later than one hundred twenty (120) days after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year ending December 31, 2019), the audited consolidated balance sheet of the Borrower and its Subsidiaries (including a separate balance sheet and cash flow statement for the non-U.S. Subsidiaries) as at the end of such Fiscal Year and related statements of income, cash flows and members' (or stockholders') equity, setting forth in each case in comparative form the corresponding figures as at the end of and for the preceding Fiscal Year, all prepared in accordance with GAAP applied on a basis consistently maintained throughout the periods involved, except as noted therein, and all statements to be reported on by the Accountants (without a "going concern" or like qualification or exception and without qualification or exception as to the scope of such audit or report, other than in each case resulting from an anticipated or an upcoming maturity of obligations or anticipated but not actual covenant default); <u>provided</u>, that (i) the 2019 Audit shall be delivered on or before July 15, 2020 and (ii) the 2020 Audit shall be delivered on or before May 15, 2021;

(b)     As soon as available but in any event not later than forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year of the Borrower (or sixty (60) days after the end of each Fiscal Quarter ending September 30, 2019), the unaudited consolidated balance sheet and related consolidated statements of income, cash flows and members' (or stockholders') equity of the Borrower and its Subsidiaries (including a separate balance sheet and cash flow statement for the non-U.S. Subsidiaries) as of the end of and for such Fiscal Quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for

the corresponding Fiscal Quarter end, and period or periods, of the previous Fiscal Year, and including management discussion and analysis of operating results inclusive of operating metrics in comparative form and monthly dashboard reporting, all certified by one of the Financial Officers of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and without notes and other presentation items required under GAAP;

(c)     As soon as available but in any event not later than thirty (30) days after the end of the first two months of each Fiscal Quarter of the Borrower (commencing with the month ending September 30, 2019), the unaudited consolidated balance sheet and related consolidated statements of income of the Borrower and its Subsidiaries as of the end of and for such fiscal month and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding fiscal month end, and period or periods, of the previous Fiscal Year, and including monthly dashboard reporting, all certified by one of the Financial Officers of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and without notes and other presentation items required under GAAP;

(d)     As soon as available, but in any event not later than forty-five (45) days after the beginning of each Fiscal Year of the Borrower (commencing with the Fiscal Year beginning January 1, 2019), a budget for the Borrower and its Subsidiaries prepared in reasonable detail and certified by a Financial Officer of the Borrower, which shall include quarterly projections for the Borrower and its Subsidiaries for such Fiscal Year, it being agreed the form of budget prepared for senior management of the Borrower will be acceptable;

(e)     Concurrently with any delivery of financial statements under Sections 5.1(a) and 5.1(b), commencing with the delivery of the financial statements under Section 5.1(b) for the Fiscal Quarter ending September 30, 2019, a certificate (a "**Compliance Certificate**") of a Financial Officer of the Borrower, substantially in the form of Exhibit 5.1(d), (i) certifying as to whether a Default has occurred and is continuing and, if a Default has occurred and is continuing, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Sections 6.13 and 6.14, and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the financial statements last delivered and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(f)     With reasonable promptness, such other information with respect to the business, assets, financial position or results of operations of the Borrower and its Subsidiaries as the Agent may from time to time reasonably request;

(g)     From the Third Amendment Effective Date until the date on which both (x) Liquidity is greater than $5,000,000, as evidenced by delivery of a certificate pursuant to Section 5.1(g) and (y) the Agent receives a Compliance Certificate in accordance with Section 5.1(d̶e) in connection with the most recent financial statements delivered pursuant to Section 5.1(b) demonstrating that Total Leverage Ratio is less than 5.00:1.00, on the Wednesday of every other week, commencing on July 1, 2020, (x) a rolling thirteen-week cash flow forecast, together with, details of all contractual deferred payments, including when such contractual deferred payments are expected to be due and payable and (y) a certificate of a Responsible Officer setting forth the calculation of the Liquidity of the Credit Parties on a Pro Forma Basis; and

(h)      Promptly upon request (but in any event within five (5) days), with respect to CARES Indebtedness,

(i) a reasonably detailed estimate of the amount of CARES Indebtedness that the Borrower reasonably anticipates will be subject to forgiveness pursuant to the provisions of the CARES Act – Title I,

(ii) copies of any material amendments, modifications, waivers, supplements or consents executed and delivered with respect to such CARES Indebtedness promptly upon execution and delivery thereof,

(iii) copies of any notices of default received by any Credit Party with respect to such CARES Indebtedness,

(iv) to the extent not included in the foregoing, promptly upon receipt, transmission or filing thereof, as applicable, copies of all material documents, applications and correspondence with the applicable lender, the Small Business Administration or any other Governmental Authority relating to such CARES Indebtedness with respect to loan forgiveness (including any applications and documentation delivered to a lender of CARES Indebtedness or the Small Business Administration in accordance with Section 5.14 (b));

(v) an addendum to Compliance Certificates delivered in connection with the most recent financial statements delivered pursuant to Sections 5.1(a) or 5.1(b) detailing (x) the amount of CARES Indebtedness outstanding and (y) the amount of CARES Unforgiven Indebtedness;

(vi) on the CARES Forgiveness Date, a certificate of a Responsible Officer of Borrower certifying as to the amount of CARES Indebtedness that will be forgiven pursuant to the provisions of the CARES Act – Title I, together with reasonably detailed analysis thereof,

(vii) prompt notice (together with a reasonably detailed description) of any action taken (or any action not taken) by any Credit Party that could reasonably be expected to result in any CARES Indebtedness being ineligible for forgiveness pursuant to the provisions of the CARES Act – Title I, and

(viii) any other information regarding such CARES Indebtedness reasonably requested by Agent.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (c) of this Section 5.1 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (i) the applicable financial statements of any direct or indirect parent of the Borrower that directly or indirectly holds all of the Stock of the Borrower or (ii) the Borrower's or such entity's Form 10-K or 10-Q, as applicable, filed with the United States Securities and Exchange Commission; *provided* that with respect to each of clauses (i) and (ii), (A) to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information (which need not be audited) that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to the Borrower and the Subsidiaries on a standalone basis, on the other hand and (B) to the extent such information is in lieu of information required to be provided under Section 5.1(a),

such materials are reported on by the Accountants (without a "going concern" or like qualification or exception and without qualification or exception as to the scope of such audit or report, other than resulting from an anticipated or an upcoming maturity of obligations).  Any financial statements required to be delivered pursuant to this Section 5.1 shall not be required to contain purchase accounting adjustments to the extent it is not practicable to include any such adjustments in such financial statements.

5.2     Maintenance of Legal Existence

.

The Borrower shall (i) maintain in full force and effect its limited liability company existence and (ii) cause each of its Subsidiaries to do or cause to be done all things reasonably necessary to preserve, renew and maintain in full force and effect its corporate or limited liability company, as the case may be, existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business, except in each case under this clause (ii) as would not reasonably be expected to result in a Material Adverse Effect.

5.3     Maintenance of Properties

.

The Borrower shall and shall cause each of its Subsidiaries to keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except in each case as would not reasonably be expected to result in a Material Adverse Effect.

5.4     Insurance

.

The Borrower shall and shall cause each of its Subsidiaries to maintain, sound and reputable insurance companies liability, casualty, property and business interruption insurance (including, without limitation, insurance with respect to its tangible Collateral) in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business; and furnish to Agent, upon the request of Agent, full information as to the insurance carried.  To the extent permitted under applicable laws, Agent shall be named (i) as lenders' loss payee, as its interest may appear with respect to any property insurance, and (ii) as additional insured, as its interest may appear, with respect to any such liability insurance, and the Credit parties shall use their commercially reasonable efforts to cause each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments to be furnished to Agent, that it will give Agent thirty (30) days prior written notice before any such policy or policies shall be altered or cancelled, and such policies shall provide that no act or default of the Credit Parties or any of their Subsidiaries or any other Person shall affect the rights of Agent or the Lenders under such policy or policies.

5.5     Inspection of Property, Books and Records

.

|US-DOCS\122553549.2143398915.4||

The Borrower shall and shall cause each of its Subsidiaries to permit (a) representatives of the Agent (which, once per year and during the continuance of a Default, shall be at the Borrower's expense), upon reasonable written notice, to visit and inspect any of its Property and examine and take abstracts from its records and books of account and to discuss its business with its executive officers, including, without limitation, for the purpose of assessing the financial condition and credit-worthiness of the Borrower and (b) at such times as the Agent may reasonably require, representatives of the Agent to conduct (which, once per year and during the continuance of a Default or Event of Default, shall be at the Borrower's expense), an audit of the Collateral; *provided* that absent a continuing Event of Default such visitation, inspection and appraisal rights will not be exercised more than twice annually.

5.6     Notice of Material Events

.

The Borrower, upon obtaining actual knowledge thereof, shall promptly give notice to the Agent, including brief particulars, of:

(a)     the occurrence of a Default or Event of Default hereunder;

(b)     the passage of any statute, the publication of any decree or order, the promulgation of any regulation thereunder or interpretation thereof or the institution of any litigation, proceeding or investigation against or affecting any Credit Party which, in the judgment of the Borrower, could reasonably be expected to have a Material Adverse Effect;

(c)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to have a Material Adverse Effect;

(d)     any lapse, refusal to renew or extend or other termination of any material license, permit, franchise (including any Franchise Agreement) or other authorization issued to any Credit Party by any Person or Governmental Authority, which lapse, refusal or termination, would reasonably be expected to have a Material Adverse Effect;

(e)     the publication of any decree, order or judicial filing, the receipt of any settlement offer or the institution of any litigation, proceeding or investigation against or affecting any Credit Party, in each case, in connection with a Contingent Acquisition Consideration Claim; or

(f)     ~~(e)~~ any other development that has, or would reasonably be expected to have, a Material Adverse Effect.

5.7     Payment of Taxes

.

The Borrower shall and shall cause each of its Subsidiaries to pay at or before the fixed or extended maturity thereof, all of its or their respective material Taxes, except any of such obligations or liabilities which are being contested in good faith and by appropriate proceedings, and appropriate reserves with respect thereto required in accordance with GAAP shall have been set aside on its or their respective books.

5.8     Compliance with Laws

.

The Borrower shall and shall cause each of its Subsidiaries to comply in all material respects with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where such failure to comply would not reasonably be expected to have a Material Adverse Effect.

5.9     Use of Proceeds

.

The Borrower shall use the proceeds of the Loans and shall use each Letter of Credit only for the purposes set forth in Section 2.12.

5.10     Governmental Consents and Approvals

.

The Borrower shall and shall cause each of its Subsidiaries promptly to obtain and use all reasonable efforts to keep in force and shall comply in all material respects with all such approvals, consents, orders and authorizations by and licenses from, give all such notices to, register, enroll and file all such documents with, and take all such other actions with respect to, any Governmental Authority that are applicable to it or its Property, except where such failure would not reasonably be expected to have a Material Adverse Effect.

5.11     Environmental Matters

.

The Borrower shall and shall cause each of its Subsidiaries to take all actions reasonably necessary to comply with all Environmental Laws applicable to it or its business or Property, and shall not and shall not permit any Subsidiary knowingly to permit or suffer any violation of Environmental Laws by any third party lessee in connection with its lease of its Property, which Environmental Laws, if violated, or which violation, as the case may be, could reasonably be expected to have a Material Adverse Effect.

5.12     Notice of Certain Changes

.

Without limiting the restrictions contained in Section 6.12, the Borrower shall and shall cause each of its Subsidiaries to furnish to the Agent prompt written notice (and, in any event, within thirty (30) days thereof) of any change in (a) its legal name or in any trade name used to identify it in the conduct of its business or in the ownership of its Property, (b) its jurisdiction of organization or the location of its chief executive office, its principal place of business, or any office in which it maintains its books or records, (c) its identity or organizational structure or (d) its organizational identification number.

5.13     Additional Collateral

.

If after the Closing Date, the Borrower or any other Credit Party acquires any property which would constitute Collateral, the Borrower shall, and shall cause each such Subsidiary (other than any Excluded Subsidiary) to, promptly execute any and all documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law, or which the Agent may reasonably request, to grant, preserve, protect or perfect the Liens created or intended to be created by the Collateral Documents or the validity or priority of any such Lien, all at the expense of the Borrower; provided that, in respect of a Foreign Subsidiary that ceases to be an Excluded Subsidiary, Borrower shall, and shall cause each such Foreign Subsidiary to execute any and all documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law, or which the Agent may reasonably request, to grant, preserve, protect or perfect the Liens created or intended to be created by the Collateral Documents or the validity or priority of any such Lien, all at the expense of the Borrower within thirty (30) days after the date on which the Agent or Borrower elects in writing that such Foreign Subsidiary shall no longer be an Excluded Subsidiary.

Notwithstanding anything to the contrary in any Loan Document, no Credit Party shall be required to deliver landlord lien waivers, estoppels or collateral access letters in any circumstances other than with respect to locations listed on Schedule 5.13.

5.14     Further Assurances

.

(a) The Borrower shall and shall cause each other Credit Party to, at any time and from time to time, without expense to the Agent, execute, acknowledge (if appropriate) and deliver, or cause to be executed, acknowledged (if appropriate) and delivered, any and all of such further agreements and other instruments and will take or cause to be taken such other action, as may be reasonably required by the Agent or any Lender, as necessary to maintain, preserve, safeguard and continue its rights and interests hereunder, including without limitation, delivering to the Agent, on or before the sixtieth (60th) day after the Agent's request therefor (or such longer period of time as the Agent may agree to), Landlord Agreements from the respective landlords for each of the operating leases of the Credit Parties (to the extent not previously delivered to the Agent).  The Borrower hereby irrevocably authorizes the Agent to file (without the Borrower's or any of its Subsidiaries' signature) any financing statement or similar document pursuant to the Uniform Commercial Code as enacted and in force in any jurisdiction within, or subject to, the jurisdiction of the United States and any analogous document under legislation of like import or purpose for the time being in force, in any other country, the filing of which may be reasonably necessary to perfect, protect or continue any of the rights of the Agent or any Lender hereunder and under the other Loan Documents.  Without limiting the foregoing, to the extent any security interest in the Collateral (other than any Collateral owned by a Credit Party organized under the laws of the United States of America and located in the United States of America, the security interest in which may be perfected by the filing of a Uniform Commercial Code financing statement or the execution of an intellectual property security agreement or the delivery of stock certificates) is not perfected on the Closing Date after the use of commercially reasonable efforts to do so, the Borrower will take or cause to be taken such action, as may be reasonably required by the Agent, as necessary to cause such security interest(s) to be perfected within thirty (30) days after the Closing Date.

(b) With respect to CARES Indebtedness, the obligor in respect thereof shall timely submit all applications and required documentation necessary or desirable for the lender of such CARES Indebtedness and/or the Small Business Administration to make a determination regarding the amount of CARES Indebtedness that is eligible to be forgiven.

5.15    Cash Management

.

Each Credit Party shall enter into, and cause each depository, securities intermediary or commodities intermediary to enter into, Control Agreements with respect to each domestic deposit, securities, commodity or similar account maintained by such Person (other than (a) any payroll account, payroll tax account, benefit account, other employee wage and benefit account or zero balance account, (b) petty cash and other bank accounts, amounts on deposit in which do not exceed $100,000 in the aggregate at any one time, (c) withholding tax and fiduciary or trust accounts and (d) with the prior written consent of the Agent, any accounts directly related to foreign currency exchange services (such excluded accounts, "**Excluded Accounts**")) as of and after the dates required in the immediately following sentence.  It is agreed and understood that the Credit Parties shall have until (x) that date that is ninety (90) days following the Closing Date (or such later date as may be agreed to by Agent in its sole discretion) to deliver Control Agreements with respect to all domestic deposit, securities, commodity or similar accounts maintained by the Credit Parties (other than Excluded Accounts) existing on the Closing Date and (y) the date that is ninety (90) days following the closing date of a Permitted Acquisition (or such later date as may be agreed to by Agent in its sole discretion) to deliver Control Agreements with respect to all domestic deposit, securities, commodity or similar accounts acquired by the Credit Parties in connection with such Permitted Acquisition (other than Excluded Accounts).

