# EXHIBIT A

## Security Agreement

# AMENDMENT NO. 1 TO SECURITY AGREEMENT

**THIS AMENDMENT NO. 1 TO SECURITY AGREEMENT** (this "Amendment No. 1") is entered into as of July 6, 2020, by and among the parties identified as "Grantors" on the signature pages hereto and such other parties as may become Grantors after the date hereof (collectively, the "Grantors", and each, a "Grantor"), and **WHITEHORSE CAPITAL MANAGEMENT, LLC**, in its capacity as agent under the Credit Agreement referred to below (in such capacity, the "Agent") for the Secured Parties. The Grantors and Agent are collectively referred to herein as the "Parties" and each, a "Party".

## RECITALS

WHEREAS, pursuant to that certain Credit Agreement, dated as of September 6, 2019 (as it may be amended, restated, amended and restated, joined, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among **HONORS HOLDINGS, LLC**, a Georgia limited liability company (the "Borrower"), **HH HOLDCO, INC.**, a Delaware corporation ("Holdings"), each of the undersigned and future Subsidiaries of the Borrower from time to time party thereto, the financial institutions from time to time party thereto (each a "Lender" and collectively, the "Lenders") and the Agent, the Lenders agreed to make Loans and provide other financial accommodations upon the terms and subject to the conditions set forth therein. Capitalized terms used but not otherwise defined in this Amendment No. 1 shall have the meanings ascribed to them in the Credit Agreement.

WHEREAS, to secure the Credit Parties' Obligations under the Credit Agreement, the Grantors and Agent entered into that certain Security Agreement dated as of September 6, 2019 (the "Security Agreement").

WHEREAS, each Grantor party hereto will derive substantial benefits from the transactions contemplated by this Amendment No. 1 and the other Loan Documents.

WHEREAS, this Amendment No. 1 shall constitute a Loan Document, and these Recitals shall be construed as a part of this Amendment No. 1.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the Parties, intending to be bound, hereby agree as follows:

## AGREEMENTS

1. Amendments to the Security Agreement. In reliance upon the representations and warranties set forth in Section 3 below and upon satisfaction of the conditions to effectiveness set forth in Section 2 below, the Security Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text or double-underlined text) as set forth in the pages of the attached hereto as Annex A (the "Amended Security Agreement").

2. Conditions of Effectiveness. This Amendment No. 1 shall become effective as of the date hereof, but only upon receipt by the Agent of one or more counterparts of this Amendment No. 1 executed by the Grantors and the Agent.

3. Representations and Warranties. Each Grantor represents and warrants to the Agent, for the benefit of the Secured Parties that (i) such Grantor has all requisite power and authority to execute and deliver this Amendment No. 1 and to perform its obligations hereunder; (ii) this Amendment No. 1 has been duly authorized by all requisite corporate or limited liability company action, as applicable, and constitutes the legal, valid, and binding obligations of such Grantor and is enforceable against such Grantor in accordance with its terms, except as such enforceability may be limited by applicable Bankruptcy Code or by equitable principles relating to enforceability; and (iii) neither the execution, delivery, or performance by such Grantor of this Amendment No. 1 (A) contravene the terms of any Grantor's Organization Documents; (B) conflict with or result in any breach or contravention of, or the creation of any Lien under, (i) any material Contractual Obligation to which any Grantor is a party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Grantor or the Property of any Grantor is subject; (C) violate any applicable Law (including Regulation U or Regulation X issued by the FRB); or (D) result in a limitation on any licenses, permits or other Governmental Approvals applicable to the business, operations or properties of any Grantor.

4. No Modification; Reaffirmation. Except as expressly set forth herein, nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Security Agreement or any of the other Loan Documents or constitute a course of conduct or dealing among the parties. Except as expressly stated herein, the Agent and Lenders reserve all rights, privileges and remedies under the Loan Documents. Except as amended or consented to hereby, the Security Agreement and other Loan Documents remain unmodified and in full force and effect. All references in the Loan Documents to the Security Agreement No. 1 shall be deemed to be references to the Security Agreement as modified hereby. This Amendment shall constitute a Loan Document. Each of the Grantors as debtor, grantor, pledgor, guarantor, assignor, or in any other similar capacity in which such Grantor grants liens or security interests in its property or otherwise acts as accommodation party or guarantor, as the case may be, hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party (after giving effect hereto) and (ii) to the extent such Grantor granted liens on or security interests in any of its property pursuant to any such Loan Document as security for or otherwise guaranteed the Borrower's Obligations under or with respect to the Loan Documents, ratifies and reaffirms such guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Obligations as amended hereby. Each of the Grantors hereby consents to this Amendment No. 1 and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed. Except as set forth in Sections 1 hereto, the execution of this Amendment No.1 shall not operate as a waiver of any right, power or remedy of the Agent or Lenders, constitute a waiver of any provision of any of the Loan Documents or serve to effect a novation of the Obligations.

5. Miscellaneous.

a. Successors and Assigns. The provisions of this Amendment No. 1 shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that none of the Grantors may assign or transfer any of its rights or obligations under this Amendment No. 1 without the prior written consent of the Agent.

b. Entire Agreement. This Amendment No. 1 constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all other understandings, oral or written, with respect to the subject matter hereof.

c. Headings. Section headings in this Amendment No. 1 are included herein for convenience of reference only and shall not affect the interpretation of this Amendment No. 1.

d. Severability. The illegality or unenforceability of any provision of this Amendment No. 1 or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Amendment No. 1 or any instrument or agreement required hereunder.

e. Counterparts. This Amendment No. 1 may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Amendment No. 1 by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

f. Governing Law; Waiver of Jury Trial. The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Amendment No. 1, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest). Sections 10.16 and 10.17 of the Credit Agreement are hereby incorporated by reference in their entirety herein *mutatis mutandis.*

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow.]*

IN WITNESS WHEREOF, intending to be legally bound, the parties hereto have duly executed this Amendment No. 1 to Security Agreement as of the date first above written.

**GRANTORS:**

**HONORS HOLDINGS, LLC**

By: ____________________________
Name: Jeffrey J. Teschke
Title: Vice President and Secretary

**3 KINGS HOLDINGS, LLC**
**BLACKBERRY VISION, LLC**
**BLUEBERRY VISION INVESTMENTS, LLC**
**CRANBERRY VISION LLC**
**HONORS HOLDINGS MANAGEMENT LLC**
**JM ACWORTH LLC**
**JM ARNOLD CREEK, LLC**
**JM AUGUSTA LLC**
**JM BUFORD LLC**
**JM CHATTANOOGA, LLC**
**JM CLEMSON, LLC**
**JM CLEVELAND, LLC**
**JM DULUTH, LLC**
**JM EAST BEAVERTON, LLC**
**JM FOREST ACRES LLC**
**JM GREENVILLE DOWNTOWN, LLC**
**JM GREENVILLE, LLC**
**JM GREER LLC**
**JM GRESHAM, LLC**
**JM HIXSON, LLC**
**JM IRMO FITNESS LLC**
**JM KENNESAW, LLC**
**JM LEX LLC**
**JM LLOYD DISTRICT, LLC**
**JM MARIETTA, LLC**
**JM MEDFORD LLC**
**JM MT PLEASANT, LLC**
**JM MYRTLE BEACH LLC**
**JM NE COLUMBIA LLC**
**JM NORCROSS, LLC**
**JM NORTH MT. PLEASANT, LLC**
**JM NORTHSHORE, LLC**

By: **HONORS HOLDINGS, LLC,**
the sole equity owner of each of the entities listed above

By: ____________________________
Name: Jeffrey J. Teschke
Title: Vice President and Secretary

**JM NW 23RD, LLC**
**JM NW 23RD LLC**
**JM PEARL DISTRICT, LLC**
**JM SE PORTLAND, LLC**
**JM SOUTH WATERFRONT, LLC**
**JM SPARTANBURG FITNESS LLC**
**JM SPECIAL VENUE LLC**
**JM SUGAR HILL, LLC**
**JM SUMMERVILLE LLC**
**JM VANCOUVER, LLC**
**JM VININGS LLC**
**JM WEST ASHLEY LLC**
**JM WEST BEAVERTON, LLC**
**JM WEST COBB, LLC**
**JM WILSONVILLE, LLC**
**JM WOODSTOCK, LLC**
**JW CANTON, LLC**
**OREGON HOLDINGS LLC**
**RASBERRY VISION LLC**
**SIMPLE BERRY LLC**
**SOUTH CAROLINA AR HOLDINGS, LLC**
**STRAWBERRY VISION LLC**
**VAILLANTINO LS, LLC**
**VAILLANTINO, LLC**
**VAILLANTINO JC, LLC**
**VVDC CHAMBLEE, LLC**
**VVDC DUNWOODY, LLC**
**VVDC LAWRENCEVILLE, LLC**
**VVDC MILTON, LLC**
**VVDC NORTHLAKE, LLC**
**VVDC POOLER, LLC**
**VVDC SANDY PLAINS, LLC**
**VVDC SAVANNAH, LLC**
**VVDC WEBB GIN, LLC**
**VVDC, LLC**
**JM HASSLO LLC**

