# <u>EXHIBIT B</u>

## Partial Strict Foreclosure Agreement

# PARTIAL STRICT FORECLOSURE AGREEMENT

This PARTIAL STRICT FORECLOSURE AGREEMENT (this "Agreement") is made and entered into as of the 25th day of September, 2024 by: (a) WhiteHorse Capital Management, LLC, as Agent for the Lenders (in such capacity, together with its successors and permitted assigns, including any assignee formed by the Agent and designated as an assignee for purposes of this Agreement, the "Agent"); (b) Honors Holdings, LLC, a Georgia limited liability company (the "Borrower"); (c) the subsidiaries of the Borrower set forth on the signature pages hereto (collectively, the "Guarantors"; Guarantors together with the Borrower are each a "Credit Party" and, collectively, the "Credit Parties"); and (d) the undersigned Lenders solely with respect to the releases set forth in Section 12 herein. The Agent, the Borrower, the Guarantors and the Lenders are hereinafter referred to individually as a "Party" and collectively as the "Parties."

## Recitals and Statement of Purpose

A. The Borrower, HH Holdco, Inc., a Delaware corporation ("Holdings"), the Persons from time to time party thereto as a "Credit Party", including the Credit Parties, the Lenders from time to time party thereto and the Agent are parties to that certain Credit Agreement, dated as of September 6, 2019 (as amended by that certain First Amendment to Credit Agreement, dated as of December 2, 2019, as amended by that certain Limited Consent No. 1 and Second Amendment to Credit Agreement, dated as of December 19, 2019, as supplemented by that certain Limited Consent No. 2 to Credit Agreement, dated as of February 28, 2020, as supplemented by that certain Forbearance Agreement, dated as of June 5, 2020, as amended by that certain Limited Waiver and Third Amendment to Credit Agreement, dated as of July 6, 2020, as amended by that certain Limited Waiver and Fourth Amendment to Credit Agreement, dated as of February 19, 2021, as supplemented by that certain Limited Consent No. 3 to Credit Agreement, dated as of April 14, 2021, as amended by that certain Fifth Amendment to Credit Agreement, dated as of April 20, 2021, as amended by that certain Sixth Amendment to Credit Agreement, dated as of April 29, 2022, as amended by that certain Seventh Amendment, dated as of September 29, 2022, as supplemented by that certain Temporary Waiver Agreement, dated as of May 19, 2023, as amended by that certain Limited Waiver and Eighth Amendment to Credit Agreement, dated as of July 11, 2023, as supplemented by that certain extension letter agreement, dated as of December 1, 2023, as supplemented by that certain extension letter agreement, dated as of December 5, 2023, as supplemented by that certain extension letter agreement, dated as of December 19, 2023, as supplemented by that certain Supplement to Credit Agreement, dated as of February 2, 2024, as supplemented by that certain extension letter agreement, dated as of March 8, 2024, as supplemented by that certain extension letter agreement, dated as of March 29, 2024 (such extension letter agreements, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "Extension Letter"), and as amended by that certain Ninth Amendment to Credit Agreement, dated as of June 20, 2024 (as same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement")).

B. The Guarantors, the other Persons from time to time party thereto as "Guarantors" and the Agent are parties to that certain Subsidiary Guarantee Agreement, dated as of September 6, 2019 (as same has been or may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Guarantee Agreement"), pursuant to which each Guarantor

agreed, among other things, to guarantee the payment and performance of the Borrower's obligations and liabilities under the Credit Agreement and the other Loan Documents.

C. Holdings and the Agent are parties to that certain Holding Company Security Agreement, dated as of September 6, 2019 (as same has been or may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Holding Company Security Agreement"), pursuant to which Holdings granted to the Agent a security interest in, among other things, all right, title and interest owned by Holdings in any membership interests Holdings owned in the Borrower, as security for the payment or performance, as applicable, in full of the Credit Party Obligations (as defined in the Holding Company Security Agreement) (the "Borrower Pledged Equity").

D. The Borrower and the other Grantors from time to time party thereto (collectively, the "Grantors") and the Agent are parties to that certain Security Agreement, dated as of September 6, 2019 (as same has been or may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"),[1] pursuant to which each Grantor (including, without limitation, the Guarantors) granted the Agent a security interest in and Lien upon, among other things, the Collateral, including without limitation: (i) all personal property and fixtures of every kind and nature, wherever located, whether now owned or hereafter acquired or arising, of such Grantor including, without limitation, all (a) Accounts, (b) Receivables, (c) Receivable Records, (d) Equipment, (e) General Intangibles, (f) Inventory, (g) Instruments, (h) Pledged Debt, (i) Pledged Equity, (j) Documents, (k) Collateral Records, (l) Chattel Paper (whether tangible or electronic), (m) money, (n) Deposit Accounts, (o) Payment Intangibles, (p) Letter-of-Credit Rights (whether or not the letter of credit is evidenced in writing), (q) Commercial Tort Claims as set forth on Schedule 1 attached to Security Agreement (as updated from time to time in accordance with the terms thereof), (r) Intellectual Property, (s) Supporting Obligations, (t) Goods, (u) Investment Property, (v) any other contract rights or rights to the payment of money, (w) tort claims, (x) all insurance policies, (y) insurance claims and proceeds, and (z) unless otherwise agreed upon in writing by such Grantor and the Agent, all other tangible and intangible property owned or held by or on behalf of such Grantor that may be delivered to and held by the Agent pursuant to the terms thereof; (ii) all cash or non-cash Proceeds of any of the foregoing, including all Proceeds which constitute property of the types described in clause (i) above, and to the extent not otherwise included, all payments and rights under any issuance, indemnity, warranty or guaranty with respect to any of the foregoing Collateral; and (iii) all Accessions of any property of the types described in clause (i) above (all property, rights, interests and collateral described in clauses (i) through (iii), together with any other assets of the Grantors pledged as security for the Credit Party Obligations (as defined in the Security Agreement), the "Collateral").

E. On April 22, 2024, the Agent delivered to the Credit Parties that certain Notice of Default and Reservation of Rights, dated as of April 22, 2024 (the "Notice of Default"), notifying such Credit Parties, among other things, that an Event of Default had occurred and was continuing pursuant to Section 2.3 of the Credit Agreement and Extension Letter as a result of Borrower's failure to pay the Whitehorse Interest Payment for the Specified Interest Period in respect of the

[1] For purposes of this recital only, each capitalized term used in this recital but not otherwise defined herein shall have the meaning ascribed to such term in the Security Agreement.

Term Loans and Revolving Loans for the Interest Period on or before April 22, 2024 at 5:00 p.m. (New York City time) (the "Existing Event of Default").

F. Upon the occurrence and continuance of the Existing Event of Default, pursuant to the Holding Company Security Agreement, including, without limitation, Section 6(b) of the Holding Company Security Agreement, all of Holdings' rights to (i) exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6(a)(i) of the Holding Company Security Agreement and (ii) receive the dividends, principal and interest payments and other distributions which Holdings would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) of the Holding Company Security Agreement, automatically ceased, and all such rights and all other rights of Holdings with respect to the Borrower Pledged Equity, including, without limitation, the right to participate in the management of the Borrower, became vested in the Agent or its nominee to the same extent as Holdings.

G. The Agent was entitled pursuant to the Holding Company Security Agreement, including, without limitation, Section 6(d) and Section 6(i) of the Holding Company Security Agreement, among other things, under the irrevocable proxy granted to it and as attorney-in-fact of Holdings, with full authority in the place and stead of Holdings and in the name of Holdings, to exercise all voting and other rights pertaining to the Borrower Pledged Equity in the Agent's reasonable discretion. Such irrevocable proxy and attorney-in fact granted thereby became effective automatically upon the occurrence of the Existing Event of Default without the necessity for any action to be taken by any person.

H. On April 22, 2024, the Agent, in its capacity as pledgee (in such capacity, the "Pledgee"), contemporaneous with the delivery of the Notice of Default, exercised such rights to vote the Borrower Pledged Equity to exercise the rights, powers and privileges to which Holdings was entitled as the Borrower's sole member to amend that certain Second Amended and Restated Limited Liability Company Agreement of the Borrower, dated as of September 6, 2019, to, among other things (i) remove Holdings as manager of the Borrower, (ii) provide that the Borrower would be manager-managed, (iii) appoint Grant Lyon as the sole independent manager of the Borrower (the "Independent Manager") and (iv) vest all authority to manage and operate the Borrower in the Independent Manager.

I. On April 22, 2024, among other things, the Independent Manager removed all previously appointed officers of the Borrower and its direct and indirect Subsidiaries, and took full and exclusive access to and disposition over the property, books and records, facilities and bank accounts of the Borrower and its direct and indirect Subsidiaries and since such date has been independently operating the Borrower and its direct and indirect Subsidiaries.

J. In relation to the Existing Events of Default and any other Events of Default that have occurred and are continuing, the Agent and the Lenders had and continue to have the right to exercise any and all remedies and other rights under and in relation to the Loan Documents, including under the Uniform Commercial Code as in effect in the State of New York (the "NYUCC") and other applicable law.

K. The Credit Parties acknowledge (i) their current obligation to repay all Obligations under the Loan Documents, (ii) that the Agent and the Lenders have the current right under the Security

Agreement at any time in their sole discretion to take ownership, possession and control of the Collateral free and clear of all right, title, interest or claim thereto or therein of the Credit Parties or any other Person claiming through the Credit Parties, and (iii) that the Agent has, through the date hereof, forborne from foreclosing on the Collateral, and from exercise of other remedies at the request of and as a financial accommodation to the Credit Parties.

L. The Credit Parties (as applicable) have agreed to transfer, convey, assign and surrender to the Agent for the benefit of the Lenders (i) with respect to the Borrower, all of the Borrower's possession, right, title and interest in, to and under the Collateral, including the Pledged Equity (as defined in the Security Agreement) for the entities set forth on Schedule A(i) hereto (the "Borrower Transferred Entities")[2], (ii) with respect to VVDC, LLC ("VVDC"), all of VVDC's possession, right, title and interest in, to and under the Pledged Equity for the entities set forth on Schedule A(ii) hereto (the "VVDC Entities"), (iii) with respect to Blueberry Vision Investments, LLC ("BVI"), all of BVI's possession, right, title and interest in, to and under the Pledged Equity for the entities set forth on Schedule A(iii) hereto (the "BVI Entities"; the BVI Entities together with the Borrower Transferred Entities and the VVDC Entities are each a "Transferred Entity" and, collectively, the "Transferred Entities"), but in the case of clauses (i) – (iii) above, excluding any Pledged Equity for the entities not set forth on Schedule A hereto (each an "Excluded Entity" and, collectively, the "Excluded Entities") and (iv) with respect to the Excluded Entities, all of the Excluded Entities' assets (the "Transferred Assets") listed on Schedule B hereto (collectively, (i) - (iv), together with all proceeds thereof and all other documents and instruments executed in connection therewith, the "Transferred Collateral"), in each case free and clear of all liens, claims, interests and encumbrances to the fullest extent permitted under applicable law, including any Obligations owing by any of the Transferred Entities under any Loan Documents, other than any liabilities identified in Schedule C-1 hereto (the "Assumed Liabilities") and any agreements identified in Schedule C-2 hereto (the "Assumed Agreements"), and that such transfer and satisfaction are intended to comprise a partial strict foreclosure for purposes of Section 9-620(c) of the NYUCC. The Transferred Collateral constitutes a subset of the Collateral.