5.16    Interest Rate Protection

.

Within ninety (90) days of the Closing Date, Borrower shall enter into, and thereafter maintain, Rate Contracts providing protection against fluctuations in interest rates with one or more financial institutions with respect to at least 50% of the principal amount of the sum of the Aggregate Term Loan Commitment on the date hereof, which agreements shall provide for not less than a three (3) year term and containing such other terms as are customary and are reasonably satisfactory to Agent.

5.17    Post-Closing Obligations

.

The Borrower agrees to deliver or to cause to be delivered to Agent, in form and substance reasonably satisfactory to Agent, the items described on Schedule 5.17 on or before the dates specified with respect to such items, or such later dates as may be agreed to by Agent, in its sole discretion.

5.18    Lenders' Calls

.

|US-DOCS\~~122553549.2~~143398915.4||

From the Third Amendment Effective Date until the date on which (x) Liquidity is greater than $5,000,000, as evidenced by delivery of a certificate pursuant to Section 5.1(g) and (y) the Agent receives a Compliance Certificate in accordance with Section 5.1(de) in connection with the most recent financial statements delivered pursuant to Section 5.1(b) demonstrating that Total Leverage Ratio is less than 5.00:1.00, once every month, commencing on July 1, 2020, the Borrower will conduct a meeting (which shall be held by telephone conference call or other means acceptable to the Borrower and Agent or Required Lenders, as applicable) of Agent, and the Lenders to discuss the most recently reported financial results and the financial condition of Credit Parties and their Subsidiaries, at which there shall be present a Responsible Officer and such other officers of the Credit Parties as may be reasonably requested and reasonably available to attend by Agent or Required Lenders, such request or requests to be made at a reasonable time prior to the scheduled date of such meeting. Such meetings shall be held at a time and place convenient to the Lenders and to the Borrower.

## 6.    NEGATIVE COVENANTS

Each Credit Party and Holdings (solely with respect to Section 6.18 in the case of Holdings) covenants and agrees that until the Facility Termination Date:

6.1    Limitation on Indebtedness.

The Borrower shall not and shall not permit any Subsidiary to create, incur, assume, guarantee or otherwise become or remain liable in respect of any Indebtedness or Disqualified Stock, other than the following ("***Permitted Indebtedness***"):

(a)    Indebtedness under the Loan Documents;

(b)    unsecured intercompany Indebtedness, not to exceed $500,000 in the aggregate with respect to intercompany Indebtedness owed by a non-Credit Party;

(c)    additional Indebtedness incurred in the ordinary course of business or Indebtedness incurred to finance the acquisition of any fixed assets or Capital Leases in any case, provided that (i) both before and after giving effect to the incurrence of such Indebtedness, no Event of Default shall have occurred and be continuing and (ii) the aggregate principal amount of all such Indebtedness, at any time outstanding, shall not exceed the product of (x) $100,000 and (y) the number of open studios as of the last day of the month for which financial statements have been delivered to Agent pursuant to Section 5.1(a), (b) or (c) (whichever was most recently delivered to Agent); *provided* that, the aggregate principal amount of Indebtedness incurred to finance Capital Leases shall not exceed $8,500,000 at any time outstanding during the Third Amendment Leverage Period;

(d)    Obligations of the Borrower or any of its Subsidiaries existing or arising under any Rate Contracts entered into by such Person in accordance with Section 6.8(g);

(e)    Indebtedness existing on the Closing Date and set forth on Schedule 6.1(e) and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof;

(f)    [reserved];

(g)      unsecured Indebtedness; <u>provided</u> that in connection with the incurrence of any Indebtedness under this clause, (i) after giving effect to such incurrence of Indebtedness, the Total Leverage Ratio is not greater than 3.00:1.00 on a Pro Forma Basis, (ii) such Indebtedness is subordinated in right of payment to the Obligations on terms that (A) a Financial Officer of the Borrower certifies are no less favorable, in the aggregate, to the Lenders than the subordination provisions contained in customary or "Rule 144A" issuance of non-investment grade subordinated notes or (B) are reasonably acceptable to the Lenders at the time of issuance thereof, (iii) there is no Default or Event of Default both before and after giving effect to the incurrence of such Indebtedness, (iv) there shall be compliance, on a Pro Forma Basis, with each of the financial covenants under Sections 6.13 and 6.14, and (v) such Indebtedness shall have no scheduled amortization payments, or mature, prior to the date that is one year following the last of the scheduled maturities of the Loans to occur;

(h)      Indebtedness in an aggregate principal amount not to exceed the aggregate amount of cash received by the Borrower after the date of this Agreement from the sale of equity interests or as a contribution to it common equity capital (in each case, other than to or from a Subsidiary of the Borrower); *provided* that such Indebtedness (i) is incurred within 180 days after the sale of such Stock or the making of such capital contribution and (ii) is designated as "Contribution Indebtedness" as certified in a certificate of a Financial Officer of the Borrower on the date of its incurrence; *provided further* that during the Third Amendment Leverage Period, (i) any such Indebtedness incurred after the Third Amendment Date shall be unsecured and (ii) the aggregate principal amount of all such unsecured Indebtedness incurred after the Third Amendment Effective Date, at any time outstanding, shall not exceed $500,000;

(i)      Indebtedness of any Person that becomes a Subsidiary on or after the date of this Agreement; *provided* that such Indebtedness, (i) exists at the time such person becomes a Subsidiary, (ii) not created in anticipation or contemplation of such person becoming a Subsidiary, and (iii) is not directly or indirectly recourse to any Credit Party or any of their respective assets, other than to the person that becomes a Subsidiary and its Subsidiaries; *provided further* that during the Third Amendment Leverage Period, (i) any such Indebtedness incurred after the Third Amendment Effective Date shall be unsecured and (ii) the aggregate principal amount of all such unsecured Indebtedness, at any time outstanding, shall not exceed $500,000;

(j)      Indebtedness arising from agreements of the Borrower or any Subsidiary of the Borrower providing for indemnification, hold backs adjustment of purchase price or similar obligations (including earn-outs), non-compete agreements, deferred compensation or similar obligations, including Contingent Acquisition Consideration**,** or from guaranties or letters of credit, surety bonds or performance bonds, in each case entered into in connection with Permitted Acquisitions and other Acquisitions;

(k)      Guarantee obligations otherwise constituting investments permitted by this Agreement;

(l)      Indebtedness consisting of promissory notes issued by a Credit Party to current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) to finance the purchase or redemption of Stock of the Borrower or Holdings in an aggregate amount not to exceed $2,000,000 at any time outstanding;

(m)      Ordinary Course Debt (to the extent not otherwise covered under clause (j) above); and

(n)      other Indebtedness not otherwise permitted by the preceding clauses in an aggregate principal amount not to exceed $9,595,615.00 advanced by (A) any Governmental Authority (including the Small Business Administration) or (B) any other Person to the extent such Debt under this clause (n) is guaranteed by a Governmental Authority (including the Small Business Administration), in each case, pursuant to the CARES Act – Title I (or related legislation) (such Indebtedness, "**CARES Indebtedness**" and the amount of such CARES Indebtedness, the "**CARES Indebtedness Cap**"), in each case, as long as such CARES Indebtedness is not secured by any of the assets or properties of a Credit Party; provided, that, unless otherwise approved by the Agent, the proceeds of such CARES Indebtedness shall (1) be used by the Credit Parties and their Subsidiaries solely for purposes of working capital, as permitted under the CARES Act – Title I, (2) have a maturity date not less than two (2) years after the incurrence of the CARES Indebtedness, (3) bear interest at a rate not greater than one percent (1%) per annum, (4) not be reborrowed by any Credit Party, to the extent any amounts of such CARES Indebtedness were repaid or forgiven and (5) otherwise have terms customary for loans made pursuant to the CARES Act – Title I (taken as a whole).

Accrual of interest, the accretion of accreted value, amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 6.1.

For the avoidance of doubt, the issuance of Disqualified Stock by any Credit Party is not permitted.

6.2     Limitation on Guarantees

.

The Borrower shall not and shall not permit any of its Subsidiaries to create, incur, assume or otherwise become or remain liable in respect of any Guarantee other than:

(a)      Guarantees existing on the date hereof and set forth on Schedule 6.2, including any extensions, renewals or replacements of any such Guarantees that do not increase the amount of the obligation Guaranteed;

(b)      Guarantees by the Borrower or any of its Subsidiaries of the Indebtedness or other obligations of the Borrower or any other Subsidiary (including lease Guarantees), in any case to the extent such Indebtedness or other obligations are permitted (or not prohibited, as the case may be) under this Agreement; and

(c)      agreements providing for indemnifications, surety or performance bonds entered into in the ordinary course of business.

6.3     Limitation on Liens

.

The Borrower shall not and shall not permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon any of its property, assets, income or profits, present or future, except in favor of the Agent and except for the following (each a "*Permitted Lien*"):

(a)      Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves are provided);

(b)      [reserved];

(c)      [reserved];

(d)      [reserved];

(e)      attachment or judgment liens in respect of judgments, writs or warrants of attachment or similar process that do not constitute an Event of Default under Section 6.1(j);

(f)      any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any of its Subsidiaries or existing on any property or asset of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary, *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, (ii) such Lien shall not apply to any other property or assets of the Borrower or any of its Subsidiaries, (iii) such Lien shall secure only those obligations that it secures on the date of such acquisition or the date such Person becomes a Subsidiary, and any extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof, and (iv) such Lien does not apply to any inventory or accounts receivable of the Borrower or any of its Subsidiaries;

(g)      Liens on fixed assets or Capital Leases acquired by the Borrower or any of its Subsidiaries and the proceeds thereof, *provided* that (i) such security interests secure Indebtedness permitted by Section 6.1(c), (ii) such security interests and the Indebtedness secured thereby are created substantially simultaneously with the acquisition of such assets, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring such fixed assets or Capital Leases, and (iv) such security interests shall not apply to any other property or assets of the Borrower or any of its Subsidiaries;

(h)      [reserved];

(i)      [reserved];

(j)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by applicable law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrower and its Subsidiaries taken as a whole;

(k)      Liens existing on the Closing Date and set forth on Schedule 6.3(k);

(l)      easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any real property, in each case whether now or hereafter in existence, not (i) securing Indebtedness for borrowed money, (ii) individually or in the aggregate materially impairing the value or marketability of such real property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Credit Parties at such real property;

(m)      leases of properties entered into in the ordinary course of business so long as such leases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business or (ii) materially impair the use (for its intended purposes) or the value of the property subject thereto;

(n)      Liens on property rented to, or leased by, pursuant to a sale and leaseback transaction; provided that such sale and leaseback transaction is otherwise not prohibited by this Agreement; and

(o)      Ordinary Course Liens.

6.4      Fundamental Changes

.

(a)      The Borrower shall not and shall not permit any of its Subsidiaries to merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it (other than mergers or consolidations of a Subsidiary into another Subsidiary or into the Borrower), other than in connection with a, and to the extent permitted under the definition of, Permitted Acquisition;

(b)      The Borrower shall not and shall not permit any of its Subsidiaries to engage in any business other than the Line of Business and any business reasonably related or complimentary thereto; and

(c)      Any Subsidiary (other than a Guarantor) may liquidate, dissolve or dispose of Stock if the Borrower determines in good faith that such liquidation, dissolution or disposition is in the best interests of the Borrower and is not materially disadvantageous to the Lenders, provided that all of the proceeds received in connection with or in respect of such liquidation, dissolution or disposal are paid to the Borrower or another Credit Party.

6.5      Limitation on Certain Transactions with Affiliates

.

Except as expressly permitted by this Agreement, the Borrower shall not and shall not permit any of its Subsidiaries to sell, transfer, lease or otherwise dispose (including pursuant to a merger) of any property or assets to, or purchase, lease or otherwise acquire (including pursuant to a merger) any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except

(a)      at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties;

(b)      for compensation arrangements for officers and employees of the Borrower or its Subsidiaries entered into in the ordinary course of business,

(c)      any Restricted Payments permitted by Section 6.15;

(d)      if and to the extent permitted by the Lenders, the payment of management, consulting and advisory fees and related expenses to the Sponsor and general or limited partners made pursuant to any financial advisory, financing, underwriting or placement

agreement or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures which are approved by the Board of Directors of Borrower or such Subsidiary in good faith; *provided* that the aggregate amount of all payments made pursuant to this clause (d) shall not exceed $250,000 per fiscal year during the Third Amendment Leverage Period;

(e) director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of the applicable Credit Party;

(f) as long as no Default or Event of Default shall have occurred and then be continuing, any issuance of securities, or other non-cash payments, awards or grants, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options, stock ownership plans, including restricted stock plans, stock grants, directed share programs and other equity based plans and the granting and stockholder rights of registration rights approved by the Board of Directors of the Borrower;

(g) entering into any indemnification agreement or any similar arrangement with directors, officers, consultants and employees in the ordinary course of business and payment fees and indemnities to directors, officers, consultants and employees in the ordinary course of business;

(h) any purchase of Stock of the Borrower or any contribution by Holdings to the equity capital of the Borrower;

(i) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 6.5(i) attached hereto, or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect taken as a whole;

(j) any transaction may be entered into among the Credit Parties not involving third parties;

(k) investments permitted hereunder; and

(l) the incurrence of intercompany Indebtedness to the extent permitted under Section 6.1(b).

6.6 <u>Asset Sales</u>.

The Borrower shall not and shall not permit any of its Subsidiaries to consummate a Disposition of any asset, except the Borrower or any of its Subsidiaries may:

(a) make sales, transfers and other Dispositions of obsolete or worn out products, inventory, used or surplus equipment, or assets no longer used or useful in the conduct of its business;

(b) make sales, transfers and other Dispositions of products, inventory, or equipment, in each case in the ordinary course of business;

(c) dispose of property to the Borrower or any other Credit Party;

(d) [reserved];

(e)      enter into leases or subleases granted to others in the ordinary course of business or not interfering in any material respect with the business of the Borrower or any of its Subsidiaries;

(f)      unwind any interest rate contracts;

(g)      [reserved];

(h)      abandon or otherwise dispose of intellectual property that is, in the reasonable good faith judgment of the Borrower, no longer economically practicable to maintain or useful;

(i)      sales of assets that are made subject to Capital Leases to the extent the Indebtedness thereunder is permitted under Section 6.1(c);

(j)      investments and consolidations and Restricted Payments, in each case, to the extent permitted by this Agreement;

(k)      enter into licenses or sublicenses of intellectual property in the ordinary course of business;

(l)      any Disposition that constitutes a casualty event;

(m)      sales or Dispositions of property of any Subsidiary that is not a Credit Party to any other Subsidiary;

(n)      liquidate or sell Permitted Investments for cash or other Permitted Investments;

(o)      Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(p)      the sale or discount in each case without recourse and in the ordinary course of business of overdue receivables arising in the ordinary course of business, but only in connection with the compromise or collection thereof; and

(q)      other Dispositions of property not to exceed $1,500,000 in the aggregate; *provided* that (i) such Dispositions of property are made for fair market value, and (ii) at least 85% of the consideration payable in respect of such Disposition of property is in the form of cash or Permitted Investments.

6.7      Sale and Leaseback Transactions

.

The Borrower shall not and shall not permit any Subsidiary to enter into any Sale and Leaseback Transaction, directly or indirectly, with any Person.

6.8      Investments, Loans, Advances, Guarantees and Acquisitions

.