By: **HONORS HOLDINGS, LLC,**
the sole equity owner of each of the entities listed above

By: ______________________________
Name: Jeffrey J. Teschke
Title: Vice President and Secretary

**SIMPLE VENTURES, LLC**
**SIMPLE VENTURES 2, LLC**
**QIG FITNESS NATICK LLC**
**QIG FITNESS WALTHAM LLC**
**BURLINGTON FITNESS ACQUISITION, LLC**
**SOMERVILLE FITNESS ACQUISITION, LLC**
**BRAINTREE FITNESS LLC**
**BISH VENTURE MERGE, LLC**
**BISH ONE MERGE, LLC**
**BISH 2 MERGE, LLC**
**BISH THREE, LLC**
**BISH FIVE, LLC**
**LEO INVESTMENTS, LLC**
**FITNESS CAPITAL VENTURES, LLC**
**FITNESS CAPITAL VENTURES #2, LLC**
**FITNESS CAPITAL VENTURES #3, LLC**
**FITNESS CAPITAL VENTURES #4, LLC**

By: **HONORS HOLDINGS, LLC,**
the sole equity owner of each of the entities listed above

By: ______________________________
Name: Jeffrey J. Teschke
Title: Vice President and Secretary

**AGENT:**

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By:____________________________________
Name: Richard Siegel
Title: Authorized Signatory

# <u>ANNEX A</u>

**Amended Security Agreement**

[*See Attached*]

*Amendment No. 1 to Security Agreement, dated as of July 6, 2020*

# SECURITY AGREEMENT

**SECURITY AGREEMENT**, dated as of September 6, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "*Security Agreement*"), among **HONORS HOLDINGS, LLC**, a Georgia limited liability company (the "*Borrower*"), each of the undersigned and future Subsidiaries of the Borrower from time to time party hereto (each such Subsidiary, each a "*Guarantor*" and, collectively, the "*Guarantors*"; the Guarantors and the Borrower are referred to herein individually as a "*Grantor*" and collectively as the "*Grantors*"), and **WHITEHORSE CAPITAL MANAGEMENT, LLC**, in its capacity as agent under the Credit Agreement referred to below (in such capacity, the "Agent") for the Secured Parties.

Reference is made to the Credit Agreement, dated as of even date herewith (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), by and among the Borrower, HH Holdco, Inc., a Delaware corporation ("*Holdings*"), the Guarantors, the financial institutions from time to time party thereto (each a "*Lender*" and collectively, the "*Lenders*") and the Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

It is a condition precedent to the Credit Agreement and the obligations of the Lenders to make Loans to, and to issue and/or acquire participation interests in Letters of Credit for the account of, the Borrower that each of the Grantors shall have executed and delivered this Security Agreement to the Agent for the ratable benefit of the Lenders and the other Secured Parties to secure the Credit Party Obligations.

Accordingly, the Grantors and the Agent hereby agree as follows:

Section 1. Definitions

(a) Unless the context otherwise requires, capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement or in the Uniform Commercial Code in effect in the State of New York from time to time (the "*NYUCC*").

(b) As used herein, the following terms shall have the following meanings:

"*Borrower Obligations*": collectively, all Obligations of the Borrower to the Agent and/or any other Secured Party, but in all cases excluding Excluded Rate Contract Obligations.

"*Collateral*": with respect to any Grantor (a) all personal property and fixtures of every kind and nature, wherever located, whether now owned or hereafter acquired or arising, of such Grantor including, without limitation, all (i) Accounts, (ii) Receivables, (iii) Receivable Records, (iv) Equipment, (v) General Intangibles, (vi) Inventory, (vii) Instruments, (viii) Pledged Debt, (ix) Pledged Equity, (x) Documents, (xi) Collateral Records, (xii) Chattel Paper (whether tangible or electronic), (xiii) money, (xiv) Deposit Accounts, (xv) Payment Intangibles, (xvi) Letter-of-Credit Rights (whether or not the letter of credit is evidenced in writing), (xvii) Commercial Tort Claims as set forth on Schedule 1 attached hereto (as updated from time to time in accordance with the terms hereof), (xviii) Intellectual Property, (xix) Supporting Obligations, (xx) Goods, (xxi) Investment Property, (xxii) any other contract rights or rights to the payment of money, (xxiii) tort claims, (xxiv) all insurance policies, (xxv) insurance claims and proceeds, and (xxvi) unless otherwise agreed upon in writing by such Grantor and the Agent, all other tangible and intangible property owned or held by or on behalf of such Grantor that may be delivered to and held by the Agent pursuant to the terms hereof, (b) all cash or non-cash Proceeds of any of the foregoing, including all Proceeds which constitute property of the types described in clause (a) above, and to the extent not otherwise included, all payments and rights under any issuance, indemnity, warranty or guaranty with respect to any of the foregoing Collateral and (c) all Accessions of any property of the types described in clause (a) above.

"*Collateral Records*": all books and records, including books of account and ledgers of every kind and nature, all electronically recorded data (including all computer programs, disks, tapes, electronic data processing media and software used in connection with maintaining each Grantor's books and records), all files, correspondence and all containers for the foregoing pertaining to the Collateral.

"*Credit Party Obligations*": collectively, the Borrower Obligations and the Guarantor Obligations.

"*Excluded Asset*": any property of any Grantor excluded from the Security Interest hereunder by virtue of Section 2(c) hereof.

"*Governmental Approval*": any and all licenses, permits, certificates, certifications, consents, registrations or contracts, authorizations and approvals of each Government Authority issued or required under applicable law.

"*Guarantor Obligations*": collectively, all Obligations of the Guarantors to the Agent and/or any other Secured Party, but in all cases excluding Excluded Rate Contract Obligations.

"*Intellectual Property*": all intellectual and similar property of any Grantor of every kind and nature now owned or hereafter acquired by any Grantor, including inventions, designs, patents, copyrights, trademarks (and goodwill connected with the use thereof and symbolized thereby), and registrations thereof, trade secrets, confidential or proprietary technical and business information, customer lists, supplier contracts,

advertising materials know-how, show-how or other data or information, computer programs, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

"*Perfection Certificate*": means a certificate substantially in the form of Annex I, and supplemented with the schedules and attachments contemplated thereby.

"*Pledged Debt*": all right, title and interest of any Grantor to the payment of any loan, advance or other debt of every kind and nature (other than Receivables and General Intangibles), whether due or to become due, whether or not it has been earned by performance, and whether now or hereafter acquired or arising in the future.

"*Pledged Equity*": with respect to any Grantor, all right, title and interest owned by such Grantor in any Stock, whether now or hereafter acquired or arising in the future (other than any Excluded Asset).

"*Pledged Securities*": the Pledged Debt, the Pledged Equity and all notes, chattel paper, instruments, certificates, files, records, ledger sheets and documents covering, evidencing, representing or relating to any of the foregoing, in each case whether now existing or owned or hereafter arising or acquired.

"*Receivable Records*": (a) all originals or copies of all documents, instruments or other writings evidencing the Receivables, (b) all books, correspondence, credit or other files, records, ledger sheets or cards, invoices, and other papers relating to Receivables, including without limitation all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of the Grantors or any computer bureau or agent from time to time acting for the Grantors or otherwise, (c) all evidences of the filing of financing statements and the registration of other instruments in connection therewith and amendments, supplements or other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments, or other writings, including without limitation lien search reports, from filing or other registration officers, (d) all credit information, reports and memoranda relating thereto, and (e) all other written or non-written forms of information related in any way to the foregoing or any Receivable.

"*Receivables*": shall include, without limitation, all rights to payment, now or hereafter existing, in each case arising out of or in connection with the rendering of services and goods provided by any Grantor, including, without limitation, any Grantor's right to be compensated for its services and reimbursed for related costs and expenses incurred, amounts disbursed or obligations incurred for the account of such Grantor's customers for fees paid or payable to or goods or services obtained from any Grantor or third parties and any Grantor's rights pertaining to any interest in such services and goods, whether or not such Grantor has rendered a bill for such services or disbursements

or entered the value of such services or disbursements in its books as accounts receivable, whether or not such services or disbursements have been completed and whether or not an express or implied agreement for compensation for such services or reimbursement for such disbursements exists, and all rights now or hereafter existing in and to all agreements and contracts securing or otherwise relating to any such Accounts, Instruments, General Intangibles or obligations, whether or not earned by performance and all rights in respect of the Account Debtor, including without limitation, all such rights in which any Grantor has any right, title or interest by reason of the purchase thereof by such Grantor, and including without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible, note, contract, invoice, purchase order, draft, acceptance, book debt, intercompany account, security agreement, or other evidence of indebtedness or security, together with (a) any collateral assigned, hypothecated or held to secure any of the foregoing and the rights under any security agreement granting a security interest in such collateral, (b) all guarantees, endorsements and indemnifications on, or of, any of the foregoing, and (c) all powers of attorney for the execution of any evidence of indebtedness or security or other writing in connection therewith.