M. The Agent, on behalf of the Lenders, shall have the option to acquire (i) any Pledged Equity of the Excluded Entities and (ii) any assets hereunder that are not Transferred Assets (collectively, (i) and (ii), the "Excluded Assets") following the Closing Date.

N. The Agent on behalf of the Lenders has agreed to accept the Credit Parties' transfer of the Transferred Collateral in exchange for the partial satisfaction of existing Obligations under the Loan Documents, all in accordance with and subject to the provisions set forth more fully below.

## Agreement

NOW, THEREFORE in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

---

[2] For the avoidance of doubt, any entity not listed on Schedule A(i), A(ii), or A(iii) attached hereto, shall be treated as an Excluded Entity.

1. Recitals Incorporated. The recitals and prefatory phrases and paragraphs set forth above are hereby incorporated in full and made a part of this Agreement.

2. Definitions; Rules of Construction. Capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement. Defined terms may be used in the singular or the plural, as the context requires. The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation." Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or." References to Sections, Exhibits and Schedules are to Sections, Exhibits and Schedules of this Agreement unless otherwise expressly provided. All incorporations by reference of provisions from other agreements are incorporated as if such provisions were fully set forth into this Agreement and include all necessary definitions and related provisions from those other agreements. Unless the context in which it is used otherwise clearly requires, all references to days, weeks and months mean calendar days, weeks and months.

3. Existing Indebtedness. As of September 24, 2024, the amount necessary to satisfy the payment in full of the Loans and all other unpaid Obligations under the Loan Documents, inclusive of all principal, interest, expenses (including, without limitation, legal fees and expenses for counsel to the Agent and the Lenders) and all other amounts due and owing under the Loan Documents was not less than $114,411,461.46.

4. Acknowledgement of Default. The Borrower acknowledges that as a result of the continuing Existing Event of Default, (i) the Borrower is in default of the Credit Agreement, and (ii) the Agent has rights (a) under Section 9-610 of the NYUCC to sell and transfer to any Person for value in a public or private sale, all of the Credit Parties' right, title and interest in and to any or all of the Transferred Collateral, and (b) under Section 9-620 of the NYUCC to accept the Transferred Collateral in partial satisfaction of the Obligations and pursuant to Section 7 of the Security Agreement.

5. No Obligations. As a result of the occurrence and continuance of the Existing Event of Default under the Credit Agreement, and other than as set out in this Agreement and the TSA, the Agent and the Lenders have no obligation to make additional Loans or otherwise extend or continue to extend credit or any other financial accommodations to the Borrower under the Loan Documents or otherwise and have the right to exercise any and all of their rights and remedies under the Loan Documents, the NYUCC and other applicable law. Each Credit Party acknowledges and agrees that the Agent and the Lenders have fully performed all undertakings owed to the Credit Parties and the Agent and the Lenders do not waive, diminish or limit any term or condition contained in the Loan Documents.

6. Reaffirmation of Obligations; Confirmation of Credit Agreement and Liens. Each Credit Party hereby ratifies, confirms, reaffirms and acknowledges: (a) that the Obligations constitute valid, secured and perfected indebtedness and obligations owing by the Credit Parties to the Agent and the Lenders as of the date hereof; and (b) the continuing validity and effectiveness of (i) the Credit Agreement and each of the other Loan Documents and all of the terms thereof, including, without limitation, the Borrower's promise and obligation to repay the Loans and the other Obligations and the Guarantee Agreement, (ii) the Liens granted by the Credit Parties to the

Agent for the benefit of the Secured Parties in the Collateral pursuant to the Credit Agreement and the other Loan Documents, which such Credit Party acknowledges and agrees are valid, enforceable and duly perfected Liens on the Collateral, and (iii) all other rights and remedies of the Agent and the Lenders arising under the Credit Agreement, each of the other Loan Documents and applicable law.

7. Transfer of the Transferred Collateral.

a. Pursuant to Section 9-620 *et seq.* of the NYUCC, on the date of the satisfaction of the conditions precedent set forth in Section 18 hereof (the "Closing Date"), the Credit Parties will execute and deliver to the Agent an assignment, substantially in the form attached hereto as Exhibit A (the "Assignment"), which will evidence the irrevocable conveyance, assignment and transfer of the ownership and title to the Transferred Collateral to the Agent on behalf of the Lenders in exchange for the partial satisfaction of their existing Obligations under the Loan Documents in the amount of $70,000,000 and the other consideration provided herein, including the assumption of the Assumed Liabilities and the Assumed Agreements and the option to acquire the Excluded Assets, and following such partial satisfaction on the Closing Date, the Obligations owing by the Credit Parties that are Excluded Entities under the Loan Documents as of the date hereof are agreed to be $44,411,461.46 (such amount, the "Remaining Obligations").

b. The Credit Parties that are Excluded Entities agree to provide to the Agent or its assignee access to financial account books and records, tax records, checkbooks, and cancelled checks of the Credit Parties upon the Closing Date and copies of same promptly following the Closing Date.

c. The Credit Parties that are Excluded Entities agree that, from and after the Closing Date, they will not take any action inconsistent with or harmful to the Agent's and the Lenders' absolute ownership, possession, control, and quiet enjoyment of all Transferred Collateral, and in particular will not make or publish any statement or communicate with any Person in any manner that might be expected to cause such Person to understand or believe that such Credit Parties continue to have any interest in, or rights in relation to, any Transferred Collateral.

8. Acceptance of the Transferred Collateral as Partial Satisfaction. Upon the Closing Date, pursuant to Section 9-620 et seq. of the NYUCC and other applicable laws, the Agent on behalf of the Lenders shall accept the transfer from the Credit Parties of all of the Credit Parties' possession, right, title, and interest in and to the Transferred Collateral, as herein provided, free and clear of all liens, claims, interests and encumbrances to the fullest extent permitted under applicable law, including any Obligations owing by any of the Transferred Entities under any Loan Documents, other than the Assumed Liabilities and the Assumed Agreements, in exchange for the partial satisfaction of the Credit Parties' Obligations under the Loan Documents other than the Remaining Obligations. Each Credit Party consents without any objection of any kind or nature to the acceptance of the Transferred Collateral by the Agent on behalf of the Lenders. This Agreement shall also constitute the Credit Parties' post-default waiver and renunciation of all of their rights under Section 9-611, Section 9-620, and Section 9-621 of Article 9, subdivision 6, of the NYUCC. Each Credit Party acknowledges that the credit to be received for the Transferred Collateral,

together with the other consideration and concessions granted hereunder, including the Assumed Liabilities, the Assumed Agreements and the TSA (as defined below), is fair and reasonable.

9. Assumption of Liabilities and Agreements. On and following the occurrence of the Closing Date, the Agent will assume and agree to pay, perform and discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof) only the Assumed Liabilities and the Assumed Agreements, in each case only as identified in Schedule C-1 and Schedule C-2 hereto; *provided*, *however*, that any modifications to Schedule C-1 or Schedule C-2 hereto shall require the written consent of all Parties.

10. Option to Acquire Excluded Assets. In the one-hundred and twenty (120) day period following the Closing Date, the Agent, on behalf of the Lenders, shall have the option to acquire any Excluded Asset by providing written notice to the Credit Parties of such acquisition. Upon providing such written notice of such acquisition, without any action of any Party or Person, the Excluded Asset shall be a Transferred Entity or a Transferred Asset (as applicable) for all purposes herein, and the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated to reflect such acquisition; *provided*, that, for the sake of clarity, no additional consideration shall be due for such acquisition.

11. Collection of Account Receivable; Attorney-in-Fact.

a. As of the Closing Date, each Excluded Entity hereby (i) authorizes the Agent to open any and all mail addressed to such Excluded Entity relating to the Transferred Collateral (or which the Agent believes may be related to the Transferred Collateral prior to opening) and delivered to the offices of the business or otherwise to the Agent if received on or after the Closing Date and (ii) appoints the Agent or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by the Agent after the Closing Date with respect to accounts receivable that are Transferred Collateral or accounts receivable relating to work performed by the Transferred Entities after the Closing Date, as the case may be, made payable or endorsed to such Transferred Entity or Excluded Entity or such entity's order, for the Agent's own account; *provided*, that upon request of any Excluded Entity, the Agent shall promptly provide an accounting and supporting documentation with respect to such endorsements and all other deposits.

b. As of the Closing Date, each Excluded Entity agrees that any cash, monies, checks, or negotiable instruments received by such Excluded Entity after the Closing Date with respect to (i) accounts receivable (including credit card receivables), (ii) other Transferred Collateral, or (iii) cash, monies, checks, negotiable instruments or accounts receivable relating to the period after the Closing Date, shall be held in trust by such Excluded Entity for the Agent's benefit and account, and promptly upon receipt by such Excluded Entity of any such payment (but in any event within three (3) business days of such receipt), such Excluded Entity shall pay over to the Agent the amount of such payments with appropriate endorsements. In addition, each Excluded Entity agrees that, after the Closing Date, it shall hold in trust and shall promptly transfer and deliver to the Agent, from time to time as and when received by such Excluded Entity, any other property that such Excluded Entity may receive on or after the Closing Date which properly belongs to the Agent hereunder.

c. As of the Closing Date, the Agent shall have the sole authority to bill and collect accounts receivable that are Transferred Collateral and accounts receivable relating to work performed by the Transferred Entities after the Closing Date.