The Borrower shall not and shall not permit any of its Subsidiaries to purchase, hold or acquire (including pursuant to any merger) any Stock, evidences of Indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions (including pursuant to any merger)) any assets of any other Person constituting a business unit, or purchase, hold or acquire any "derivative", except that the Borrower or any of its Subsidiaries may make or receive (as applicable):

(a)     Permitted Investments;

(b)     the Borrower may acquire and hold the Stock of its Subsidiaries, and any new Subsidiaries formed in accordance with the terms of this Agreement;

(c)     investments made by a Credit Party in another Credit Party;

(d)     Guarantees permitted to be incurred pursuant to Section 6.2;

(e)     receivables arising and trade credit granted in the ordinary course of business and equity or debt securities received in satisfaction or partial satisfaction from financially troubled account debtors, whether by settlement or as a result of bankruptcy, insolvency or other proceedings;

(f)     deposits, prepayments and other credits to suppliers and service providers made in the ordinary course of business, and customary trade arrangements with customers and accounts receivable of the Borrower and its Subsidiaries created or acquired in the ordinary course of business;

(g)     Rate Contracts entered into solely for non-speculative purposes;

(h)     Permitted Acquisitions;

(i)     (i) loans and advances in the ordinary course of business to employees and (ii) advances of payroll payments and expenses to employees in the ordinary course of business;

(j)     investments in the form of loans to officers, directors and employees for the sole purpose of purchasing Stock (or purchase of such loans made by others) of Holdings, provided such investments are either cashless or the cash for such investments is used substantially simultaneously to complete such purchase;

(k)     investments made pursuant a "rabbi trust" or similar employee benefit plan or arrangement designed to defer the taxability of compensation to an employee, officer or director or purchase payments made in connection with an acquisition;

(l)     investments made as a result of the receipt of non-cash consideration from a Disposition;

(m)     Capital Expenditures; *provided* that any such Capital Expenditures incurred with respect to new studios shall only be permitted so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom; *provided*, *that*, the foregoing limitations on Capital Expenditures shall not apply if the Total Leverage Ratio is less

than 5.00 to 1.00, calculated as of the Measurement Period ending on or most recently prior to such measurement date for which financial statements have been delivered pursuant to Section 5.1;

(n)      investments in Foreign Subsidiaries (A) so long as,

(i)      no Default or Event of Default shall have occurred and be continuing;

(ii)      the Total Leverage Ratio, on a Pro Forma Basis after giving effect to such Investment, is 0.25 inside the then current Total Leverage Ratio required by Section 6.13, if applicable;

(iii)      after giving effect to such Investment, the Borrower shall have Investment Availability of not less than $2,100,000;

(iv)      the Borrower provides Agent not less than three days (or such shorter time period as agreed to by the Agent) prior to any such investment, a year-to-date accounting of distributions under this clause (n)(A) and the current amount under clause (iv) hereof (which may be provided in Excel);

(v)      the aggregate amount of all such investments pursuant to this clause (n)(A) shall not exceed: (A) $3,250,000 in any twelve (12) month period; provided that, notwithstanding the foregoing conditions of this Section 6.8(n), up to $2,600,000 (to the extent such amount is the proceeds of an equity issuance and netted against any cash distributions from any Foreign Subsidiaries to a Domestic Subsidiary; provided, that any such new equity issuance that is not common equity is on terms reasonably satisfactory to the Agent) may be invested in such Foreign Subsidiaries in Fiscal Year 2019 shall be permitted subject only to clause (iv) hereof;

(vi)      the aggregate amount of all such investments pursuant to this clause (n) shall not exceed (x) $2,000,000 during the Third Amendment Leverage Period, (y) $3,200,000 per annum after the Third Amendment Leverage Period and (z) $12,000,000 in the aggregate; and

(vii)      Liquidity on a Pro Forma Basis is greater than $2,500,000 during the Third Amendment Leverage Period, as evidenced by delivery of a certificate pursuant to Section 5.1(g); and

(B) in an unlimited amount to the extent such investment is funded by the proceeds of a new equity issuance; provided that, any such new equity issuance that is not common equity is on terms reasonably satisfactory to the Agent; and

(o)      other investments by any Credit Party; provided that the aggregate amount of all investments made pursuant to this clause (o) shall not exceed (x) $250,000 during the Third Amendment Leverage Period and (y) $500,000 outside of the Third Amendment Leverage Period.

6.9     CARES Indebtedness.  The Borrower shall not and shall not permit any of its Subsidiaries to repay any CARES Indebtedness or repurchase, redeem, retire or otherwise acquire such CARES Indebtedness, provided, that, notwithstanding the foregoing, to the extent such CARES Indebtedness is not forgiven in accordance with the CARES Act – Title I, the Credit Parties and their Subsidiaries may, directly or indirectly, to the extent required under the terms of the CARES Indebtedness, pay interest payable in respect of the CARES Indebtedness as and when due, at a rate not exceeding 1.0% per annum in respect thereof, in accordance with the terms thereof.

6.10     Modifications of Certain Agreements.  No Credit Party shall, nor shall it permit any Subsidiary to (except as otherwise required by applicable law), directly or indirectly, amend, terminate, or otherwise modify (or permit any amendment, termination or modification of), including, without limitation, waivers of compliance, material rights or remedies thereunder, or consent to noncompliance in any material respect with, any documents entered into in connection with the CARES Indebtedness without the prior written consent of the Agent.

6.11     Restrictive Agreements

.

The Borrower shall not and shall not permit any of its Subsidiaries, directly or indirectly, to enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon: (a) the ability of the Borrower or any Credit Party to create, incur or permit to exist any Lien upon any of its property or assets (other than with respect to specific property covered by a Permitted Lien and customary provisions restricting assignments, subletting and other transfers contained in leases, licenses, client agreements, vendor agreements and other similar agreements entered into in the ordinary course of business); (b) any of its Subsidiaries that is not a Credit Party to pay dividends or other distributions with respect to any shares of its Stock; or (c) any of its Subsidiaries that is not a Credit Party to make or repay loans or advances to the Borrower or a Credit Party, *provided* that

(i)     the foregoing shall not apply to restrictions and conditions imposed by law or by the Loan Documents,

(ii)     the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.11 (but shall apply to any extension, renewal, amendment or modification expanding the scope of any such restriction or condition),

(iii)     the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is sold and such sale is permitted hereunder,

(iv)     clause (a) shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness or Capital Lease Obligations permitted by this Agreement so long as such restrictions and conditions apply only to the property or assets securing such Indebtedness,

(v)     clause (a) shall not apply to customary provision in leases or other contractual arrangements restricting the assignment thereof,

(vi)   the foregoing shall not apply to applicable law,

(vii)   the foregoing shall not apply to this Agreement and the other Loan Documents,

(viii)   the foregoing shall not apply to a permitted refinancing; *provided* that the encumbrances, restrictions and conditions under any such refinancing are not materially more restrictive, taken as a whole, than those contained in the documentation governing the Indebtedness being refinanced,

(ix)   to the extent not covered under clause (v), the foregoing shall not apply to provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary entered into in the ordinary course of business,

(x)   the foregoing shall not apply to licensing agreements entered into in each case entered into in the ordinary course of business,

(xi)   the foregoing shall not apply to provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business,

(xii)   the foregoing shall not apply to restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; provided that (i) such restrictions and conditions apply only to the property to be sold, and (ii) such sale is permitted hereunder,

(xiii)   the foregoing shall not apply to any agreement in effect at the time such Subsidiary becomes a Subsidiary of Borrower, so long as such agreement was not entered into in connection with or in contemplation of such person becoming a Subsidiary of Borrower,

(xiv)   to the extent not covered under clause (v), the foregoing shall not apply to restrictions and negative pledges imposed by any agreement relating to secured Indebtedness to the extent that such restrictions apply only to the property or assets securing such Indebtedness, and

(xv)   to the extent not covered under clause (viii), the foregoing shall not apply to any encumbrances or restrictions imposed by any amendments or refinancing that are otherwise permitted by the Loan Documents; provided that such amendments or refinancing are no more restrictive, taken as a whole, with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

6.12   Amendment of Organizational Documents

.

The Borrower shall not amend, modify or waive any of its rights under any of its Organization Documents or the Capital Call Agreement, and shall not permit any of its Subsidiaries to amend, modify or waive any of its rights under its Organization Documents, in each case in any manner that would materially and adversely affect the Agent or the Lenders.

6.13   Total Leverage Ratio

.

|US-DOCS\~~122553549.2~~143398915.4||

The Borrower shall not permit the Total Leverage Ratio to be greater than the ratios set forth below at the end of any Fiscal Quarter set forth below:

| Fiscal Quarter End | Total Leverage Ratio |
|---|---|
| December 31, 2019 | Not Tested |
| March 31, 2020 | Not Tested |
| June 30, 2020 | Not Tested |
| September 30, 2020 | Not Tested |
| December 31, 2020 | Not Tested |
| March 31, 2021 | Not Tested |
| June 30, 2021 | Not Tested |
| September 30, 2021 | Not Tested |
| December 31, 2021 | Not Tested |
| March 31, 2022 | 8.25 to 1.00 |
| June 30, 2022 | 7.00 to 1.00 |
| September 30, 2022 | 5.75 to 1.00 |
| December 31, 2022 | 5.50 to 1.00 |
| March 31, 2023 | 5.25 to 1.00 |
| June 30, 2023 | ~~5.00~~6.25 to 1.00 |
| September 30, 2023 | ~~4.75~~6.25 to 1.00 |
| December 31, 2023 | ~~4.50~~6.00 to 1.00 |
| March 31, 2024 | ~~4.25~~6.00 to 1.00 |
| June 30, 2024 and thereafter | ~~4.00~~5.75 to 1.00 |

6.14    Fixed Charge Coverage Ratio

.

Commencing with the Fiscal Quarter ending September 30, 2022 until the Eighth Amendment Effective Date, the Borrower shall not permit the Fixed Charge Coverage Ratio to be less than 1.25 to 1.00 at the end of any Fiscal Quarter ending after the Closing Date.

6.15    Restricted Payments and Earnouts

.

The Borrower shall not and shall not permit any of its Subsidiaries to declare or make any Restricted Payment or make any earnout payments, except that:

(a)     so long as no Default shall have occurred and be continuing at the time thereof or would result therefrom, the Borrower may declare and pay distributions payable only in Stock of the Borrower;

(b)     any Subsidiary of the Borrower may declare and pay cash dividends or distributions to the Borrower;

(c)     so long as the Borrower is a member of a group filing a consolidated, unitary or combined tax return with Holdings (or is a disregarded entity for tax purposes owned by Holdings), the Borrower may declare and pay cash distributions to Holdings in the amount of any Taxes for which Holdings (or any direct or indirect parent of Holdings) is liable, provided, that such amount shall not exceed the amount of any such Taxes that the Borrower and its Subsidiaries that are members of such group would have been required to pay on a separate group basis if the Borrower and such Subsidiaries had paid tax on a consolidated, combined, group, affiliated or unitary basis on behalf of an affiliated group consisting only of the Borrower and such Subsidiaries;

(d)     so long as (x) no Default or Event of Default shall have occurred and be continuing at the time thereof or would result therefrom and (y) the Credit Parties are in compliance on a Pro Forma Basis with the Liquidity covenant set forth in Section 6.19 during the Third Amendment Leverage Period, the Borrower may declare and pay (i) distributions to Holdings in a maximum aggregate amount of $400,000 in any Fiscal Year of the Borrower, which amount is to be used by Holdings solely to pay accrued interest on seller notes;

(e)     (xw) on the Fifth Amendment Effective Date, the Borrower may pay Contingent Acquisition Consideration Payments in an amount not to exceed $1,500,000, (x) on or following the Eighth Amendment Effective Date, the Borrower may pay Contingent Acquisition Consideration Payments in an amount not to exceed $300,000 in the aggregate in connection with either or both of the Permitted Acquisitions pursuant to the Thanos Acquisition Agreement and the Pegasus Acquisition Agreement (to be determined in Borrower's sole discretion), respectively, (y) prior to September 1, 2021, the Borrower may pay Contingent Acquisition Consideration Payments incurred in connection with Permitted Acquisitions (including earnout obligations outstanding on the Fourth Amendment Effective Date but excluding amounts paid in respect of the foregoing clause (x)) in an amount not to exceed in the aggregate $1,000,000, and (z) on and after September 1, 2021 and prior to the Eighth Amendment Effective Date, so long as (i) no Default or Event of Default shall have occurred and be continuing at the time thereof or would result therefrom and (ii) Liquidity on a Pro Forma Basis is greater than $5,000,000 both before and after giving effect to such Contingent Acquisition Consideration Payment, the Borrower may pay Contingent Acquisition Consideration Payments incurred in connection with Permitted Acquisitions (including earnout obligations outstanding on the Fourth Amendment Effective Date) with balance sheet cash, (aa) on and after the Eighth Amendment Effective Date, so long as (i) no Default or Event of Default shall have occurred and be continuing at the time thereof or would result therefrom, (ii) Liquidity on a Pro Forma Basis is greater than $2,500,000 both before and after giving effect to such Contingent Acquisition Consideration Payment and

|US-DOCS\122553549.2143398915.4||

(iii) the Borrower is in compliance with the Total Leverage Ratio required by Section 6.13 on a Pro Forma Basis, the Borrower may pay Contingent Acquisition Consideration Payments consisting of monthly interest payments in an amount not to exceed $20,000 in any month in connection with either or both (to be determined in Borrower's sole discretion) of the Permitted Acquisitions pursuant to the Thanos Acquisition Agreement and the Pegasus Acquisition Agreement, respectively, and (bb) commencing on the date on which the Agent has received a Compliance Certificate in accordance with the requirements in Section 5.1(e) demonstrating compliance with the relevant financial covenants for the Fiscal Quarter ending December 31, 2023, so long as (i) no Default or Event of Default shall have occurred and be continuing at the time thereof or would result therefrom, (ii) unrestricted cash and cash equivalents on a Pro Forma Basis is greater than $5,000,000 both before and after giving effect to such Contingent Acquisition Consideration Payment, (iii) the Total Leverage Ratio is less than 5.50:1.00 on a Pro Forma Basis and (iv) the outstanding Revolver Loans on a Pro Forma Basis shall be $0, the Borrower may pay quarterly Contingent Acquisition Consideration Payments consisting of principal payments with balance sheet cash; *provided*, that the foregoing conditions and restrictions shall not apply to Contingent Acquisition Consideration Payments paid with the proceeds of a new equity issuance for equity contributed after the Fourth Amendment Effective Date, so long as any such new equity issuance that is not common equity is on terms reasonably satisfactory to the Agent;

(f)        so long as (x) no Event of Default is then in existence or would otherwise arise therefrom and (y) the Credit Parties are in compliance on a Pro Forma Basis with the Liquidity covenant set forth in Section 6.19 during the Third Amendment Leverage Period, the Borrower may make Restricted Payments to Holdings to enable Holdings to redeem or repurchase Stock from officers, directors, employees or consultants of any Credit Party upon termination of employment in connection with the exercise of stock options, stock appreciation rights or other equity incentives or equity based incentives pursuant to management incentive plans or in connection with the death or disability of such officers, directors, employees or consultants; provided that in all such cases the aggregate amount paid in respect of all such shares so redeemed or repurchased does not exceed (x) $250,000 in the aggregate during the Third Amendment Leverage Period and (y) $2,000,000 in the aggregate outside of the Third Amendment Leverage Period;

(g)        Restricted Payments that result from the cancellation of Indebtedness from officers, directors, employees or consultants in connection with any repurchase of stock or stock equivalents will not be deemed to constitute a Restricted Payment under this Agreement;

(h)        Restricted Payments deemed made as the result of the incurrence of Indebtedness;

(i)        So long as the Credit parties are in compliance on a Pro Forma Basis with the Liquidity covenant set forth in Section 6.19 during the Third Amendment Leverage Period, repurchases of Stock deemed to occur upon the exercise of stock options if such Stock represents a portion of the exercise price thereof;

(j)        the Borrower may declare and pay cash dividends to Holdings in the amount necessary to permit Holdings to pay:

(i)        reasonable corporate and operating expenses (including reasonable out-of-pocket expenses for legal, administrative and accounting services provided by third parties, and compensation, benefits and other amounts payable to

officers and employees in connection with their employment in the ordinary course of business and to board of director observers); and

(ii)    franchise fees or similar taxes and fees required to maintain its legal existence;

(k)    Restricted Payments resulting from the acquisition of any shares of Stock (the "**Retired Capital Stock**") either (i) solely in exchange for shares of Stock that are not Disqualified Stock (the "**Refunding Capital Stock**") or (ii) through the application of net proceeds of a substantially concurrent sale for cash (other than to a Subsidiary of the Borrower) of shares of Stock that are not Disqualified Stock of the Borrower or Holdings;

(l)    Investments permitted by Section 6.8(n);

(m)    dividends or other distributions with respect to any shares of its Stock as permitted by Section 2.12(e);

(n)    the Borrower may declare and pay the Closing Date Distribution;

(o)    the Borrower may declare and pay the Fifth Amendment Distribution; and

(p)    the Borrower may declare and pay an additional distribution after the Fifth Amendment Effective Date in an aggregate amount equal to $10,000,000, so long as, as of each of the date of declaration and payment of such additional distribution, (x) for the two most recent fiscal quarters then ended, the Total Leverage Ratio was less than 4.50 to 1.00 as demonstrated by the annualized Total Leverage Ratio for the three most recent calendar months then ended and (y) Liquidity of the Credit Parties, on a pro forma basis after giving effect to such additional distribution, shall not be less than $15,000,000.