"*Security Interest*": as defined in Section 2(a).

"*UCC*": with respect to any jurisdiction, the Uniform Commercial Code as from time to time in effect in such jurisdiction.

(c) The principles of construction specified in Section 1.2 of the Credit Agreement shall be applicable to this Security Agreement.

Section 2. Grant of Security Interest; No Assumption of Liability

(a) Grant of Security Interest. As security for the payment or performance, as applicable, in full of the Credit Party Obligations, each of the Grantors hereby mortgages, pledges, and hypothecates to the Agent (subject to Section 6(h)), for the ratable benefit of the Secured Parties, and hereby grants to the Agent, for the ratable benefit of the Secured Parties, a security interest in, all of the right, title and interest of such Grantor in, to and under its respective Collateral (collectively, the "*Security Interest*"). Without limiting the foregoing, the Agent is hereby authorized to file one or more financing statements, continuation statements or other documents as are necessary for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each of the Grantors, without the signature of any Grantor, and naming any Grantor or the Grantors, as applicable, as debtors and the Agent as secured party. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of Collateral that accurately describes such property in any other manner as the Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the Security Interest in the Collateral granted in this Security Agreement, including, without limitation, describing such property as "all assets" or "all personal property." Each Grantor also hereby ratifies its authorization for Agent to have filed any initial financing statement or amendment

thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof. Each Grantor hereby (i) waives any right under the UCC or any other Requirement of Law to receive notice and/or copies of any filed or recorded financing statement, amendments, continuations or termination statements and (ii) releases and excuses each Secured Party from any obligation under the UCC or any other Requirement of Law to provide notice or a copy of any such filed or recorded documents; *provided* that upon the Borrower's request, the Agent shall promptly provide the Borrower with copies of all filed or recorded financing statement, amendments, continuations or termination statements.

(b) No Assumption of Liability. The Security Interest is granted as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.

(c) Excluded Assets. Notwithstanding anything to the contrary contained herein, the Security Interest granted under this Security Agreement shall not extend to (and such Property shall not constitute Collateral) the following (collectively referred to herein as "*Excluded Assets*"):

(i) any Property that is the subject of a Lien securing purchase money Indebtedness or Capital Lease, in each case, permitted under the Loan Documents pursuant to documents that prohibit such Grantor from granting any other Liens in such Property,

(ii) any contract, agreement, instrument, lease, license, permit or other document of a Grantor (each, a "*Contract*") if the grant of a security interest in such Contract in the manner contemplated by this Security Agreement is prohibited by the terms of such Contract or by applicable law and would result in the termination of such Contract, or abandonment, invalidation or unenforceability of any right, or interest of any Grantor under any Contract or give the other parties thereto the right to terminate, accelerate or otherwise adversely alter such Grantor's rights, titles and interests under such Contract (including upon the giving of notice or the lapse of time or both); provided that, with respect to prohibitions by applicable law (which Contracts shall be excluded in any event) Contracts subject to this clause (ii) shall not exclude (A) any franchise agreement, area representative agreement or related management agreement entered into by any Grantor, or otherwise assigned to or assumed by such Grantor as successor thereto or (B) any other contract, agreement, instrument, lease, license, permit or other document of any Grantor material to the conduct and operations of the business of such Grantor,

(iii) any Governmental Approval that, under the terms and conditions of such Governmental Approval or under applicable laws, prohibits or limits the granting of a Lien without the consent of the relevant Governmental Authority, which consent has not been obtained,

(iv) any Property which would result in the forfeiture of the Grantor's rights in the Property including, without limitation, any trademark applications filed in the United States Patent and Trademark Office on the basis of such Grantor's "intent-to-use" such trademark, unless and until acceptable evidence of use of the trademark has been filed with and accepted by the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. 1051, et seq.), to the extent that granting a Lien in such trademark application prior to such filing would adversely affect the enforceability or validity of such trademark application,

(v) Excluded Accounts, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes or standing timber and Accessions or Proceeds thereof,

(vi) to the extent material and adverse tax consequences would reasonably be expected to arise in the absence of such exclusion as a result of a change in law relating to Section 956 of the Code and regulations thereunder after the date hereof, voting equity interests in any Subsidiary that is a CFC or CFC Holdco representing in excess of 65% of the voting equity interests of such CFC or CFC Holdco,

(vii) motor vehicles, aircraft and other assets subject to certificates of title or ownership (including, without limitation, aircraft, airframes, aircraft engines or helicopters, or any equipment or other asset constituting a part thereof, in each case to the extent a security interest therein cannot be perfected by the filing of a UCC-1 financing statement in the jurisdiction or organization of the applicable Grantor,

(viii) Letters of Credit rights less than $250,000 to the extent a security interest therein cannot be perfected by the filing of UCC-1 financing statements,

(ix) (A) any fee interest in owned real property with a fair market value below $500,000 and (B) any Fixtures affixed to any real property to the extent (1) such real property does not constitute Collateral or (2) a security interest in such Fixtures may not be perfected by the filing of a UCC financing statement in the jurisdiction of organization of the applicable Grantor; and

(x) the Proceeds, substitutions or replacements of any of the foregoing clauses (i) through (ix) but only to the extent such Proceeds, substitutions or replacements would constitute Excluded Assets;

provided that (A) any such limitation described in the foregoing clauses (i), (ii), (iii) and (iv) on the Security Interests granted hereunder shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other applicable law (including the UCC and Sections 9-406, 9-407, 9-408 and 9-409 of the

UCC) or principles of equity, (B) leasehold mortgages are not required to be provided with respect to any leasehold interest in real property and (C) in the event of the termination or elimination of any such prohibition or the requirement for any consent contained in such Contract or in any applicable law, to the extent sufficient to permit any such item to become Collateral hereunder, or upon the granting of any such consent, or waiving or terminating any requirement for such consent, a security interest in such Contract shall be automatically and simultaneously granted hereunder and shall be included as Collateral hereunder. The pledge and grant of a security interest in Proceeds shall not, in itself, be deemed to give the Agent any right to dispose of any of the Collateral, except as may otherwise be permitted herein or in the other Loan Documents. Notwithstanding anything contained herein to the contrary, (x) except as otherwise provided for in this Security Agreement, the Grantors shall not be required to take any action intended to cause any Excluded Asset to constitute Collateral, (y) each defined term used in describing types or categories of Collateral that would otherwise include Excluded Assets shall be deemed to exclude such Excluded Assets and (z) none of the representations, warranties and covenants contained in this Security Agreement regarding perfection or other matters relating to the granting or maintaining a Lien in favor of the Agent shall be deemed to apply to any Property constituting Excluded Assets. Without limiting such Grantor's obligations under this Security Agreement, the Agent and the Borrower shall determine, in their reasonable discretion, whether the costs of perfecting any Lien granted to the Agent hereunder outweighs the benefits of perfection, and to the extent the Agent and the Borrower have in any particular circumstance so determined that the costs outweigh the benefits, such Grantor shall not be required to comply with the applicable provision of this Security Agreement to cause such Lien to be perfected (without limiting such Grantor's other obligations under this Agreement).

(d) Use of Collateral. Subject to the terms hereof and in the other Loan Documents, it is understood and agreed that the Security Interest created hereby and under the Credit Agreement shall not prevent the Grantors from using the Collateral in any manner the ordinary course of their respective businesses.

Section 3. Delivery of the Collateral

Subject to the following sentence, each of the Grantors agrees promptly to deliver or cause to be delivered to the Agent any and all notes, chattel paper, instruments, stock certificates and other documents evidencing or representing any of the Pledged Securities owned or held by or on behalf of such Grantor, in each case accompanied by (a) in the case of any notes, chattel paper, instruments or stock certificates, stock powers duly executed in blank or other instruments of transfer reasonably satisfactory to the Agent and such other instruments and documents as the Agent may reasonably request and (b) in all other cases, proper instruments of assignment duly executed by such Grantor and such other instruments or documents as the Agent may reasonably request. To the extent any Pledged Debt in excess of $100,000 is evidenced by a duly executed promissory note, the applicable Grantor shall deliver such promissory note to the Agent pursuant to the terms hereof. Upon the Agent's request, each Grantor shall cause (or, in

the case of Pledged Equity received in the ordinary course of business of such Grantor and permitted by the Credit Agreement, shall use good faith efforts to cause) each issuer of Pledged Equity that constitutes uncertificated securities to comply with Section 5(j) hereof with respect to such Pledged Equity.