12. Release of Claims.

a. Release of Credit Parties. The Agent and the Lenders, and, to the maximum extent permitted by law, each of their respective partners, members, shareholders, directors, managers, agents, counsel, advisors, representatives, employees and affiliates and the heirs, successors or assigns of any of the foregoing, and all persons acting by, through or under control of any of the foregoing (each, solely in its capacity as such, a "Transferee Releasor"), hereby unconditionally and irrevocably releases, waives, discharges and covenants not to sue, or cause to be sued, in each case whether directly or indirectly, the Transferred Entities, the Independent Manager, in his capacity as such, and each of the Credit Parties' current officers, counsel, advisors and representatives or the heirs, successors and assigns of each of the foregoing (each, in its capacity as such, a "Transferee Releasee") from any and all liabilities, claims, suits, debts, liens, losses, causes of action, demands, rights, damages, penalties, costs and expenses of any kind, character or nature whatsoever, known or unknown, asserted or unasserted, fixed or contingent, that each Transferee Releasor ever had, now has or may have in the future against any Transferee Releasee for, upon or by reason of any matter, cause or thing whatsoever, to the fullest extent of the law, from the beginning of time until the execution and delivery of this release and the Closing Date (the "Transferee Released Claims"), and agrees forever to refrain from commencing, instituting, joining or prosecuting, directly or indirectly, any lawsuit, action or other proceeding against the Transferee Releasees with respect to any and all Transferee Released Claims; *provided*, *however*, the Transferee Released Claims do not release (i) a Transferee Releasor's rights or obligations arising under this Agreement, (ii) any claims for any Remaining Obligations, (iii) any Assumed Liabilities of the Transferred Entities or the Assumed Agreements, or (iv) any liabilities, claims, suits, debts, liens, losses, causes of action, demands, rights, damages, penalties, costs or expenses arising from or related to the gross negligence, willful misconduct or fraud of a Transferee Releasee (but solely with respect to such Transferee Releasee) as determined by a final order entered by a court of competent jurisdiction not subject to appeal. For the avoidance of doubt, nothing in the foregoing shall prohibit a Transferee Releasor from impleading or otherwise commencing an action against a Transferee Releasee solely with respect to claims that are not Transferee Released Claims.

b. Release of the Agent and the Lenders. Each Credit Party, and, to the maximum extent permitted by law, each of the Credit Parties' respective partners, members, shareholders, directors, managers, agents, counsel, advisors, representatives, employees and affiliates and the heirs, successors or assigns of any of the foregoing, and all persons acting by, through or under control of any of the foregoing (each, in its capacity as such, a "Transferor Releasor"), hereby unconditionally and irrevocably releases, waives, discharges and covenants not to sue, or cause to be sued, in each case whether directly or indirectly, each of the Agent and the Lenders, and each of their respective officers, directors, managers, agents, counsel, advisors, representatives, employees and affiliates or the heirs, successors and assigns of each of the foregoing (each, in its capacity as such, a "Transferor Releasee") from any and all liabilities, claims, suits, debts, liens, losses, causes of action, demands, rights, damages, penalties, costs and expenses of any kind, character or nature whatsoever, known or unknown, asserted or unasserted,

fixed or contingent, that each Transferor Releasor ever had, now has or may have in the future against any Transferor Releasee for, upon or by reason of any matter, cause or thing whatsoever, to the fullest extent of the law, from the beginning of time until the execution and delivery of this release and the Closing Date (the "Transferor Released Claims"), and agrees forever to refrain from commencing, instituting, joining or prosecuting, directly or indirectly, any lawsuit, action or other proceeding against the Transferor Releasees with respect to any and all Transferor Released Claims; *provided*, *however*, the Transferor Released Claims do not release (i) a Transferor Releasor's rights or obligations arising under this Agreement, or (ii) any liabilities, claims, suits, debts, liens, losses, causes of action, demands, rights, damages, penalties, costs or expenses arising from or related to the actual gross negligence, willful misconduct or fraud of a Transferor Releasee (but solely with respect to such Transferor Releasee) as determined by a final order entered by a court of competent jurisdiction not subject to appeal. For the avoidance of doubt, nothing in the foregoing shall prohibit a Transferor Releasor from impleading or otherwise commencing an action against a Transferor Releasee solely with respect to claims that are not Transferor Released Claims.

13. Adequacy of Notice; Waivers. Each of the Credit Parties consents to the acceptance of the Transferred Collateral by the Agent and the Lenders in each case subject to and in accordance with the terms hereof. Each of the Credit Parties expressly: (a) waives (i) any requirement for receipt of post-default notice and a proposal by the Agent or the Lenders to accept the Transferred Collateral in partial satisfaction of the Obligations of the Credit Parties, in each case in compliance with Sections 9-620 and 9-621 of the NYUCC and any right to notification of sale, transfer, conveyance, or surrender of the Transferred Collateral pursuant to Sections 9-620 and 9-621 of the NYUCC or otherwise, and (ii) any remedies, rights, defenses or actions the Credit Parties might have as a result of failure to have received such notice; (b) waives the right to redeem the Transferred Collateral under Section 9-623 of the Uniform Commercial Code or otherwise; (c) waives any right to object to the sale, transfer, conveyance or surrender of the Transferred Collateral pursuant to Section 9-620 of the NYUCC or otherwise; (d) waives any obligation of the Agent or the Lenders to dispose of the Transferred Collateral; (e) waives any other right, whether legal or equitable, which the Credit Parties may possess in and relating to the Transferred Collateral; and (f) agrees that the transactions contemplated herein are in good faith and are commercially reasonable. Each of the Credit Parties acknowledges and agrees that the acknowledgements, consents and waivers set forth in this Section 13 and elsewhere in this Agreement constitute material consideration for the agreement of the Agent and the Lenders to execute and deliver this Agreement.

14. Representations, Warranties, Covenants and Further Acknowledgments. Each of the Credit Parties hereby represents, warrants, covenants and acknowledges that:

a. it knowingly and freely has entered into this Agreement without any duress, coercion or undue influence exerted by or on behalf of the Agent or the Lenders or any affiliate of the Agent or the Lenders, and it has other business and legal options available to it;

b. this Agreement has been duly authorized, executed, and delivered by each of the Credit Parties and constitutes a legal, valid, and binding agreement and obligation of each such Credit Party;

c. the execution, delivery and performance by it of this Agreement does not and will not contravene: (i) with regard to each business organization, its organizational documents; (ii) any law, judgment, award, rule, regulation, order, decree, writ or injunction of any court, legislature, agency, board, bureau, commission, instrumentality of any legislative, administrative or regulatory body (in each case whether federal, state, local, foreign or domestic or any agreement); or (iii) any agreement, instrument or indenture binding on or otherwise affecting it, other than those on Schedule D hereto;

d. the execution, delivery and performance by it of this Agreement does not and will not require any filing or registration with, consent or authorization or approval of, or notice to, or other action with or by, any court, legislature, agency, board, bureau, commission or instrumentality of any legislative, administrative or regulatory body (in each case whether federal, state, local, foreign or domestic or pursuant to any agreement), other than those set forth on Schedule E hereto;

e. with regard to each business organization, it is duly organized, validly existing and in good standing under the laws of the state of its incorporation or formation. It has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby, including without limitation to own, hold, sell and transfer (pursuant to this Agreement) the Transferred Collateral;

f. it does not and will not dispute that the Agent and the Lenders are presently entitled to exercise enforcement rights and remedies under the Loan Documents as herein contemplated;

g. it agrees that it does not and shall not dispute the validity, priority, enforceability or extent of the Agent's and the Lenders' Liens and security interests in the Transferred Collateral, nor the Agent's and the Lenders' entitlement to the immediate possession of the Transferred Collateral, in any judicial, administrative or other proceeding;

h. it is not acting on any representation, understanding or agreement not expressly set forth in this Agreement;

i. such Credit Party has provided the Agent and the Lenders with copies of all books and records of such Credit Party related to the Transferred Collateral and the Credit Parties have not sold, transferred, conveyed, assigned, pledged, hypothecated or granted any interest of any kind in or to the Transferred Collateral and such Credit Party holds title thereto free and clear of all liens, claims and encumbrances to the fullest extent permitted under applicable law;

j. the Loan Documents are valid and binding upon each of the Credit Parties and are enforceable against each of the Credit Parties in accordance with their respective terms;

k. there are no offsets, claims, counterclaims, cross-claims or defenses with respect to the Obligations; and

l. all representations and warranties in the Loan Documents are true and correct in all material respects except to the extent that (i) any of them speak to a different specific

date or (ii) the facts on which any of them were based have been changed by transactions contemplated or permitted by the Credit Agreement.

Except as otherwise agreed herein, each of the Credit Parties' representations, warranties, covenants and acknowledgments contained in this Agreement shall survive the execution, delivery and acceptance of this Agreement by the Agent and the Lenders.

15. Authority. Each of the Parties represents and warrants to each other Party as of the date hereof that: (a) it has the requisite mental and legal capacity and power to enter into this Agreement and the transactions contemplated hereby; and (b) assuming the execution and delivery by the other Parties hereto, the execution and delivery of this Agreement has been duly authorized and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

16. Covenant of Further Assurances. Each of the Parties covenants and agrees that from and after the execution and delivery of this Agreement, it shall, from time to time, execute, deliver and file any and all documents and instruments, or take such further action as may be reasonably requested by a Party to implement the terms of this Agreement. Each of the Parties further covenants to provide reasonable access to all books and records related to the Transferred Collateral for purposes of effectuating the agreements contained herein.

17. Limited Effect of Agreement. For the avoidance of doubt, the Guarantors are not being released pursuant to this Agreement from their obligations as Guarantors under the Guarantee Agreement or the Security Agreement. Notwithstanding anything herein to the contrary, the Loan Documents are, shall continue to be, and shall remain in full force and effect except as expressly provided herein and, for the avoidance of doubt, shall not be deemed to be modified in any respect as a result of this Agreement and the transfer of the Transferred Collateral hereunder. Each of the Credit Parties confirms to the Agent and the Lenders that the Obligations are and continue to be secured by each security interest and lien granted in favor of the Lenders under the Credit Agreement and other Loan Documents with respect to the Collateral. Except as expressly provided herein, this Agreement shall not be deemed or otherwise construed: (i) to be a waiver of, or consent to or a modification or amendment of any other term or condition of the Loan Documents; (ii) to prejudice any right that the Agent and the Lenders now have or may have in the future under or in connection with the Loan Documents, as such documents may be amended, restated or otherwise modified from time to time; (iii) to be a commitment or any other undertaking or expression of any willingness to engage in any further discussion with the Credit Parties or any other Person with respect to any waiver, amendment, modification or any other change to the Loan Documents or any rights or remedies arising in favor of the Agent and the Lenders under or with respect to any of them; or (iv) to be a waiver of, or consent to or a modification or amendment of any other term or condition of any other agreement by and between the Credit Parties, on the one hand, and the Agent and the Lenders, on the other hand (other than the reduction of the monetary obligations under the Loan Documents as provided in Section 7 hereof). Neither the requirements of good faith and fair dealing nor any other theory, concept or argument shall require the Agent and the Lenders to impart upon the Credit Parties any further or greater benefits, to suffer any prejudice or impairment of any kind whatsoever, or to tolerate any noncompliance with this Agreement or the Loan Documents because the Agent and the Lenders have bargained for and given valuable consideration for this Agreement, the Loan Documents and the documents

evidencing and/or securing the Loans and their creation of express, explicit and objective limits of what benefits the Agent and the Lenders are willing to provide to the Credit Parties and what, in return, the Credit Parties are required to provide to the Agent and the Lenders. This Agreement, the Loan Documents and the other instruments evidencing and/or securing the Obligations provide a clear statement of the Agent's requirements and obligations and creates an agreed upon standard of performance upon which the Agent and the Lenders are entitled to rely in exercising and enforcing their remedies thereunder.