6.16    Subsidiaries

.

The Borrower shall not create any Subsidiary or make any acquisition of an entity that constitutes a Subsidiary, unless, within thirty (30) days after such Subsidiary is created or entity acquired (or such longer period as is acceptable to the Agent), unless such Subsidiary is an Excluded Subsidiary, such Subsidiary executes and delivers to the Agent,

(a)    the Guarantee and Security Agreement or a joinder to the Guarantee and Security Agreement, in form and substance satisfactory to the Agent, pursuant to which such Subsidiary guarantees the repayment of all of the Obligations and such Subsidiary grants to the Agent, for the ratable benefit of the Secured Parties, a first priority security interest in all of its assets (subject to any Permitted Liens),

(b)    instruments and certificates constituting Collateral, duly indorsed, or with powers executed, in blank by an Authorized Signatory of such Subsidiary,

(c)    a certificate from the president, secretary, treasurer or other duly authorized officer of each of such Subsidiary attaching (A) a true and complete copy of the resolutions of its Managing Person and of all documents evidencing all necessary company action (in form and substance satisfactory to the Agent) taken by it to authorize such guaranty

and security agreement and the transactions contemplated thereby, (B) attaching a true and complete copy of its Organizational Documents, (C) setting forth the incumbency of its officer or officers or other analogous counterpart who may sign such guaranty and security agreement, including therein a signature specimen of such officer or officers and (D) attaching a certificate of good standing of the Secretary of State or similar Governmental Authority of the jurisdiction of its incorporation or formation, and

(d)     such other documents as the Agent may reasonably require in connection with the perfection of its security interests in the Property of such Subsidiary.

6.17    Compliance with Anti-Terrorism Laws, Money Laundering Laws, Etc

.

The Borrower shall not cause or permit any Affected Person to, (i) violate any Anti-Terrorism Law, (ii) engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering, (iii) use, directly or indirectly, the proceeds of any Revolving Loan, or lend, contribute or otherwise make available such proceeds to any other Person, (1) to fund any activities or business of or with any Sanctioned Person or in any Sanctioned Jurisdiction, (2) in any other manner that would result in a violation of Sanctions by any Person, or (3) in any way that would violate any Anti-Corruption Law, (iv) deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, or (v) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any prohibition set forth in any Anti-Terrorism Law.

6.18    Holding Company

.

Holdings shall not conduct, transact or otherwise engage in any material business or operations; provided, that the following shall be permitted in any event: (i) its ownership of the Stock of the Borrower or any other Subsidiary and, in each case, activities incidental thereto, (ii) the entry into, and the performance of its obligations with respect to the Loan Documents, (iii) the consummation of the Closing Date Distribution, (iv) the entry into, and the performance of its obligations with respect to seller notes in an aggregate amount not to exceed $4,000,000, (v) the payment of dividends and distributions and the making of contributions to the capital of its Subsidiaries, (vi) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees and those of its Subsidiaries), (vii) the participation in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, including compliance with Requirements of Law and legal, tax and accounting matters related thereto and activities relating to its officers, directors, managers and employees, (viii) the holding of any cash and Permitted Investments (but not operating any property), (ix) the entry into, and performance of its obligations with respect to contracts and other arrangements with officers, managers, employees, consultants, independent contractors and directors of Holdings or any of its Subsidiaries relating to their employment or directorships (including the providing of indemnification of such Persons), (x) the obtainment of, and the payment of any fees and expenses for, management, consulting, monitoring, investment banking,

advisory and other services to the extent otherwise permitted by this Agreement, (xi) any transaction between Holdings and the Borrower or any Subsidiary expressly permitted under this Article VI, (xii) maintaining deposit accounts in connection with the conduct of its business, (xiii) preparing reports to Governmental Authorities and to its shareholders, (xiv) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with any Requirement of Law and (xv) complying with any Requirement of Law and activities incidental to the foregoing.

    6.19    <u>Liquidity</u>

.

    Beginning with the month ending April 30, 2021 ~~and through and including the month ending June 30, 2022~~<u>until the Eight Amendment Effective Date</u>, the Borrower will not permit Liquidity of the Credit Parties as of the last day of each month, to be less than $7,500,000, as evidenced by delivery of a certificate pursuant to Section 5.1(g).  <u>Beginning on the Eighth Amendment Effective Date and thereafter until the Total Leverage Ratio is less than 5.00 to 1.00 as of the most recent test period for which financial statements were delivered to the Agent, the Borrower will not permit Liquidity of the Credit Parties, measured two (2) Business Days after each of the 15th and 30th day of each calendar month, commencing on July 15, 2023, to be less than $2,500,000, as evidenced by delivery of a certificate pursuant to Section 5.1(g).</u>

    <u>6.20    Contingent Acquisition Consideration Claims.</u>

    <u>No Credit Party shall use the proceeds of the Loans to pay or satisfy any settlement with respect to any Contingent Acquisition Consideration Claim without the prior written consent of the Agent.</u>

7.    [RESERVED]

8.    EVENTS OF DEFAULT

8.1    <u>Event of Default</u>

.

    The following shall each constitute an "***Event of Default***" hereunder:

    (a)    The failure of the Borrower to make any payment of principal when due and payable; or

    (b)    The failure of the Borrower to make any payment of interest or Fees, payable under any Loan Document to the Agent or the Lenders with respect to the credit facilities established hereunder within five (5) days of the date when due and payable; or

    (c)    Any representation or warranty made by any Credit Party or Holdings (or by an officer thereof on its behalf) in any Loan Document or in any certificate, report, opinion (other than an opinion of counsel) or other document delivered or to be delivered pursuant thereto, shall prove to have been incorrect or misleading (whether because of misstatement or omission) in any material respect when made; or

(d)    The failure of the Borrower to observe or perform any covenant or agreement contained in Sections 5.1 (other than with respect to Sections 5.1(g), 5.1(h) and 5.1(i)) within five (5) days of the date when due, 5.1(g), 5.1(h), 5.1(i), 5.2 (as to legal existence of the Borrower only), 5.6(a), 5.9, 5.14, 5.17, 5.18 or Section 6 (subject, in the case of Sections 6.13, 6.14  and 6.19 to the Cure Right set forth in Section 8.3); or

(e)    The failure of any Credit Party or Holdings to observe or perform any other term, covenant, or agreement contained in any Loan Document and such failure shall have continued unremedied for a period of thirty (30) days after the Borrower shall have received notice thereof from the Agent; or

(f)    Indebtedness of the Borrower (other than its obligations under this Agreement) or any other Credit Party, whether as principal, guarantor, surety or other obligor, in an aggregate amount in excess of $1,000,000 shall become or shall be declared to be due and payable prior to the expressed maturity thereof, or shall not be paid when due or within any grace period for the payment thereof, or any holder of any such obligation shall have the right to declare such obligation due and payable prior to the expressed maturity thereof or as a consequence of the occurrence or continuation of any event or condition, the Borrower or any other Credit Party has become obligated to purchase or repay any such amount of Indebtedness before its regularly scheduled maturity date *provided* that (A) this clause (f) shall not apply to (1) Indebtedness held exclusively by a Credit Party or any Affiliate of a Credit Party or secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness ~~or~~, (2) the Existing Lease Defaults or (3) Indebtedness secured by a judgment lien in respect of any Contingent Acquisition Consideration Claim (it being understood that any such Indebtedness in respect of the foregoing shall in no event constitute an Event of Default hereunder) and (B) such event is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the commitments and acceleration of the Loans hereunder; or

(g)    (i) Any termination of any franchise of a Credit Party that has or would be reasonably expected to result in a Material Adverse Effect on the Credit Parties, taken as a whole or (ii) any breach by any Credit Party of its obligations under any Franchise Agreement that results in a loss of any franchise that has or would be reasonably expected to result in a Material Adverse Effect on the Credit Parties taken as a whole; or

(h)    The Borrower or any other Credit Party or Holdings shall make an assignment for the benefit of creditors, generally not be paying its debts as such debts become due, admit in writing its inability to pay its debts as they become due, file a voluntary petition in bankruptcy, file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment of debt, liquidation or dissolution or similar relief under any present or future statute, law or regulation of any jurisdiction, petition or apply to any tribunal for any receiver, custodian or any trustee for any substantial part of its Property, be the subject of any such proceeding filed against it which remains undismissed for a period of sixty (60) days, file any answer admitting or not contesting the material allegations of any such petition filed against it or any order, judgment or decree approving such petition in any such proceeding, seek, approve, consent to, or acquiesce in any such proceeding, or in the appointment of any trustee, receiver, sequestrator, custodian, liquidator, or fiscal agent for it, or any substantial part of its Property, or an order is entered appointing any such trustee, receiver, custodian, liquidator or fiscal agent and such order remains in effect for sixty (60) days, or take any formal action for the purpose of effecting any of the foregoing or effecting the liquidation or dissolution of the Borrower or such other Credit Party or Holdings; or

(i)　　　An order for relief is entered under the United States bankruptcy laws or any other decree or order is entered by a court having jurisdiction adjudging the Borrower or any other Credit Party or Holdings bankrupt or insolvent, approving as properly filed a petition seeking reorganization, liquidation, arrangement, adjustment or composition of or in respect of the Borrower or any other Credit Party or Holdings under the United States bankruptcy laws or any other applicable law, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Borrower or any other Credit Party or Holdings or of any substantial part of the Property of any thereof, or ordering the winding up or liquidation of the affairs of the Borrower or any other Credit Party or Holdings, and any such decree or order continues unstayed and in effect for a period of sixty (60) days; or

(j)　　　Final judgments or decrees against the Borrower or any other Credit Party that are not subject to appeal aggregating in excess of $1,000,000 (to the extent not covered by a third party insurance or other indemnity) shall remain unpaid, unstayed, undischarged, unbonded, unsatisfied or undismissed for a period of thirty (30) days; provided that this clause (j) shall not apply to any judgments or decrees against the Borrower or any other Credit Party rendered in respect of Contingent Acquisition Consideration Claims (it being understood that any such judgment or decree shall not constitute an Event of Default hereunder); or

(k)　　　Any Loan Document shall cease, for any reason, to be in full force and effect, other than pursuant to its terms or as a result of the satisfaction of all obligations thereunder or the Borrower or any other Credit Party or Holdings shall so assert in writing or shall disavow any of its obligations thereunder; or

(l)　　　(i) Any ERISA Event shall occur; (ii) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA) involving any Benefit Plan; (iii) the Borrower, any other Credit Party or any ERISA Affiliate shall fail to pay when due an amount which is payable by it to the PBGC or to a Pension Plan under Title IV of ERISA; (iv) the imposition of any tax under Section 4980B(a) of the Code; (v) the assessment of a civil penalty with respect to any Benefit Plan under Section 502(c) of ERISA; or (vi) any other event or condition shall occur or exist with respect to a Benefit Plan which in the case of clauses (i) through (vi) would, individually or in the aggregate, have a Material Adverse Effect; or

(m)　　　Any Lien purported to be created under any Collateral Document shall cease to be, or shall be asserted by the Borrower, any other Credit Party or Holdings not to be, a valid and perfected Lien on any Collateral, with the priority required by the Collateral Documents other than as a result of an action taken by the Agent (or any Person acting on its behalf), the failure of the Agent to take an action within its control or to the extent covered by title insurance or other third party indemnity; or

(n)　　　The occurrence of a Change in Control;

(o)　　　Any of the subordination or similar provisions of any subordination agreement in favor of the Agent or the Lenders governing Subordinated Debt of any Credit Party shall cease, for any reason, to be in full force and effect (other than in accordance with their respective terms), or any Credit Party shall so assert in writing or shall disavow any of its obligations thereunder;

(p)　　　Failure of any Credit Party or any Subsidiary to pay when due any payment (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, and after passage of any grace period) in respect of any CARES Indebtedness or if

there is a default in one or more agreements to which a Credit Party or any Subsidiary is a party with one or more third Persons relative to a Credit Party's or any of its Subsidiaries' CARES Indebtedness, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right, that has not been waived in writing, by such third Person, irrespective of whether exercised, to accelerate the maturity of such Credit Party's or its Subsidiary's obligations thereunder; or

(q)     The Capital Call Agreement shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect, or any Person shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligations thereunder except in accordance with the terms thereof, (ii) the Borrower or Holdings shall have failed to request any required funding, investment and/or participation thereunder in accordance with the terms therein or shall have otherwise defaulted in the due performance of any term, covenant or agreement therein, or the Sponsor, its Affiliates or another institution that directly or indirectly owns equity interests in Holdings shall have failed to fund or otherwise invest or apply any proceeds when required thereby or shall have otherwise defaulted in the due performance of any term, covenant or agreement therein, (iii) any representation, warranty or statement made or deemed to be made by the Sponsor, Holdings or Borrower therein or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto shall prove untrue in any material (without duplication of any existing materiality qualifiers) respect on the date as of which it was deemed to have been made, or (iv) the occurrence of any of the types of events described in Sections 8.1(h) or (i) herein with respect to the Sponsor, it being agreed and understood that, for purposes of this clause (q), references in Sections 8.1(h) and (i) to "Credit Parties" shall be deemed to be references to the Sponsor.

8.2     Contract Remedies

.

Upon the occurrence of an Event of Default or at any time thereafter during the continuance thereof, (a) if such event is an Event of Default specified in clause (h) or (i) of Section 8.1, the Commitments shall immediately and automatically terminate and the Loans, all accrued and unpaid interest thereon and all other amounts owing under the Loan Documents shall immediately and automatically become due and payable, and the Agent may exercise any and all remedies and other rights provided in the Loan Documents, and (b) if such event is any other Event of Default, any or all of the following actions may be taken: the Agent may, by notice to the Borrower, declare the Commitments to be terminated forthwith, whereupon such Commitments shall immediately terminate, and the Agent may, by notice of default to the Borrower, declare the Loans, all accrued and unpaid interest thereon and all other amounts owing under the Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable, direct the Borrower to pay to the Agent an amount, to be held as cash security in the cash collateral account held by the Agent equal to 103% of the Letter of Credit Obligations then outstanding, and the Agent may, exercise any and all remedies and other rights provided in the Loan Documents.  Except as otherwise provided in this Section 8.2, presentment, demand, protest and all other notices of any kind are hereby expressly waived.  The Borrower hereby further expressly waives and covenants not to assert any appraisement, valuation, stay, extension, redemption or similar laws, now or at any time hereafter in force which might delay, prevent or otherwise impede the performance or enforcement of any Loan Document.  Notwithstanding the foregoing, no proceeds realized for any Guarantee or Collateral of a Credit Party who is not a Qualified ECP Guarantor shall be applied to the payment of Obligations due under Rate Contracts.

|US-DOCS\~~122553549.2~~143398915.4||

8.3     Equity Cure

.