Section 4. Representations and Warranties

Each of the Grantors, jointly with the others and severally, represents and warrants to the Agent, for the benefit of the Secured Parties, that, and such representations and warranties shall be continuing so long as any Credit Party Obligations shall remain outstanding:

(a) Title and Authority. Such Grantor has good and valid rights in and title to the Collateral and has full power and authority to grant to the Agent, for the ratable benefit of the Secured Parties, the Security Interest in the Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Security Agreement, without the consent or approval of any other Person (subject to the Section 4(j) below).

(b) Perfection Certificate. The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein is correct and complete in all material respects. UCC financing statements (including fixture filings, as applicable) prepared based upon the information provided to the Agent in the Perfection Certificate for filing in each governmental, municipal or other office specified in Schedule 4 of the Perfection Certificate (or specified by notice from the applicable Grantor to the Agent after the Closing Date in the case of filings, recordings or registrations required by u of the Credit Agreement), are all the filings, recordings and registrations (other than any filings with respect to real property, filings required to be made in the United States Patent and Trademark Office or the United States Copyright Office in order to perfect the Security Interest in Intellectual Property or any filings required to be made in the applicable foreign office with respect to the creation or perfection of security interests in Intellectual Property registered in any jurisdiction outside the United States) necessary to establish a legal, valid and perfected security interest in favor of the Agent (for the benefit of the Secured Parties) in respect of all Article 9 Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration with respect to such Article 9 Collateral is necessary in any such jurisdiction, except as provided under applicable Law with respect to the filing of amendment or continuation statements. Each Grantor represents and warrants that on the Closing Date and on and as of each other date as required by Section 5(f), fully executed intellectual property security agreements containing a description of all Intellectual Property consisting of (x) U.S. Patents (and U.S. Patents for which applications are pending), U.S. registered Trademarks (and U.S. Trademarks for which registration applications are pending) or U.S. registered Copyrights, as applicable, have been or will be delivered to the Agent for recording by the United States Patent and Trademark Office

or the United States Copyright Office, as applicable, pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder and (y) foreign Patents (and Foreign Patents for which applications are pending), foreign. registered Trademarks (and foreign Trademarks for which registration applications are pending) or foreign registered Copyrights, as applicable, have been or will be delivered to the Agent for recording by the applicable foreign office and the regulations thereunder.

(c) Security Interest. Except as expressly permitted or provided otherwise under the Loan Documents, the Security Interest in favor of the Agent, for itself and for the benefit of the Secured Parties, constitutes a legal and valid Lien on and perfected (to the extent expressly required hereunder) security interest in all of the Collateral securing the payment and performance of the Credit Party Obligations.

(d) No Other Liens. The Security Interest is and shall be prior to any other Lien on any of the Collateral owned or held by or on behalf of such Grantor other than Permitted Liens. The Collateral owned or held by or on behalf of such Grantor is so owned or held by it free and clear of any Lien, except for Permitted Liens. To each Grantor's knowledge, no financing statement or other evidence of a Lien covering or purporting to cover any of the Collateral is on file in any public office other than financing statements and other evidence of a Lien filed or to be filed in connection with the security interests granted to the Agent, for itself and for the benefit of the Secured Parties, and Permitted Liens.

(e) Inventory. With respect to all Inventory: (i) such Inventory is located on the premises set forth in the Perfection Certificate, or is Inventory in transit for sale in the ordinary course of business, (ii) no such Inventory is subject to any Lien other than Permitted Liens, and (iii) no such Inventory with a fair market value in excess of $100,000 is on consignment or is now stored or shall be stored at any time after the Closing Date with a bailee, warehouseman or similar Person.

(f) Existence and Power. Such Grantor is duly organized and validly existing in good standing under the laws of the jurisdiction of its incorporation or formation, has all requisite power and authority to own its Property and to carry on its business as now conducted, and is in good standing and authorized to do business in each jurisdiction in which the nature of the business conducted therein or the Property owned by it therein makes such qualification necessary, except where any failure to qualify could not reasonably be expected to have a Material Adverse Effect.

(g) Authority and Execution. Such Grantor has full legal power and authority to enter into, execute, deliver and perform the terms of this Security Agreement which has been duly authorized by all necessary company action and is in compliance with its Organization Documents in all material respects. Such Grantor has duly executed and delivered this Security Agreement.

(h) Receivables. To each Grantor's knowledge, each Receivable (i) is the genuine, legal, valid and binding obligation of the Account Debtor in respect thereof,

representing an unpaid obligation of such Account Debtor, (ii) is enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in an action of law or in equity) and (iii) is in full force and effect and is not subject to any setoffs, defenses, taxes, counterclaims (except with respect to refunds, returns, credits and allowances in the ordinary course of business). The representation and warranty made in this Section 4(h) shall be true and correct in all material respects (x) on the date hereof as to those Receivables in existence on the date hereof and (y) on the date such Receivable arises, with respect to those Receivables arising after the date hereof.

(i) Binding Agreement. This Security Agreement constitutes the valid and legally binding obligation of such Grantor, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in an action of law or in equity).

(j) Required Consent. Except (i) for the filing or recording of UCC financing statements, (ii) the filing of appropriate notices with the United States Patent and Trademark Office and the United States Copyright Office, (iii) for obtaining control to perfect the Security Interest created by this Security Agreement, (iv) such actions as may be required by laws and/or regulations affecting the offering and sale of securities, (v) such actions as may be required by applicable foreign laws or regulations affecting (x) the pledge of the Pledged Equity of foreign subsidiaries and (y) the creation or perfection of security interests in assets located or titled outside the United States, including any Intellectual Property registered in any jurisdiction outside of the United States, (vi) for consents, authorizations, filings or other actions which have been obtained or made, (vii) actions required with respect to Collateral permitted under this Security Agreement or the Credit Agreement to be in the possession of third parties, (viii) as may be required by the applicable court in connection with any commercial tort claim, (ix) as may be required in connection with enforcement against an account debtor under applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws, (x) as may be required by laws generally applicable to the enforcement of remedies, (xi) actions which are not required to be taken by the Grantors pursuant to this Security Agreement or the Credit Agreement and (xii) notices, the failure of which to give or obtain could not reasonably be expected to result in a Material Adverse Effect, no consent of any other Person and no authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required (A) for the grant of the Security Interest by such Grantor in the Collateral pursuant to this Security Agreement or for the execution, delivery or performance of this Security Agreement by such Grantor, (B) for the perfection of the Security Interest granted hereby (including maintaining the priority of such Security Interest other than the filing of continuation

statements) to the extent required by the Loan Documents or (C) for the exercise by the Agent of the voting or other rights provided for in this Security Agreement or the remedies in respect of the Collateral pursuant to this Security Agreement (except as may be required in connection with any disposition of any portion of the Collateral by the UCC or laws affecting the offering and sale of securities generally); provided, however, it being understood that leases, licenses, client agreements and other similar agreements included in the Collateral may contain customary provisions restricting assignments, subletting and other transfers for which consent may not be sought or obtained, and that the existence of such provisions shall not constitute a breach of any of the Grantors' representations or obligations hereunder.

(k) Pledged Equity. All Pledged Equity that are issued by an issuer that is a corporation are represented by certificates and constitute "securities" subject to Article 8 of the UCC. None of the Pledged Equity that are issued by an issuer that is not a corporation (i) are dealt in or traded on a securities exchange or in a securities market, (ii) are investment company securities, (iii) are held in a Securities Account not subject to a securities account control agreement, (iv) by their terms expressly provide that they are "securities" governed by Article 8 of the UCC or (v) are evidenced by certificates.

(l) Commercial Tort Claims. The only Commercial Tort Claims of any Grantor existing on the Closing Date (regardless of whether the amount, defendant or other material facts can be determined and regardless of whether such commercial tort claim has been asserted, threatened or has otherwise been made known to the obligee thereof or whether litigation has been commenced for such claims) are those listed on **Schedule 1**, which sets forth such information separately for each Grantor.

(m) Specific Collateral. None of the Collateral is or is proceeds or products of farm products, as-extracted collateral, health-care-insurance receivables or timber to be cut.

(n) Pledged Securities. As of the Closing Date, Pledged Securities (other than Pledged Equity that is uncertificated) and all Pledged Debt consisting of instruments and certificates with a value in excess of $100,000 have been delivered to the Agent or its designee to the extent required by and in accordance with Section 3.