18. Conditions Precedent. The effectiveness of this Agreement and the partial strict foreclosure contemplated herein (the "Partial Strict Foreclosure") shall be subject to the full and timely satisfaction of all of the following conditions precedent, any of which may be waived by the Agent and the Lenders in their sole discretion:

a. the Agent shall not have received any written objection to the Partial Strict Foreclosure within the period contemplated by Section 9-620(c)(2)(c) of the NYUCC;

b. the Agent shall have received the Assignment in accordance with Section 7 above signed by the Credit Parties;

c. to the extent not waived in writing by any Person entitled to make an objection pursuant to Section 9-620 of the NYUCC to the Partial Strict Foreclosure the expiration of twenty (20) days following the date of notice during which period the Agent shall not have received any written objection to the Partial Strict Foreclosure from any Person entitled to make such objection pursuant to Section 9-620 of the NYUCC;

d. no bankruptcy, insolvency or similar proceeding shall have been filed by or against any of the Credit Parties;

e. no injunction, writ, restraining order or other order of any nature restricting or prohibiting, directly or indirectly, the consummation of the Partial Strict Foreclosure shall have been issued by any court or other Governmental Authority prior to the Closing Date;

f. each of the Credit Parties and the Agent shall have entered into a Transition Services Agreement, in form and substance acceptable to the Agent and the Lenders in their sole discretion, which shall include an agreed upon wind down budget of the Credit Parties that is attached thereto (the "TSA");

g. all of the reasonable fees and expenses of each of the Credit Parties' legal advisors, investment banks, other financial advisors and other consultants incurred in connection with the restructuring of obligations under the Loan Documents, this Agreement and the TSA shall have been paid in full;

h. the Agent shall have transferred all applicable funds (if any) to the Wind Down Account (as defined below) in accordance with the TSA and the wind down budget; and

i. to the extent required under any Franchise Agreements, the franchisor shall have provided all required consents to assignment of such Franchise Agreements, in each case in form and substance acceptable to the Agent and the Lenders in their sole discretion.

Once all of the foregoing conditions precedent have been fully and timely satisfied or waived, as determined by the Agent in its sole discretion, the Agent shall send written notice to the Borrower and thereafter the Borrower shall wire to instructions provided by the Agent all cash and cash equivalents of the Credit Parties other than $846,814.32 in the designated account of HH Accounts Payable, LLC, representing all amounts necessary to fund the Credit Parties' agreed wind down budget that is attached to the TSA (the "Wind Down Account"), and immediately thereafter, the Partial Strict Foreclosure shall be deemed to be fully consummated and effective as of the Closing Date. If any of the foregoing conditions precedent are not fully or timely satisfied or waived, as determined at any time after the date hereof by the Agent in its sole discretion, then the Partial Strict Foreclosure shall not be deemed to have been consummated or effective, and this Agreement shall, upon the Agent's written notice to the Credit Parties, be deemed to have been automatically revoked, cancelled and terminated without any further action by any party and the parties hereto shall be restored to the status quo as if this Agreement had not been executed. Notwithstanding any provision to the contrary herein, the funds in the Wind Down Account shall not constitute Transferred Assets.

19. Revival of Obligations. Notwithstanding any other provision of this Agreement, in the event that the transfer of the Transferred Collateral, or any part thereof, is subsequently invalidated, declared to be fraudulent or preferential, set aside, avoided and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause pursuant to a final, non-appealable order of a court of competent jurisdiction, then the Loan Documents, and the security interests and liens related thereto, shall be revived and continued in full force and effect as if such transfer of the Transferred Collateral, or such part thereof, had not been received by the Agent.

20. Bankruptcy Relief. In the event that one or more of the Credit Parties: (a) files any voluntary proceeding under any chapter of the Bankruptcy Code (Title 11, United States Code, hereinafter referred to as the "Bankruptcy Code"), or in any manner seeks any relief under any other state, federal or other insolvency law or laws providing for relief of debtors, or directly or indirectly causes a filing of any such petition or to seek any such relief; (b) is named as a debtor or alleged debtor in any involuntary petition filed under any chapter of the Bankruptcy Code, or directly or indirectly causes any involuntary petition under any chapter of the Bankruptcy Code to be filed against it, or directly or indirectly causes itself to become the subject of any proceeding pursuant to any other state, federal or other insolvency law or laws providing for the relief of debtors; or (c) directly or indirectly causes the Collateral or any of such Credit Party's interest in the Collateral to become the property of any bankruptcy estate or the subject of any state, federal or other bankruptcy, dissolution, liquidation or insolvency proceeding, such Credit Party consents to an application brought by the Agent for the lifting of the automatic stay by the appropriate bankruptcy court "for cause" due to lack of adequate protection pursuant to section 362(d)(1) of the Bankruptcy Code (11 U.S.C. § 362(d)(1)).

21. Confidentiality. The Parties expressly reaffirm that each of them have carefully reviewed and will adhere to and comply with all of the confidentiality obligations set forth in the Loan Documents, to which they continue to be bound in all respects.

22. Public Announcements. The Credit Parties and Agent agree that they will not, without the written approval of the other Parties, issue any press release or otherwise make any

public statement with respect to this Agreement or the transactions contemplated by this Agreement, except as may be required by applicable law or by the rules of any national securities exchange or stock market, in which case the Party required to make such release or announcement shall allow the other Parties reasonable time to comment on such release or announcement in advance of such issuance; provided that the Credit Parties may make internal announcements to their respective directors, managers, officers and employees regarding the transactions contemplated by this Agreement.

23. Governing Law. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without reference to the conflicts or choice of law principles thereof other than Section 5-1401 of the New York General Obligations Law.

24. Consent to Jurisdiction. Each of the Parties hereby irrevocably consents to the non-exclusive personal jurisdiction of the state and federal courts located in the County of New York (Manhattan), New York, in any action, claim or other proceeding arising out of any dispute in connection with this Agreement, any rights or obligations hereunder, or the performance of such rights and obligations. Each of the Parties hereby irrevocably consents to the service of a summons and complaint and other process in any action, claim or proceeding brought by another Party in connection with this Agreement, any rights or obligations hereunder, or the performance of such rights and obligations, on behalf of itself or its property, in the manner specified in the applicable Loan Document. Nothing in this Section 24 shall affect the right of the Agent to serve legal process in any other manner permitted by applicable law or affect the right of the Agent to bring any action or proceeding against any of the Credit Parties or any of their respective properties in the courts of any other jurisdictions.

25. WAIVER OF JURY TRIAL. EACH OF THE AGENT, THE LENDERS AND THE CREDIT PARTIES HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION, CLAIM OR OTHER PROCEEDING ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.

26. No Consequential Damages. No Party hereto, nor any agent or attorney of any such Party, shall be liable to any other Party or any other Person on any theory of liability for any special, indirect, consequential or punitive damages.

27. Headings. The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

28. Counterparts. This Agreement and any amendment hereof may be executed in several counterparts and by each Party on a separate counterpart, each of which when executed and delivered shall be an original, and all of which together shall constitute one instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-

based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

29. Time Is of the Essence. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

30. Entire Agreement. This Agreement, the TSA and the Loan Documents express the entire understanding of the Parties with respect to the transactions contemplated hereby. There are no oral agreements among the Parties with respect to the subject matter of this Agreement or the other Loan Documents.

31. Third-Party Beneficiaries; Amendments. Except for the Transferor Releasees and the Transferee Releasees for purposes of Section 12 hereof, this Agreement does not and shall not be construed to confer any rights or remedies upon any Person other than the Parties to this Agreement and their respective successors and permitted assigns. This Agreement may not be amended except in writing executed by each of the Parties hereto; *provided* that Section 12 of this Agreement may not be amended in any manner adverse to (i) any Transferee Releasee without the prior written consent of such Transferee Releasee or (ii) any Transferor Releasee without the prior written consent of such Transferor Releasee.

32. Successors and Assigns. This Agreement shall: (a) be binding on the Agent, the Lenders, the Credit Parties and their respective legal representatives, successors and assigns (including any chapter 11 or chapter 7 trustee appointed in any chase under the Bankruptcy Code and any assignee formed by the Agent and designated as an assignee for purposes of this Agreement); and (b) inure to the benefit of the Agent, the Lenders, the Credit Parties and their respective legal representatives, successors and assigns (including any chapter 11 or chapter 7 trustee appointed in any chase under the Bankruptcy Code and any assignee formed by the Agent and designated as an assignee for purposes of this Agreement). The Agent at any time or from time to time may assign or otherwise transfer any or all of its rights and/or obligations under this Agreement to one or more entities formed for the purpose of receiving the Transferred Collateral, the Assumed Liabilities and the Assumed Agreements, *provided* that any such assignee or transferee has the ability, and assumes the obligation, to perform under this Agreement and, in such case, as used herein, "Agent" shall include any such entity or entities. The Credit Parties may at any time or from time to time may assign or otherwise transfer any or all of its rights and/or obligations under this Agreement, *provided* that any such assignee or transferee has the ability, and assumes the obligation, to perform under this Agreement, and, in such case, as used herein, "Credit Parties" shall include any such entity or entities.

33. Severability. The provisions of this Agreement are severable and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

34. Employment Matters. The Agent hereby covenants that within 30 calendar days of the date of this Agreement, the Agent shall provide Vincent Mariani, Mirko Schueppel, Vanessa Vossler, and Michael Mehr a term sheet setting forth the proposed terms of each such employee's employment with Camarillo Fitness Management Holdings, LLC, a Delaware limited liability company.

35. Good Faith and Consultation with Legal Counsel. This Agreement has been jointly drafted by the Parties at arms' length and each Party has had access to and the opportunity to consult with independent legal counsel. Each of the Parties acknowledges having read all of the terms of this Agreement and enters into the agreement voluntarily and without duress.