In the event that the Borrower fails to comply with the requirements of any financial covenant set forth in Sections 6.13, 6.14 and 6.19, at any time prior to the tenth (10th) day after delivery of the Compliance Certificate after the date on which financial statements are required to be delivered with respect to the applicable Fiscal Quarter, the Borrower shall have the right to issue Permitted Cure Securities to Holdings for cash or otherwise receive cash contributions to the capital of the Borrower, and, in each case, apply the amount of the proceeds thereof to increase EBITDA and/or clause (b) in the case of the definition of "Liquidity" (as applicable) with respect to such applicable quarter and each subsequent Measurement Period that includes such Fiscal Quarter; *provided*, that for the avoidance of doubt, proceeds distributed for purposes of achieving compliance with Section 6.19 shall not result in an increase to EBITDA (the "***Cure Right***"); *provided* that

(a)     such proceeds are actually received by the Borrower no later than ten (10) days after the date on which financial statements are required to be delivered with respect to such Fiscal Quarter hereunder;

(b)     such proceeds do not exceed the aggregate amount necessary to cure (by addition to EBITDA) (the "***Cure Amount***") the Event of Default resulting from the Borrower's failure to comply with Section 6.13, 6.14 or 6.19 for such period;

(c)     the Cure Right (other than with respect to Section 6.19) shall not be exercised more than four (4) times during the term of this Agreement; and

(d)     in each period of four (4) Fiscal Quarters, there shall be at least two (2) Fiscal Quarters during which the Cure Right is not exercised.

If, after giving effect to the foregoing pro forma adjustment (but not, for the avoidance of doubt, giving pro forma effect in the Fiscal Quarter in which the Cure Right is exercised or any Measurement Period that includes such Fiscal Quarter to any repayment of Indebtedness in connection therewith), the Borrower is in compliance with the financial covenants set forth in Sections 6.13, 6.14 and 6.19, the Borrower shall be deemed to have satisfied the requirements of such Sections as of the relevant date of determination with the same effect as though there had been no failure to comply on such date, and each applicable Event of Default that had occurred shall be deemed cured for purposes of this Agreement.  The parties hereby acknowledge that this Section 8.3 may not be relied on for purposes of calculating any financial ratios other than as applicable to Sections 6.13, 6.14 and 6.19 and shall not result in any adjustment to any amounts other than the amount of the EBITDA referred to in the immediately preceding sentence or clause (b) in the case of the definition of "Liquidity" (as applicable).  If the Borrower has notified the Agent of its intent to exercise the Cure Right pursuant to this Section 8.3, the Agent will not exercise any of its rights or remedies hereunder with respect to the Borrower's compliance with Sections 6.13, 6.14 or 6.19 prior to the last day by which the Cure Amount may be delivered.

8.4     Equity Contribution.  The Borrower shall deliver to Agent confirmation that such Contingent Liquidity Equity Contribution has been received by the Borrower in accordance with the terms of the Capital Call Agreement; provided that, the Contingent Liquidity Equity Contribution shall be excluded for the purpose of calculating EBITDA, shall not increase

availability under any basket or incurrence capacity under this Agreement, shall not be included as a Cure Right, and shall not be used by any Credit Party to make any payment or distribution prohibited under this Agreement.

9.      AGENT

9.1      Appointment and Duties

.

(a)      Appointment of Agent.  Each Secured Party hereby appoints WhiteHorse (together with any successor Agent pursuant to Section 9.9) as Agent hereunder and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such other actions on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.  Each Secured Party consents to and authorizes Agent's execution and delivery of any subordination agreements from time to time as contemplated by the terms hereof on behalf of such Secured Party and agrees to be bound by the terms and provisions thereof.

(b)      Duties as Collateral and Disbursing Agent.  Without limiting the generality of clause (a) above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Secured Parties), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders and the L/C Issuers with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in Sections 8.1(f) or 8.1(g) or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in Section 8.1(f) or 8.1(g) or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Secured Parties with respect to the Credit Parties and/or the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Secured Party to act as collateral sub-agent for Agent, the Secured Parties for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Permitted Investments held by, such Secured Party, and may further authorize and direct the Secured Parties to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Secured Party hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)      Limited Duties.  Under the Loan Documents, Agent (i) is acting solely on behalf of the Secured Parties (except to the limited extent provided in Section 2.4(b) with

|US-DOCS\~~122553549.2~~143398915.4||

respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming and shall not have any actual or implied obligations, functions, responsibilities, duties, under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Secured Party or any other Person, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) and (ii) above.

9.2     **Binding Effect**

. Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken (or omitted to be taken) by Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken (or omitted to be taken) by Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

9.3     **Use of Discretion**

.

(a)     **No Action without Instructions**.  Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where expressly required by the terms of this Agreement, the Required Revolving Lenders or a greater proportion of the Lenders).

(b)     **Right Not to Follow Certain Instructions**.  Notwithstanding clause (a) above, Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against Agent or any Related Person thereof or (ii) that is, in the opinion of Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

(c)     **Exclusive Right to Enforce Rights and Remedies**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Secured Parties; provided that the foregoing shall not prohibit (i) Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) each of the L/C Issuer and the Swing Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer or Swing Lender, as the case may be) hereunder and under the other Loan Documents, (iii) the Agent from exercising setoff

rights in accordance with Section 10.11 and this Section 9.3 or (iv) any Secured Party from filing proofs of claim (and thereafter appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other debtor relief law), but in the case of this clause (iv) if, and solely if, Agent has not filed such proof of claim or other instrument of similar character in respect of the Obligations within five (5) days before the expiration of the time to file the same.

9.4     Delegation of Rights and Duties

.   Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).   Any such Person shall benefit from this Article IX to the extent provided by Agent.

9.5     Reliance and Liability

.   Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 10.9, (ii) rely on the Register to the extent set forth in Section 2.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(a)     None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Holdings, Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.   Without limiting the foregoing, Agent and its Related Persons:

(i)     shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

(ii)     shall not be responsible to any Secured Party or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)     makes no warranty or representation, and shall not be responsible, to any Secured Party or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with

respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and

(iv)     shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from Borrower or any Secured Party describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Secured Party, Holdings and Borrower hereby waives and agrees not to assert (and each of Holdings and Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

9.6     Agent Individually

.   Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Revolving Lender", "Required Lender", "Required Revolving Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include Agent or such Affiliate, as the case may be, in its individual capacity as Lender, Revolving Lender, one of the Required Lenders or one of the Required Revolving Lenders, respectively.

9.7     Lender Credit Decision

.   Each Secured Party acknowledges that it shall, independently and without reliance upon Agent, any other Secured Party or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders or L/C Issuers, Agent shall not have any duty or responsibility to provide any Secured Party with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of Agent or any of its Related Persons.

9.8     Expenses; Indemnities; Withholding
.

(a)     Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to, its rights or responsibilities under, any Loan Document.

(b)     Each Lender further agrees to indemnify Agent, each L/C Issuer and each of their respective Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (including, to the extent not indemnified pursuant to Section 9.8(c), Taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against Agent, any L/C Issuer or any of their respective Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document, any Letter of Credit or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent, any L/C Issuer or any of their respective Related Persons under or with respect to any of the foregoing; provided, that with respect to any indemnification owed to any L/C Issuer or any of its Related Persons in connection with any Letter of Credit, only Revolving Lenders shall be required to indemnify, such indemnification to be made severally and ratably based on such Revolving Lender's Commitment Percentage of the Aggregate Revolving Loan Commitment (determined as of the time the applicable indemnification is sought by such L/C Issuer or Related Person from the Revolving Lenders); provided, further, that no Lender shall be liable to Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)     To the extent required by any Requirement of Law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding Tax (including withholding Taxes imposed under Chapters 3 and 4 of Subtitle A of the Code).  If the IRS or any other Governmental Authority asserts a claim that Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding Tax with respect to a particular type of payment, or because such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding Tax ineffective, failed to maintain a Participant Register or for any other reason), or Agent reasonably determines that it was required to withhold Taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by Agent as Tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding Tax that

was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this Section 9.8(c).

9.9     Resignation of Agent or L/C Issuer

.

(a)     Agent may resign at any time by delivering notice of such resignation to the Lenders and Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this Section 9.9.  If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent.  If, after 30 days after the date of the retiring Agent's notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Each appointment under this clause (a) (other than an appointment by Agent) shall be subject to the prior consent of Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)     Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under Section 9.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

(c)     Any L/C Issuer may resign at any time by delivering notice of such resignation to Agent, effective on the date set forth in such notice or, if no such date is set forth therein, on the date such notice shall be effective.  Upon such resignation, the L/C Issuer shall remain an L/C Issuer and shall retain its rights and obligations in its capacity as such (other than any obligation to Issue Letters of Credit but including the right to receive fees or to have Lenders participate in any L/C Reimbursement Obligation thereof) with respect to Letters of Credit Issued by such L/C Issuer on or prior to the date of such resignation and shall otherwise be discharged from all other duties and obligations under the Loan Documents.

9.10     Release of Collateral or Guarantors

.  Each Secured Party hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)     any Subsidiary of Borrower from its guaranty of any Obligation if all of the Stock of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to Section 5.13 or otherwise upon consummation of a transaction permitted by this Agreement following which such Person is not a Subsidiary of the Borrower; and

(b)      any Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to Section 5.13 after giving effect to such transaction have been granted and (ii) all of the Collateral and all Credit Parties, upon (A) the occurrence of the Facility Termination Date and (B) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance reasonably acceptable to Agent.

Each Secured Party hereby directs Agent, and Agent hereby agrees, upon receipt of reasonable advance notice from Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary at Borrower's expense to release the guaranties and Liens when and as directed in this Section 9.10.  The Agent shall be entitled to rely exclusively on an officer's certificate from the Borrower certifying that any such transaction is permitted by the Loan Documents.

9.11    Additional Secured Parties

. The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender or L/C Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to Agent) (i) this Article IX, Section 10.3, Section 10.9, Section 10.10, Section 10.11, Section 10.15, Section 10.16, Section 10.17, Section 10.20, Section 10.23 and Section 11.1 (and, solely with respect to L/C Issuers, Section 2.1(c)) (ii) all terms and provisions contained herein applicable to Secured Swap Providers or Secured Cash Management Banks, as applicable, and (iii) decisions and actions of Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 9.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of Agent, the Lenders and the L/C Issuers party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

9.12    Lead Arranger

**.** Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Lead Arranger (the "**Lead Arranger**") shall not have any duties or responsibilities, nor shall the Lead Arranger have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Lead Arranger.

9.13    Credit Bid

. Each of the Lenders hereby irrevocably authorizes (and by entering into a Secured Rate Contract or Secured Cash Management Agreement, each Secured Swap Provider or Secured Cash Management Bank hereby authorizes and shall be deemed to authorize) Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a)    consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of the Bankruptcy Code, including Section 363 thereof;

(b)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 thereof;

(c)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC;

(d)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure or other Disposition conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)    estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party;

it being understood that no Lender shall be required to fund any amount (other than by means of offset) in connection with any purchase of all or any portion of the Collateral by Agent pursuant to the foregoing clauses (b), (c) or (d) without its prior written consent.

Each Secured Party agrees that Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion the Collateral; *provided* that, in connection with any credit bid or purchase described under clauses (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) may be, and shall be, credit bid by Agent on a ratable basis.

With respect to each contingent or unliquidated claim that is an Obligation, Agent is hereby authorized, but is not required, to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph so long as the estimation of the amount or liquidation of such claim would not unduly delay the ability of Agent to credit bid the Obligations or purchase the Collateral in the relevant Disposition. In the event that Agent, in its sole and absolute discretion, elects not to estimate any such contingent or unliquidated claim or any such claim cannot be estimated without unduly delaying the ability of Agent to consummate any credit bid or purchase in accordance with the second preceding paragraph, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid,

and shall not be entitled to any interest in the portion or the entirety of the Collateral purchased by means of such credit bid.

Each Secured Party whose Obligations are credit bid under clauses (b), (c) or (d) of the third preceding paragraph shall be entitled to receive interests in the Collateral or any other asset acquired in connection with such credit bid (or in the Stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (x) the amount of the Obligations of such Secured Party that were credit bid in such credit bid or other Disposition, by (y) the aggregate amount of all Obligations that were credit bid in such credit bid or other Disposition.

9.14    Erroneous Payments

. Each of the Lenders hereby irrevocably authorizes (and by entering into a Secured Rate Contract or Secured Cash Management Agreement, each Secured Swap Provider or Secured Cash Management Bank hereby authorizes and shall be deemed to authorize) Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a) Each Lender and each L/C Issuer hereby agrees that (i) if the Agent notifies such Lender or L/C Issuer that the Agent has determined in its sole discretion that any funds received by such Lender or L/C Issuer from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender or L/C Issuer (whether or not known to such Lender or L/C Issuer)  (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Lender or L/C Issuer shall promptly, but in no event later than one Business Day thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender or L/C Issuer to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender or L/C Issuer shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.  A notice of the Agent to any Lender or any L/C Issuer under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), each Lender and each L/C Issuer hereby further agrees that if it receives an Erroneous Payment from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "**Erroneous Payment Notice**"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender or L/C Issuer otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender or L/C Issuer shall not assert any right or claim to the Erroneous Payment, and

hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.  Each Lender and each L/C Issuer agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Agent of such occurrence and, upon demand from the Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender or L/C Issuer to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)     The Borrower and each other Credit Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender or L/C Issuer that has received such Erroneous Payment (or portion thereof) for any reason, the Agent shall be subrogated to all the rights of such Lender or L/C Issuer with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party; provided that, to the extent that such Erroneous Payment was made with funds received from the Borrower or its Subsidiaries, this clause (c) shall only be applicable if the amount of such funds is returned to the Borrower.

(d)     Each party's obligations under this Section 9.14 shall survive the resignation or replacement of the Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

<h2 style="text-align:center">10.     MISCELLANEOUS</h2>

### 10.1     Amendments and Waivers

.

(a)     Amendments Generally. Subject to the provisions of Section 10.1(e), (f), and (g) hereof, no amendment or waiver of, or supplement or other modification (which shall include any direction to Agent pursuant) to, any Loan Document (other than the Fee Letter Agreement, any Control Agreement, any mortgage, or any letter of credit reimbursement or similar agreement or any landlord, bailee or mortgagee agreement) or any provision thereof, and no consent with respect to any departure by any Credit Party from any such Loan Documents, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent with the consent of the Required Lenders), and Borrower, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, supplement (including any additional Loan Document) or consent shall, unless in writing and signed by all the Lenders directly and adversely affected thereby (or by Agent with the consent of all the Lenders directly and adversely affected thereby), in addition to the Required Lenders (or by Agent with the consent of the Required Lenders) and Borrower, do any of the following:

(i)     increase or extend the Commitment of such Lender (or reinstate any Commitment terminated pursuant to Section 8.2(a));

|US-DOCS\~~122553549.2~~143398915.4||

(ii)   postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest (other than default rate interest, which may be postponed, delayed, reduced or waived by the Required Lenders), fees or other amounts (other than principal) due to the Lenders (or any of them) or L/C Issuer hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 2.8 (other than scheduled installments under Section 2.8(a)) may be postponed, delayed, reduced, waived or modified with the consent of Required Lenders);

(iii)   reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of Required Lenders) or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document, including L/C Reimbursement Obligations;

(iv)   (A) change or have the effect of changing the priority or pro rata treatment of any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement or otherwise, of new loans or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Obligations or otherwise), or (B) advance the date fixed for, or increase, any scheduled installment of principal due to any of the Lenders under any Loan Document;

(v)   change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(vi)   amend this Section 10.1 (other than Section 10.1(c)) or, subject to the terms of this Agreement, the definition of Required Lenders, the definition of Required Revolving Lenders or any provision providing for consent or other action by all Lenders;

(vii)   release all or substantially all of the Guarantors from their respective Obligations under the Loan Documents, or release all or substantially all of the Collateral, in each case, except as otherwise may be provided in this Agreement or the other Loan Documents, except as otherwise may be provided in this Agreement or the other Loan Documents; or

(viii)   subordinate Agent's lien in respect of all, or substantially all of the Collateral;

it being agreed that (X) all Lenders shall be deemed to be directly and adversely affected by an amendment, waiver or supplement described in the preceding clauses (iv)(B), (v), (vi), (vii) or (viii) and (Y) notwithstanding the preceding clause (X), only those Lenders that have not been provided a reasonable opportunity, as determined in the good faith judgment of Agent, to receive the most-favorable treatment under or in connection with the applicable amendment, waiver or supplement described in the preceding clause (iv) (other than the right to receive customary administrative agency, arranging, underwriting and other similar fees) that is provided to any other Person, including the opportunity to participate on a pro rata basis on the same terms in any new loans or other Indebtedness permitted to be issued as a result of such amendment, waiver or

supplement, shall be deemed to be directly and adversely affected by such amendment, waiver or supplement.