Section 5. Covenants

(a) Changes with respect to Collateral. Each of the Grantors shall, within thirty (30) days thereof, notify the Agent in writing of any change (i) in its legal name, (ii) in its jurisdiction of incorporation or formation, (iii) in the location of its chief executive office or principal place of business, (iv) in its identity or legal or organizational structure or (v) in its organization identification number or its Federal Taxpayer Identification Number. None of the Grantors shall effect or permit any change referred to in the preceding sentence unless all filings have been made or shall have been made under the UCC or otherwise that are required in order for the Agent to continue at

all times following such change to have a valid, legal and perfected security interest in all the Collateral (subject only to Permitted Liens). Each Grantor shall promptly notify the Agent in writing if any material portion of the Collateral owned or held by or on behalf of such Grantor is damaged or destroyed.

(b) Maintenance of Records. Each of the Grantors shall maintain, at its own cost and expense, such complete and accurate records with respect to the Collateral owned or held by it or on its behalf as is consistent with its current practices and permit representatives of the Agent to inspect such records and conduct and audit of the Collateral in accordance with Section 5.5 of the Credit Agreement.

(c) Perfection Certificate. Upon the Agent's reasonable request, no more frequently than once a year, the Borrower shall deliver to the Agent a certificate executed by a Financial Officer of the Borrower, setting forth the information required pursuant to the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate or the date of the most recent certificate delivered pursuant to this paragraph.

(d) Defense of Security Interest. Upon the reasonable request of the Agent, each of the Grantors shall, at its own cost and expense, take any and all actions reasonably necessary to defend title to the Collateral owned or held by it or on its behalf against all Persons and to defend the perfected Security Interest of the Agent in such Collateral and the priority thereof against any Lien not expressly permitted to be senior to the Security Interest pursuant to the Loan Documents.

(e) Further Assurances. Each of the Grantors shall, at its own expense, execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents reasonably acceptable to the Agent and take all such actions as the Agent may from time to time reasonably request to preserve, protect and perfect the Security Interest granted by it and the rights and remedies created hereby, including the payment of any fees required in connection with its execution and delivery of this Security Agreement, the granting by it of the Security Interest and the filing of any financing statements or other documents in connection herewith or therewith.

(f) Intellectual Property.

Concurrently with the financial statements delivered pursuant to Section 5.1(b) of the Credit Agreement, each Grantor shall provide Agent notification of, if applicable, any change, with respect to material Intellectual Property, in the information of the type required to be set forth in the Perfection Certificate on the Closing Date for such Grantor and, promptly thereafter, shall deliver short-form intellectual property security agreements in form and substance reasonably satisfactory to the Agent for (x) all United States federally registered and applied for copyrights, trademarks and patents and (y) all foreign copyrights, trademarks and patents registered or applied for in any jurisdiction outside of the United States owned by such Grantor and any other documents that the Agent reasonably requests with respect thereto.

(g) Grantors Remain Liable. Each of the Grantors shall remain liable to observe and perform all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Collateral, all in accordance with the terms and conditions thereof.

(h) Use of Collateral. None of the Grantors shall make or permit to be made an assignment, pledge or hypothecation of the Collateral owned or held by it or on its behalf, or shall grant any other Lien in respect of such Collateral, except as permitted by the Loan Documents. Except for the Security Interest and, except as permitted by the Loan Documents, no Grantor shall make or permit to be made any transfer, sale, lease, or other disposition of such Collateral, and each Grantor shall remain at all times in possession of such Collateral and shall remain the direct owner, beneficially and of record, of the Pledged Equity included in such Collateral, except that, so long as no Event of Default has occurred and is continuing, the Grantors may use and dispose of the Collateral in any lawful manner not inconsistent with the provisions of this Security Agreement, the Credit Agreement or any other Loan Document. Without limiting the generality of the foregoing, no Grantor shall permit any Inventory with a fair market value in excess of $100,000 to be in the possession or control of any warehouseman, bailee, agent or processor at any time unless such warehouseman, bailee, agent or processor shall have been notified of the Security Interest and shall have agreed in writing to hold such Inventory subject to the Security Interest and the instructions of the Agent and to subordinate to the Agent any Lien held by it with respect to such Inventory, whether arising by operation of law or otherwise.

(i) Security Certificates. All of the certificates now or hereafter owned by or in the possession of such Grantor which constitute Pledged Equity shall be, to the extent not subject to a control agreement in a manner in all respects satisfactory to the Agent, promptly delivered to the Agent, to be held by the Agent for the ratable benefit of the Secured Parties pursuant hereto, in suitable form for transfer by delivery or accompanied by duly executed documents of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Agent. Such Grantor agrees that, with respect to all items of such Grantor's Pledged Equity which such Grantor is or shall hereafter be obligated to deliver to the Agent, until so delivered such items shall be held by such Grantor in trust for the benefit of the Agent and be segregated from the other property of such Grantor. Each of the Grantors hereby agrees that such Grantor will comply with reasonable instructions originated by the Agent with respect to such uncertificated Pledged Equity.

(j) Perfection Through Control. If any Collateral shall consist of Electronic Chattel Paper, Letter-of-Credit Rights or Pledged Equity constituting uncertificated securities, in each case, with a value in excess of $250,000, execute and deliver (and, with respect to any Pledged Equity constituting Uncertificated Securities, cause the issuer thereof to execute and deliver) to the Agent all control agreements, assignments, instruments or other documents as reasonably requested by the Agent for the purposes of obtaining and maintaining control of such Collateral. If any Collateral shall

consist of Deposit Accounts or Securities Accounts, the applicable Grantor shall comply with Section 5.15 of the Credit Agreement with respect to such Collateral.

(k) Receivables. Each Grantor shall perform in all material respects all of its obligations with respect to the Receivables. So long as no Event of Default shall have occurred and be continuing, each Grantor may (A) grant any extension or renewal of the time of payment of any Receivable, (B) compromise or settle any dispute, claim or legal proceeding with respect to any Receivable for less than the total unpaid balance thereof, (C) release, wholly or partially, any Person liable for the payment thereof, or (D) allow any credit or discount thereon.

(l) Notice of Commercial Tort Claims. Each Grantor agrees that, if it shall acquire any interest in Commercial Tort Claims (whether from another Person or because such commercial tort claim shall have come into existence) with a value in excess of $250,000, such Grantor shall, promptly upon knowledge of such acquisition, deliver to the Agent, in each case in form and substance reasonably satisfactory to the Agent, a notice of the existence and nature of such Commercial Tort Claim and a supplement to **Schedule 1** containing a specific description of such Commercial Tort Claim and (ii) such Grantor shall execute and deliver to the Agent, in each case in form and substance satisfactory to the Agent, any document, and take all other action, deemed by the Agent to be reasonably necessary or appropriate for the Agent to obtain, for the benefit of the Secured Parties, a perfected Security Interest having at least the priority set forth in Section 4(d) in all such Commercial Tort Claims. Any supplement to **Schedule 1** delivered pursuant to this Section 5(l) shall, after the receipt thereof by the Agent, become part of **Schedule 1** for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

Section 6. Certain Rights as to the Collateral; Attorney-In-Fact; Agent's Authority

(a) So long as no Event of Default shall have occurred and be continuing:

(i) Each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Security Agreement and the other Loan Documents, *provided,* that such Grantor shall not exercise or refrain from exercising any such right without the prior written consent of the Agent if such action or inaction would materially impair the value of the Collateral or the validity, priority or perfection of the Security Interest granted hereby or the remedies of the Agent and the Secured Parties hereunder.

(ii) Each Grantor shall be entitled to pay, receive and/or retain any and all dividends, principal, interest and other distributions in respect of the Collateral to the extent not prohibited by this Security Agreement or the other Loan Documents, *provided,* that, subject to Section 5(k) above, upon the

occurrence and during the continuance of an Event of Default, any and all (A) dividends, principal, interest and other distributions paid or payable other than in cash in respect of, and instruments (other than checks in payment of cash dividends) and other Property received, receivable or otherwise distributed in respect of, or in exchange for, Collateral, (B) dividends and other distributions paid or payable in cash in respect of any Pledged Debt or Pledged Equity in connection with a partial or total liquidation or dissolution of such Grantor or in connection with a reduction of capital, capital surplus or paid-in-surplus, unless permitted to be retained by such Grantor under the terms of the Credit Agreement, and (C) except as otherwise expressly permitted under the Credit Agreement, cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Debt or Pledged Equity, shall be, and shall forthwith be delivered to the Agent to be held as, Collateral (in an interest bearing account maintained with the Agent) and shall, if received by such Grantor, be received in trust for the benefit of the Agent, be segregated from the other Property of such Grantor, and be forthwith delivered to the Agent as Collateral in the same form as so received (with any necessary endorsement or assignment).