**NOTHING CONTAINED IN THIS AGREEMENT, OR ANY INSTRUMENT OR DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT, IS INTENDED TO CREATE OR CONVEY OR GIVE RISE TO ANY LIABILITY, CLAIM OR OBLIGATION OF UPON ANY PERSON OR ENTITY (OTHER THAN THE PARTIES HERETO IN ACCORDANCE WITH THE STRICT TERMS HEREOF) INCLUDING WITHOUT LIMITATION ANY OF THE OFFICERS, DIRECTORS, MANAGERS, MEMBERS, EMPLOYEES, AGENTS AFFILIATES, PARENTS, CONSULTANTS, AUDITORS ACCOUNTANTS OR ATTORNEYS OF ANY OF THE PARTIES HERETO.**

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**AGENT:**

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**ASSIGNEES:**

**CAMARILLO FITNESS HOLDINGS, LLC**, as Assignee of Agent

By: ______________________________
Name: John Yeager
Title: Co-President, Co-Treasurer and Co-Secretary

**CAMARILLO FITNESS OPCO, LLC**, as Assignee of Agent

By: ______________________________

Name: John Yeager
Title: Co-President, Co-Treasurer and Co-Secretary

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

__AGENT__:

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By: ______________________________________

Name: Richard Siegel

Title: Authorized Signatory

__ASSIGNEES__:

**CAMARILLO FITNESS HOLDINGS, LLC**, as Assignee of Agent

By: ______________________________________

Name: John Yeager

Title: Co-President, Co-Treasurer and Co-Secretary

**CAMARILLO FITNESS OPCO, LLC**, as Assignee of Agent

By: ______________________________________

Name: John Yeager

Title: Co-President, Co-Treasurer and Co-Secretary

**<u>CREDIT PARTIES</u>:**

**HONORS HOLDINGS, LLC**, as Borrower

By: ________________________________________
Name: Grant Lyon
Title: Manager

**JM ACWORTH LLC**
**VAILLANTINO, LLC**
**HH ANDERSON, LLC**
**JD FAMILY FITNESS ENTERPRISES 1 LLC**
**JM AUGUSTA 2, LLC**
**BISH 2 MERGE, LLC**
**HH BEARDEN, LLC**
**BISH ONE MERGE, LLC**
**CRANBERRY VISION LLC**
**OTB2NY LLC**
**JM BUFORD, LLC**
**BURLINGTON FITNESS ACQUISITION, LLC**
**JW CANTON, LLC**
**HH FITNESS CAPITOL HILL LLC**
**BAMCARLYLE LLC**
**CENTENNIAL FITNESS LLC**
**CBVRG LLC**
**VVDC CHAMBLEE LLC**
**JM WEST ASHLEY LLC**
**RASBERRY VISION LLC**
**JM CHATTANOOGA, LLC**
**JM CLEMSON, LLC**
**CONFLUENCE GROUP II, LLC**
**JM DOWNTOWN COLUMBIA, LLC**
**JM DULUTH, LLC**
**HH FITNESS DUNN LORING, LLC**
**VVDC DUNWOODY, LLC**
**VAILLANTINO JC, LLC**
**FITNESS CAPITAL VENTURES #4, LLC**
**SIMPLE BERRY LLC**
**HH FITNESS FAIRFAX, LLC**
**HH FITNESS FALLS CHURCH LLC**
**HH FARRAGUT, LLC**
**JM FOREST ACRES LLC**

**JM SE PORTLAND, LLC**
**JM GREENVILLE, LLC**
**JM GREENVILLE DOWNTOWN, LLC**
**JM GREER LLC**
**JM GRESHAM, LLC**
**JM SUGAR HILL LLC**
**MAB MANAGEMENT LLC D/B/A TMA LLC**
**JM VANCOUVER, LLC**
**KELLY O, LLC**
**BLUEBERRY VISION INVESTMENTS, LLC**
**RIVER5 FITNESS 3 LLC**
**JM INMAN PARK LLC**
**VAILLANTINO LS, LLC**
**JM JOHNSON CITY LLC**
**BISH THREE, LLC**
**BA MANAGEMENT, LLC**
**G3 FITNESS GROUP IV LLC**
**LVE FITNESS LLC**
**OTLV1 LLC**
**BOTK1 LLC**
**JM LEX LLC**
**JM HASSLO, LLC**
**JM MABLETON LLC**
**JCM MACON, LLC**
**HH FITNESS MANASSAS LLC**
**JCM MCDONOUGH, LLC**
**G3 FITNESS GROUP DC1, LLC**
**MAB3 MANAGEMENT LLC**
**JM MEDFORD LLC**
**STRAWBERRY VISION LLC**
**VVDC MILTON, LLC**
**HH MOUNT JULIET, LLC**
**MOUNTAINS EDGE FITNESS LLC**
**JM MT PLEASANT, LLC**
**HH MT. VERNON LLC**
**JM MYRTLE BEACH LLC**
**QIG FITNESS NATICK LLC**
**JM NORCROSS, LLC**
**HH FITNESS NORTH LAS VEGAS, LLC**
**JM NORTH MT. PLEASANT, LLC**
**HH FITNESS NORTH READING, LLC**
**VVDC NORTHLAKE, LLC**
**JM NORTHSHORE, LLC**
**HH NW RENO LLC**
**BAA MANAGEMENT, LLC**
**HH FITNESS OREGON CITY, LLC**

**HH OXFORD, LLC**
**VVDC POOLER, LLC**
**BBAB MANAGEMENT, LLC**
**FITNESS CAPITAL VENTURES #3, LLC**
**VVDC SANDY PLAINS, LLC**
**CONFLUENCE GROUP, LLC**
**SIMPLE VENTURES 2, LLC**
**VVDC SAVANNAH, LLC**
**JM SE POWELL LLC**
**JM NW 23RD, LLC**
**JK FIT, LLC**
**SOMERVILLE FITNESS ACQUISITION, LLC**
**JM SOUTH BUCKHEAD LLC**
**JM FITNESS SOUTH BUCKHEAD LLC**
**HH SOUTH RENO LLC**
**MAB2 MANAGEMENT LLC**
**JM SUMMERVILLE, LLC**
**G3 FITNESS GROUP VI LLC**
**JM VININGS LLC**
**QIG FITNESS WALTHAM, LLC**
**VVDC WEBB GIN, LLC**
**JM WEST BEAVERTON, LLC**
**JM WEST COBB, LLC**
**HH FITNESS WEST LINN, LLC**
**JM WEST MIDTOWN LLC**
**LV FITNESS SUMMERLIN, LLC**
**SIMPLE VENTURES, LLC**
**JM WILSONVILLE, LLC**
**JM WOODSTOCK, LLC**
**BISH FIVE, LLC**
**BOTK3 LLC**
**HH SPARKS LLC**
**BOTK2 LLC**
**BISH VENTURE MERGE, LLC**
**BMA MANAGEMENT, LLC**
**HH COLLECTIONS, LLC**
**HH RESERVE, LLC**
**HH TN01-MS01 LLC**
**LEO INVESTMENTS, LLC**
**OGBERRY LLC**
**OREGON HOLDINGS, LLC**

**OTLV REGION, LLC**
**SOUTH CAROLINA AR HOLDINGS, LLC**
**HH YORK LLC**
**ORANGE GODDESS I, LLC**
**ACAIBERRY LLC**
**JM LLOYD DISTRICT, LLC**
**HH FITNESS READING, LLC**
**HOODBERRY, LLC**
**OG HORIZON, LLC**
**JM ATHENS, LLC**
**OTLV3, LLC**
**HH WEST SAHARA, LLC**
**BISH 2 LLC**
**BISH ONE LLC**
**BURLINGTON FITNESS LLC**
**HH FITNESS IDYLWOOD LLC**
**SOMERVILLE FITNESS LLC**

By: ____________________________________
Name: Grant Lyon
Title: Authorized Signatory

**LENDERS (SOLELY WITH RESPECT TO THE RELEASES SET FORTH IN SECTION 12 HEREIN):**

**BCSSS Holdco UK Limited**, as a Lender
By: H.I.G. IMA Advisors, LLC, its Investment Manager

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**H.I.G. Global Credit Holdings, LLC**,
as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**H.I.G. WHITEHORSE SMA, L.P.**,
as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**H.I.G. WHITEHORSE TRINITY CREDIT, LLC**,
as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**H.I.G. WHITEHORSE TRISTAR CREDIT, LLC**,
as a Lender

By: H.I.G.-GPII, Inc., as its Manager

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**SWISS CAPITAL HYS PRIVATE DEBT FUND L.P.,**
as a Lender

By: Whitehorse Capital Management, LLC, its Investment Advisor

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**SWISS CAPITAL HYS PRIVATE DEBT OFFSHORE SP**,
as a Lender

By: Whitehorse Capital Management, LLC, its Investment Advisor

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**Thorney Island Limited Partnership**, as a Lender

By: H.I.G. Capital, LLC, its Investment Manager

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**TMPSL Investments Limited**, as a Lender

By: H.I.G. IMA Advisors, LLC,
its Investment Manager

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHITEHORSE FINANCE CREDIT I, LLC**,
as a Lender

By: Whitehorse Finance, Inc.,
its designated manager

By: ________________________________
Name: Joyson Thomas
Title: Authorized Signatory

**Whitehorse Offshore Credit Opportunities I, LLC**
as a Lender

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHITEHORSE ONSHORE CREDIT OPPORTUNITIES I, LLC**,
as a Lender

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHPL SPV I Class A, LLC**,
as a Lender

By: ________________________________
Name: Richard Siegel
Title: Authorized Signatory

**TMPSL Investments Limited**, as a Lender

By: H.I.G. IMA Advisors, LLC,
its Investment Manager

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHITEHORSE FINANCE CREDIT I, LLC**,
as a Lender

By: Whitehorse Finance, Inc.,
its designated manager

By: ______________________________
Name: Joyson Thomas
Title: Authorized Signatory

**Whitehorse Offshore Credit Opportunities I, LLC**
as a Lender

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHITEHORSE ONSHORE CREDIT OPPORTUNITIES I, LLC**,
as a Lender

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHPL SPV I Class A, LLC**,
as a Lender

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHPL SPV I Offshore, LLC**,
as a Lender

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**WHPL SPV I, LLC**,
as a Lender

By: ______________________________
Name: Richard Siegel
Title: Authorized Signatory