(b) <u>Agent, Swing Lender and L/C Issuer</u>. No amendment, waiver or consent shall, unless in writing and signed by Agent, the Swing Lender or the L/C Issuer, as the case may be, in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by Agent with the consent of the Required Lenders or all the Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent, the Swing Lender or the L/C Issuer, as applicable, under this Agreement or any other Loan Document.  No amendment, modification or waiver of this Agreement or any Loan Document altering the ratable treatment of Secured Rate Contract Obligations or Secured Cash Management Obligations resulting in such Secured Rate Contract Obligations or Secured Cash Management Obligations being junior in right of payment to principal on the Loans or resulting in such Secured Rate Contract Obligations or Secured Cash Management Obligations becoming unsecured (other than releases of Liens permitted in accordance with the terms hereof), in each case in a manner adverse to any Secured Swap Provider or Secured Cash Management Bank, shall be effective without the written consent of such Secured Swap Provider or Secured Cash Management Bank, as the case may be.

(c) <u>Required Revolving Lenders</u>. No amendment or waiver shall, unless signed by Required Revolving Lenders (or by Agent with the consent of the Required Revolving Lenders) in addition to the Required Lenders (or by Agent with the consent of the Required Lenders) and Borrower: (i) amend or waive compliance with the conditions precedent to the obligations of Lenders to make any Revolving Loan (or of any L/C Issuer to Issue any Letter of Credit) in Section 3.2; or (ii) waive any Default or Event of Default for the purpose of satisfying the conditions precedent to the obligations of Lenders to make any Revolving Loan (or of any L/C Issuer to Issue any Letter of Credit) in Section 3.2.  No amendment shall: (x) amend or waive this Section 10.1(c) or the definitions of the terms used in this Section 10.1(c) insofar as the definitions affect the substance of this Section 10.1(c); (y) change the definition of the term Required Revolving Lenders; or (z) change the percentage of Lenders which shall be required for Revolving Lenders to take any action hereunder, in each case, without the consent of all Revolving Lenders.

(d) Without limitation of the provisions of the preceding clause (a), (i) no amendment, waiver or other modification to this Agreement shall, unless signed by the Required Closing Date Delayed Draw Term Lenders, (i) make less restrictive the calculation of the Closing Date Delayed Draw Term Loan Limit; (ii) change the definition of the term Required Closing Date Delayed Draw Term Lenders or the percentage of Lenders which shall be required for Required Closing Date Delayed Draw Term Lenders to take any action hereunder; (iii) waive any existing Event of Default or Default for purposes of satisfying the conditions to funding set forth in Section 3.2 with respect to any requested Closing Date Delayed Draw Term Loans; or (iv) amend, waive or otherwise modify this Section 10.1(d) or the definitions of the terms used in this Section 10.1(d) insofar as the definitions affect the substance of this Section 10.1(d) and (ii) no amendment, waiver or other modification to this Agreement shall, unless signed by the Required First Amendment Delayed Draw Term Lenders, (i) make less restrictive the calculation of the First Amendment Delayed Draw Term Loan Limit; (ii) change the definition of the term Required First Amendment Delayed Draw Term Lenders or the percentage of Lenders which shall be required for Required First Amendment Delayed Draw Term Lenders to take any action hereunder; (iii) waive any existing Event of Default or Default for purposes of satisfying the conditions to funding set forth in Section 3.2 with respect to any requested First Amendment Delayed Draw Term Loans; or (iv) amend, waive or otherwise modify this Section 10.1(d) or the definitions of the terms used in this Section 10.1(d) insofar as the definitions affect the substance of this Section 10.1(d)

(e)     Additional Credit Facilities. This Agreement may be amended with the written consent of Agent, Borrower and the Required Lenders to (i) add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the outstanding principal and accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Loans and the accrued interest and fees in respect thereof and (ii) include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(f)     Schedules; Corrections; Liens. Notwithstanding anything to the contrary contained in this Section 10.1, (i) Borrower may amend Schedules 4.19 and 4.20 upon notice to Agent, (ii) Agent may amend Schedules 2.1(a), 2.1(b) and 2.1(c) to reflect Sales entered into pursuant to Section 10.9, (iii) Agent and Borrower may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein, (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional Property for the benefit of the Secured Parties or join additional Persons as Credit Parties and (3) to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the Revolving Loans and the accrued interest and fees in respect thereof and to include appropriately the Lenders holding such credit facilities in any determination of the Required Revolving Lenders and Required Lenders; and (iv) Agent and Borrower may amend or modify this Agreement or any other Loan Document to reflect any conforming amendments permitted under Section 6.13.

(g)     Certain other Loan Documents.  The Fee Letter Agreement, any Control Agreement, any mortgage, any letter of credit reimbursement or similar agreement or any landlord, bailee or mortgagee agreement may be amended as provided therein and if not provided therein, by each of the parties thereto.

10.2    Notices

.

(a)     Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to Syndtrak® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.syndtrak.com or using such other means of posting to Syndtrak® as may be available and reasonably acceptable to Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of Borrower, and Agent and the Swing Lender, to the other parties hereto and (B) in the case of all other parties, to Borrower and Agent.  Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Borrower, and (z) if receipt of such transmission is acknowledged by Agent.

(b)     Effectiveness.

|US-DOCS\~~122553549.2~~143398915.4||

(i)      All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; provided, however, that no communications to Agent pursuant to Article II shall be effective until received by Agent.

(ii)      The posting, completion and/or submission by any Credit Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Credit Parties that any representation, warranty, certification or other similar statement required by the Loan Documents to be provided, given or made by a Credit Party in connection with any such communication is true, correct and complete except as expressly noted in such communication or E-System.

(c)      Each Lender shall notify Agent in writing on or around the Closing Date of the address to which notices to such Lender should be directed, of addresses of its Lending Office and of payment instructions in respect of all payments to be made to it hereunder and thereafter, of any changes to the foregoing and such other administrative information as Agent shall reasonably request.

10.3     Electronic Transmissions

.

(a)      Authorization.  Subject to the provisions of Section 10.2(a), each of Agent, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein. Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)      Signatures.  Subject to the provisions of Section 10.2(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each other Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and

purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)     Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 10.2 and this Section 10.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d)     LIMITATION OF LIABILITY.     ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".   NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.  Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

10.4     No Waiver; Cumulative Remedies

. No failure to exercise and no delay in exercising, on the part of Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

10.5     Costs and Expenses

. Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.  In addition, Borrower agrees to pay or reimburse upon demand (a) Agent for all reasonable out-of-pocket costs and expenses incurred by it or any of its Related Persons in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of

Agent, the cost of environmental audits, syndication, distribution, Collateral audits and appraisals, background checks and similar expenses, to the extent permitted hereunder, (b) Agent for all reasonable costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent for its examiners), (c) each of Agent, its Related Persons, and L/C Issuer for all costs and expenses incurred in connection with (i) the creation, perfection and maintenance of the perfection of Agent's Liens upon the Collateral, including Lien search, filing and recording fees, (ii) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" in any insolvency or bankruptcy proceeding or otherwise and whether or not consummated, (iii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or any attempt to inspect, verify, protect, insure, collect, sell, liquidate or otherwise dispose of any Collateral or (iv) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation or the Closing Date Distribution, including Attorney Costs, (d) the cost of purchasing insurance that the Credit Parties fail to obtain as required by the Loan Documents and (e) fees and disbursements of Attorney Costs of one law firm on behalf of all Lenders (other than Agent) incurred in connection with any of the matters referred to in clause (c) above.

10.6    Indemnity

.

(a)      Each Credit Party agrees to indemnify, hold harmless and defend Agent, each Lender, each L/C Issuer and each of their respective Related Persons (each such Person being an "**Indemnitee**") from and against all Liabilities (including Attorneys' Costs, brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person) in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), any Letter of Credit, the use or intended use of the proceeds of any Loan or the use of any Letter of Credit or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Target, any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including Attorneys' Costs in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "**Indemnified Matters**"); provided, however, that no Credit Party shall have any liability under this Section 10.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), (a) to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Indemnitee, as

determined by a court of competent jurisdiction in a final non-appealable judgment or order or (b) such Indemnitee is in material breach of its duties hereafter.  Furthermore, Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.  This Section 10.6(a) shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.

(b)      Without limiting the foregoing, "**Indemnified Matters**" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any Property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Substances on, upon or into such Property or natural resource or any Property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

10.7      Marshaling; Payments Set Aside

. No Secured Party shall be under any obligation to marshal any Property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

10.8      Successors and Assigns

. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 10.9, and provided further that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender. For the avoidance of doubt, no Credit Party may undergo a "Division" or any other similar conversion or process, except pursuant to the terms of Section 1.6 and this Section 10.8. If any Credit Party becomes a "Dividing Company", each resulting "Division Company" of such Credit Party shall be a successor in interest to such Credit Party and automatically become a party to the Loan Documents, in the same capacity as such Credit Party and subject to the same rights and obligations of such Credit Party; provided that, if any Borrower becomes a "Dividing Company", each resulting "Division Company" of such Borrower, in addition to being subject to the provisions of the immediately preceding clause, shall also automatically become a party to the Loan Documents as a Guarantor. For the purposes of this Section 10.8, the terms "Division", "Division Company", and "Dividing Company" shall

have the meanings assigned to such terms in Section 18-217 of Title 6 of the Delaware Code or any other similar terms in the applicable statute(s) of any other jurisdiction, as applicable.

10.9    Binding Effect; Assignments and Participations

.

(a)    Binding Effect.  This Agreement shall become effective when it shall have been executed by Holdings, Borrower, the other Credit Parties signatory hereto and Agent and when Agent shall have been notified by each Lender that such Lender has executed it. Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Holdings, Borrower, the other Credit Parties hereto (in each case except for Article VIII), Agent, each Lender and each L/C Issuer receiving the benefits of the Loan Documents and, to the extent provided in Section 9.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in Section 9.9), none of Holdings, Borrower, any other Credit Party, any L/C Issuer or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)    Right to Assign.  Each Lender may sell, transfer, negotiate or assign (a "**Sale**") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans and Letters of Credit) to:

(i)    any existing Lender (other than a Defaulting Lender);

(ii)    any Affiliate or Approved Fund of any existing Lender (other than a natural Person or a Defaulting Lender);

(iii)    reserved; or

(iv)    any other Person (other than a natural Person, a Defaulting Lender or Borrower or any of Borrower's Affiliates or Subsidiaries) who is an "accredited investor" (as defined in Regulation D of the Securities Act of 1933) acceptable (which acceptances shall not be unreasonably withheld or delayed) to Agent and, as long as no Event of Default under Sections 8.1(a), (b), (h) or (i) is continuing, Borrower, and, in the case of any Sale of a Revolving Loan, Letter of Credit or Revolving Loan Commitment, each L/C Issuer that is a Lender (which acceptances of L/C Issuer and Borrower shall be deemed to have been given unless an objection is delivered to Agent within five (5) Business Days after notice of a proposed Sale is delivered to the L/C Issuer and Borrower, as applicable). Notwithstanding any provision herein to the contrary:

(A)    such Sales do not have to be ratable between the Revolving Loan and Term Loans but must be ratable among the obligations owing to and owed by such Lender with respect to the Revolving Loans or a Term Loan;

(B)    for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans, Commitments and Letter of Credit Obligations subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of Borrower (to the extent Borrower's consent is otherwise required) and Agent;

(C)      interest accrued, other than any interest that is payable-in-kind, prior to and through the date of any such Sale may not be assigned;

(D)      such Sales by Lenders who are Defaulting Lenders due to clause (a) of the definition of Defaulting Lender shall be subject to Agent's prior written consent in all instances, unless in connection with such sale, such Defaulting Lender cures, or causes the cure of, its Defaulting Lender status as contemplated in Section 2.11(e)(v); and

(E)      such Sales shall not be to a Disqualified Institution.

Agent's refusal to accept a Sale to a Credit Party, a Subsidiary of a Credit Party or a Person that would be a Defaulting Lender, or the imposition of conditions or limitations (including limitations on voting) upon Sales to such Persons, shall not be deemed to be unreasonable.  In the event of any purported assignment or transfer by a Lender of its rights or obligations under this Agreement and the other Loan Documents to any Affiliate of Borrower (other than Holdings or any of its Subsidiaries) that does not comply with the terms hereof, Borrower shall, within ten (10) Business Days cause the applicable Affiliate to contribute such Term Loans to the common equity of Borrower (which such Term Loans and all rights and obligations as a Term Lender related thereto, immediately and automatically, without any further action on the part of Borrower, any Lender, Agent or any other Person, upon such contribution shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect and Borrower shall neither obtain nor have any rights as a Lender hereunder or under the other Loan Documents by virtue of such assignment).  Any Loan acquired by Holdings or any Subsidiary thereof shall immediately upon such acquisition be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect. Any purported assignment or transfer by a Lender of its rights or obligations under this Agreement and the other Loan Documents to any Person not Affiliated with Borrower that does not comply with the terms hereof shall be treated for purposes of this Agreement as a sale by such Lender of a participation of such rights and obligations in accordance with Section 10.9(f), provided that such treatment shall not relieve any assigning Lender from any Liabilities arising as a consequence of its breach of this Agreement.

(c)      <u>Procedure</u>.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent), any Tax forms required to be delivered pursuant to Section 11.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided that (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent).  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iv) of Section 10.9(b), upon Agent (and, if applicable, Borrower and L/C Issuer) consenting to such Assignment, from and after the effective

date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)      Effectiveness.  Subject to the recording of an Assignment by Agent in the Register pursuant to Section 2.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)      Grant of Security Interests.  In addition to the other rights provided in this Section 10.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)      Participants and SPVs.  In addition to the other rights provided in this Section 10.9, each Lender may, (x) with notice to Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from Agent or Borrower, sell participations to one or more Persons (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or Borrower or any of Borrower's Affiliates or Subsidiaries) in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Term Loans, Revolving Loans and Letters of Credit); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article XI, but, with respect to Section 11.1, only to the extent such participant or SPV delivers the Tax forms such Lender is required to collect pursuant to Section 11.1(h) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation except to the extent such entitlement to receive a greater amount results from any change in, or in the interpretation of, any Requirement of Law

that occurs after the date such grant or participation is made (and in consideration of the foregoing, each such Participant and SPV shall be deemed to have acknowledged and agreed to be bound by the provisions of Section 10.20) and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of Section 10.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vii) of Section 10.1(a).  No party hereto shall institute (and Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to be reimbursed by such SPV for any such Liability).  The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person other than Agent except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Agent shall have no responsibility for maintaining a Participant Register.

> 10.10   Non-Public Information; Confidentiality.

> > (a)      Non-Public Information.

> > > (i)      Distribution of Materials to Lenders and L/C Issuers.  The Credit Parties acknowledge and agree that (A) the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "**Borrower Materials**") may be disseminated by, or on behalf of, Agent, and made available, to the Lenders and the L/C Issuers by posting such Borrower Materials on an E-System; and (B) certain of the

Lenders (each a "**Public Lender**") may have personnel who do not wish to receive material non-public information ("**MNPI**") with respect to the Holdings or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Credit Parties authorize Agent to download copies of their logos from its website and post copies thereof on an E-System.