(iii) The Agent shall execute and deliver (or cause to be executed and delivered) to the Grantors (at the Grantors' expense), all such proxies and other instruments as the Grantors may reasonably request for the purpose of enabling the Grantors to exercise the voting and other rights which they are entitled to exercise pursuant to clause (i) above and to receive the dividends, principal or interest payments, or other distributions which they are authorized to receive and retain pursuant to clause (ii) above.

(b) Upon the occurrence and continuance of an Event of Default:

(i) All rights of each Grantor to (A) exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6(a)(i) shall, upon notice to such Grantor by the Agent, cease and (B) receive the dividends, principal and interest payments and other distributions which it would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) shall automatically cease, and all such rights and all other rights of such Grantor granting the security interest in the Pledged Equity, including the right to participate in the management of the issuer of such Pledged Equity, shall thereupon become vested in the Agent or its nominee to the same extent as such Grantor. Upon the vesting of the foregoing rights in the Agent or its nominee, the Agent or its nominee shall have the right, but not the obligation, to exercise such rights and to receive and hold as Collateral the Pledged Equity of such Grantor and such dividends, principal or interest payments and distributions.

(ii) All dividends, principal and interest payments and other distributions which are received by any Grantor contrary to the provisions of Section 6(b)(i) shall be received in trust for the benefit of the Agent and the other Secured Parties, shall be segregated from other funds of such Grantor and shall be

forthwith paid over to the Agent as Collateral (to be held in an interest bearing account maintained with the Agent) in the same form as so received (with any necessary endorsement).

(c) In the event that all or any part of the securities or instruments constituting the Collateral are lost, destroyed or wrongfully taken (by a party other than the Agent) while such securities or instruments are in the possession of the Agent, the Grantors shall deliver new securities or instruments in place of the lost, destroyed or wrongfully taken securities or instruments upon request therefor by the Agent without the necessity of any indemnity bond or other security other than the Agent agreement or indemnity therefor customary for security agreements similar to this Security Agreement.

(d) Each Grantor hereby irrevocably appoints the Agent, on behalf of the Secured Parties, such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time at any time when an Event of Default occurs and is continuing, in the Agent's reasonable discretion, to take any action and to execute any instrument which the Agent may reasonably deem necessary to accomplish the purposes of this Security Agreement, including, without limitation:

(i) to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, and to receive, endorse, and collect any drafts or other chattel paper, instruments and documents in connection therewith,

(ii) to file any claims or take any action or institute any proceedings which the Agent may reasonably deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Agent with respect to any of the Collateral, and

(iii) to receive, endorse and collect all instruments made payable to such Grantor representing any dividend, principal payment, interest payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same. The powers granted to the Agent under this Section constitute a power coupled with an interest which shall be irrevocable by such Grantor and shall survive until all of the Credit Party Obligations have been paid in full in cash (other than indemnification obligations that have not been asserted as of such date).

The Agent agrees to provide written notice to the applicable Grantor no later than ten (10) days after taking any of the actions above in this Section 6(d), provided that failure to give such notice shall not invalidate such action and the Agent shall have no liability for failing to give such notice.

(e) Upon the occurrence and continuance of an Event of Default, if any Grantor fails to perform any agreement contained herein, the Agent may itself perform, or cause performance of, such agreement, and the reasonable expenses of the Agent incurred in connection therewith shall be payable by the Grantors pursuant to the terms of the Credit Agreement.

(f) The powers conferred on the Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Agent shall have no duty as to any Collateral. In addition, the Agent shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Agent in good faith. The Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Agent accords its own property. No Secured Party and no Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or, except for the safe custody of any Collateral in its possession, to take any other action whatsoever with regard to the Collateral. The powers conferred on the Agent hereunder shall not impose any duty upon any other Secured Party to exercise any such powers. The other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their respective officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as finally determined in a non-appealable judgment by a court of competent jurisdiction.

(g) Each Grantor acknowledges that the rights and responsibilities of the Agent under this Security Agreement with respect to any action taken by the Agent or the exercise or non-exercise by Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Agent and the other Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Agent and any Grantor, the gent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation or entitlement to make any inquiry respecting such authority.

(h) The Grantors hereby grant to the Agent, effective upon the occurrence and during the continuance of any Event of Default, the nonexclusive right and license (subject, in the case of trademarks, to sufficient rights to quality control and inspection in favor of such Grantors) to use all Intellectual Property owned or used by any Grantor that relate to the Collateral and any other collateral granted by the Grantors as

security for the Credit Party Obligations (to the extent sublicensable), together with any goodwill associated therewith, all to the extent necessary to enable the Agent to use, possess and realize on the Collateral and to enable any successor or assign to enjoy the benefits of the Collateral. This right and license shall inure to the benefit of all successors, assigns and transferees of the Agent and its successors, assigns and transferees, whether by voluntary conveyance, operation of law, assignment, transfer, foreclosure, deed in lieu of foreclosure or otherwise. Such right and license is granted free of charge, without requirement that any monetary payment whatsoever be made to the Grantors.

(i) In addition to each of the foregoing and any other rights of the Agent as set forth herein or in any other Loan Document, each Grantor hereby grants to the Agent (through itself, its representatives, designees or agents), until the payment in full in cash of the Obligations, an **IRREVOCABLE PROXY**, to vote all or any part of such Grantor's Pledged Securities from time to time, in each case in any manner the Agent deems advisable in its sole discretion, in its capacity as a pledgee, member and/or manager, either for or against any or all matters submitted, or which may be submitted to a vote of shareholders, partners, managers, or members, as the case may be, and to exercise all other rights, powers, privileges, and remedies to which any such shareholders, partners, managers, or members would be entitled (including, without limitation, giving or withholding written consents, ratifications, and waivers with respect to the Pledged Securities, calling special meetings of the holders of the Pledged Securities of any issuer and voting at such meetings). To the extent permitted by applicable law, the **IRREVOCABLE PROXY** granted hereby is effective automatically without the necessity that any other action (including, without limitation, that any transfer of any of the Pledged Securities be recorded on the books of the relevant Credit Party or issuer) be taken by any Person (including the relevant Credit Party or issuer of any Pledged Securities or any officer or agent thereof), is coupled with an interest, and shall be irrevocable, shall survive the bankruptcy, dissolution or winding up of any relevant Grantor, and shall terminate only on the Maturity Date. Notwithstanding the foregoing, the Agent shall only exercise the irrevocable proxy set forth in this Section 6(j) while any Event of Default has occurred and/or is continuing and upon contemporaneous notice to such Grantor, and immediately upon waiver of such Event of Default (and so long as no separate or future Event of Default has occurred and/or is continuing), shall immediately (or take all reasonably necessary actions available) discontinue exercise of such irrevocable proxy. Each Grantor hereby agrees that on the date that is thirty (30) days prior to the date of expiration (by operation of applicable laws) of the irrevocable proxy granted pursuant hereto, such Grantor shall automatically be deemed to grant the Agent a new **IRREVOCABLE PROXY**, on the same terms as those previously granted pursuant hereto. Upon the reasonable written request of the Agent, each Grantor further agrees to deliver to the Agent, on behalf of the Agent and the other Secured Parties, such further evidence of such irrevocable proxy or such further irrevocable proxies to enable the Agent to vote the Pledged Securities.

Section 7. Remedies upon Default

(a) Upon the occurrence and continuation of an Event of Default, the Agent and the Secured Parties may declare all Credit Party Obligations to be due and payable, in accordance with the terms of Section 8.2 of the Credit Agreement.

(b) Upon the occurrence and continuation of an Event of Default, each of the Grantors shall assemble and deliver each item of Collateral to the Agent on demand, and the Agent and the Secured Parties shall have in any jurisdiction in which enforcement hereof is sought, in addition to any other rights and remedies, the rights and remedies of a secured party under the NYUCC or the UCC of any jurisdiction in which the Collateral is located, including, without limitation, the right, with or without legal process and with or without prior notice or demand for performance, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral (and for that purpose the Agent may, so far as the Grantors can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the Collateral therefrom) and, generally, to exercise any and all rights afforded to a secured party under the UCC or other applicable law. Without limiting the generality of the foregoing, each of the Grantors agrees that upon the occurrence and during the continuation of an Event of Default, the Agent shall have the right, subject to the mandatory requirements of applicable law, to (i) notify or require any Grantor to notify any and all Account Debtors or parties against which such Grantor has a claim that Accounts have been assigned to the Agent for the benefit of the Secured Parties and/or that the Agent, for the benefit of the Secured Parties, has a Security Interest therein and that all payments should be made to the Agent; (ii) endorse the name of any Grantor upon any instruments of payments (including payments made under any policy of insurance) that may come into the possession of the Agent in full or part payment of any amount owing to the Agent; (iii) sign and endorse the name of any Grantor upon drafts against Account Debtors or other obligors and to sign and endorse the name of any Grantor on any assignments, verifications, and notices in connection with Accounts, contracts, Chattel Paper, Instruments or Documents, relating thereto or to the rights of such Grantor therein; (iv) send requests for verification to Account Debtors or other obligors; and (v) sell or otherwise dispose of all or any part of the Collateral, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Agent shall deem commercially reasonable. The Agent agrees to provide written notice to the applicable Grantor no later than ten (10) days after taking any of the actions in the immediately preceding sentence, provided that failure to give such notice shall not invalidate such action and the Agent shall have no liability for failing to give such notice. Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each of the Grantors hereby waives (to the extent permitted by law) all rights of redemption, stay, valuation and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(c) Upon the occurrence and continuation of an Event of Default, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Agent shall give to the Grantors at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. Each Grantor hereby acknowledges that ten (10) days' prior written notice of such sale or sales shall be reasonable notice. Each Grantor hereby waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Agent's rights hereunder, including, without limitation, the right of the Agent following an Event of Default to take immediate possession of the Collateral and to exercise the Agent's rights with respect thereto.