**Exhibit A –**

**Form of Assignment Agreement**

ASSIGNMENT AGREEMENT

HONORS HOLDINGS, LLC, a Georgia limited liability company ("**Holdings**") and the subsidiaries of Holdings listed on Annex I attached hereto (together with Holdings, the "**Transferors**") for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby surrender and irrevocably convey, assign, transfer and deliver to CAMARILLO FITNESS HOLDINGS, LLC ("**Fitness Holdings**") and CAMARILLO FITNESS OPCO, LLC ("**Opco**" and, together with Fitness Holdings, each a "**Transferee**" and, collectively, the "**Transferees**"), in their capacities as assignees of WHITEHORSE CAPITAL MANAGEMENT, LLC, agent for the Lenders under that certain Credit Agreement, dated as of September 6, 2019, by and among Holdings, HH Holdco, Inc., a Delaware corporation, the other credit parties from time to time party thereto, the Lenders from time to time party thereto and Agent, as Agent for the several Lenders from time to time party thereto, pursuant to that certain Partial Strict Foreclosure Agreement dated September 24, 2024 (the "**Partial Strict Foreclosure Agreement**"), by and among Agent, Transferees, Holdings, the other Credit Parties party thereto, and the Lenders party thereto, and further pursuant to Section 9-620 et seq. of the Uniform Commercial Code, as enacted in the State of New York, all of the Transferors' right, title, and interest to the Transferred Collateral and the Assumed Agreements as set forth on Annex II attached hereto and shall be deemed to have surrendered and irrevocably conveyed, assigned and transferred to the Transferees, physical possession, custody and control of the Transferred Collateral and Assumed Agreements as set forth on Annex II attached hereto. All capitalized terms used in this Assignment but not defined herein shall have the meanings ascribed to such terms in or by reference to the Partial Strict Foreclosure Agreement.

On or after the date hereof, the Transferors will from time to time at Agent's or Transferees' reasonable request use reasonable efforts to execute and deliver such further instruments as shall be reasonably necessary to further effect or record the conveyance, assignment and transfer to Transferees hereunder.

Dated: September 25, 2024

**HONORS HOLDINGS LLC**, as Transferor

By: ____________________

Name: Grant Lyon
Title: Manager

**BLUEBERRY VISION INVESTMENTS, LLC**
**VVDC, LLC**
**BAMFREDERICKSBURG LLC**
**BAMSTAFFORD LLC**
**BAMWESTSPRINGFIELD LLC**
**BRAINTREE FITNESS LLC**
**HH LYNCHBURG, LLC**
**FITNESS CAPITAL VENTURES #2 LLC**

Docusign Envelope ID: FD5FA0DA-E59E-423D-AF5B-1479AB6C63A1

**FITNESS CAPITAL VENTURES LLC**
**G3 FITNESS GROUP DCII LLC**
**G3 FITNESS GROUP III LLC**
**HH ACCOUNTS PAYABLE, LLC**
**HH BEAUFORT LLC**
**HH FITNESS BROOKLAND LLC**
**HH FITNESS CARSON CITY LLC**
**HH FITNESS SALEM LLC**
**HH FITNESS SEVEN CORNERS LLC**
**HH FITNESS STATESBORO LLC**
**HH FITNESS THOMAS CIRCLE LLC**
**HH KNOXVILLE NORTHSHORE LLC**
**HONORS HOLDING MANAGEMENT, LLC**
**JM AIKEN LLC**
**JM ASTOR PLACE FITNESS LLC**
**JM AUGUSTA LLC**
**JM CLEVELAND LLC**
**JM FLORENCE LLC**
**JM GAINESVILLE LLC**
**JM HIXSON LLC**
**JM IRMO FITNESS LLC**
**JM KENNESAW LLC**
**JM LEXINGTON LLC**
**JM NE COLUMBIA LLC**
**JM ROME FITNESS LLC**
**JM SIMPSONVILLE LLC**
**JM SMITHFIELD LLC**
**JM SOHO LLC**
**JM SOUTH WATERFRONT LLC**
**JM SPARTANBURG FITNESS LLC**
**JM VALDOSTA LLC**
**JM VANCOUVER WATERFRONT LLC**
**LV FITNESS FLAMINGO, LLC**
**OTB1NY LLC**
**BLACKBERRY VISION LLC**
**HH FITNESS DANVERS, LLC**
**JM MARIETTA, LLC**
**JM MARIETTA HOLDINGS, LLC**
**JM PEARL DISTRICT LLC**
**OTLV2, LLC**
**INTERVAL ZONE FITNESS, LLC**
**GOJIBERRY, LLC**
**JM IRMO, LLC**
**VVDC LAWRENCEVILLE, LLC**
**JM SPECIAL VENUE LLC**

**CHIKARA FITNESS, LLC**
**JM ARNOLD CREEK LLC**

in each case, as Transferors

By: ____________________

Name: Grant Lyon
Title: Authorized Signatory

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By: ____________________

Name: Richard Siegel

Title: Authorized Signatory

**CAMARILLO FITNESS HOLDINGS, LLC**, as Transferee

By: ____________________

Name: John Yeager

Title: Co-President, Co-Treasurer and Co-Secretary

**CAMARILLO FITNESS OPCO, LLC**, as Transferee

By: ____________________

Name: John Yeager

Title: Co-President, Co-Treasurer and Co-Secretary

**WHITEHORSE CAPITAL MANAGEMENT, LLC**, as Agent

By: ____________________

Name: Richard Siegel

Title: Authorized Signatory

**CAMARILLO FITNESS HOLDINGS, LLC**, as Transferee

By: ____________________

Name: John Yeager

Title: Co-President, Co-Treasurer and Co-Secretary

**CAMARILLO FITNESS OPCO, LLC**, as Transferee

By: ____________________

Name: John Yeager

Title: Co-President, Co-Treasurer and Co-Secretary

## Annex I

1. Blueberry Vision Investments, LLC, a Georgia limited liability company.
2. VVDC, LLC, a Delaware limited liability company.
3. BAMFredericksburg LLC, a Virginia limited liability company.
4. BAMStafford LLC, a Virginia limited liability company.
5. BAMWestSpringfield LLC, a Virginia limited liability company.
6. Braintree Fitness LLC, a Massachusetts limited liability company.
7. Fitness Capital Ventures #2 LLC, a Rhode Island limited liability company.
8. Fitness Capital Ventures LLC, a Massachusetts limited liability company.
9. G3 Fitness Group DCII LLC, a Virginia limited liability company.
10. G3 Fitness Group III LLC, a Virginia limited liability company.
11. HH Accounts Payable, LLC, a Georgia limited liability company.
12. HH Beaufort LLC, a South Carolina limited liability company.
13. HH Fitness Brookland LLC, a Virginia limited liability company.
14. HH Fitness Carson City LLC, a Nevada limited liability company.
15. HH Fitness Salem LLC, an Oregon limited liability company.
16. HH Fitness Seven Corners LLC, a Virginia limited liability company.
17. HH Fitness Statesboro LLC, a Georgia limited liability company.
18. HH Fitness Thomas Circle LLC, a Washington D.C. limited liability company.
19. HH Knoxville Northshore LLC, a Tennessee limited liability company.
20. Honors Holding Management, LLC, a Georgia limited liability company.
21. JM Aiken LLC, a South Carolina limited liability company.
22. JM Astor Place Fitness LLC, a New York limited liability company.
23. JM Augusta LLC, a Georgia limited liability company.
24. JM Cleveland LLC, a Tennessee limited liability company.
25. JM Florence LLC, a South Carolina limited liability company.
26. JM Gainesville LLC, a Georgia limited liability company.
27. JM Hixson LLC, a Tennessee limited liability company.
28. JM Irmo Fitness LLC, a South Carolina limited liability company.
29. JM Kennesaw LLC, a Georgia limited liability company.
30. JM Lexington LLC, a New York limited liability company.
31. JM Marietta, LLC, a Washington limited liability company.

32. JM Marietta Holdings, LLC, a Washington limited liability company.
33. JM NE Columbia LLC, a South Carolina limited liability company.
34. JM Rome Fitness LLC, a Georgia limited liability company.
35. JM Simpsonville LLC, a South Carolina limited liability company.
36. JM Smithfield LLC, a Rhode Island limited liability company.
37. JM Soho LLC, a New York limited liability company.
38. JM South Waterfront LLC, an Oregon limited liability company.
39. JM Spartanburg Fitness LLC, a South Carolina limited liability company.
40. JM Valdosta LLC, a Georgia limited liability company.
41. JM Vancouver Waterfront LLC, a Washington limited liability company.
42. LV Fitness Flamingo, LLC a Nevada limited liability company.
43. OTB1NY LLC, a New York limited liability company.
44. Blackberry Vision LLC, a Georgia limited liability company.
45. HH Fitness Danvers, LLC, a Massachusetts limited liability company.
46. JM Pearl District LLC, an Oregon limited liability company.
47. OTLV2, LLC, a Nevada limited liability company.
48. Interval Zone Fitness, LLC, a New Hampshire limited liability company.
49. Gojiberry, LLC, a Georgia limited liability company.
50. JM Irmo, LLC, a South Carolina limited liability company.
51. VVDC Lawrenceville, LLC, a Georgia limited liability company.
52. JM Arnold Creek LLC, an Oregon limited liability company.
53. JM Special Venue LLC.
54. HH Lynchburg, LLC, a Delaware limited liability company.
55. Chikara Fitness, LLC, a District of Columbia limited company.

# Annex II

1. All of the Borrower Transferred Entities set forth on Schedule A(i) of the Partial Strict Foreclosure Agreement, VVDC Entities set forth on Schedule A(ii) of the Partial Strict Foreclosure Agreement and BVI Entities set forth on Schedule A(iii) of the Partial Strict Foreclosure Agreement shall be transferred, conveyed and assigned to Fitness Holdings.
2. All of the Transferred Assets listed on Schedule B of the Partial Strict Foreclosure Agreement shall be transferred, conveyed and assigned to Opco.
3. All of the Assumed Liabilities listed on Schedule C-1(1) of the Partial Strict Foreclosure Agreement shall be assumed by Opco.
4. All of the Assumed Liabilities listed on Schedule C-1(2) of the Partial Strict Foreclosure Agreement shall be assumed by Fitness Holdings.
5. All of the Assumed Agreements listed on Schedule C-2 of the Partial Strict Foreclosure Agreement shall be assumed by Opco.