(ii)     Material Non-Public Information.   The Credit Parties hereby agree that they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (A) identify in writing, and (B) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of United States federal and state securities laws as "PUBLIC". The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent, the Lenders and the L/C Issuers shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of United States federal and state securities laws. The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (I) the Loan Documents, including the schedules and exhibits attached thereto, and (II) administrative materials of a customary nature prepared by the Credit Parties or Agent (including, Notices of Borrowing, Notices of Conversion/Continuation, L/C Requests, Swingline Requests and any similar requests or notices posted on or through an E-System). Before distribution of Borrower Materials, the Credit Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

(iii)     Each of Agent, each Lender and each L/C Issuer acknowledges and agrees that it may receive MNPI hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state securities laws and regulations).   Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Parent or its securities for purposes of United States Federal or state securities laws.

(b)     Confidential Information.   Each of Agent, each Lender and each L/C Issuer agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with Borrower's consent, (ii) to Related Persons of such Lender, L/C Issuer or Agent, as the case may be, or to any Person that any L/C Issuer causes to Issue Letters of Credit hereunder, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than

as a result of a breach of this Section 10.10 or (B) available to or in the possession of such Lender, L/C Issuer or Agent or any of their Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority or any other regulatory or self-regulatory authority having jurisdiction over such Person or its Affiliates, (v) to the extent necessary or customary for inclusion in league table measurements, (vi)(A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees, SPVs (including the investors or prospective investors therein), participants or any Eligible Assignee invited to be an Additional Lender, direct or contractual counterparties to any Secured Rate Contracts and Secured Cash Management Agreements and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto, and (ix) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender, L/C Issuer, Secured Swap Provider, Secured Cash Management Bank or Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender, L/C Issuer, Secured Swap Provider, Secured Cash Management Bank or Agent or any of their Related Persons.  In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 10.10 shall govern.

(c)      Tombstones.  Each Credit Party consents to the publication by Agent or any Lender of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark. Agent or such Lender shall provide a draft of any such press release, advertising or other promotional material to Borrower for review and comment prior to the publication thereof.

(d)      Press Release and Related Matters.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party) using the name, logo or otherwise referring to WhiteHorse or of any of its Affiliates, the Loan Documents or any transaction contemplated herein or therein to which WhiteHorse or any of its Affiliates is party without the prior written consent of WhiteHorse or such Affiliate except to the extent required to do so under applicable Requirements of Law and then, only after consulting with WhiteHorse or such Affiliate.

10.11   Set-off; Sharing of Payments

.

(a)      Right of Setoff.  Each of Agent, each Lender, each L/C Issuer and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or

special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender, such L/C Issuer or any of their respective Affiliates to or for the credit or the account of Borrower or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured.  No Lender or L/C Issuer shall exercise any such right of setoff without the prior consent of Agent or Required Lenders.  Each of Agent, each Lender and each L/C Issuer agrees promptly to notify Borrower and Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 10.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Lenders, the L/C Issuer, their Affiliates and the other Secured Parties, may have.

(b)     Sharing of Payments, Etc.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) (and other than pursuant to Section 10.9, Section 10.20, or Article XI) and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of Borrower, applied to repay the Obligations in accordance herewith); provided, however, that (i) if such payment is rescinded or otherwise recovered from such Lender or L/C Issuer in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender or L/C Issuer without interest and (ii) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.  If a Defaulting Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in Section 2.11(e).

10.12   Counterparts; Facsimile Signature

.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

10.13   Severability; Captions; Independence of Provisions

.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder. The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different

limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

10.14    Interpretation

.   **This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or Agent merely because of Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 10.18 and 10.19.**

10.15    No Third Parties Benefited

.  This Agreement is made and entered into for the sole protection and legal benefit of Borrower, the Lenders, the L/C Issuers party hereto**,** Agent and, subject to the provisions of Section 9.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents. Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

10.16    Governing Law and Jurisdiction

.

(a)    Governing Law.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

(b)    Submission to Jurisdiction.  Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America sitting in the Southern District of New York and, by execution and delivery of this Agreement, Borrower and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided that nothing in this Agreement shall limit the right of Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents.  The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process.  Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding

brought in the United States with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)     Non-Exclusive Jurisdiction.  Nothing contained in this Section 10.16 shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

10.17   Waiver of Jury Trial

. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.   THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE. EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO RELATED PERSON OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS, AS APPLICABLE, BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.18   Entire Agreement; Release; Survival

.

(a)     THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY L/C ISSUER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT OTHER THAN THE FEE LETTER AGREEMENT. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENTS OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)     Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.   In no event shall any

Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)      Any indemnification or other protection provided to any Indemnitee pursuant to this Section 10.18, Sections 10.5 (Costs and Expenses), and 10.6 (Indemnity), and Article IX (Agent) and, with the exception of Section 11.1 (Taxes), Article XI (Taxes, Yield Protection and Illegality) shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to clause (i) above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

10.19   USA Patriot Act

. Each Lender that is subject to the USA Patriot Act (and Agent (for itself and not on behalf of any Lender)) hereby notifies the Credit Parties that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or Agent to identify each Credit Party in accordance with the USA Patriot Act.

10.20   Replacement of Lender

. Within forty-five days after: (i) receipt by Borrower of written notice and demand from (A) any Lender (an "**Affected Lender**") for payment of additional costs as provided in Sections 11.1, 11.3 and/or 10.6 or that has become a Defaulting Lender or (B) any SPV or participant (an "**Affected SPV/Participant**") for payment of additional costs as provided in Section 10.9(f), unless the option or participation of such Affected SPV/Participant shall have been terminated prior to the exercise by Borrower of their rights hereunder; or (ii) any failure by any Lender (other than Agent or an Affiliate of Agent) to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender (or each Lender directly affected thereby, as applicable) is required with respect thereto, Borrower may, at its option, notify (A) in the case of clause (i)(A) or (ii) above, Agent and such Affected Lender (or such non-consenting Lender) of Borrower's intention to obtain, at Borrower's expense, a replacement Lender ("**Replacement Lender**") for such Affected Lender (or such non-consenting Lender), or (B) in the case of clause (i)(B) above, Agent, such Affected SPV/Participant, if known, and the applicable Lender (such Lender, a "**Participating Lender**") that (1) granted to such Affected SPV/Participant the option to make all or any part of any Loan that such Participating Lender would otherwise be required to make hereunder or (2) sold to such Affected SPV/Participant a participation in or to all or a portion of its rights and obligations under the Loan Documents, of Borrower's intention to obtain, at Borrower's expense, a Replacement Lender for such Participating Lender, in each case, which Replacement Lender shall be reasonably satisfactory to Agent; provided, however, that in the case of any such assignment resulting from a claim for compensation under Section 11.3 or payments required to be made pursuant to Section 11.1, the replacement of the Lender with the Replacement Lender will result in a reduction in such compensation or payments thereafter. In the event Borrower obtains a Replacement Lender within forty-five (45) days following notice of its intention to do so, the Affected Lender (or such

non-consenting Lender) or Participating Lender, as the case may be, shall sell and assign its Loans and Commitments to such Replacement Lender, at par, provided that Borrower have reimbursed such Affected Lender or Affected SPV/Participant, as applicable, for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment, and in the case of a Participating Lender being replaced by a Replacement Lender, (x) all right, title and interest in and to the Obligations and Commitments so assigned to the Replacement Lender shall be assigned free and clear of all Liens or other claims (including pursuant to the underlying option or participation granted or sold to the Affected SPV/Participant, but without affecting any rights, if any, of the Affected SPV/Participant to the proceeds constituting the purchase price thereof) of the Affected SPV/Participant, and (y) to the extent required by the underlying option or participation documentation, such Participating Lender shall apply all or a portion of the proceeds received by it as a result of such assignment, as applicable, to terminate in full the option or participation of such Affected SPV/Participant. In the event that a replaced Lender does not execute an Assignment pursuant to Section 10.9 within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 10.20 and presentation to such replaced Lender of an Assignment evidencing an assignment pursuant to this Section 10.20, Borrower shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by Borrower, the Replacement Lender and Agent, shall be effective for purposes of this Section 10.20 and Section 10.9.  Notwithstanding the foregoing, with respect to a Lender that is a Defaulting Lender, Agent may, but shall not be obligated to, obtain a Replacement Lender and execute an Assignment on behalf of such Defaulting Lender at any time with three (3) Business Days' prior notice to such Lender (unless notice is not practicable under the circumstances) and cause such Lender's Loans and Commitments to be sold and assigned, in whole or in part, at par.  Upon any such assignment and payment and compliance with the other provisions of Section 10.9, such replaced Lender shall no longer constitute a "**Lender**" for purposes hereof; provided, any rights of such replaced Lender to indemnification hereunder shall survive.

10.21    Joint and Several

. The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.

10.22    Creditor-Debtor Relationship

. The relationship between Agent, each Lender and the L/C Issuer, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor.  No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

10.23    Keepwell

. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its payment obligations under the Subsidiary Guaranty Agreement in respect of Swap Obligations under any Secured Rate Contract (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.23 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.23, or otherwise under the Subsidiary Guaranty Agreement, voidable under

applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 10.23 shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Secured Rate Contract have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement. Each Qualified ECP Guarantor intends that this Section 10.23 constitute, and this Section 10.23 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

10.24    Secured Swap Providers and Secured Cash Management Banks

.    No Secured Swap Provider or Secured Cash Management Bank that obtains the benefits of the Collateral Documents or any Collateral or guaranty by virtue of the provisions hereof or of any other Loan Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral or guaranty (including the release or impairment of any Collateral or guaranty) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article X to the contrary, the Agent shall not be required to verify the existence, amount or payment of any Secured Swap Obligations or Secured Cash Management Obligations.  Upon the request of Agent, each Secured Swap Provider and Secured Cash Management Bank will promptly provide Agent with such information and supporting documentation with respect to its Secured Rate Contract Obligations and Secured Cash Management Obligations as Agent shall request, including the amounts (contingent and/or due and payable) thereof.

10.25    Special Oregon Statute of Frauds Provision

.    **UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY US CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY US TO BE ENFORCEABLE.**

11.    TAXES, YIELD PROTECTION AND ILLEGALITY

11.1    Taxes

.

(a)    Except as required by a Requirement of Law, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or other Liabilities) with respect thereto (collectively, "**Taxes**").

(b)    If any Taxes shall be required by any Requirement of Law (as determined in the good faith discretion of the relevant Credit Party or Agent, as applicable) to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) if such Tax is an Indemnified Tax, such amount payable shall be increased as necessary to ensure that, after all required deductions for Indemnified Taxes are made (including

deductions applicable to any increases to any amount under this Section 11.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Credit Party shall deliver to Agent an original or certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of payment reasonably satisfactory to Agent.

(c)       In addition, the Borrower agrees to pay, and authorize Agent to pay in its name, any Other Taxes.  The Swing Lender may, upon request of the Borrower, by making funds available to Agent in the amount equal to any such payment, make a Swing Loan to Borrower in such amount, the proceeds of which shall be used by Agent in whole to make such payment. Within 30 days after the date of any payment of Other Taxes by any Credit Party, Borrower shall furnish to Agent, at its address referred to in Section 10.2, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Agent.

(d)       [Reserved].

(e)       Without duplication of any other amounts paid under this Section 11.1, the Borrower shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Indemnified Taxes (including any Indemnified Taxes imposed by any jurisdiction on amounts payable under this Section 11.1) paid or payable by such Secured Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this clause (e), setting forth the amounts to be paid thereunder and delivered to Borrower with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error.

(f)       Each Lender shall severally indemnify Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.9(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to the Lender from any other source against any amount due to Agent under this Section 11.1(f).

(g)       Any Lender claiming any additional amounts payable pursuant to this Section 11.1 or Section 11.3 shall (at the request of the Borrower) use reasonable efforts (consistent with Requirements of Law) to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates if, in the judgment of such Lender, such a change (i) would eliminate or reduce any such additional amounts (or any similar amount that may thereafter accrue), and (ii) would not subject such Lender to any unreimbursed cost or expense and would not be otherwise disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(h)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and Agent, at the time or times reasonably requested by the Borrower or Agent, such properly completed and executed documentation reasonably requested by the Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or Agent, shall deliver such other documentation prescribed by any Requirement of Law or reasonably requested by the Borrower or Agent as will enable the Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 11.1(h)(ii)(A), (B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing:

(A)     Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from or reduction of U.S. withholding Tax or, after a change in any Requirement of Law, is subject to such withholding Tax at a reduced rate under an applicable Tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by is pursuant to this clause and (z) from time to time if requested by Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed copies of each of the following, as applicable:  (A) Forms W-8ECI (claiming exemption from U.S. withholding Tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (claiming exemption from, or a reduction of, U.S. withholding Tax) or any successor form and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN or W-8BEN-E (claiming exemption from U.S. withholding Tax) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding Tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents. Unless Borrower and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding Tax or are subject to such Tax at a rate reduced by an applicable Tax treaty, the Credit Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(B)     Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which

any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause and (D) from time to time if requested by Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed copies of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding Tax) or any successor form.

(C)    Each Lender having sold a participation in any of its Obligations or identified an SPV as such to Agent shall collect from such participant or SPV the documents required to be provided pursuant to this Section 11.1(h) and provide them to Agent.

(D)    If a payment made to a Non-U.S. Lender Party would be subject to U.S. federal withholding Tax imposed by FATCA if such Non-U.S. Lender Party fails to comply with the applicable reporting requirements of FATCA, such Non-U.S. Lender Party shall deliver to Agent and Borrower either (i) at the time or times prescribed by any Requirement of Law or (ii) at such time or times reasonably requested by the Borrower or Agent, such documentation prescribed by Requirement of Law or reasonably requested by Agent or Borrower as may be necessary for Agent or Borrower to comply with their obligations under FATCA and to determine that such Non-U.S. Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for the purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    If any Secured Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 11.1 (including by the payment of additional amounts pursuant to Section 11.1), it shall pay to the relevant Credit Party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 11.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Secured Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such Credit Party, upon the request of such Secured Party, shall repay to such Secured Party the amount paid over pursuant to this Section 11.1(h)(iii) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Secured Party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 11.1(h)(iii), in no event shall the Secured Party be required to pay any amount to a Credit Party pursuant to this Section 11.1(h)(iii) the payment of which would place the Secured Party in a less favorable net after-Tax position than the Secured Party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 11.1(h)(iii) shall not be construed to require any Secured Party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Credit Party or any other Person.

(i)    For purposes of this Section 11.1, the term "Lender" includes any L/C Issuer and the term "Requirement of Law" includes FATCA.

11.2    Illegality

.    If after the date hereof any Lender shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make SOFR Loans, then, on notice thereof by such Lender to Borrower through Agent, the obligation of that Lender to make SOFR Loans shall be suspended until such Lender shall have notified Agent and Borrower that the circumstances giving rise to such determination no longer exists.

(a)    Subject to clause (c) below, if any Lender shall determine that it is unlawful to maintain any SOFR Loan, Borrower shall prepay in full all SOFR Loans of such Lender then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans, together with any amounts required to be paid in connection therewith pursuant to Section 11.4.

(b)    If the obligation of any Lender to make or maintain SOFR Loans has been terminated, Borrower may elect, by giving notice to such Lender through Agent that all Loans which would otherwise be made by any such Lender as SOFR Loans shall be instead Base Rate Loans.

(c)    Before giving any notice to Agent pursuant to this Section 11.2, the affected Lender shall designate a different Lending Office with respect to its SOFR Loans if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the Agent, be illegal or otherwise disadvantageous to the Agent.

11.3    Increased Costs and Reduction of Return

.