(d) Upon the occurrence and continuation of an Event of Default, any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Agent may (in its commercially reasonable discretion) determine. The Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Agent until the sale price is paid by the purchaser or purchasers thereof, but the Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by applicable law, private) sale made pursuant to this Section, the Agent may bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all such rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Agent from any Grantor as a credit against the purchase price, and the Agent may, upon compliance with the terms of sale, hold, retain and dispose of such property. For purposes hereof, (i) a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof and (ii) the Agent shall be free to carry out such sale pursuant to such agreement. As an alternative to exercising the power of sale herein conferred upon it, the Agent may proceed by a suit or suits at law or in equity to foreclose upon the Collateral and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver.

(e) Upon the occurrence and continuation of an Event of Default, any sale pursuant to the provisions of this Section 7 shall be deemed to conform to the

commercially reasonable standards as provided in Section 9-610 of the NYUCC or the UCC of any other jurisdiction in which Collateral is located or any other requirement of applicable law. Without limiting the foregoing, each Grantor agrees and acknowledges that, to the extent that applicable law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, it shall be commercially reasonable for the Agent to do any or all of the following: (i) fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw materials or work in process into finished goods or other finished products for disposition, (ii) fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on any Collateral, (iv) exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of the Collateral, (vii) hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) dispose of Collateral utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have reasonable capability of doing so, or that match buyers and sellers of assets, (ix) disclaim dispositions of warranties, (x) purchase (or fail to purchase) insurance or credit enhancements to insure the Agent against risk of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral, or (xi) to the extent reasonably deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Nothing in this Section 7 shall be construed to grant any rights to the Grantors or to impose any duties on the Agent that would not have been granted or imposed by this Security Agreement or applicable law in the absence of this Section 7 and the parties hereto acknowledge that the purpose of this paragraph is to provide non-exhaustive indications of what actions or omissions by the Agent would be deemed commercially reasonable in the exercise by the Agent of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being set forth in this Section 7.

(f) Each Grantor acknowledges and agrees that the Agent may elect, with respect to the offer or sale of any or all of the Stock constituting each Grantor's Pledged Equity, to conduct such offer and sale in such a manner as to avoid the need for registration or qualification of such Stock or the offer and sale thereof under any Federal or state securities laws and that the Agent is authorized to comply with any limitation or restriction in connection with such sale as counsel may advise the Agent is reasonably necessary in order to avoid any violation of applicable law, compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that

such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Stock, or in order to obtain any required approval of the sale or of the purchaser by any Governmental Authority. Each Grantor further acknowledges and agrees that any such transaction may be at prices and on terms less favorable than those which may be obtained through a public sale and not subject to such restrictions and agrees that, notwithstanding the foregoing, the Agent is under no obligation to conduct any such public sale and may elect to impose any or all of the foregoing restrictions, or any other restrictions which may be reasonably necessary in order to avoid any such registration or qualification, at its sole discretion, and that any such offer and sale so conducted shall be deemed to have been made in a commercially reasonable manner.

Section 8. Application of Proceeds of Sale

The Agent shall apply the proceeds of any collection or sale of the Collateral, moneys or balances after, subject to Section 9.5 of the Credit Agreement, deducting all reasonable and documented out of pocket costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of Agent and any other Secured Party hereunder, including reasonable and documented attorneys' fees and disbursements, to the payment in whole or in part of the Credit Party Obligations, as set forth in the Credit Agreement, and only after such application and after the payment by Agent of any other amount required by any Requirement of Law, need Agent account for the surplus, if any, to any Grantor. Upon any sale of the Collateral by the Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Agent or such officer or be answerable in any way for the misapplication thereof. Notwithstanding the foregoing, no proceeds realized for any guarantee or Collateral of a Guarantor who is not a Qualified ECP Guarantor shall be applied to the payment of Credit Party Obligations due under Secured Rate Contracts.

Section 9. Grantors Remain Liable under Receivables

Anything herein to the contrary notwithstanding (including, without limitation, the grant of any rights to the Agent), each Grantor shall remain liable under each of the Receivables to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Receivables. The Agent shall not have any obligation or liability under any Receivable (or any agreement giving rise thereof) by reason of or arising out of this Security Agreement or the receipt by the Agent of any payment relating to such Receivable pursuant hereto, nor shall the Agent be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereof), to make any payment, to make any inquiry as to the nature

or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Receivable (or any agreement giving rise thereof), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

Section 10. [Reserved]

Section 11. Waivers; Amendment

(a) No failure or delay of the Agent or any other Secured Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that it would otherwise have. No notice or demand on any Grantor in any case shall entitle such Grantor to any other or further notice or demand in similar or other circumstances.

(b) Neither this Security Agreement nor any provision hereof may be waived, amended, modified or terminated except as set forth in the Credit Agreement.

Section 12. Security Interest Absolute

All rights of the Agent and the other Secured Parties hereunder, the Security Interest and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Credit Party Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Credit Party Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument relating to any of the foregoing, (c) any exchange, release or non-perfection of any Lien on any other collateral, or any release or amendment or waiver of, or consent under, or departure from, any guaranty securing or guaranteeing all or any of the Credit Party Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Credit Party Obligations or in respect of this Security Agreement or any other Loan Document (other than the payment or performance in full thereof, as applicable).

Section 13. Notices

All communications and notices required or permitted to be given hereunder shall be in conformance with Section 10.2 of the Credit Agreement.

Section 14. Binding Effect; Several Agreement; Assignments

Whenever in this Security Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor that are contained in this Security Agreement shall bind and inure to the benefit of each Secured Party and its permitted successors and assigns. This Security Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Agent and a counterpart hereof shall have been executed on behalf of the Agent, and thereafter shall be binding upon such Grantor, the Agent, the Secured Parties and their respective successors and assigns, and shall inure to the benefit of such Grantor, the Agent, the Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign its rights or obligations hereunder or any interest herein or in the Collateral (and any such attempted assignment shall be void), except as expressly contemplated by the Credit Agreement. This Security Agreement shall be construed as a separate agreement with respect to each of the Grantors and may be amended, restated, amended and restated, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

Section 15. Survival of Agreement; Severability

(a) All covenants, agreements, representations and warranties made by the Grantors herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Security Agreement or any other Loan Document shall be considered to have been relied upon by the Agent and shall survive the execution and delivery of any Loan Documents and the making of any Loan or issuance of any Letter of Credit, regardless of any investigation made by the Agent or on its behalf, and shall continue in full force and effect until this Security Agreement shall terminate.

(b) The provisions of this Security Agreement are severable, and if any clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Security Agreement in any jurisdiction. Each of the covenants, agreements and conditions contained in this Security Agreement is independent and compliance by the Grantors with any of them shall not excuse non-compliance by any Grantor with any other. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 16. GOVERNING LAW

THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS RULES PERTAINING TO CONFLICTS OF LAWS.

Section 17. Counterparts

This Security Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one contract (subject to Section 14), and shall become effective as provided in Section 14. Delivery of an executed counterpart of this Security Agreement by facsimile or email transmission shall be as effective as delivery of a manually executed counterpart of this Security Agreement.

Section 18. Headings

Section headings used herein are for convenience of reference only, are not part of this Security Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Security Agreement.

Section 19. JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL

The terms of Sections 10.16 and 10.17 of the Credit Agreement are incorporated herein by reference, mutatis mutandis, and the parties hereto agree to such terms.

Section 20. [Reserved]

Section 21. Additional Grantors

Upon execution and delivery after the date hereof by the Agent and a Subsidiary of the Borrower of an instrument in the form of Annex II, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of any such instrument shall not require the consent of any Grantor hereunder. The rights and obligations of each of the Grantors hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

Section 22. Termination

Upon the Facility Termination Date, this Security Agreement shall terminate and the Agent shall promptly execute and deliver all necessary documents (including, without limitation, UCC termination statements) to terminate all liens and security interests held by the Agent against the Grantors, all at the expense of the

Grantors, and return to the Grantors any and all Collateral in its possession, including any instruments and certificates evidencing Pledged Securities, and any other documentation relating to the Collateral.