**Schedule A(i)**

**Borrower Transferred Entities**

1. JM Acworth LLC, a Georgia limited liability company.
2. HH Anderson, LLC, a South Carolina limited liability company.
3. JD Family Fitness Enterprises 1 LLC, a Massachusetts limited liability company.
4. JM Augusta 2, LLC, a Georgia limited liability company.
5. Bish 2 Merge, LLC, a Massachusetts limited liability company.
6. HH Bearden, LLC, a Tennessee limited liability company
7. Bish One Merge, LLC, a Massachusetts limited liability company.
8. OTB2NY LLC, a New York limited liability company.
9. JM Buford, LLC, a Georgia limited liability company.
10. Burlington Fitness Acquisition, LLC, a Massachusetts limited liability company.
11. JW Canton, LLC, a Georgia limited liability company.
12. HH Fitness Capitol Hill LLC, a District of Columbia limited liability company.
13. BAMCarlyle LLC, a Virginia limited liability company.
14. Centennial Fitness LLC, a Nevada limited liability company.
15. CBVRG LLC, a Virginia limited liability company.
16. JM West Ashley LLC, a Georgia limited liability company.
17. JM Chattanooga, LLC, a Georgia limited liability company.
18. JM Clemson, LLC, a South Carolina limited liability company.
19. Confluence Group II, LLC, a Georgia limited liability company.
20. JM Downtown Columbia, LLC, a South Carolina limited liability company.
21. JM Duluth, LLC, a Georgia limited liability company.
22. HH Fitness Dunn Loring, LLC, a Virginia limited liability company.
23. Fitness Capital Ventures #4, LLC, a Rhode Island limited liability company.
24. HH Fitness Fairfax, LLC, a Virginia limited liability company.
25. HH Fitness Falls Church LLC, a Virginia limited liability company.
26. HH Farragut, LLC, a Tennessee limited liability company.
27. JM Forest Acres LLC, a South Carolina limited liability company.
28. JM SE Portland, LLC, an Oregon limited liability company.
29. JM Greenville, LLC, a South Carolina limited liability company.
30. JM Greenville Downtown, LLC, a Georgia limited liability company.

31. JM Greer LLC, a South Carolina limited liability company.
32. JM Gresham, LLC, an Oregon limited liability company.
33. JM Sugar Hill LLC, a Georgia limited liability company.
34. MAB Management LLC d/b/a TMA LLC, a Delaware limited liability company.
35. JM Vancouver, LLC, a Washington limited liability company.
36. Kelly O, LLC, a South Carolina limited liability company.
37. Blueberry Vision Investments, LLC, a Georgia limited liability company.
38. River5 Fitness 3 LLC, a Virginia limited liability company.
39. JM Inman Park LLC, a Georgia limited liability company.
40. JM Johnson City LLC, a Tennessee limited liability company.
41. Bish Three, LLC, a Massachusetts limited liability company.
42. BA Management, LLC, a Virginia limited liability company.
43. G3 Fitness Group IV LLC, a Virginia limited liability company.
44. LVE Fitness LLC, a Nevada limited liability company.
45. OTLV1 LLC, a Nevada limited liability company.
46. BOTK1 LLC, a Kansas limited liability company.
47. JM Lex LLC, a South Carolina limited liability company.
48. JM Hasslo, LLC, an Oregon limited liability company.
49. JM Mableton LLC, a Georgia limited liability company.
50. JCM Macon, LLC, a Georgia limited liability company.
51. HH Fitness Manassas LLC, a Virginia limited liability company.
52. JCM McDonough, LLC, Georgia limited liability company.
53. G3 Fitness Group DC1, LLC, a Virginia limited liability company.
54. MAB3 Management LLC, a Pennsylvania limited liability company.
55. JM Medford LLC, an Oregon limited liability company.
56. HH Mount Juliet, LLC, a Tennessee limited liability company.
57. Mountains Edge Fitness LLC, a Nevada limited liability company.
58. JM Mt Pleasant, LLC, a Georgia limited liability company.
59. HH Mt. Vernon LLC, a Delaware limited liability company.
60. JM Myrtle Beach LLC, a South Carolina limited liability company.
61. QIG Fitness Natick LLC, a Massachusetts limited liability company.
62. JM Norcross, LLC, a Georgia limited liability company.
63. HH Fitness North Las Vegas, LLC, a Nevada limited liability company.

64. JM North Mt. Pleasant, LLC, a Georgia limited liability company.
65. HH Fitness North Reading, LLC, a Massachusetts limited liability company.
66. JM Northshore, LLC, a Tennessee limited liability company.
67. HH NW Reno LLC, a Nevada limited liability company.
68. BAA Management, LLC, a Virginia limited liability company.
69. HH Fitness Oregon City, LLC, an Oregon limited liability company.
70. HH Oxford, LLC, a Mississippi limited liability company.
71. BBAB Management, LLC, a Virginia limited liability company.
72. Fitness Capital Ventures #3, LLC, a Rhode Island limited liability company.
73. Confluence Group, LLC, a Georgia limited liability company.
74. Simple Ventures 2, LLC, a Massachusetts limited liability company.
75. JM SE Powell LLC, an Oregon limited liability company.
76. JM NW 23rd, LLC, a Georgia limited liability company.
77. JK Fit, LLC, a Georgia limited liability company.
78. Somerville Fitness Acquisition, LLC, a Massachusetts limited liability company.
79. JM South Buckhead LLC, a Georgia limited liability company.
80. JM Fitness South Buckhead LLC, a Georgia limited liability company.
81. HH South Reno LLC, a Nevada limited liability company.
82. MAB2 Management LLC, a Pennsylvania limited liability company.
83. JM Summerville, LLC, a Georgia limited liability company.
84. G3 Fitness Group VI LLC, a Virginia limited liability company.
85. JM Vinings LLC, a Georgia limited liability company.
86. QIG Fitness Waltham, LLC, a Massachusetts limited liability company.
87. JM West Beaverton, LLC, an Oregon limited liability company.
88. JM West Cobb, LLC, a Georgia limited liability company.
89. HH Fitness West Linn, LLC, an Oregon limited liability company.
90. JM West Midtown LLC, a Georgia limited liability company.
91. LV Fitness Summerlin, LLC, a Nevada limited liability company.
92. Simple Ventures, LLC, a Massachusetts limited liability company.
93. JM Wilsonville, LLC, an Oregon limited liability company.
94. JM Woodstock, LLC, a Georgia limited liability company.
95. Bish Five, LLC, a Massachusetts limited liability company.
96. BOTK3 LLC, a Kansas limited liability company.

97. HH Sparks LLC, a Nevada limited liability company.
98. BOTK2 LLC, a Kansas limited liability company.
99. Bish Venture Merge, LLC
100. BMA Management, LLC, a Delaware limited liability company.
101. HH Collections, LLC, a Georgia limited liability company.
102. HH Reserve, LLC, a Georgia limited liability company.
103. HH TN01-MS01 LLC, a Tennessee limited liability company.
104. Leo Investments, LLC, a Rhode Island limited liability company.
105. OGBerry LLC, an Oregon limited liability company.
106. Oregon Holdings, LLC, a Georgia limited liability company.
107. OTLV Region, LLC, a Nevada limited liability company.
108. South Carolina AR Holdings, LLC, a Georgia limited liability company.
109. HH York LLC, a Pennsylvania limited liability company.
110. Orange Goddess I, LLC, a South Carolina limited liability company.
111. Acaiberry LLC, an Oregon limited liability company.
112. JM Lloyd District, LLC, an Oregon limited liability company.
113. HH Fitness Reading, LLC, a Massachusetts limited liability company.
114. Hoodberry, LLC, an Oregon limited liability company.
115. OG Horizon, LLC, a Georgia limited liability company.
116. JM Athens, LLC, a Georgia limited liability company.
117. OTLV3, LLC, a Nevada limited liability company.
118. HH West Sahara, LLC, a Nevada limited liability company.
119. Bish 2 LLC, a Massachusetts limited liability company.
120. Bish One LLC, a Massachusetts limited liability company.
121. Burlington Fitness LLC, a Massachusetts limited liability company.
122. HH Fitness Idylwood LLC, a Virginia limited liability company.
123. Somerville Fitness LLC, a Massachusetts limited liability company.

## <u>Schedule A(ii)</u>

### VVDC Entities

1. Vaillantino, LLC, a Georgia limited liability company.
2. Vaillantino LS, LLC, a Georgia limited liability company.
3. Vaillantino JC, LLC, a Georgia limited liability company.
4. VVDC Chamblee LLC, a Georgia limited liability company.
5. VVDC Dunwoody, LLC, a Georgia limited liability company.
6. VVDC Milton, LLC, a Georgia limited liability company.
7. VVDC Northlake, LLC, a Georgia limited liability company.
8. VVDC Pooler, LLC, a Georgia limited liability company.
9. VVDC Sandy Plains, LLC, a Georgia limited liability company.
10. VVDC Savannah, LLC, a Georgia limited liability company.
11. VVDC Webb Gin, LLC, a Georgia limited liability company.

## Schedule A(iii)

### BVI Entities

1. Strawberry Vision LLC, a Florida limited liability company.
2. Cranberry Vision LLC, a Georgia limited liability company.
3. Rasberry Vision LLC, a Georgia limited liability company.
4. Simple Berry LLC, a Georgia limited liability company.

## Schedule B

## Transferred Assets

On the terms and subject to the conditions of this Agreement, each Excluded Entity set forth on the Annex to this Schedule B shall transfer, convey, assign, and surrender to the Agent for the benefit of the Lenders, all of such Excluded Entity's right, title and interest in and to all of the properties, rights, interests, and other tangible and intangible assets of such Excluded Entity, of every kind and description, real, personal or mixed, tangible or intangible, known or unknown, and wherever located (whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any and all assets acquired by such Excluded Entity after the date hereof but prior to the Closing Date free and clear of all Liens, for the consideration provided herein. Without limiting the generality of the foregoing, the Transferred Assets shall include all of the following, but, for the avoidance of doubt, shall not include any Pledged Equity owned by any Excluded Entity set forth on Annex B:[3]

a. all Accounts Receivable of such Excluded Entity;

b. all customer lists, customer files and customer accounts of each Excluded Entity;

c. all vehicles used by any Excluded Entity, whether or not titled or registered with a Excluded Entity;

d. all machinery, fixtures, furniture, equipment, computer and other information technology equipment, data files, applications, systems, leasehold improvements (to the extent of such Excluded Entity's rights to any leasehold improvements under leases), materials, parts, supplies, tools and other tangible property and all other furnishings and equipment owned by the following Excluded Entities:

   i. BAMFredericksburg LLC, a Virginia limited liability company.
   ii. HH Fitness Danvers, LLC, a Massachusetts limited liability company.
   iii. JM Vancouver Waterfront LLC, a Washington limited liability company.
   iv. JM NE Columbia LLC, a South Carolina limited liability company.
   v. Fitness Capital Ventures #2 LLC, a Rhode Island limited liability company.
   vi. BAMWestSpringfield LLC, a Virginia limited liability company.
   vii. HH Fitness Salem LLC, an Oregon limited liability company.
   viii. G3 Fitness Group III LLC, a Virginia limited liability company.
   ix. JM Rome Fitness LLC, a Georgia limited liability company.
   x. JM Hixson LLC, a Tennessee limited liability company.
   xi. BAMStafford LLC, a Virginia limited liability company.
   xii. Fitness Capital Ventures LLC, a Massachusetts limited liability company.
   xiii. Interval Zone Fitness, LLC, a New Hampshire limited liability company.