(a)    If any Lender or L/C Issuer shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any Requirement of Law (other than in respect of Taxes) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, (x) there shall be any increase in the cost to such Lender or L/C Issuer of agreeing to make or making, funding or maintaining any SOFR Loans or of Issuing or maintaining any Letter of Credit or (y) the Agent or L/C Issuer shall be subject to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, then Borrower shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender or L/C Issuer (with a copy of such demand to Agent), pay to Agent for the account of such Lender or L/C Issuer, additional amounts as are sufficient to compensate such Lender or L/C Issuer for such increased costs or such Taxes; provided, that Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this Section 11.3(a) for any increased costs incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies Borrower, in writing of the increased costs and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided, further, that if the circumstance giving rise to such increased costs is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)    If any Lender or L/C Issuer shall have determined that:

(i)    the introduction of any Capital Adequacy Regulation;

(ii)     any change in any Capital Adequacy Regulation;

(iii)    any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)     compliance by such Lender or L/C Issuer (or its Lending Office) or any entity controlling the Lender or L/C Issuer, with any Capital Adequacy Regulation; affects the amount of capital required or expected to be maintained by such Lender or L/C Issuer or any entity controlling such Lender or L/C Issuer and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's or L/C Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender or L/C Issuer (with a copy to Agent), Borrower shall pay to such Lender or L/C Issuer, from time to time as specified by such Lender or L/C Issuer, additional amounts sufficient to compensate such Lender or L/C Issuer (or the entity controlling the Lender or L/C Issuer) for such increase; provided, that Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this Section 11.3(b) for any amounts incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies Borrower, in writing of the amounts and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)     Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case in respect of this clause (ii) pursuant to Basel III, shall, in each case, be deemed to be a change in a Requirement of Law under Section 11.3(a) above and/or a change in Capital Adequacy Regulation under Section 11.3(b) above, as applicable, regardless of the date enacted, adopted or issued.

11.4     Funding Losses

.  Borrower agrees to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of:

(a)     the failure of Borrower to make any payment or mandatory prepayment of principal of any SOFR Loan (including payments made after any acceleration thereof);

(b)     the failure of Borrower to borrow, continue or convert a Loan after Borrower has given (or is deemed to have given) a Notice of Borrowing or a Notice of Conversion/Continuation;

(c)     the failure of Borrower to make any prepayment after Borrower have given a notice in accordance with Section 2.7;

(d)     the prepayment (including pursuant to Section 2.8) of a SOFR Loan on a day which is not the last day of the Interest Period with respect thereto; or

(e)     the conversion pursuant to Section 2.6 of any SOFR Loan to a Base Rate Loan on a day that is not the last day of the applicable Interest Period;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain its SOFR Loans hereunder or from fees payable to terminate the deposits from which such funds were obtained; provided that, with respect to the expenses described in clauses (d) and (e) above, such Lender shall have notified Agent of any such expense within two (2) Business Days of the date on which such expense was incurred.  Solely for purposes of calculating amounts payable by Borrower to the Lenders under this Section 11.4 and under Section 11.3(a): each SOFR Loan made by a Lender (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at Adjusted Term SOFR used in determining the interest rate for such SOFR Loan by a matching deposit or other borrowing in the interbank Eurodollar market for a comparable amount and for a comparable period, whether or not such SOFR Loan is in fact so funded.

11.5     Inability to Determine Rates

.  If Agent shall have determined in good faith that (i) for any reason adequate and reasonable means do not exist for ascertaining the SOFR for any requested Interest Period with respect to a proposed SOFR Loan or (ii) that Adjusted Term SOFR applicable pursuant to Section 2.3(a) for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to the Lenders of funding or maintaining such Loan, Agent will forthwith give notice of such determination to Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain SOFR Loans hereunder shall be suspended until Agent revokes such notice in writing.  Upon receipt of such notice, Borrower may revoke any Notice of Borrowing or Notice of Conversion/Continuation then submitted by it.  If Borrower does not revoke such notice, the Lenders shall make, convert or continue the Loans, as proposed by Borrower, in the amount specified in the applicable notice submitted by Borrower, but such Loans shall be made, converted or continued as Base Rate Loans.

11.6     Reserves on SOFR Loans

.  Borrower shall pay to each Lender, as long as such Lender shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including eurocurrency funds or deposits (currently known as "**Eurocurrency liabilities**"), additional costs on the unpaid principal amount of each SOFR Loan equal to actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), payable on each date on which interest is payable on such Loan provided Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to Agent) of such additional interest from the Agent.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest shall be payable fifteen (15) days from receipt of such notice.

11.7     Certificates of Lenders

.  Any Lender claiming reimbursement or compensation pursuant to this Article XI shall deliver to Borrower (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on Borrower in the absence of manifest error.

11.8     Acknowledgement and Consent to Bail-In of EEA Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and

agrees and consents to, and acknowledges and agrees to be bound by: (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution, and (b) the effects of any Bail-in Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document, or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

11.9   Acknowledgement Regarding Any Supported QFCs.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Obligation or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**", and each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)   In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**[Signature Pages Follow.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

BORROWER:

**HONORS HOLDINGS, LLC**

By: _____
Name:  Vincent Mariani
Title:  Chief Executive Officer


FEIN:  41-1180459

Address for notices:
120 Interstate North Parkway SE, Suite 308
Atlanta, GA 30339
Attn: Vincent Mariani, Chief Executive Officer
E-mail: vmariani@honorsholdingsllc.com

with a copy to (which shall not constitute a notice):

Prospect Hill Growth Partners
500 Totten Pond Road, 6th Floor
Waltham, MA 02451
Attn: Jeffrey J. Teschke
Email: Jteschke@phgrowth.com

Address for wire transfers:

120 Interstate North Parkway SE, Suite 308
Atlanta, GA 30339

[Signature Page of Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**HH HOLDCO, INC.**

By: _____
Name:  Jeffrey J Teschke
Title:  Authorized Person


FEIN:  82-3674246

Address for notices:

500 Totten Pond Road, 6th Floor
Waltham, MA 02451
Attn: Jeffrey J. Teschke
Facsimile: Jteschke@phgrowth.com

[Signature Page of Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**3 KINGS HOLDINGS, LLC**
**BLACKBERRY VISION, LLC BLUEBERRY**
**VISION INVESTMENTS, LLC CRANBERRY**
**VISION LLC**
**HONORS HOLDINGS MANAGEMENT LLC JM**
**ACWORTH LLC**
**JM ARNOLD CREEK, LLC**
**JM AUGUSTA LLC**
**JM BUFORD LLC**
**JM CHATTANOOGA, LLC**
**JM CLEMSON, LLC**
**JM CLEVELAND, LLC**
**JM DULUTH, LLC**
**JM EAST BEAVERTON, LLC**
**JM FOREST ACRES LLC**
**JM GREENVILLE DOWNTOWN, LLC**
**JM GREENVILLE, LLC**
**JM GREER LLC**
**JM GRESHAM, LLC**
**JM HIXSON, LLC**
**JM IRMO FITNESS LLC**
**JM KENNESAW, LLC**
**JM LEX LLC**
**JM LLOYD DISTRICT, LLC**
**JM MARIETTA, LLC**
**JM MEDFORD LLC**
**JM MT PLEASANT, LLC**
**JM MYRTLE BEACH LLC**
**JM NE COLUMBIA LLC**
**JM NORCROSS, LLC**
**JM NORTH MT. PLEASANT, LLC**
**JM NORTHSHORE, LLC**

By: _____
Name:  Vincent Mariani
Title:  Chief Executive Officer

Address for notices:
120 Interstate North Parkway SE, Suite 308
Atlanta, GA 30339
Attn: Vincent Mariani, Chief Executive Officer
E-mail: vmariani@honorsholdingsllc.com

[Signature Page of Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**JM NW 23RD, LLC**
**JM NW 23RD LLC**
**JM PEARL DISTRICT, LLC**
**JM SE PORTLAND, LLC**
**JM SOUTH WATERFRONT, LLC**
**JM SPARTANBURG FITNESS LLC**
**JM SPECIAL VENUE LLC**
**JM SUGAR HILL, LLC**
**JM SUMMERVILLE LLC**
**JM VANCOUVER, LLC**
**JM VININGS LLC**
**JM WEST ASHLEY LLC**
**JM WEST BEAVERTON, LLC**
**JM WEST COBB, LLC**
**JM WILSONVILLE, LLC**
**JM WOODSTOCK, LLC**
**JW CANTON, LLC**
**OREGON HOLDINGS LLC**
**RASBERRY VISION LLC**
**SIMPLE BERRY LLC**
**SOUTH CAROLINA AR HOLDINGS, LLC**
**STRAWBERRY VISION LLC**
**VAILLANTINO LS, LLC**
**VAILLANTINO, LLC**
**VAILLANTINO JC, LLC**
**VVDC CHAMBLEE, LLC**
**VVDC DUNWOODY, LLC**
**VVDC LAWRENCEVILLE, LLC**
**VVDC MILTON, LLC**
**VVDC NORTHLAKE, LLC**
**VVDC POOLER, LLC**
**VVDC SANDY PLAINS, LLC**
**VVDC SAVANNAH, LLC**
**VVDC WEBB GIN, LLC**
**VVDC, LLC**

By: _____
Name:  Vincent Mariani
Title:  Chief Executive Officer

Address for notices:
120 Interstate North Parkway SE, Suite 308
Atlanta, GA 30339
Attn: Vincent Mariani, Chief Executive Officer
E-mail: vmariani@honorsholdingsllc.com

[Signature Page of Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**JM HASSLO LLC**

By: _____
Name:  Vincent Mariani
Title:  Chief Executive Officer

Address for notices:
120 Interstate North Parkway SE, Suite 308
Atlanta, GA 30339
Attn: Vincent Mariani, Chief Executive Officer
E-mail: vmariani@honorsholdingsllc.com

[Signature Page of Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By:_____
Name: Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

With a copy to:

Proskauer Rose LLP
One International Place
Boston, Massachusetts 02210
Attn: Stephen A. Boyko, Esq.
Email: sboyko@proskauer.com

[Signature Page of Credit Agreement]

|US-DOCS\122553549.2|

**SWISS CAPITAL HYS PRIVATE DEBT FUND L.P.**, as a Lender

By: Whitehorse Capital Management, LLC, its Investment Advisor

By: _____
Name:   Richard Siegel
Title:    Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**H.I.G. WHITEHORSE TRINITY CREDIT, LLC**, as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: _____
Name:  Richard Siegel
Title:    Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

[Signature Page of Credit Agreement]

|US-DOCS\122553549.2|

**WHITEHORSE ONSHORE CREDIT OPPORTUNITIES I SPV, LLC**, as a Lender

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**H.I.G. WHITEHORSE PRINCIPAL LENDING HOLDINGS, LLC**, as a Lender

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**THORNEY ISLAND LIMITED PARTNERSHIP**, as a Lender

By: H.I.G. Capital, LLC, its Investment Manager

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

[Signature Page of Credit Agreement]

|US-DOCS\122553549.2||

**H.I.G. WHITEHORSE PRINCIPAL LENDING OFFSHORE HOLDINGS, LLC**, as a Lender

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**BCSSS HOLDCO UK LIMITED**, as a Lender

By: H.I.G. Capital, LLC, its Investment Manager

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**MPS HOLDCO UK LIMITED**, as a Lender

By: H.I.G. Capital, LLC, its Investment Manager

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

[Signature Page of Credit Agreement]

**H.I.G. WHITEHORSE TRISTAR CREDIT, LLC**, as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**H.I.G. WHITEHORSE SMA ABF, INC.**, as a Lender

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**HGC SPV, LLC**, as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: _____
Name:  Richard Siegel
       Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

[Signature Page of Credit Agreement]

US-DOCS\122553549.2

**H.I.G. GLOBAL CREDIT HOLDINGS, LLC**, as a Lender

By: _____
Name:  Richard Siegel
Title:  Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com

**WHITEHORSE FINANCE CREDIT I, LLC**, as a Lender

By: Whitehorse Finance Inc., its designated manager

By: _____
Name:  Joyson Thomas
Title:    Authorized Signatory

Address for Notices:

c/o WhiteHorse Capital Management, LLC
1450 Brickell Avenue
31st Floor
Miami, Florida 33131
Attn: John Yeager
Email: jyeager@higwhitehorse.com
Attn: John Yeager

[Signature Page of Credit Agreement]

**WEBSTER BANK, NATIONAL ASSOCIATION**, as an L/C Issuer, as Swing Lender and as a Lender

By: _____
Name: _____
Title: _____

Address for Notices:

Webster Bank, National Association
185 Asylum Street – 5th Floor
Hartford, Connecticut 06013
Attn: Carol Pirek, Vice President

With a copy to:
Haynes and Boone, LLP
101 S. Tryon Street
Suite 2550
Charlotte, North Carolina 28280
Attn: Justin Riess, Esq.
Email: justin.riess@haynesboone.com

[Signature Page of Credit Agreement]

**SCHEDULE 2.1(A)**

TERM LOAN COMMITMENTS

| Entities: | Initial Term Loan Commitment | First Amendment Term Loan Commitment | Closing Date Delayed Draw Term Commitment Amount | First Amendment Delayed Draw Term Commitment Amount |
|---|---|---|---|---|
| H.I.G. WHITEHORSE PRINCIPAL LENDING HOLDINGS, LLC | $4,091,163.24 | $0.00 | $1,058,059.46 | $969,887.84 |
| H.I.G. WHITEHORSE PRINCIPAL LENDING OFFSHORE HOLDINGS, LLC | $8,449,377.30 | $0.00 | $2,185,183.78 | $2,003,085.13 |
| WHITEHORSE ONSHORE CREDIT OPPORTUNITIES I SPV, LLC | $11,364,864.86 | $0.00 | $2,939,189.19 | $2,694,256.75 |
| WHITEHORSE FINANCE CREDIT I, LLC | $9,405,405.41 | $0.00 | $2,432,432.43 | $2,229,729.73 |
| SWISS CAPITAL HYS PRIVATE DEBT FUND L.P. | $5,094,594.59 | $0.00 | $1,317,567.57 | $1,207,770.28 |
| BCSSS HOLDCO UK LIMITED | $1,696,500.00 | $0.00 | $438,750.00 | $402,187.50 |
| MPS HOLDCO UK LIMITED | $3,398,094.59 | $0.00 | $878,817.57 | $805,582.77 |
| H.I.G. WHITEHORSE TRISTAR CREDIT, LLC | $4,310,810.81 | $0.00 | $1,114,864.86 | $1,021,959.46 |
| H.I.G. WHITEHORSE TRINITY CREDIT, LLC | $3,918,918.92 | $0.00 | $1,013,513.51 | $929,054.05 |
| H.I.G. WHITEHORSE SMA ABF, INC. | $1,567,567.57 | $0.00 | $405,405.41 | $371,621.63 |
| THORNEY ISLAND LIMITED PARTNERSHIP | $1,254,054.05 | $0.00 | $324,324.32 | $297,297.29 |
| HGC SPV, LLC | $3,448,648.65 | $0.00 | $0.00 | $0.00 |
| H.I.G. GLOBAL CREDIT HOLDINGS, LLC | $0.00 | $0.00 | $891,891.89 | $817,567.57 |
| WEBSTER BANK, NATIONAL ASSOCIATION | $17,000,000.00 | $3,000,000.00 | $0.00 | $5,000,000.00 |

| Total: | $75,000,000.00 | $3,000,000.00 | $15,000,000.00 | $18,750,000.00 |

**SCHEDULE 2.1(B)**

REVOLVING LOAN COMMITMENTS

| Entities: | Revolving Loan Commitment |
|---|---|
| WEBSTER BANK, NATIONAL ASSOCIATION | $5,000,000.00 |
| **Total:** | **$5,000,000.00** |

|US-DOCS\~~122553549.2~~143398915.4||

**SCHEDULE 6.12**

EXISTING LEASE DEFAULTS

| Credit Party | Amounts Owed | Period Owed |
|---|---|---|
| JM Spartanburg Fitness LLC | $20,081.58 | 4/2020 and 5/2020 |
| Vaillantino LS, LLC | $9,854.36 | 4/2020 and 5/2020 |
| Bish 2, LLC | $37,449.66 | 4/2020 and 5/2020 |
| VVDC Webb Gin, LLC | $16,908.72 | 4/2020 and 5/2020 |
| Simple Berry, LLC | $27,015.15 | 4/2020 and 5/2020 |
| JM Marietta, LLC | $13,443.90 | 4/2020 and 5/2020 |
| JM Norcross, LLC | $13,483.68 | 4/2020 and 5/2020 |
| JM Sugar Hill LLC | $10,878.64 | 4/2020 and 5/2020 |
| JM Augusta, LLC | $12,903.01 | 4/2020 and 5/2020 |