Section 23. Restrictions on Transfers of Stock Not Applicable

Each Grantor hereby agrees that the pledge of the Collateral to the Agent hereunder and the sale of the Collateral by the Agent in accordance with the provisions of this Security Agreement shall be free from restrictions on the transfer of Stock of any Person, if any, contained in any Organization Document of such Person. Each Grantor hereby consents to the exercise by the Agent and any other Secured Party of any of its rights and remedies hereunder upon the occurrence of an Event of Default and agrees that the Agent and each other Secured Party shall have the right to exercise such rights and remedies in accordance with the terms hereof upon the occurrence of an Event of Default notwithstanding any restrictions set forth in any Organization Document of any Person.

Section 24. Loan Document.

This Security Agreement constitutes a "Loan Document" under and as defined in the Credit Agreement and is subject to the terms and provisions therein regarding Loan Documents.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have duly executed this Security Agreement as of the day and year first above written.

**GRANTORS:**

**HONOR HOLDINGS, LLC**

By: ________________________________
Name:
Title:

**3 KINGS HOLDINGS, LLC**

**BLACKBERRY VISION, LLC**

**BLUEBERRY VISION INVESTMENTS, LLC**

**CRANBERRY VISION LLC**

**HONORS HOLDINGS MANAGEMENT LLC**

**JM ACWORTH LLC**

**JM ARNOLD CREEK, LLC**

**JM AUGUSTA LLC**

**JM BUFURD, LLC**

**JM CHATTANOOGA, LLC**

**JM CLEMSON, LLC**

**JM CLEVELAND, LLC**

**JM DULUTH, LLC**

**JM EAST BEAVERTON, LLC**

**JM FOREST ACRES LLC**

**JM GREENVILLE DOWNTOWN, LLC**

**JM GREENVILLE, LLC**

**JM GREER LLC**

**JM GRESHAM, LLC**

**JM HASSLO LLC**

**JM HIXSON, LLC**

**JM IRMO FITNESS LLC**

**JM KENNESAW, LLC**

**JM LEX LLC**

**JM LLOYD DISTRICT, LLC**

**JM MARIETTA, LLC**

**JM MEDFORD LLC**

**JM MT PLEASANT, LLC**

**JM MYRTLE BEACH LLC**

**JM NE COLUMBIA LLC**

**JM NORCROSS, LLC**

**JM NORTH MT. PLEASANT, LLC**

**JM NORTHSHORE, LLC**

**JM NW 23RD, LLC**

**JM PEARL DISTRICT, LLC**

**JM SE PORTLAND, LLC**

**JM SOUTH WATERFRONT, LLC**

**JM SPARTANBURG FITNESS LLC**

By: ________________________________
Name:
Title:

**JM SPECIAL VENUE LLC**

**JM SUGAR HILL, LLC**

**JM SUMMERVILLE LLC**

**JM VANCOUVER, LLC**

**JM VININGS LLC**

**JM WEST ASHLEY LLC**

**JM WEST BEAVERTON, LLC**

**JM WEST COBB, LLC**

**JM WILSONVILLE, LLC**

**JM WOODSTOCK, LLC**

**JW CANTON, LLC**

**OREGON HOLDINGS LLC**

**RASBERRY VISION LLC**

**SIMPLE BERRY LLC**

**SOUTH CAROLINA AR HOLDINGS, LLC**

**STRAWBERRY VISION LLC**

**VAILLANTINO LS, LLC**

**VAILLANTINO, LLC**

**VAILLANTINO JC, LLC**

**VVDC CHAMBLEE, LLC**

**VVDC DUNWOODY, LLC**

**VVDC LAWRENCEVILLE, LLC**

**VVDC MILTON, LLC**

**VVDC NORTHLAKE, LLC**

**VVDC POOLER, LLC**

**VVDC SANDY PLAINS, LLC**

**VVDC SAVANNAH, LLC**

**VVDC WEBB GIN, LLC**

**VVDC, LLC**

By: ________________________________
Name:
Title:

**AGENT:**

**WHITEHORSE CAPITAL MANAGEMENT, LLC**

By:__________________________
Name:
Title:

## SCHEDULE 1

## COMMERCIAL TORT CLAIMS

None.

**ANNEX I TO SECURITY AGREEMENT**

**<u>PERFECTION CERTIFICATE</u>**

(attached)

## ANNEX II TO SECURITY AGREEMENT

## FORM OF SUPPLEMENT

**SUPPLEMENT NO. __**, dated as of __________ ___, 20__ (this "*Supplement*"), to the SECURITY AGREEMENT, dated as of July 17, 2018 (as amended, restated, amended and restated supplemented or otherwise modified from time to time, the "*Security Agreement*"), among **HONOR HOLDINGS, LLC**, a Georgia limited liability company (the "*Borrower*"), each of the existing and future Subsidiaries of the Borrower from time to time party to the Security Agreement (each such Subsidiary, each a "*Guarantor*" and, collectively, the "*Guarantors*"; the Guarantors and the Borrower are referred to herein individually as a "*Grantor*" and collectively as the "*Grantors*"), and **WHITEHORSE CAPITAL MANAGEMENT, LLC**, in its capacity as agent under the Credit Agreement referred to below (in such capacity, the "*Agent*") for the Secured Parties.

Reference is made to the Credit Agreement, dated as of September 6, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), by and among the Borrower, HH Holdco, Inc., a Delaware corporation ("*Holdings*"), the Guarantors, the financial institutions from time to time party thereto (each a "*Lender*" and collectively, the "*Lenders*") and the Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Security Agreement.

The Grantors have entered into the Security Agreement in order to induce the Lenders to make Loans to, and to issue and/or acquire participation interests in Letters of Credit for the account of, the Borrower. Section 21 of the Security Agreement provides that Subsidiaries of the Borrower may become Grantors under the Security Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "*New Grantor*") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Grantor under the Security Agreement in order to induce the Lender to make additional Loans and to issue and/or acquire participations in Letters of Credit and as consideration for Loans previously made and Letters of Credit previously issued.

Accordingly, the Agent and the New Grantor agree as follows:

Section 1. In accordance with Section 21 of the Security Agreement, the New Grantor by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder. In furtherance of the foregoing, the New Grantor, as security for the payment and performance in full of the Credit Party Obligations, does hereby create and grant to the Agent, for the benefit of the Secured

Parties, a security interest in and lien on all of the New Grantor's right, title and interest in and to the Collateral (as defined in the Security Agreement) of the New Grantor. Each reference to a "*Grantor*" in the Security Agreement shall be deemed to include the New Grantor. The Security Agreement is hereby incorporated herein by reference.

Section 2. The New Grantor represents and warrants to the Agent that (a) this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity (whether considered in an action of law or in equity), (b) set forth on the Schedule attached hereto is a true and complete schedule of all of the information called for by the Perfection Certificate that would have been required to have been delivered by or on behalf of the New Grantor pursuant to the Security Agreement and the Credit Agreement if the New Grantor had been originally named in the Security Agreement and (c) the representations and warranties made by it as a Grantor under the Security Agreement and in any other Loan Document are true and correct in all material respects on and as of the date hereof based upon the applicable information referred to in clause (b) of this Section.

Section 3. This Supplement may be executed in counterparts, each of which shall constitute an original, but both of which, when taken together, shall constitute but one contract. This Supplement shall become effective when the Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of the New Grantor and the Agent. Delivery of an executed counterpart of this Supplement by facsimile or email transmission shall be as effective as delivery of a manually executed counterpart of this Supplement.

Section 4. Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

Section 5. **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS RULES PERTAINING TO CONFLICTS OF LAWS.**

Section 6. The provisions of this Supplement are severable, and if any clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Security Agreement in any jurisdiction. Each of the covenants, agreements and conditions contained in this Supplement and the Security Agreement is independent and compliance by the New Grantor with any of them shall not excuse non-compliance by the

New Grantor with any other. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 7. All communications and notices hereunder shall be in writing and given as provided in Section 13 of the Security Agreement. All communications and notices hereunder to the New Grantor shall be given to it at the address set forth in the Schedule hereto.

Section 8. This Supplement to Security Agreement constitutes a "Loan Document" under and as defined in the Credit Agreement and is subject to the terms and provisions therein regarding Loan Documents.

**IN WITNESS WHEREOF**, the New Grantor and the Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

**[Name of New Grantor]**

By:___________________________
Name:
Title:

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By:___________________________
Name:
Title:

# SCHEDULE TO THE SUPPLEMENT