[3] For the avoidance of doubt, employees and employee related liabilities shall not constitute Transferred Assets.

e. to the extent assignable, all of each Excluded Entity's rights under all third-party manufacturing and vendor warranties relating to the Transferred Assets and the Assumed Agreements;

f. each Excluded Entity's records;

g. all goodwill associated with the Excluded Entity and/or any of the Transferred Assets and Assumed Agreements, including all goodwill associated with the intellectual property owned by any Excluded Entity and all rights of any Excluded Entity under non-disclosure or confidentiality, work-for-hire, intellectual property, non-compete or non-solicitation agreements with current or former service providers and agents of any Excluded Entity with third parties;

h. all permits;

i. all rights to any insurance proceeds, including those proceeds received by any Excluded Entity after the date hereof, in respect of (i) the loss, destruction or condemnation of any Transferred Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities or Assumed Agreements;

j. to the extent transferable, all insurance policies that, on or prior to the Closing, the Agent designates in writing and provides the same to the Excluded Entity as Transferred Assets hereunder, and all rights and benefits of any Excluded Entity of any nature under such insurance policies;

k. all of the intellectual property owned by any Excluded Entity; or used or held for use by any Excluded Entity in the ordinary course of business, together with all claims, demands, income, damages, royalties, payments, accounts and accounts receivable now or hereafter due and payable, and rights to causes of action and remedies, related to any of the foregoing, including all proceeds to infringement suits, the right to sue and prosecute for past, present and future infringement, misappropriation or other violation of rights related to any of the foregoing;

l. all inventory, supplies, materials and spare parts of any Excluded Entity (including all rights of any Excluded Entity to receive such inventory, supplies, materials and spare parts that are on order) and all open purchase orders with suppliers;

m. all cash of any Excluded Entity;

n. all claims, rights, credits, causes of action (including any commercial tort claims), defenses and rights of set-off of any type of any Excluded Entity, and the right to control, all claims, counterclaims, causes of action and defenses of any Excluded Entity, including all avoidance actions, and all claims against an Excluded Entity or its directors and officers for which coverage is available under an Excluded Entity's director and officer insurance policies, non-disclosure, confidentiality, non-compete, and/or non-solicitation agreements, and all proceeds of the foregoing (except for amounts under an Excluded Entity's directors and officers insurance policy to which individual directors or officers may be entitled in connection with

fees and expenses covered by such a policy), in each case whether or not the Agent chooses to settle, dismiss, prosecute, defend or otherwise pursue or resolve such claims, rights, credits, causes of action, defenses and/or rights of set-off;

o. all prepaid expenses, unbilled services, refundable deposits and cash or other collateral provided in connection with the business and all contracts;

p. all tax refunds, refundable VAT, rebates, credits (including any employee retention tax credits), or similar benefits relating to taxes, including employee retention tax credits, and other governmental charges related to the Transferred Assets;

q. all assets maintained pursuant to or in connection with any employee benefit plan; and

r. all other assets that are related to or used in connection with the business and that are owned, leased, or licensed by any Excluded Entity.

**Annex to Schedule B**

1. VVDC, LLC, a Delaware limited liability company.
2. BAMFredericksburg LLC, a Virginia limited liability company.
3. BAMStafford LLC, a Virginia limited liability company.
4. BAMWestSpringfield LLC, a Virginia limited liability company.
5. Braintree Fitness LLC, a Massachusetts limited liability company.
6. Fitness Capital Ventures #2 LLC, a Rhode Island limited liability company.
7. Fitness Capital Ventures LLC, a Massachusetts limited liability company.
8. G3 Fitness Group DCII LLC, a Virginia limited liability company.
9. G3 Fitness Group III LLC, a Virginia limited liability company.
10. HH Accounts Payable, LLC, a Georgia limited liability company.
11. HH Beaufort LLC, a South Carolina limited liability company.
12. HH Fitness Brookland LLC, a Virginia limited liability company.
13. HH Fitness Carson City LLC, a Nevada limited liability company.
14. HH Fitness Salem LLC, an Oregon limited liability company.
15. HH Fitness Seven Corners LLC, a Virginia limited liability company.
16. HH Fitness Statesboro LLC, a Georgia limited liability company.
17. HH Fitness Thomas Circle LLC, a Washington D.C. limited liability company.
18. HH Knoxville Northshore LLC, a Tennessee limited liability company.
19. Honors Holding Management, LLC, a Georgia limited liability company.
20. JM Aiken LLC, a South Carolina limited liability company.
21. JM Astor Place Fitness LLC, a New York limited liability company.
22. JM Augusta LLC, a Georgia limited liability company.
23. JM Cleveland LLC, a Tennessee limited liability company.
24. JM Florence LLC, a South Carolina limited liability company.
25. JM Gainesville LLC, a Georgia limited liability company.
26. JM Hixson LLC, a Tennessee limited liability company.
27. JM Irmo Fitness LLC, a South Carolina limited liability company.
28. JM Kennesaw LLC, a Georgia limited liability company.
29. JM Lexington LLC, a New York limited liability company.
30. JM Marietta, LLC, a Washington limited liability company.
31. JM NE Columbia LLC, a South Carolina limited liability company.

32. JM Rome Fitness LLC, a Georgia limited liability company.
33. JM Simpsonville LLC, a South Carolina limited liability company.
34. JM Smithfield LLC, a Rhode Island limited liability company.
35. JM Soho LLC, a New York limited liability company.
36. JM South Waterfront LLC, an Oregon limited liability company.
37. JM Spartanburg Fitness LLC, a South Carolina limited liability company.
38. JM Valdosta LLC, a Georgia limited liability company.
39. JM Vancouver Waterfront LLC, a Washington limited liability company.
40. LV Fitness Flamingo, LLC a Nevada limited liability company.
41. OTB1NY LLC, a New York limited liability company.
42. Blackberry Vision LLC, a Georgia limited liability company.
43. HH Fitness Danvers, LLC, a Massachusetts limited liability company.
44. JM Marietta Holdings, LLC, a Washington limited liability company.
45. JM Pearl District LLC, an Oregon limited liability company.
46. OTLV2, LLC, a Nevada limited liability company.
47. Interval Zone Fitness, LLC, a New Hampshire limited liability company.
48. Gojiberry, LLC, a Georgia limited liability company.
49. JM Irmo, LLC, a South Carolina limited liability company.
50. VVDC Lawrenceville, LLC, a Georgia limited liability company.
51. JM Arnold Creek LLC, an Oregon limited liability company.
52. JM Special Venue LLC.
53. HH Lynchburg, LLC, a Delaware limited liability company.
54. Chikara Fitness, LLC, a District of Columbia limited company.

## Schedule C-1

**Assumed Liabilities**

1. All debts, liabilities and obligations of any nature whatsoever, whether accrued or fixed, absolute or contingent, mature or unmatured, known or unknown or determined or indeterminable, with respect to all Transferred Assets, including those that have accrued in the ordinary course of business, but are not yet due and payable as of the effective date of the Agreement.
2. $70,000,000 of Obligations under the Loan Documents.

## Schedule C-2

**Assumed Agreements**

1. All Franchise Agreements to which the following Excluded Entities are a party or have rights with respect to:
    a. JM Aiken LLC, a South Carolina limited liability company.
    b. JM Astor Place Fitness LLC, a New York limited liability company.
    c. Braintree Fitness LLC, a Massachusetts limited liability company.
    d. G3 Fitness Group III LLC, a Virginia limited liability company.
    e. Blackberry Vision LLC, a Georgia limited liability company.
    f. JM Cleveland LLC, a Tennessee limited liability company.
    g. Fitness Capital Ventures #2 LLC, a Rhode Island limited liability company.
    h. HH Fitness Danvers, LLC, a Massachusetts limited liability company.
    i. JM Augusta LLC, a Georgia limited liability company.
    j. JM Florence LLC, a South Carolina limited liability company.
    k. BAMFredericksburg LLC, a Virginia limited liability company.
    l. G3 Fitness Group DCII LLC, a Virginia limited liability company.
    m. JM Hixson LLC, a Tennessee limited liability company.
    n. JM Irmo Fitness LLC, a South Carolina limited liability company.
    o. JM Irmo, LLC, a South Carolina limited liability company.
    p. JM Kennesaw LLC, a Georgia limited liability company.
    q. JM Marietta, LLC, a Washington limited liability company.
    r. JM Marietta Holdings, LLC, a Washington limited liability company.
    s. Fitness Capital Ventures LLC, a Massachusetts limited liability company.
    t. Interval Zone Fitness, LLC, a New Hampshire limited liability company.
    u. JM NE Columbia LLC, a South Carolina limited liability company.
    v. JM Pearl District LLC, an Oregon limited liability company.
    w. JM Arnold Creek LLC, an Oregon limited liability company.
    x. JM Lexington LLC, a New York limited liability company.
    y. JM Rome Fitness LLC, a Georgia limited liability company.
    z. HH Fitness Salem LLC, an Oregon limited liability company.
    aa. HH Fitness Seven Corners LLC, a Virginia limited liability company.
    bb. JM Simpsonville LLC, a South Carolina limited liability company.

cc. JM South Waterfront LLC, an Oregon limited liability company.

dd. Gojiberry, LLC, a Georgia limited liability company.

ee. JM Spartanburg Fitness LLC, a South Carolina limited liability company.

ff. OTLV2, LLC, a Nevada limited liability company.

gg. BAMStafford LLC, a Virginia limited liability company.

hh. HH Fitness Thomas Circle LLC, a Washington D.C. limited liability company.

ii. JM Valdosta LLC, a Georgia limited liability company.

jj. VVDC Lawrenceville, LLC, a Georgia limited liability company.

kk. JM Vancouver Waterfront LLC, a Washington limited liability company.

ll. LV Fitness Flamingo, LLC a Nevada limited liability company.

mm. BAMWestSpringfield LLC, a Virginia limited liability company.

nn. JM Gainesville LLC, a Georgia limited liability company.

**Schedule D**

## Noncontravention

## **Schedule E**

## **Governmental Filings**

None.